UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x

LOCKHEED MARTIN TRANSPORTATION SECURITY
SOLUTIONS, AN OPERATING UNIT OF LOCKHEED
MARTIN CORPORATION,

                          Plaintiff,

         -against-

MTA CAPITAL CONSTRUCTION COMPANY and
METROPOLITAN TRANSPORTATION AUTHORITY,

                Defendants.

---------------------------------------------------------------------x

TRAVELERS CASUALTY AND SURETY COMPANY
OF AMERICA, FEDERAL INSURANCE COMPANY,
and SAFECO INSURANCE COMPANY OF AMERICA,

                  Plaintiff,

         -against-

METROPOLITAN TRANSPORTATION AUTHORITY,
MTA CAPITAL CONSTRUCTION COMPANY, and
NEW YORK CITY TRANSIT AUTHORITY,

                Defendants.

---------------------------------------------------------------------x

No. 09 cv 4077 (PGG)(GWG)

ECF CASE

Oral Argument Requested

No. 09 cv 6033 (PGG)(GWG)

## MEMORANDUM OF LAW
## IN SUPPORT OF PLAINTIFF LOCKHEED MARTIN'S
## MOTION TO COMPEL PRODUCTION OF DOCUMENTS
## AND
## FOR A PROTECTIVE ORDER

DUANE MORRIS LLP
Matthew A. Taylor (MT 2914)
Michael Chartan (MC 4609)
Michael P. Davis (MD 5250)
1540 Broadway
New York, NY 10036
Tel: (212) 471-1862 (Davis)
*Attorneys for Plaintiff Lockheed
Martin Transportation Security
Solutions, an operating unit of
Lockheed Martin Corporation*

## TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ...................................................................1

II.  RELEVANT BACKGROUND ...................................................................2

    A.   Motion to Compel Production of MTA Documents ..............................3

        1.   Business Documents Relating to Ms. Hakim's Role as "Acting President of MTACC" - 73 documents ("Category 1")...............................................5

        2.   Budget, Funding, or Payment Documents Relating to Ms. Hakim's Business Role as "Vice President in charge of Procurement" - 28 documents ("Category 2") ............................................................6

        3.   Non-Legal Project Status Reporting Documents Directed to the MTA Board of Directors– 20 documents ("Category 3") ...................................6

        4.   Project Status Reporting Documents to be Sent to the New York State Comptroller - 12 documents ("Category 4") ...............................................7

        5.   Documents Involving a Third Party "Independent Engineering Consultant" or Third Party Security Consultant – 17 documents ("Category 5")..........................................................................7

        6.   MTA's July 19, 2011 Substantially Revised Descriptions – 16 documents ("Category 6").........................................................9

    B.   Motion for a Protective Order for Lockheed Martin's Documents .....................11

III. ARGUMENT.....................................................................................19

    A.   This Court Should Compel Disclosure of MTA Documents in Categories 1 through 5 Above Because Such Documents Are Business Related, Non-Legal, and Not Privileged ............................................................19

        1.   New York State Law of Attorney-Client Privilege....................................19

        2.   Attorney-Client Privilege and Corporate In-House Counsel ....................21

        3.   The MTA Documents in Categories 1 through 5 are Clearly Not Privileged Under New York Law and Should be Produced ....................23

    B.   The MTA Documents in Categories 1 through 5 Were Not Prepared in Anticipation of Litigation, and Should be Produced ............................................23

        1.   Federal Law of Work Product Supports Disclosure ................................23

i

2.  MTA Cannot Meet the Critical *Adlman* Test - "Because of the Prospect of Litigation" ................................................................................. 24

3.  The MTA Documents in Categories 1 through 5 are Not Work Product Under Federal Law ..................................................................... 25

C.  Even If Privileged or Work Product, MTA Waived Any Protection For Documents in Category 5 By Its Voluntary Disclosures to Third Parties ............ 27

1.  MTA Waived Privilege ................................................................. 27

2.  MTA Waived Work Product ........................................................ 29

D.  This Court Should View MTA's Inconsistent Disclosures Relating to Category 6, and Newly-Hatched Work Product Assertions, with Great Skepticism ........................................................................................... 31

E.  This Court Should Grant Lockheed Martin's Motion for a Protective Order ....... 33

IV.  CONCLUSION ........................................................................................... 34

DM1\2743973.1

## TABLE OF AUTHORITIES

**Federal Cases**

*Allied Irish Banks v. Bank of America*, 240 F.R.D. 96 (S.D.N.Y. 2007)................................23-25

*Bank of America v. Terra Nova Ins. Co.*, 212 F.R.D. 166 (S.D.N.Y. 2002) .................................29

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437................................33

*Bank of New York, N.A. v. Terra Nova Ins. Co. Ltd.*, 211 F. Supp. 2d 493 (S.D.N.Y.
2002) ........................................................................................................................................28

*Bowne of N.Y.C., Inc. v. AmBase Corp.*, 150 F.R.D. 465 (S.D.N.Y. 1993) ..........................20, 28

*Dinler v. City of New York (In re City of New York)*, 607 F.3d 923 (2d Cir. 2010) .....................26

*Dixon v. 80 Pine St. Corp.*, 516 F.2d 1278 (2d Cir. 1975) ............................................................19

*G-I Holdings, Inc., v Baron & Budd*, 199 F.R.D. 529 (S.D.N.Y. 2001)........................................33

*Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466 (S.D.N.Y. 2003)...........24

*Hickman*, 329 U.S. at 510-11 ........................................................................................................24

*In re Steinhardt Partners*, L.P., 9 F.3d 230, 235 (2d Cir. 1993) ..................................................29

*Josephson v. Marshall*, 2001 U.S. Dist. LEXIS 10049, 2001 WL 815517 (S.D.N.Y. July
19, 2001) ..................................................................................................................................28

*Medinol, Ltd. v. Bos. Sci. Corp.*, 214 F.R.D. 113 (S.D.N.Y. 2002)..........................................29-31

*Mercator Corp. v. United States*, 318 F.3d 379 (2d Cir. 2003).....................................................24

*MSF Holding, Ltd. v. Fiduciary Trust Co. Int'l.*, No. 03 Civ. 1818, 2005 U.S. Dist LEXIS
34171 (S.D.N.Y. Dec. 7, 2005)................................................................................................22

*Nat'l Educ. Training Grp., Inc. v. Skillsoft Corp.*, No. M8-85, 1999 U.S. Dist. LEXIS
8680 (S.D.N.Y. June 10, 1999).................................................................................................28

*Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.*, 258 F.R.D. 95
(S.D.N.Y. 2009)........................................................................................................................26

*Sims v. Blot*, 534 F.3d 117 (2d Cir. 2008)....................................................................................26

*Strougo v. BEA Assocs.*, 199 F.R.D. 515 (S.D.N.Y. 2001)..........................................................33

*U.S. Postal Serv. v. Phelps Dodge Ref. Corp.*, 852 F. Supp. 156 (E.D.N.Y. 1994) .....................28

*United States v. Adlman*, 134 F.3d 1194 (2d Cir. 1998).........................................................23-25

*United States v. Arthur Young & Co.*, 465 U.S. 805 (1984) ............................................... 30

*United States v. Hatfield*, No. 06-CR-0550, 2010 U.S. Dist. LEXIS 4026 (E.D.N.Y. Jan. 8, 2010) ................................................................................................................................... 30

*Upjohn*, 449 U.S. 383, 391-92 ............................................................................................... 33

*Von Bulow ex rel. Auersperg v. Von Bulow*, 811 F.2d 136 (2d Cir. 1986) ......................... 20

*Weizmann Inst. of Sci. v. Neschis*, No. 00 Civ. 7850, 2004 U.S. Dist. LEXIS 4254 (S.D.N.Y. March 17, 2004) ................................................................................................... 26

**State Cases**

*Charter One Bank, F.S.B. v. Midtown Rochester, LLC*, 738 N.Y.S.2d 179 (Sup. Ct. 2002) ........ 20

*Delta Fin. Corp. v. Morrison*, 820 N.Y.S.2d 745 (Sup. Ct. 2006) ...................................... 27

*Deutsche Bank Trust Co. v. Tri-Links Inv. Trust*, 837 N.Y.S.2d 15 (App. Div. 2007) ............... 26

*Doe v. Poe*, 664 N.Y.S.2d 120 (2d Dep't 1997), *aff'd*, 700 N.E.2d 309 (N.Y. 1998) ................. 28

*John Blair Commc'ns, Inc. v. Reliance Capital Grp.,* 582 N.Y.S.2d 720 (App. Div. 1992) .......... 20

*People v. Mitchell*, 448 N.E.2d 121, 461 N.Y.S.2d 267 (1983) .......................................... 20

*People v. Osorio*, 549 N.E.2d 1183, 550 N.Y.S.2d 612 (1989) ........................................... 27

*Quail Ridge Assocs. v. Chem. Bank*, 571 N.Y.S.2d 648 (App. Div. 1991) .......................... 22

*Rossi v. Blue Cross & Blue Shield of Greater N.Y.*, 540 N.E.2d 703, 542 N.Y.S.2d 508 (1989) ................................................................................................................................. 20-22

*Spectrum Sys. Int'l Corp. v. Chem. Bank*, 581 N.E.2d 1055, 575 N.Y.S.2d 809 (1991) ......... 20-21

*In re Stenovich v. Wachtell, Lipton, Rosen & Katz*, 756 N.Y.S.2d 367 (Sup. Ct. 2003) .............. 27

*U.S. Fid. & Guar. Co. v. Am. Re-Ins. Co.*, No. 604517/02, 2008 N.Y. Misc. LEXIS 10434 (Sup. Ct. October 14, 2008*), aff'd* 888 N.Y.S.2d 887 (App. Div. 2009) ................................ 26

**Federal Statutes and Rules of Court**

Fed. R. Civ. P. 26(b)(1) .......................................................................................................... 33

Fed. R. Civ. P. 26(b)(3) .......................................................................................................... 23

Fed. R. Civ. P. 26(c) ............................................................................................................... 33

Fed. R. Evid. 501 ................................................................................................................... 19

DM1\2743973.1

## I.    PRELIMINARY STATEMENT

Plaintiff Lockheed Martin Transportation Security Solutions, an operating unit of Lockheed Martin Corporation ("Lockheed Martin") respectfully submits this motion: (1) to compel the production of certain documents not produced by Defendants MTA Capital Construction Company and Metropolitan Transportation Authority (together, "MTA") based upon MTA's overreaching claims of attorney-client privilege and work product, and (2) for a protective order with respect to certain Lockheed Martin documents that are, in fact, privileged or work product.[1]

Lockheed Martin has narrowed the dispute to six (6) categories of documents where MTA's assertion of privilege is overreaching. The common thread throughout all of the disputed documents is the involvement of Ms. Veronique Hakim, who was employed by MTA in multiple different capacities: (1) Vice President "in charge" of Procurement; (2) attorney; and (3) Acting President of MTA Capital Construction Company. Based upon context and content (derived from MTA's privilege logs), the withheld documents are all business-related and non-legal, and thus, discoverable. These documents all go to the heart of the disputed issues between the parties in this litigation as they discuss the parties' performance of their respective contractual obligations. The fifth category of disputed documents has a second, independent basis requiring disclosure – even if protected at one time, those documents lost all protection when MTA *voluntarily* disclosed those documents to third parties. Lockheed Martin is constrained to add a

---

[1] At the January 19, 2011 Pre-Motion Conference, Judge Gorenstein authorized the filing of this motion. See Declaration of Michael P. Davis, Esq., dated July 21, 2011 ("Davis Decl."), submitted herewith, Exhibit A, Transcript of Pre-Motion Conference, 23:14-17. Due to MTA designations of "confidential" and in light of the Stipulated Confidentiality Agreement and Protective Order governing this matter, certain exhibits attached to the Davis Decl. have been filed under seal.

1

sixth category to address MTA's eleventh-hour disclosure of sixteen "updated descriptions" that are substantially at odds with the descriptions presented by MTA over the past eleven months.

Lockheed Martin also seeks a protective order for a limited number of its documents that MTA challenges as "non-legal" – based on substantially different facts. MTA's challenges involve six (6) different Lockheed Martin in-house attorneys, as well as Lockheed Martin's outside litigation counsel, Duane Morris LLP. MTA makes this challenge with no evidence that any of these attorneys held business or operational positions or provided such non-legal advice to their client. In fact, the attorney declarations submitted herewith make the protected nature of these documents clear.

Lockheed Martin submits that, based upon this memorandum of law and the annexed declarations and exhibits thereto, this Court can rule in Lockheed Martin's favor on these issues categorically. If not, Lockheed Martin respectfully requests an *in camera* review; or, if it is this Court's recommendation that the parties retain a third-party referee to resolve these privilege challenges, Lockheed Martin is prepared to begin that process immediately.

## II.   RELEVANT BACKGROUND

Briefly, this matter arose from a contract between MTA and Lockheed Martin for "the design, development, furnishing, and installation of an integrated electronic security system (IESS) and security operations (C3) Centers at various locations." After completing and being paid for a substantial amount of the work, Lockheed Martin filed a Declaratory Judgment action seeking judicial direction with respect to its remaining contractual obligations. MTA then terminated Lockheed Martin for default.

Over the course of discovery, the parties have exchanged millions of documents and terabytes of electronic data. Depositions are well underway; however, several key depositions are being held up as a result of ongoing issues relating to claims of attorney-client privilege and

2

work product. MTA initially claimed privilege over 12,000 documents. Lockheed Martin initially challenged approximately 6,500 entries; then, to streamline discovery, focused on approximately 3,700 documents. MTA responded with approximately 3,700 challenges of their own. After numerous good faith meet-and-confers over the past eleven (11) months, the parties made supplemental productions and narrowed their respective challenges.

This dispute was first presented to Judge Gorenstein by joint letter dated January 15, 2011, supplemented by MTA's letter of January 18, 2011. Davis Decl., Exh. B & Exh. C. At that time approximately 2,000 documents were at issue. In response to the Court's guidance and Rule 502(d) Order (Davis Decl., Exh. D), the parties resolved differences as to 1,750 documents; but are at a stalemate on approximately 250 documents.

A.    **Motion to Compel Production of MTA Documents**

Lockheed Martin moves to compel MTA's production of approximately 145 documents identified on MTA's privilege logs. The dispute has been narrowed to six (6) categories of documents, reflected in six spreadsheets (Davis Decl., Exh. E, Tabs 1 through 6), which are fully discussed below. The documents sought are narrowly categorized and pertain to key factual issues that underlie Lockheed Martin's claims, defenses, and issues in this litigation including MTA's orders for additional work, delays to progress of the work, funding for work, and software testing. Davis Decl., ¶16. The dispute relates to the documents of one person, Veronique Hakim.[2] At all times at issue (2006 to 2009), Ms. Hakim wore at least "two hats," serving in an operational function, making business decisions, and as an attorney. In fact, there

---

[2] MTA has identified approximately one hundred other MTA in-house and other attorneys in relation to the project or their privilege logs. Davis Decl., ¶11. Lockheed Martin has not, to date, challenged documents involving any other MTA in-house attorney. Davis Decl., ¶11.

3

can be no dispute that Ms. Hakim was directly responsible for operational issues and business decisions, as was made clear in the depositions of MTA's own witnesses.[3]  For example:

- Former MTACC President, Mysore Nagaraja (whom Ms. Hakim directly reported to prior to succeeding him as interim Acting President of MTACC) testified that he dealt with Ms. Hakim on "operational issues," and referred to Ms. Hakim as his "deputy," explaining that:

  > Her position was vice-president and general counsel, but she wore a lot of hats. She was not just my lawyer. She was also managing aspects of the program and procurement was under her.

  Davis Decl. Exh. F, Deposition Transcript of M. Nagaraja, 61:22–62:9.

- MTACC Project Manager Ashok Patel testified that Ms. Hakim "was wearing two hats. She was general counsel for MTACC as well as the head of procurement." Davis Decl. Exh. G, Deposition Transcript of Ashok Patel, 175:15-22. Ms. Hakim was the "number 2 person in the agency," and she would, for example, "check" status reports submitted by project personnel to her and MTACC President Nagaraja. Davis Decl., Exh. G, 176:23-177:10. Mr. Patel readily acknowledged that Ms. Hakim's procurement responsibilities were a "business function." Davis Decl., Exh. G, 176:18-21.

- MTACC Project Manager Mr. Ronald Pezik testified that Ms. Hakim's role as senior vice president was to be "an assistant to the president to support the projects that were being managed by MTACC." Davis Decl. Exh. H, Deposition Transcript of Ronald Pezik, Day 1 of 2, 33:14-34:11. Ms. Hakim was "in charge" of the procurement department of MTACC. Davis Decl., Exh. H, 34:19-25. Because she was "in charge," Mr. Pezik testified that Ms. Hakim was involved in making "business decisions." Davis Decl., Exh. H, 35:2-18. For example, Ms. Hakim was involved in the negotiation of change orders or additional work orders, in discussing Lockheed Martin's requests for extensions of time as they related to additional work orders, and in discussing whether to pay or not pay impact cost claims submitted by Lockheed Martin. Davis Decl., Exh. H, 37:18-39:2.

Ms. Hakim is a key witness, who was intimately involved in business matters throughout the course of the project. Davis Decl., ¶11. All the documents were generated while Ms. Hakim was responsible for procurement (2006 to 2009). In fact, Ms. Hakim was so well-versed in the

---

[3] Ms. Hakim's deposition, previously scheduled for July 2010, has not been conducted to date because many of the documents sought are necessary for Ms. Hakim's deposition.

DM1\2743973.1

business of MTA projects, including this one, that she was the Acting President of MTA Capital Construction from February 2008 through July 2008 (a key technical and operational phase of the Project). Many of the disputed documents are from February 2008 through July 2008 when Ms. Hakim ran the organization. See Davis Decl., ¶16.

The six categories of disputed documents are discussed below.

     1.    **Business Documents Relating to Ms. Hakim's Role as "Acting President of MTACC" - 73 documents ("Category 1")**

Category 1 is limited in time to that period when Ms. Hakim served as Acting President of MTACC (February 1, 2008 through July 31, 2008). During that time, Ms. Hakim wore three (3) different "hats": (1) Acting President of MTACC; (2) Vice President "in charge" of Procurement; and (3) General Counsel for MTA Capital Construction Company. See Davis Decl., Exh. E, Tab 1. MTA's privilege log entries – even as "enhanced" by MTA pursuant to this Court's Rule 502(d) Order — make only vague, conclusory references to "legal advice" or "legal concerns," with no clear examples of legal analysis or advice. See, e.g., Davis Decl., Exh. E, Tab 1, Line 30 and 31, MTACC_PRIV 0000003352 and 3353 (both regarding "NYCT URTs Changes Implementation," which refers to substantial additional work that is directly at issue in this litigation). Unredacted portions of documents produced by MTA further support the conclusion that such documents relate to business discussions or other non-legal communication. See, e.g., Davis Decl., Exh. E, Tab 1, Line 57, MTACC_PRIV 0000004625, Production Bates MTACC_E 0000612743, attached as Davis Decl., Exh. I (discussing "changes to NYCT base communications rooms," another area of work directly at issue in this litigation).

DM1\2743973.1

2.      **Budget, Funding, or Payment Documents Relating to Ms. Hakim's Business Role as "Vice President in charge of Procurement" - 28 documents ("Category 2")**

Category 2 spans Ms. Hakim's involvement throughout the project, but the disputed documents are limited to entries where the MTA privilege log descriptions or context demonstrate that Ms. Hakim was acting in her role of Vice President "in charge" of Procurement, dealing with budget, funding or payment (commercial) issues.[4] See Davis Decl., Exh. E, Tab 2. Again, MTA's privilege log entries make vague/conclusory references to "legal advice," with no clear examples of any such legal analysis or advice. See, e.g., Davis Decl., Exh. E, Tab 2, Line 5, MTACC_PRIV 0000002341. Notably, even MTA's own "enhanced" descriptions reflect that Ms. Hakim was acting in her commercial function as Vice President "in charge" of Procurement. See, e.g., Davis Decl., Exh. E, Tab 2, Line 19, MTATA_PRIV 0000000113.

3.      **Non-Legal Project Status Reporting Documents Directed to the MTA Board of Directors-- 20 documents ("Category 3")**

Category 3 is comprised of draft "talking points" and related emails concerning non-legal project status reports prepared by MTACC to the MTA Board of Directors in the ordinary course of business. See Davis Decl., Exh. E, Tab 3. Most documents in this category were provided with redactions (indicated by MTA Production Bates Numbers). See Davis Decl., Exh. E, Tab 3. Lockheed Martin challenges the redactions as an overzealous application of privilege or work-product. By their very nature and purpose, these reports would be non-legal, business discussions. See, e.g., Davis Decl., Exh. E, Tab 3, Line 2, MTAHQ_PRIV 0000000039, Production Bates MTAHQ_E 0000007942 (and covering email thereto), attached as Davis Decl.

---

[4] Note that there is overlap/duplication between categories 1-5. For example, a document involving Ms. Hakim during her time as Acting President of MTACC, where she is discussing budget issues with the Independent Engineering Consultant would appear in Categories 1, 2, and 5; with essentially three independent grounds compelling production.

6

Exh. J (designated by MTA to be "01. Attorney Client / 02. Work Product").  Unredacted

portions of documents produced by MTA show nothing more than factual status reporting on the

project at issue, not legal advice.  See Davis Decl. Exh. J.  In addition, as reflected on MTA's

privilege logs, each monthly status report was prepared collaboratively, either shared with or

directly commented upon by almost a dozen non-legal or project personnel including individuals

from MTACC, MTA, the New York City Transit Agency, and the third party independent

engineering consultant with oversight on the project, Carter & Burgess.  See, e.g., Davis Decl.,

Exh. E, Tab 3, Lines 14 and 15, entry describing MTATA_PRIV 0000000142 and 143.  Such

wide collaboration and distribution is not consistent with the careful handling of privileged

documents or a desire to protect work product.

### 4.    Project Status Reporting Documents to be Sent to the New York State Comptroller - 12 documents ("Category 4")

Category 4 is comprised of MTA's draft responses to the New York State Comptroller's

periodic reports, or draft status reports from MTA to the State Comptroller (and emails related

thereto).  See Davis Decl., Exh. E, Tab 4.  The New York State Comptroller is an independent

elected official who reports on how public funds are being used by various public authorities,

including MTA.  The Comptroller is not part of MTA.  By their very nature and purpose, these

reports and discussions related thereto would be non-legal.  See, e.g., Davis Decl., Exh. E, Tab 4,

Line 5, MTACC_PRIV 0000005765.

### 5.    Documents Involving a Third Party "Independent Engineering Consultant" or Third Party Security Consultant – 17 documents ("Category 5")

Category 5 is comprised of documents that MTA disclosed to, or otherwise involve, non-

legal, third party engineering consultants (specifically Mr. Ruben Ben-Arie and Mr. David Horn

of Carter Burgess).  See Davis Decl., Exh. E, Tab 5.  By their very nature and purpose, these

documents and discussions are non-legal.  See, e.g., Davis Decl., Exh. E, Tab 5, Line 4,

MTACC_PRIV 0000005765, or Line 10, MTACC_PRIV 0000003795 (initially described as

"Critique of David Horn's (C&B) report").  The involvement of these non-legal consultants or

other third parties strongly suggests a non-legal purpose for these documents (see Argument

Sections III.A and III.B), in addition to the separate and independent issues relating to waiver,

discussed at Argument Section III.C.

David Horn of Carter Burgess was the third party "Independent Engineering Consultant"

on the project.  See Davis Decl., Exh. G, Deposition Transcript of Ashok Patel, 181:25-184:15.

An example of Mr. Horn's involvement in non-legal business matters is reflected in an email

dated January 9, 2007 and attached presentation titled "MTA Independent Engineering

Consultant Review of MTA Capital Security Program," which was produced by MTA without

objection.  Davis Decl., Exh.K.  MTA's statutory obligation to engage a third party independent

engineering consultant derives from New York Public Authorities Law § 1263, section 4(b),

which provides for the formation of various committees, including a committee on capital

program oversight.  In support of those committees, the law states that:

> The committee shall issue a quarterly report on its activities and
> findings, and shall in connection with the preparation of such
> quarterly report, consult with the state division of the budget, the
> state department of transportation, the members of the
> metropolitan transportation authority capital program review board
> and any other group the committee deems relevant, including
> public employee organizations, and, at least annually, with a
> nationally recognized independent transit engineering firm.  Such
> report shall be made available to the members of the authority, to
> the members of the metropolitan transportation authority capital
> program review board, and the directors of the municipal
> assistance corporation for the city of New York.

N.Y. Pub. Auth. Law § 1263(4)(b) (Consol. 2011)

DM1\2743973.1

This statute does not authorize MTA to perform its work in secret nor does the statute contemplate that the independent engineering consultant become involved in MTA litigation support activities or any other legal matters. *See id.* Instead, the entire purpose for a firm like Mr. Horn's is to report on how the public's money is being used by the MTA.

Mr. Horn was involved on the project from at least February 2007 (long before the parties reasonably anticipated litigation) through August 2009. Davis Decl., ¶19. MTA has not produced any of Mr. Horn's non-privileged files relating to the project. Davis Decl., ¶19. MTA also ignored Lockheed Martin's request for copies of Mr. Horn's engagement agreement. Davis Decl., ¶19. MTA has not provided any other factual basis to support its assertion that documents involving Mr. Horn are covered by attorney-client privilege or work product. Davis Decl., ¶19.

Likewise, MTA has asserted privilege or work product over documents involving Ruben Ben-Arie, a security consultant evidently retained by MTA in or around June 2008. Davis Decl., ¶21. Again, MTA makes this assertion without producing any supporting documents and without producing Mr. Ben-Arie's non-privileged files relating to the project, or his contract with MTA. Davis Decl., ¶21.

6. **MTA's July 19, 2011 Substantially Revised Descriptions – 16 documents ("Category 6")**

On the evening of July 19, 2011, as Counsel for Lockheed Martin prepared to file this motion (almost a year since these issues first arose, and six months after the Pre-Motion Conference), MTA changed its reason for not producing seventy-one (71) documents (almost half of its then 160 remaining entries) previously designated as "Attorney Client," to "Attorney Client / Work Product." Davis Decl., ¶22, see Davis Decl., Exh. E, Tab 6, Col. M, "Updated Privilege Type….". Moreover, MTA revisited twenty-eight (28) of its previously "enhanced" supplemental descriptions, which it had presented to Lockheed Martin more than five months

9

ago (in direct response to this Court's direction and Rule 502(d) Order).[5] Davis Decl., ¶22, see Davis Decl., Exh. E, Tab 6, Col. N. For many entries, MTA provided completely new explanations. Davis Decl., ¶22. In those cases where, if taken at face value, MTA's latest descriptions indicated privilege, Lockheed Martin dropped any further challenge. Davis Decl., ¶22. However, many of MTA's new descriptions are inconsistent with their prior descriptions. Lockheed Martin is left with no choice but to present those sixteen entries to this Court for consideration as Category 6.

Category 6 includes documents that, for example, MTA previously treated as relevant and described (in its February 2011 "enhanced descriptions") as privileged and relating to "response to claims from Lockheed Martin," but now designates "NOT RELEVANT . . . ." See Davis Decl., Exh. E, Tab 6, Lines 15-17, Column K "MTA Enhanced Descriptions," and Column N "Updated Description." In addition, Category 6 includes a series of e-mails long-withheld by MTA as privileged is now described by MTA as "NOT RELEVANT," where "...General Counsel Veronique Hakim expresses her displeasure on how [an] administrative issue was handled." See Davis Decl., Ex. E, Tab 6, Line 4 and 5, MTACC_PRIV 0000001967-68. More striking than the sudden revelation that documents have been withheld for months due to "irrelevance" (not privilege), is the sudden appearance of outside litigation counsel Ira Lipton on log entries which, for the past five months, after being supplemented once as a result of this Court's direction, provided absolutely no indication of outside counsel involvement. See, e.g., Davis Decl., Exh. E, Tab 6, Line 2, MTACC_PRIV 0000001956.

As set forth in Sections III.A and III.B below, to the extent that these categories of documents evidence non-legal discussions or communications, they are not protected and must

---

[5] At the same time. Counsel for MTA delivered forty-three previously withheld documents, and sixteen newly redacted documents. Davis Decl., ¶22.

DM1\2743973.1

be disclosed. Alternatively, for Category 5, even if initially protected, MTA waived any protection by disclosures to or involvement of third parties, specifically third party "independent engineering consultant" Carter & Burgess's Mr. David Horn and/or third party security consultant Ruben Ben Arie, as set forth at Section III.C. Section III.D demonstrates why MTA's inconsistent disclosures relating to Category 6, and newly-hatched assertions of work product should be viewed with skepticism.

### B.   Motion for a Protective Order for Lockheed Martin's Documents

MTA responded to Lockheed Martin's initial challenges to the MTA privilege logs by challenging Lockheed Martin's logs. Davis Decl., ¶27. MTA's challenges began in the thousands, but were pared down by joint efforts of the parties to 110. Davis Decl., ¶27. Lockheed Martin moves for a protective order with respect to those documents because they are properly within the protections of the attorney-client privilege or work product.[6] MTA presents its challenges to Lockheed Martin as two categories "Non Legal" and "Mixed Fact and Law." Davis Decl., ¶27. The Lockheed Martin privilege log entries corresponding to the two MTA categories are identified in Exhibit L to the Davis Declaration, Tabs 1 and 2, respectively.

MTA explains that its "Non Legal" category includes: "documents where the parties appearing in the 'to', 'from', and 'cc' fields are not identified as attorneys. Additionally, there is no indication in the subject descriptions of these documents that legal advice is being conveyed or received, or that the documents were created in anticipation of litigation." *See* MTA Letter dated January 10, 2011. Davis Decl., Exh. M. First, by inspection of Lockheed Martin's privilege log entries or unredacted portions of certain of those documents (produced to MTA), it

---

[6] Lockheed Martin has prepared three binders containing hardcopies of all documents identified in Exhibit L, Tabs 1 and 2, along with additional covering emails or attachments related to those documents, which can be submitted to the Court upon request.

is clear that MTA ignores the fact that many of these communications clearly involved attorneys, a fact ignored by MTA. *See, e.g.*, Davis Decl., Exh. L,  Tab 2, Line 26, LM-PRIV 3497, Production Bates LM-E-01188816, attached as Davis Decl., Exh. N. Second, regardless of the presence of attorneys (or lack of presence) on one piece of a communication, Lockheed Martin submits that the documents are properly designated as privileged or work product doctrine.

MTA explains that it created the second category, which it labels "Mixed Fact and Legal," to include: "documents that, while being sent to, from or copying attorneys, appear, based on the subject descriptions you provided and/or the parties in the to/from/cc fields, to be not privileged because they deal predominantly, if not exclusively, with non-legal subjects." Davis Decl., Exh. M.  Here, again, MTA ignores the "fourth column" supplemental description and context provided in unredacted portions of documents. *See, e.g.*, Davis Decl., Exh. L, Tab 2, Line 6, LM-PRIV 1707, Production Bates LM-E 1188778, attached as Davis Decl., Exh O.

In point-of-fact, MTA's presentation of these two broad categories is cumbersome and requires further annotation or organization.  Lockheed Martin respectfully submits that its documents are better categorized based on which attorney was involved.  To that end, Davis Decl., Exh. L, Tabs 1 and 2 include an additional column added by Duane Morris (column W, "Attorney(s) Involved") that provides this Court with the name (or names) of the attorney involved in each entry (*e.g.*, "Loscalzo," "Pezzimenti," or "Outside Litigation Counsel"). Lockheed Martin submits that organizing MTA's challenges based on these narrow and more precise categories will better enable this Court to rule on this application.

In support of Lockheed Martin's assertion of attorney-client privilege, work product, or both, submitted herewith are the declarations of the five (5) Lockheed Martin in-house attorneys

12

primarily involved in the referenced documents, and a declaration of outside litigation counsel,

Michael Chartan, Esq. of Duane Morris LLP.[7]

These declarations explain the role of each Lockheed Martin attorney, the services

provided and why the documents should be protected from disclosure.  The facts are clear:

- The scope of services provided by Lockheed Martin in-house counsel included legal –not business– advice, including, for example, advice and counsel regarding contracts, claims and litigation.[8]

- Lockheed Martin in-house counsel consistently acted in their capacities as attorneys, for the purpose of providing legal advice.[9]

- Unlike Ms. Hakim, Lockheed Martin in-house counsel did not hold positions relating to the operations or business of Lockheed Martin, nor did they provide any operational or "business" advice.[10]

- Each Declarant identifies numerous legal bases supporting privilege or work product, with additional, detailed, specific factual examples, as to why the subject documents are privileged and concur with outside counsel's designations that the subject documents are privileged or otherwise protected.[11]

- In-house counsel affirm that the purpose of the subject documents was directly related to their roles as in-house counsel and the provision of legal advice.[12]

---

[7] Lockheed Martin has provided a table identifying the Lockheed Martin personnel appearing in relation to the LM Privileged Documents, and describing their positions within Lockheed Martin. (See Loscalzo Decl., ¶8, Exhibit A).  Note that all challenged documents involving Mr. James Comey, former General Counsel of Lockheed Martin, included other Lockheed Martin attorneys, specifically Ms. Loscalzo, Mr. Sweeney, Mr. Murray, and/or Mr. Dedman, or outside litigation counsel.  Thus, challenged documents that involved Mr. Comey are fully addressed by the declarations submitted herewith.

[8] See Declaration of Barbara Loscalzo, Esq. ("Loscalzo Decl."), ¶5.  See also Declaration of Robert Pezzimenti, Esq. ("Pezzimenti Decl.") ,¶4; Declaration of Daniel Sweeney, Esq. (Sweeney Decl.), ¶4; Declaration of David Dedman, Esq. (Dedman Decl.), ¶6; and Declaration of Neal Murray, Esq. ("Murray Decl."), ¶5; submitted herewith.

[9] See, Loscalzo Decl., ¶6; Pezzimenti Decl., ¶5; Sweeney Decl., ¶5; Dedman Decl., ¶7; and Murray Decl., ¶6.

[10] See, Loscalzo Decl., ¶6; Pezzimenti Decl., ¶5; Sweeney Decl., ¶5; Dedman Decl., ¶7; and Murray Decl., ¶6.

[11] See, Loscalzo Decl., ¶¶7 & 9. See also Pezzimenti Decl., ¶¶6-7; Sweeney Decl., ¶¶6-7; Dedman Decl., ¶¶8-9; and Murray Decl., ¶¶7-8.

[12] See, Loscalzo Decl., ¶10; Pezzimenti Decl., ¶8; Sweeney Decl., ¶8; Dedman Decl., ¶10; and Murray Decl., ¶9.

DM1\2743973.1

○    To the extent that corporate, non-legal personnel were included on the subject documents, in-house counsel affirm that those personnel were key business personnel within Lockheed Martin or were otherwise necessary to the provision of legal services, and that in-house counsel *expected* that privileged or protected materials would be kept confidential, and that they treated such documents as privileged and confidential.[13]

○    Lockheed Martin in-house counsel affirm, based on issuance of litigation hold memos, that Lockheed Martin anticipated that it might be involved in litigation with MTA, in or around April 2008.[14]

○    For the subject documents designated as work product or material prepared for litigation, in-house counsel have affirmed that they would not have engaged in those communications or been involved in the preparation of those documents had there been no likelihood of litigation or because this litigation was ongoing.[15]

Another key distinction between Lockheed Martin's challenges and MTA's is the relevant time periods at issue. With a single exception (an August 2009 document relating to MTA's costs to complete the project), Lockheed Martin's challenges of MTA's privilege logs focus on project-related documents (*i.e.,* through the date the contract was terminated, June 12, 2009). MTA, on the other hand, challenges twenty documents that were generated after MTA had terminated the contract, when Lockheed Martin's contract work had ceased, but litigation with MTA (and mediation before Judge Gorenstein) was underway. See, e.g., Davis Decl., Exh. L, Tab 1, Line 70, LM-PRIV 5685, described by LM as:

> Email re "MTA Whitepaper after legal review. . . ." re internal LM analysis of issues raised in complaint or in MTA counterclaim prepared at the direction of legal counsel, and in conjunction with ongoing mediation before Magistrate Gorenstein, materials prepared at direction of counsel in furtherance of ongoing litigation.

---

[13] *See*, Loscalzo Decl., ¶11; Pezzimenti Decl., ¶9; Sweeney Decl., ¶9; Dedman Decl., ¶11; and Murray Decl., ¶10.
[14] *See* Loscalzo Decl., ¶¶13-14.
[15] *See* Loscalzo Decl., ¶16. *See also* Pezzimenti Decl., ¶11; Sweeney Decl., ¶11; Dedman Decl., ¶14; and Murray Decl., ¶13.

14

Lockheed Martin submits that documents challenged by MTA dated after termination and during the heat of litigation and mediation before this Court bear the obvious earmarks of work product, and are, in fact, protected.

With respect to the involvement and role of outside litigation counsel, Lockheed Martin retained the law firm of Thelen LLP in or around the Spring of 2007. Declaration of Michael Chartan, Esq., ("Chartan Decl."), ¶4. Thelen dissolved in 2008, and subsequently Duane Morris was retained to represent Lockheed Martin with respect to legal issues arising out of this contract, including this litigation. Chartan Decl., ¶4. As a former member of the Thelen firm, and current member of Duane Morris, Michael Chartan has continuously represented Lockheed Martin on the legal issues arising out of this contract since the Spring of 2007, through the filing of litigation in April 2009, and to the present. Chartan Decl., ¶4. The attorneys from Duane Morris and Thelen LLP, including Michael Chartan, are collectively referred to herein as "Outside Litigation Counsel."

Since being retained in Spring 2007, Outside Litigation Counsel has provided legal advice to Lockheed Martin representatives, including in-house counsel, on issues that arose with respect to the interpretation of the this contract, negotiation and settlement of project contractual claims, legal analysis of the claims, strategy and risks of litigating project contractual claims and the planning, filing, and prosecution of this ongoing litigation. Chartan Decl., ¶5. In order to provide legal advice, at times it was necessary for Outside Litigation Counsel to meet, or otherwise communicate, with Lockheed Martin representatives and in-house counsel, as well as review written material prepared by them or prepare written material for their review. Chartan Decl., ¶6.

The subset of LM Privileged Documents that Outside Litigation Counsel was involved in, as set forth at Davis Decl., Exh L, Tabs 1 and 2, indicated in Column W (the "Outside Counsel Documents"), span from April 1, 2008 through July 27, 2009. Chartan Decl., ¶7.  Notably, with the exception of one document dated April 1, 2008, the Outside Counsel Documents involve communications to or from, or materials prepared by Outside Litigation Counsel <u>after</u> Lockheed Martin issued its first litigation hold memorandum on April 18, 2008.  Chartan Decl., ¶8, See the Declaration of Barbara Loscalzo, Esq., dated July 19, 2011, at ¶ 13.

Throughout the course of Lockheed Martin's performance of this contract, contractual claims arose. Chartan Decl., ¶9.  The Outside Counsel Documents dated prior to the initiation of the litigation contain, for example, communications between in-house counsel and Outside Litigation Counsel regarding legal analysis and opinions on the project claims, Lockheed Martin's legal entitlement under such claims, and the risks associated with litigating project claims.  Chartan Decl., ¶9.  Such communications and materials are protected as both attorney-client privileged communications and work product materials prepared in anticipation of litigation.  See e.g., log entry at Davis Decl. at Ex. L, Tab 1, Line 18, LM-PRIV 1925, email dated December 29, 2008, produced with redactions as LM-E 01143235, a copy of which is attached as Chartan Decl., Exh. A (redacting portion of document sent by Lockheed Martin representatives relaying and summarizing legal advice sent from Outside Litigation Counsel to in-house counsel, see prior email in chain).

By April 2009, negotiation of the project claims was still unresolved, and having completed a substantial amount of the work, Lockheed Martin commenced this action when it filed the initial Complaint on April 24, 2009 seeking a Declaratory Judgment action with respect to its remaining contractual obligations. Chartan Decl., ¶10.  On May 26, 2009, Defendants filed

DM1\2743973.1

their Answer and Counterclaim to Lockheed Martin's initial complaint, and that same day delivered to Lockheed Martin a default notice, which gave Lockheed Martin until June 4, 2009 to respond to the items MTA set forth in the default notice. Chartan Decl., ¶11. Copies of the Answer and Counterclaim and MTA's May 26, 2009 Default Notice are attached as Chartan Decl., Exh. B and Exh. C, respectively. On June 4, 2009, Lockheed Martin delivered to Defendants a detailed response to the default notice. Chartan Decl., ¶12. A copy of Lockheed Martin's June 4, 2009 Response to the Default Notice (without Attachments) is attached as Chartan Decl., Exh. D.

During the time between delivery of the default notice and Lockheed Martin's response on June 4, 2009, Outside Litigation Counsel worked with Lockheed Martin representatives and provided legal advice related to the preparation of Lockheed Martin's response to the default notice. Chartan Decl., ¶13. These legal services were performed in May and June, 2009 during the pendency of this action. Chartan Decl., ¶13. Given the similar allegations presented in Defendants' default notice and counterclaims, Lockheed Martin requested that Outside Litigation Counsel review their initial drafts of the response to the default notice and provide legal advice and counsel. Chartan Decl., ¶13.

On June 5, 2009, the day after Defendants received Lockheed Martin's response to the default notice, Defendants notified Lockheed Martin in writing that its response was insufficient and that a final determination would be made by June 12, 2009. Chartan Decl., ¶14. Having received MTA's June 5, 2009 letter, Outside Litigation Counsel and in-house counsel provided legal analysis and recommendations on how Lockheed Martin should respond to Defendants' June 5, 2009 letter. Chartan Decl., ¶15. Counsels' legal strategy and recommendations concerning the June 5, 2009 letter from MTA were summarized and communicated between

DM1\2743973.1

Lockheed Martin representatives.  Chartan Decl., ¶15.  See e.g., log entry at Davis Decl. at Ex. L, Tab 1, Line 42, LM-PRIV 1548, email dated June 8, 2009 (not produced for reasons described in "Fourth Column" Supplemental Description).

On June 10, 2009, Outside Litigation Counsel accompanied Lockheed Martin representatives and in-house counsel to a meeting with the Defendants to discuss the default notice and ongoing litigation.  Chartan Decl., ¶16.  In preparation for the June 10, 2009 meeting, Lockheed Martin requested that Outside Litigation Counsel review and revise documents prepared for that meeting, paying consideration to Lockheed Martin's position in the ongoing litigation.  Chartan Decl., ¶17.  See e.g., log entry at Davis Decl. at Ex. L, Tab 1, Line 50, LM-PRIV 2708, document dated June 9, 2009, entitled "MTA Default Notice – Opportunity to Cure Executive Summary" (not produced for reasons described in "Fourth Column" Supplemental Description); LM-PRIV 2707, email dated June 9, 2009, produced with redactions as LM-E 01145729, a copy of which is attached as Chartan Decl., Exh. E (forwarding LM-PRIV 2708 to in-house counsel and Outside Litigation Counsel for review).

MTA then terminated Lockheed Martin for default on June 12, 2009.  Chartan Decl., ¶18.

MTA also challenges Lockheed Martin's privilege claims for materials following the June 12, 2009 termination.  Chartan Decl., ¶19.  The Outside Counsel Documents dated after the termination are protected as attorney-client privileged communications or work product materials in that the rendering of legal advice was solely in furtherance of the litigation.  Chartan Decl., ¶19.  Lockheed Martin's performance under the contract was terminated and both Lockheed Martin's and Outside Litigation Counsel's focus was on ongoing litigation actions.  Chartan Decl., ¶19.  It was necessary for Outside Litigation Counsel to request that Lockheed Martin representatives prepare materials to substantiate Lockheed Martin's efforts in the court-ordered

mediation and in furtherance of Lockheed Martin's litigation claims and defenses.  Chartan

Decl., ¶19.  For example:

- The court-ordered mediation before Magistrate Gorenstein on June 26, 2009 and July 22, 2009.  See e.g., log entry at Davis Decl. at Ex. L, Tab 1, Line 64, LM-PRIV 4582, document dated June 24, 2009, entitled "MTA Return to Green" (privileged for reasons described in "Fourth Column" Supplemental Description).  Chartan Decl., ¶19(a).

- Responding to Defendants Counterclaims dated July 20, 2009.  See e.g., log entry at Davis Decl. at Ex. L, Tab 1, Line 74, LM-PRIV 4900, email dated July 27, 2009 (not produced for reasons described in "Fourth Column" Supplemental Description).  Chartan Decl., ¶19(b)

Although the governing law is the same for each motion, the facts and resulting outcome

must differ.  Lockheed Martin's documents are privileged based on the predominate purpose,

content and context, or are properly protected as work product, as demonstrated by this

Memorandum of Law, Lockheed Martin's privilege logs, and declarations submitted herewith.

## III.   ARGUMENT

### A.   This Court Should Compel Disclosure of MTA Documents in Categories 1 through 5 Above Because Such Documents Are Business Related, Non-Legal, and Not Privileged

#### 1.   New York State Law of Attorney-Client Privilege

Where subject matter jurisdiction is based on diversity, the applicable law governing

attorney-client privilege is state law.  See Fed. R. Evid. 501; *Dixon v. 80 Pine St. Corp.*, 516 F.2d

1278, 1280 (2d Cir. 1975).  The contract at issue requires the law of the state of New York.

Davis Decl., ¶6, citing Contract Article 8.05, Choice of Law.  New York law provides that the

attorney-client privilege applies with respect to: "evidence of a confidential communication

made between the attorney . . . and the client in the course of professional employment . . . ."

N.Y. C.P.L.R. 4503(a)(1) (Consol. 2011).

DM1\2743973.1

The party asserting attorney-client privilege "has the burden of establishing that the information was a communication between client and counsel, and that it was intended to be and was kept confidential, and [that] it was made in order to assist in obtaining or providing legal advice or services to the client." *Charter One Bank, F.S.B. v. Midtown Rochester, LLC*, 738 N.Y.S.2d 179, 190 (Sup. Ct. 2002); *accord People v. Mitchell*, 448 N.E.2d 121, 123, 461 N.Y.S.2d 267, 270 (1983) (citations omitted). The proponent of the privilege also has the burden of establishing that the protection has not been waived. *See John Blair Commc'ns, Inc. v. Reliance Capital Grp.*, 582 N.Y.S.2d 720, 721 (App. Div. 1992).

The burden can only be met with competent evidence, typically deposition testimony, declarations, or other admissible evidence. *See Von Bulow ex rel. Auersperg v. Von Bulow*, 811 F.2d 136, 146 (2d Cir. 1986) (failing to find communications privileged absent competent evidence); *Bowne of N.Y.C., Inc. v. AmBase Corp.*, 150 F.R.D. 465, 472 (S.D.N.Y. 1993). In addition to meeting that burden, "the protection claimed must be narrowly construed; and its application must be consistent with the purposes underlying the immunity." *Spectrum Sys. Int'l Corp. v. Chem. Bank*, 581 N.E.2d 1055, 1059, 575 N.Y.S.2d 809, 813 (1991) (citations omitted).

In order for the attorney-client privilege to apply, the communication must be made "for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship." *Rossi v. Blue Cross & Blue Shield of Greater N.Y.*, 540 N.E.2d 703, 706, 542 N.Y.S.2d 508, 510-11 (1989) (citation omitted). The communication must be "primarily or predominately of a legal character . . . ." *Id.* The "critical inquiry" requires a determination of whether, when viewed "in full content and context," the communication was made "in order to render legal advice or services to the client." *Spectrum*, 581 N.E.2d at 1061, 575 N.Y.S.2d at 815.

DM1\2743973.1

Because the intent of privilege is to facilitate the rendering of confidential legal advice, it does not protect communications with the attorney if intended to assist counsel in performing other services, for example in providing business advice or such functions as negotiating purely commercial terms in a business relationship. *See, e.g., Rossi*, 540 N.E.2d at 705, 542 N.Y.S.2d at 510. Indeed, "a lawyer's communication is not cloaked with privilege when the lawyer is hired for business or personal advice, or to do the work of a nonlawyer." *Spectrum*, 581 N.E.2d at 1061, 575 N.Y.S.2d at 815.

### 2.   Attorney-Client Privilege and Corporate In-House Counsel

Within the context of corporate in-house counsel, it is well-settled that "[t]he privilege applies to communications with attorneys[,] whether corporate staff counsel or outside counsel." *Rossi*, 540 N.E.2d at 705, 542 N.Y.S.2d at 510. Although the application of privilege in general has "raised nettlesome questions," the issues can become more difficult in the context of corporate, in-house staff attorneys rendering advice to their corporate clients. *Id* When in-house counsel advises a large corporation on mixed business legal matters, "courts should view a claim of privilege with great skepticism . . . ." 9-4503 Weinstein, Korn and Miller, *New York Civil Practice* § 4503.06 (2011). In the case of a corporate staff attorney's communications, the need to apply the privilege "cautiously and narrowly is heightened . . . lest the mere participation of an attorney be used to seal off disclosure." *Rossi,* 540 N.E.2d at 705, 542 N.Y.S.2d at 510.

As the Court in *Rossi* observed:  "staff attorneys may serve as company officers, with mixed business-legal responsibility; whether or not officers, their day-to-day involvement in their employers' affairs may blur the line between legal and non-legal communications . . . ." *Id.* The *Rossi* court observed further that "[o]bviously, not every communication from staff counsel to the corporate client is privileged" but "no ready test exists for distinguishing protected legal

21

communications and unprotected business or personal communications; the inquiry is necessarily fact-specific." *Id.* (citation omitted).

Although there may be no "ready test," the New York Court of Appeals has provided "guideposts." *Id.* The guideposts that the *Rossi* Court considered include whether: (1) the document was "clearly an internal, confidential document" (*i.e.*, no one outside the company had access to it); (2) the author functioned solely as an attorney, he had "no other responsibility within the organization;" (3) the communication was "made for the purpose of facilitating the rendition of legal advice or services;" and (4) the subject matter was an imminent litigation. *Rossi*, 540 N.E.2d at 705-06, 542 N.Y.S.2d at 510-11. Based on those guideposts, the Court held that a memorandum from an in-house, corporate staff attorney (who had no other business function within the organization) was privileged. *Id.*

The role or function of in-house legal staff is often a factor in evaluating claims of privilege. See, e.g., *Quail Ridge Assocs. v. Chem. Bank*, 571 N.Y.S.2d 648, 650 (App. Div. 1991) (privilege upheld where legal division was separate unit and attorneys perform no business functions). See also *MSF Holding, Ltd. v. Fiduciary Trust Co. Int'l.*, No. 03 Civ. 1818, 2005 U.S. Dist LEXIS 34171, at *2-3 (S.D.N.Y. Dec. 7, 2005) (privilege denied where e-mails authored by a Senior Vice President and Deputy Corporate Counsel "reflect[ed] the exercise of a predominately commercial function," "never alluded to a legal principle in the documents or engaged in a legal analysis. Instead she collected facts as any business executive would do in determining whether to pay an obligation. In doing so, she evidently relied on her knowledge of commercial practice rather than her experience in the law.").

DM1\2743973.1

3.   **The MTA Documents in Categories 1 through 5 are Clearly Not Privileged Under New York Law and Should be Produced**

The key distinction in the challenged MTA documents is that communications involving MTA's Ms. Hakim do <u>not</u> involve a "staff counsel" who may have had "mixed business legal responsibility" and whose communications "may blur the line between legal and non-legal communications." Ms. Hakim undisputedly wore at least two (2) "hats" at all times, one of which was clearly a distinct operational position in the MTACC business organization (*i.e.* Vice President "in charge of" Procurement). In addition, for a critical six (6) month period, Ms. Hakim wore a third hat – Acting President of MTA Capital Construction. The line between legal and non-legal communications with respect to Ms. Hakim is not so "blurry." As described at length Sections II.A. 1 through 5, with detailed examples, based on the privilege log descriptions and unredacted portions of documents produced by MTA, the documents set forth in Categories 1-5 are clearly not privileged and must be produced.

B.   **The MTA Documents in Categories 1 through 5 Were Not Prepared in Anticipation of Litigation, and Should be Produced**

1.   **Federal Law of Work Product Supports Disclosure**

The applicable law governing the assertion of the work product doctrine in a diversity action is federal law. *See, e.g., Allied Irish Banks v. Bank of America*, 240 F.R.D. 96, 105 (S.D.N.Y. 2007) (citation omitted). Rule 26(b)(3) of the Federal Rules of Civil Procedure provides that "documents and tangible things that are prepared in anticipation of litigation or for trial or for another party or its representative" are not discoverable, unless another party shows a substantial need and no undue hardship. Fed. R. Civ. P. 26(b)(3). The doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United*

*States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998)(quoting *Hickman*, 329 U.S. at 510-11);

*accord Mercator Corp. v. United States*, 318 F.3d 379, 383-84 (2d Cir. 2003).

The party asserting the work product doctrine has the burden of establishing that it

applies, and that it has not been waived. *See Allied Irish Banks,* 240 F.R.D. 96, 105 (citing

*Mercator Corp. v. United States*, 318 F.3d at 384). That burden is a "heavy one." *Mercator*

*Corp. v. United States*, 318 F.3d at 384. The elements for work product protection are that "[t]he

material must (1) be a document or a tangible thing, (2) that was prepared in anticipation of

litigation, and (3) was prepared by or for a party, or by his representative." *Allied Irish Banks*,

240 F.R.D. at 105 (internal quotation marks, citations and bracketing omitted). The often key

element of "[w]hether material was prepared 'in anticipation of litigation' requires determination

of the subjective question of whether the party actually thought it was threatened with litigation

and the objective question of whether that belief was reasonable." *Gulf Islands Leasing, Inc. v.*

*Bombardier Capital, Inc.*, 215 F.R.D. 466, 475 (S.D.N.Y. 2003).

2.   **MTA Cannot Meet the Critical *Adlman* Test - "Because of the Prospect of Litigation"**

In order for a document to be deemed "prepared in anticipation of litigation," it must be

shown that "in light of the nature of the document and the factual situation in the particular case,

[it] can fairly be said to have been prepared or obtained *because* of the prospect of litigation."

*Adlman*, 134 F.3d at 1202 (emphasis in original) (quotation omitted). Although the *Adlman*

opinion notes that documents prepared with both litigation in mind and for a business purpose

may, in some cases, be work product, the critical test turns on whether the document would have

been prepared in essentially similar form — irrespective of the expected litigation. *See Allied*

*Irish Banks,* 240 F.R.D. at 106 (citing *Adlman*, 134 F.3d at 1204). As this Court succinctly

explained in *Allied Irish Banks*:

24

> Indeed, even where "[t]here is little doubt under the evidence that [a party] had the prospect of litigation in mind when it directed the preparation of the [document] . . . ," or that "such documents might [also] help in preparation for litigation," work product protection is not available for documents "that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of litigation."

*Allied Irish Banks*, 240 F.R.D. at 106 (citing *Adlman*, 134 F.3d at 1204) (internal citations omitted).

### 3.    The MTA Documents in Categories 1 through 5 are Not Work Product Under Federal Law

Again, the key distinction in this case is that documents involving Ms. Hakim are often business-related as a result of Ms. Hakim's operational positions with the MTACC business organization and role as Acting President of MTA Capital Construction or, at best, have a mixed purpose. For example, MTA asserts that the aforementioned "Talking Points" prepared by MTACC to the MTA Board of Directors in the ordinary course of business are work product. See, for example June 2008 talking points to the MTA Board of Directors, which MTA claims are both privileged and work product. Davis Decl., Exh. E, Tab 3, Line 2, MTAHQ_PRIV 0000000039, Production Bates MTAHQ_E 0000007942, email attachment dated 6/6/2008, attached as Davis Decl. Exh. J. See Davis Decl., Exh. E, Tab 1, Line 61, MTAHQ_PRIV 0000000041 and Line 62, MTAHQ_PRIV 0000000044. These reports are clearly prepared in the ordinary course of business, reflect factual reporting of project status, and are not work product prepared even if there might be a litigation prospect. On the other hand, where MTA's privilege logs indicate that Ms. Hakim was preparing documents "because of" the litigation (for example, numerous entries in July of 2009, after MTA had terminated Lockheed Martin's contract), Lockheed Martin has not challenged those entries. In fact, the MTA's earliest litigation hold was not issued until April 30, 2009. See Davis Decl., Exh. Q. This demonstrates that MTA did not anticipate litigation in 2007 or 2008, at a minimum. Lockheed Martin submits

25

that based on the lack of a litigation hold until April 30, 2009, the privilege log descriptions and the unredacted portions of documents produced by MTA, the challenged documents as set forth in Categories 1-5 are not Work Product and must be produced.

Moreover, as a general matter, MTA "cannot use materials as a 'sword' in its defense 'while using privileges attaching to [materials relied upon for that defense] as a 'shield.'" *Dinler v. City of New York (In re City of New York)*, 607 F.3d 923, 946-47 (2d Cir. 2010) (citation omitted); *see Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008) (citation omitted) ("[A] party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party."). Whether a party has waived attorney-client privilege or work product protection depends on considerations of fairness to the party opposing the asserted protections; specifically, whether "it would be unfair for a party asserting contentions . . . to then rely on its privileges to deprive its adversary of access to material that might disprove or undermine the party's contentions." *Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.*, 258 F.R.D. 95, 106-07 (S.D.N.Y. 2009). New York state courts have similar concerns: "selective disclosure is not permitted as a party may not rely on the protection of the privilege regarding damaging communications while disclosing other self-serving communications." *Deutsche Bank Trust Co. v. Tri-Links Inv. Trust*, 837 N.Y.S.2d 15, 23 (App. Div. 2007); *see U.S. Fid. & Guar. Co. v. Am. Re-Ins. Co.*, No. 604517/02, 2008 N.Y. Misc. LEXIS 10434, at *6 (Sup. Ct. October 14, 2008), *aff'd* 888 N.Y.S.2d 887 (App. Div. 2009) (quoting *Weizmann Inst. of Sci. v. Neschis*, No. 00 Civ. 7850, 2004 U.S. Dist. LEXIS 4254 (S.D.N.Y. March 17, 2004), "[t]o selectively disclose privileged communications would cause the attorney-client privilege to be used as both a sword and a shield, resulting in fundamental unfairness").

Although MTA produced some documents prepared for and sent to Ms. Hakim, they selectively disclose Ms. Hakim's documents that support MTA's defenses and claims, while suspiciously asserting privilege and work product protections over documents that might undermine their contentions. Ms. Hakim's legal title cannot be used to seal off and shield these documents from disclosure. Such tactics deprive Lockheed Martin of the opportunity to access materials that could be fairly used in discovery and at trial. See, e.g., Davis Decl., Exh. E, Tab 3, Lines 14 and 15, MTATA_PRIV 0000000142 and 143, Production Bates MTATA_E 0001247693-94, email and attachment dated 4/28/2009, redacted document attached as Davis Decl., Exh. P.

### C. Even If Privileged or Work Product, MTA Waived Any Protection For Documents in Category 5 By Its Voluntary Disclosures to Third Parties

#### 1. MTA Waived Privilege

It is well-settled that attorney-client privileged documents lose the protection if shared with third parties for reasons unnecessary to the rendering of legal advice. See, e.g., *Delta Fin. Corp. v. Morrison*, 820 N.Y.S.2d 745, 751 (Sup. Ct. 2006) (waiving privilege by sharing documents with accountant for purposes of tax advice); *In re Stenovich v. Wachtell, Lipton, Rosen & Katz*, 756 N.Y.S.2d 367, 378 (Sup. Ct. 2003) (waiving privilege by sharing documents with investment bank consulted for business aspect of merger).

An exception to that waiver exists where "communications [are] made to counsel through a hired interpreter, or one serving as an agent of either attorney or client to facilitate communication." *People v. Osorio*, 549 N.E.2d 1183, 1186, 550 N.Y.S.2d 612, 615 (1989). The third party's role or "agency" within the confines of this exception "is not defined by the third parties' employment or function . . . ." *Id.* The determination depends on whether (1) the client had a reasonable expectation of confidentiality under the circumstances," *Id.* (citations omitted),

27

and (2) the "disclosure to [the] third party. . . [must be] necessary for the client to obtain informed legal advice." *Nat'l Educ. Training Grp., Inc. v. Skillsoft Corp.*, No. M8-85, 1999 U.S. Dist. LEXIS 8680, at *12 (S.D.N.Y. June 10, 1999) (citing *Doe v. Poe*, 664 N.Y.S.2d 120, 122 (2d Dep't 1997), *aff'd*, 700 N.E.2d 309 (N.Y. 1998)).  To be a "necessary" party to obtaining legal advice, a third party must be "more than just useful and convenient." *Nat'l Educ.*, 1999 U.S. Dist. LEXIS 8680, at *12.  They must be "nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." *Id.*

"Independent Engineering Consultants," like David Horn of Carter Burgess, are not a "necessary" party for purposes of attorney-client privilege.  As one federal district court explained, "[t]here are few, if any, conceivable circumstances where a scientist or engineer employed to gather data should be considered an agent within the scope of the privilege since the information collected will generally be factual, obtained from sources other than the client." *U.S. Postal Serv. v. Phelps Dodge Ref. Corp.*, 852 F. Supp. 156, 162 (E.D.N.Y. 1994) (federal law).[16] Such a claim of privilege "goes well beyond the 'outer boundary' of the privilege." *Id.*  Here, MTA was obligated by statute to engage a third party independent engineering consultant in relation to oversight and reporting obligations to various public entities.  Mr. Horn's role is defined by statute, a statute that does not provide for any involvement whatsoever in MTA's confidential litigation support or legal matters.  Based upon that statutory "independent" function, and guided by the relevant case law, MTA's voluntary disclosure of documents or

---

[16] Note that "New York law governing attorney-client privilege is generally similar to accepted federal doctrine," and federal case law is accepted guidance even where New York state law governs.  See, e.g., *Bank of New York, N.A. v. Terra Nova Ins. Co. Ltd.*, 211 F. Supp. 2d 493, 495-96 (S.D.N.Y. 2002) citing *Bowne, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 470 (S.D.N.Y. 1993); accord *Josephson v. Marshall*, 2001 U.S. Dist. LEXIS 10049, 2001 WL 815517, at *2 (S.D.N.Y. July 19, 2001).

28

communications to Mr. Horn waived any privilege that may have previously applied, if such privilege even applied in the first instance.

In addition, MTA's voluntary disclosures to Mr. Horn waived privilege because MTA had no reasonable expectation of privacy when it disclosed materials to a third party independent engineering consultant. By statute, Mr. Horn's firm is required to be "independent." Mr. Horn's statutory role, to the extent that MTA's committee is to consult with Mr. Horn's firm in connection with annual reporting to numerous boards and public entities, is inherently one of an independent "public watchdog," and not a member of the MTA legal team. MTA had no reasonable expectation of privacy when it disclosed materials to Mr. Horn, and those documents must be produced.

    2.    **MTA Waived Work Product**

Unlike attorney-client privilege, work product protection is not waived because the material is simply shared with any third party. *See Bank of America v. Terra Nova Ins. Co.*, 212 F.R.D. 166, 169 (S.D.N.Y. 2002). Instead, work product protection is waived when covered materials are used in a manner "inconsistent" with a claim of privilege. *See Bank of America, N.A. v. Palladium Ins. Co.*, 212 F.R.D. 166, 169-70 (S.D.N.Y. 2002)(citation omitted). For example, a voluntary disclosure to an adversary waives work product protection as to other parties. *Id.* at 170 (citing *In re Steinhardt Partners*, L.P., 9 F.3d 230, 235 (2d Cir. 1993)).

The disclosure, however, need not be to an actual adversary for a party to vitiate work product protection. *Id.* (citing *Medinol, Ltd. v. Bos. Sci. Corp.*, 214 F.R.D. 113, 117 (S.D.N.Y. 2002)). In the Southern District of New York, a corporation's disclosure of work product to its

independent auditors has been held to constitute waiver. *Medinol*, 214 F.R.D. 113, 117 (S.D.N.Y. 2002).[17]

In *Medinol*, the Court held that meeting minutes of the corporation's "Special Litigation Committee," although work product, were discoverable as a result of the corporation's voluntary disclosure of those meeting minutes to the corporation's independent auditor. *Medinol*, 214 F.R.D. at 115. The Court noted that the corporation was required by law to retain the independent auditor, that his scope of work was to evaluate disclosures and financial accounts, and to express independent opinions based on facts provided to it. *Medinol*, 214 F.R.D. at 115. The Court focused on the "adversarial tension" between a corporation and its independent auditors. *Id.* at 113. *Medinol* quoted the United States Supreme Court's explanation of the role of such independent accounting auditors:

> ...the independent auditor assumes a *public* responsibility transcending any employment relationship with the client. ...this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This 'public watchdog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust.

*Medinol*, 214 F.R.D. at 116 (quoting *United States v. Arthur Young & Co.*, 465 U.S. 805, 817-18 (1984) (emphasis in original)).

The Court found that "the auditor's interests are not necessarily aligned with the interests of the company," in fact, "in order for auditors to properly to their job, they must not share common interests with the company they audit." *Medinol*, 214 F.R.D. at 116. The Court distinguished the independent auditor from an accountant retained directly by litigation counsel

---

[17] Although some Courts have criticized the *Medinol* opinion, it remains good law and should be applied in this case. See, e.g. *United States v. Hatfield*, No. 06-CR-0550, 2010 U.S. Dist. LEXIS 4026, at *11 (E.D.N.Y. Jan. 8, 2010) (noting some criticism but finding that "the case for applying Medinol's rule is especially strong here").

DM1\2743973.1

for purposes of interpreting accounting information necessary for the attorney to develop litigation strategy (where no waiver was found). *Medinol*, 214 F.R.D. at 116. Because a corporation does not share "common interests" in litigation with their independent auditor, the Court held that disclosure of work product to the independent auditor waived any protection, and the meeting minutes were ordered to be produced. *Medinol*, 214 F.R.D. at 117.

Here, MTA asserts work product over various documents including, for example, "talking points" to be presented at periodic reports to the MTA Board as early as June 2008. Notwithstanding that Lockheed Martin asserts such documents are not work product, if they were, any protection was extinguished when MTA voluntarily shared them with Mr. Horn. Like the "independent auditor" function, the "independent engineering consultant" is required by statute in relation to oversight; and, by the terms of the statute must be "independent." As such, the independent engineering consultant's interest are not necessarily aligned with MTA's' indeed, to be "independent," they necessarily cannot be. Because Mr. Horn's interests were not, as previously explained, aligned with MTA, MTA's voluntary disclosures to him extinguished any protection.

D.   **This Court Should View MTA's Inconsistent Disclosures Relating to Category 6, and Newly-Hatched Work Product Assertions, with Great Skepticism**

MTA's recent inconsistent disclosures (set forth as Category 6), and newly-hatched assertions of work product should be greeted with great skepticism. As set forth above, documents that MTA has insisted are privileged for eleven months, are now being withheld based on claims of "irrelevance." For example, the June 9, 2008 email and attachments from Ms. Hakim to New York City Transit's Stanley Grill which, in February 2011, was described as dealing with a ". . . response to claims from Lockheed Martin," but which MTA now deems "NOT RELEVANT . . . ." See Davis Decl., Exh. E, Tab 6, Lines 15-17. Or, the April 21, 2008

31

email, which began as a "Outline for April 2008 MTACC meeting," but now, evidently, is "NOT RELEVANT," because it reflects "…General Counsel Veronique Hakim expresses her displeasure on how [an] administrative issue was handled." See Davis Decl., Ex. E, Tab 6, Line 4 and 5.

More importantly, relevant documents, previously withheld based on assertions of privilege in relation to Ms. Hakim acting as an attorney, are now turning into arguments of privilege and work product because outside litigation counsel was somehow involved -- despite absolutely no prior claim of outside counsel involvement. For example, the March 26, 2008 email from Ronald Pezik, to Veronique Hakim copied to Richard Miras, regarding an "LM Strategy Discussion," (during Ms. Hakim's tenure as Acting President of MTACC), which -- until this week -- provided absolutely no indication of outside counsel involvement, now involves MTA's outside attorney. See, e.g., Davis Decl., Exh. E, Tab 6, Line 2, MTACC_PRIV 0000001956.

Lockheed Martin respectfully requests that this Court review MTA's sixteen entries presented as Category 6, and determine whether such vastly shifting and inconsistent descriptions, which continue to delay discovery in this matter, should be exempt from production.

Lockheed Martin further submits that MTA cannot, after almost a year of defending its position based on "privilege," suddenly "move the goal posts," by broadening its designations to also include work product. Indeed, MTA cannot meet its burden (as set forth above) of showing "anticipation of litigation" throughout the ordinary course of the project, for example as early as September 2007. Davis Decl., ¶26, when MTA didn't even issue a litigation hold memo until April 2009. Davis Decl., ¶26, and Davis Decl., Exh. Q. In addition, MTA cannot show how

DM1\2743973.1

these scores of project-related emails and documents are (now) suddenly designated as prepared "because of litigation." As a result, no credence should be given to MTA's last ditch attempt to "move the goal posts," by expanding their prior designation of privilege.

E.    **This Court Should Grant Lockheed Martin's Motion for a Protective Order**

The Federal Rules of Civil Procedure provide that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). If privileged material is sought, a party move for a protective order. See Fed. R. Civ. P. 26(c). When a protective order is sought, the moving party "has the burden of establishing the essential elements of the privilege." *G-I Holdings, Inc., v Baron & Budd*, 199 F.R.D. 529, 533 (S.D.N.Y. 2001) (citations omitted).

In addition to the legal framework set forth at Argument Points III.A – III.C regarding privilege, work product, and waiver, it is important to note that the presence or absence of an attorney's name on a particular corporate communication reveals little about the privilege or work product that may underlie or be attached to that communication.[18] Although disclosure of privileged information to third parties generally waives attorney-client privilege, internal distribution among corporation representatives of privileged material does not, by itself, extinguish the privilege. *See Strougo v. BEA Assocs.*, 199 F.R.D. 515, 519-520 (S.D.N.Y. 2001) (citing *Upjohn*, 449 U.S. 383, 391-92; see also *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 442 ("since the decision-making power of the corporate client may be diffused among several employees, the dissemination of confidential communications to such persons does not defeat the privilege").

---

[18] In fact, MTA's own privilege logs contain hundreds of emails with no attorneys in the to, from, or cc fields that have not, at this time been formally challenged by Lockheed Martin. Lockheed Martin presumes MTA's logs were prepared accurately, in good faith, and consistent with the legal position they have taken in challenging similar entries on Lockheed Martin's logs.

33

MTA has no legal or factual basis on which to demand production of the referenced Lockheed Martin Documents. Here, Lockheed Martin met its burden with respect to attorney-client privilege and work product protection. Lockheed Martin's declarations (discussed in the Relevant Facts section above) make clear that Lockheed Martin in-house counsel acted in their legal capacities and Lockheed Martin's assertions of privilege and work product are appropriate and valid. Since Lockheed Martin has fully satisfied its burden, this Court should grant a protective order barring discovery of the Lockheed Martin documents.

## IV.   CONCLUSION

For the foregoing reasons, Lockheed Martin respectfully requests that the Court grant Lockheed Martin's Motion to Compel production of the MTA documents, and Motion for a Protective Order with respect to the Lockheed Martin documents.

Dated:  New York, New York
        July 21, 2011

Respectfully submitted

**DUANE MORRIS LLP**

By:  _Michael Chartan_
     Matthew A. Taylor (MT 2914)
     Michael Chartan (MC 4609)
     Michael P. Davis (MD 5250)
     1540 Broadway
     New York, NY 10036
     Tel: (212) 471-1862 (Davis)
     *Attorneys for Plaintiff, Lockheed*
     *Martin Transportation Security*
     *Solutions, an operating unit of*
     *Lockheed Martin Corporation*

DM1\2743973.1