UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
LOCKHEED MARTIN TRANSPORTATION
SECURITY SOLUTIONS, AN OPERATING UNIT OF
LOCKHEED MARTIN CORPORATION,                    No.: 09 CV 4077 (PGG) (GWG)

                Plaintiff,                     ECF CASE

   - against -

MTA CAPITAL CONSTRUCTION COMPANY and
METROPOLITAN TRANSPORTATION AUTHORITY,

                Defendants.
------------------------------------------------------------------------X
TRAVELERS CASUALTY AND SURETY COMPANY
OF AMERICA, FEDERAL INSURANCE COMPANY,
and SAFECO INSURANCE COMPANY OF AMERICA,     No. 09 CV 6033 (PGG) (GWG)

                Plaintiffs,

   - against -

METROPOLITAN TRANSPORTATION AUTHORITY,
MTA CAPITAL CONSTRUCTION COMPANY, NEW
YORK CITY TRANSIT AUTHORITY, and
LOCKHEED MARTIN CORPORATION,

                Defendants.
------------------------------------------------------------------------X

### MEMORANDUM OF LAW IN SUPPORT OF THE
### SURETIES' MOTION FOR PARTIAL SUMMARY JUDGMENT

                                    WOLFF & SAMSON PC
                                    140 Broadway, 46th Floor
                                    New York, New York 10005
                                    (212) 973-0572

                                    *Attorneys for Plaintiffs Travelers Casualty*
                                    *and Surety Company of America, Federal*
                                    *Insurance Company, and Safeco Insurance*
                                    *Company of America*

# TABLE OF CONTENTS

                                                                                                                              **P**AGE

TABLE OF AUTHORITES ........................................................................................................ii

PRELIMINARY STATEMENT ................................................................................................. 1

FACTS AND PROCEDURAL HISTORY ................................................................................. 2

ARGUMENT ................................................................................................................................ 7

      A.      THE SURETIES  SHOULD BE AWARDED PARTIAL SUMMARY
            JUDGMENT DISMISSING THE MTA'S COUNTERCLAIM AND/OR
            AWARDING THEM A CREDIT AGAINST ANY DAMAGES TO
            WHICH THE MTA MAY BE ENTITLED, TO THE EXTENT OF THE
            MTA'S IMPAIRMENT OF THE SURETIES' COLLATERAL ............................ 7

      B.      THE LANGUAGE OF THE MTA'S FORM OF PERFORMANCE
            BOND DOES NOT ALLOW THE MTA TO DISREGARD ITS
            OBLIGATIONS TO PROTECT THE CONTRACT BALANCE AND
            MITIGATE DAMAGES. ................................................................................... 12

CONCLUSION ........................................................................................................................... 15

# TABLE OF AUTHORITIES

**CASES**

*Aniero Concrete Co. v. New York City Construction Authority,*
   1998 WL 148324 (S.D.N.Y. 1998), *aff'd,* 404 F.3d 566 (2005) ........................................ 13-14

*Celotex Corporation v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................................. 7

*Gallo v. Prudential Residential Servs., Ltd. P'ship.*,
   22 F.3d 1219 (2d Cir. 1994) ................................................................................................. 7

*Globe Indem. Co. v. Southern Pac. Co.*,
   30 F.2d 580 (2d Cir.). *cert. denied*, 279 U.S. 860 (1929) ............................................... 10-11

*McMillan v. City of New York*,
   2011 WL 6129627 (S.D.N.Y. 2011) ..................................................................................... 7

*Nobel Insurance Co. v. City of New York,*
   2006 WL 2848121 (S.D.N.Y. 2006) .......................................................................... 10-11, 13-14

*Pearlman v. Reliance Ins. Co.,*
   371 U.S. 132 (1962) ............................................................................................................. 8

*Prairie State Nat'l Bank v. United States,*
   164 U.S. 227 (1896) ............................................................................................................. 9

*Scott v. Harris*,
   550 U.S. 372 (2007) ............................................................................................................. 7

*Southern Pac. Co. v. Globe Indem. Co.*,
   21 F.2d 288 (2d Cir. 1927) ................................................................................................. 10

*St. John's College, Fordham v. Aetna Indem. Co.*,
   201 N.Y. 335 (1911) ....................................................................................................... 9, 12

*Trinity Univ. Ins. Co. v. United States,*
   382 F.2d 317 (5th Cir. 1967), *cert. denied,* 390 U.S. 906 (1968) ......................................... 8

*Tynan Incinerator Co. v. Int'l Fid. Ins. Co.,*
   117 A.D.2d 796, 499 N.Y.S.2d 118 (2d Dep't 1986) ......................................................... 11

*Wordie v. Chase Manhattan Bank, N.A.,*
   140 A.D.2d 435, 529 N.Y.S.2d 1 (2d Dep't 1988) ............................................................. 11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ..................................................................................................................... 7

N.Y. Jur. Bonds §117..........................................................................................................11

Restatement (Third) Suretyship & Guar., § 42 comment a ......................................................... 8-9

Restatement (Third) Suretyship & Guar., § 42 illustration 3.........................................................9

**PRELIMINARY STATEMENT**

The MTA's claim against the Sureties' performance bond arises from what the MTA alleges was a performance by Lockheed Martin that was so woefully defective that it rose to the level of a contractual default justifying a complete termination of the contract.[1]  It is then at the very least surprising that, after firing Lockheed from the project for a performance alleged to be so poor that it justified termination of the parties' contract, after asserting a claim against Lockheed's performance bond, and knowing that the cost to complete the IESS Project would far exceed the remaining contract funds on hand, the MTA ignored its legal obligations, its obligations to the public, and common sense, and paid Lockheed another $5,468,907.83.

As explained below, if the MTA's allegations as to Lockheed's supposed default are upheld (allegations that Lockheed vehemently denies and which the MTA failed to establish during the Sureties' investigation), and the Sureties are required to pay or otherwise perform under their bond, then the Sureties have been damaged in the amount of this post-termination payment to Lockheed by virtue of the MTA's impairment of the Sureties' equitable subrogation rights in the contract balance, which is the Sureties' collateral against loss.

Accordingly, for the reasons set forth below, the Sureties are entitled to partial summary judgment dismissing the Counterclaim against them to the extent of $5,468,907.83 and/or awarding them a credit in the sum of $5,468,907.83 against any recovery to which the MTA might otherwise be entitled under its Counterclaim, if any.

---

[1] Short references to the parties and project are as defined in the accompanying papers.

1

## **FACTS AND PROCEDURAL HISTORY**[2]

The MTA and Lockheed were parties to a contract for the delivery of the IESS Project (*see* Declaration of Bruce L. Corriveau in Support of the Sureties' Motion for Partial Summary Judgment ("Corriveau Declaration"), ¶ 3).[3] In connection with this contract, the Sureties and Lockheed, as principal, executed a performance bond in favor of the MTA, as obligee ("the Bond") (*see* Appendix to the Sureties' Rule 56.1 Statement of Undisputed Facts ("Sureties' Appendix"), Exhibit 1; *see also* Corriveau Declaration, ¶¶ 2 and 4). The Bond is a form drafted by the MTA (*see* Corriveau Declaration, ¶ 5). The penal sum of the Bond is $293,379,788.00 (*id.*, ¶ 6).

As a result of various disputes between Lockheed and the MTA on the Project, on or about April 24, 2009, Lockheed commenced an action against the MTA (Docket No. 09 CV 4077, referred to hereinafter as the "Lockheed Action"), alleging that the MTA breached the contract for the IESS Project (*see* Joint Appendix to the Parties' Rule 56.1 Statements of Undisputed Facts, Exhibit 1[4]; Declaration of Adam P. Friedman in Support of the Sureties' Motion for Partial Summary Judgment ("Friedman Declaration"), ¶ 2). On or about May 26, 2009, the MTA filed its Answer and Counterclaim in the Lockheed Action (*see* Ex. J2; Friedman Declaration, ¶ 3).

By letter dated that same day – May 26, 2009 – the MTA notified Lockheed that the MTA considered Lockheed's performance on the Project to have been so deficient, for reasons asserted in the letter, that the MTA considered "multiple Events of Default" to have occurred,

---

[2] The detailed factual history underlying this litigation is contained in the motions for summary judgment being filed by the other parties. So as not to burden the Court further, this brief refers only to those facts that are germane to this motion.
[3] "The IESS Project" and "the IESS Contract" refer to the integrated electronic security system project that is the subject of this litigation and the contract relative thereto.
[4] By agreement of the parties, and for purposes of consistency, the exhibits attached to the Joint Appendix to the Parties' Rule 56.1 Statements of Undisputed Facts shall be referred to as "Ex. J_".

2

resulting in Lockheed being in "material breach" (*see* Ex. J6; Corriveau Declaration, ¶ 7). The letter further explained that the MTA would consider the IESS Contract to be terminated a week later if Lockheed failed, *inter alia,* to cure these supposed "Events of Default" (*see id.*).. Lockheed answered with a detailed response by letter dated June 4, 2009, contesting the MTA's allegations that it was in default, and provided a plan to complete as requested by the MTA (*see* Ex. J7; Corriveau Declaration, ¶ 8). Nevertheless, by letters dated June 12, 2009 (a mere eight days after Lockheed's 36-page response), the MTA formally declared Lockheed to be in default, terminated the IESS Contract for (alleged) default, and made a demand that the Sureties complete the performance of Lockheed's contractual obligations pursuant to the Bond (*see* Ex. J8; Sureties' Appendix, Exhibit 2; Corriveau Declaration, ¶¶ 9-10).

Upon receipt of the MTA's claim, the Sureties immediately undertook an investigation (Corriveau Declaration, ¶ 11). In furtherance of this investigation, by letter dated June 15, 2009, the Sureties requested various information from the MTA, including:

> 4. All payment applications, paid and unpaid, submitted by Lockheed Martin, and all copies thereof including all "marked up" versions as revised by the MTA;
>
> 5. Cancelled checks and other documentation demonstrating all payments issued by the MTA under the Contract;
>
> 6. A detailed accounting of the remaining contract balance and retainage on hand.

(Sureties' Appendix, Exhibit 3; Corriveau Declaration, ¶ 12).[5]

The reason for requesting such information is that the contract balance is the Sureties' collateral against loss and is to be available to offset the potential cost of completing the Project

---

[5] The MTA did not specifically respond to these requests, instead providing the Sureties access to the project-related documents on the project's document management system, ProjectSolve.

upon a default. As discussed herein, the obligee (the MTA) has a duty to protect the Sureties' interest in the contract balance remaining at the time of a termination for default.

On July 2, 2009 – at the expiration of the 20-day period for investigating the MTA's claim, as provided in the Bond, and having been unable to conclude that Lockheed was, in fact, in default or material breach – the Sureties filed a Complaint seeking a determination of the parties' rights and obligations under the Bond (Docket No. 09 CV 6033, *see* Sureties' Appendix, Exhibit 4; *see also* Friedman Declaration, ¶ 5; Corriveau Declaration, ¶ 20). The Sureties' declaratory judgment action was immediately consolidated with the Lockheed Action (*see* Sureties' Appendix, Exhibit 5; Friedman Declaration, ¶ 6).

On July 7, 2009, Lockheed filed an Amended Complaint (*see* Ex. J3; Friedman Declaration, ¶ 7). The MTA responded by filing an Answer and Counterclaims to Lockheed's Amended Complaint on July 20, 2009 ("MTA Answer and Counterclaims") (*see* Ex. J4; Friedman Declaration, ¶ 8). The MTA's allegations in its Counterclaims against Lockheed make clear that, based upon the MTA's version of the story (which Lockheed denies), the MTA should not have been making any payments to Lockheed post-termination. In the MTA Answer and Counterclaims, the MTA contends that its termination of Lockheed arose because, for example, Lockheed "breached fundamental and material provisions of the parties' contract . . . resulting in substantial delays to the job and monetary damages . . ." (MTA Answer and Counterclaims, Counterclaims ¶ 1, Friedman Declaration, ¶ 9). The MTA then identified nine specific supposed failures of Lockheed (*id.*, ¶ 2, Friedman Declaration, ¶ 10), and alleged damages of more than $88 million (*id.* at 33, Friedman Declaration, ¶ 11).

The MTA responded to the Sureties' action by filing its Answer and Counterclaim against the Sureties on or about August 18, 2009 (*see* Sureties' Appendix, Exhibit 7; Friedman

4

Declaration, ¶ 14). The Counterclaim against the Sureties seeks damages for the Sureties' alleged default under the Bond (*see id.*). On or about August 25, 2009, the Sureties filed their Reply to the MTA's Counterclaim, which alleged, *inter alia,* that the MTA failed to mitigate its damages and that the MTA overpaid Lockheed (*see* Sureties' Appendix, Exhibit 8; Friedman Declaration, ¶ 15).

**The MTA Pays $5,468,907.83 to Lockheed After Terminating It for Default**

At his deposition, the MTA's construction manager for the IESS Project, Nino Pirraglia (*see* Sureties' Appendix, Exhibit 9 ("Pirraglia Deposition")), testified that, on or about June 1, 2009, approximately one week after the MTA advised Lockheed that numerous "events of default" had occurred, Lockheed submitted to the MTA "Estimate No. 40" for payment in the amount of $5,468,907.83 (Pirraglia Deposition at 77 (lines 4-24); 82 (lines 13-19); Sureties' Appendix, Exhibit 10; Friedman Declaration, ¶ 18). As construction manager, Mr. Pirraglia's responsibilities included reviewing and approving Lockheed's payment requests and arranging for the issuance of payment to Lockheed. (Pirraglia Deposition, pg. 27, lines 17-25; pg. 28, lines 2-3; Friedman Declaration, ¶ 17). The amount sought by Lockheed in Estimate No. 40 represented the value of the work Lockheed estimated it had completed between April 18, 2009, and May 22, 2009 (*see* Sureties' Appendix, Exhibit 10 at 1; Friedman Declaration, ¶ 19).

Inexplicably, subsequent to the MTA's termination of the IESS Contract for default on June 12, 2009, and the MTA's demand that the Sureties complete the performance of Lockheed's obligations thereunder, and utterly inconsistent with its allegations as to Lockheed's supposed woefully defective performance and the alleged resulting damages to the MTA, the MTA approved Estimate No. 40 and, on or about July 1, 2009, paid Lockheed an additional $5,468,907.83 (Pirraglia Deposition, pg. 83, lines 17-25; pg. 84, line 2; Friedman Declaration, ¶

5

20). Because the MTA's alleged cost of completion far exceeds the remaining contract balance (the MTA is now alleging a cost to complete of as much as nearly $170 million over and above the remaining contract balance) (*see* MTA's Fifth Supplemental Response to Lockheed's Interrogatories, Sureties' Appendix, Exhibit 6, at 2-4; Friedman Declaration, ¶¶ 12-13), if the MTA's allegations are upheld, then there could not have been (and cannot be) any money due to Lockheed.

When asked why the MTA paid Lockheed nearly $5.5 million after it terminated Lockheed for default, Mr. Pirraglia testified that he "wouldn't have paid Lockheed, but that decision wasn't up to me." (Pirraglia Deposition, pg. 84, lines 3-10; Friedman Declaration, ¶ 21). In fact, in an internal email dated June 19, 2009, Mr. Pirraglia advised that the MTA should "hold the money in escrow until we get a better understanding of the cost of the remaining work" (*see* Sureties' Appendix, Exhibit 11; Friedman Declaration, ¶ 22). In a subsequent email dated June 24, 2009, Mr. Pirraglia again implored the MTA to "hold the electronic transfer of funds to Lockheed Martin under Payment 40" (*see* Sureties' Appendix; Exhibit 12; Friedman Declaration, ¶ 23).

Despite Mr. Pirraglia's pleas, the MTA paid Estimate 40 to Lockheed after Mr. Pirraglia's email of June 24, 2009 (Pirraglia Deposition, pg. 83, lines 11-25; Friedman Declaration, ¶ 24). In doing so, if the MTA sustained damages as a result of the breaches of contract it alleged as of June 12, 2009, then the MTA damaged the Sureties by impairing their equitable subrogation rights in the remaining contract balance – the Sureties' collateral against loss – which the MTA was obligated to protect.

6

**ARGUMENT**

A.     **THE SURETIES SHOULD BE AWARDED PARTIAL SUMMARY JUDGMENT DISMISSING THE MTA'S COUNTERCLAIM AND/OR AWARDING THEM A CREDIT AGAINST ANY DAMAGES TO WHICH THE MTA MAY BE ENTITLED, TO THE EXTENT OF THE MTA'S IMPAIRMENT OF THE SURETIES' COLLATERAL.**

Summary judgment "is properly regarded, not as a disfavored shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corporation v. Catrett*, 477 U.S. 317, 327 (1986). Rule 56(a) of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

While this Court must view all facts in the light most favorable to the nonmoving party, it should not deny the motion unless there is a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *McMillan v. City of New York*, 2011 WL 6129627, *5 (S.D.N.Y. 2011). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.*, 22 F.3d 1219, 1224 (2d Cir. 1994) (internal citation omitted).

The facts pertinent to this motion cannot be in dispute. Based upon the law discussed below, the Court should grant the Sureties partial summary judgment dismissing the MTA's Counterclaim and/or awarding them a credit against any damages to which the MTA may be entitled (if any), to the extent of the MTA's impairment of the Sureties' equitable subrogation rights, $5,468,907.83.

There is no dispute that the MTA paid Lockheed's Estimate 40, in the amount of $5,468,907.83, after it terminated the IESS Contract for default and demanded that the Sureties complete the performance of Lockheed's obligations. The Sureties have an interest in the contract balance, as potential subrogee of the owner (the MTA), should they be required to pay or otherwise perform under their Bond.[6] In other words, should the Sureties be required to pay or otherwise perform under the Bond, pursuant to equitable principles they subrogate to the right of the MTA to apply the contract balance to the cost of completion (*see* Ex. J10.4, Contract Terms and Conditions, Contract Article 7.03 (upon default, the MTA has the right to complete the work and charge the cost thereof to Lockheed); Article 3.09(a)(2) and the references therein (discussing the MTA's right to complete work and deduct the cost thereof from the contract balance)).

The Restatement of Suretyship and Guaranty explains the damage to a surety where an owner impairs the surety's interest in the contract balance, as a potential subrogee (also known as an "overpayment"):

> The collateral securing the underlying obligation increases the ability of the obligee to recover with respect to the underlying obligation. When the secondary obligor [the surety] is subrogated to the rights of the obligee with respect to the underlying obligation, the collateral protects the secondary obligor. Thus, when the obligee impairs the value of the collateral, the obligee impairs the ability of a secondary obligor who performs the secondary obligation to pass the cost of that performance to the principal obligor. As between the principal obligor and the secondary obligor, it is the principal obligor that ought to bear this cost. The obligee's impairment of collateral interferes with this

---

[6] "And probably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 137 (1962); *see also Trinity Univ. Ins. Co. v. United States,* 382 F.2d 317, 320 (5th Cir. 1967), *cert. denied,* 390 U.S. 906 (1968) (surety is subrogee of obligee and is entitled to assert the obligee's rights in the contract balance).

8

> allocation. Accordingly, the secondary obligor is discharged to the extent of the impairment of collateral.

Restatement (Third) Suretyship & Guar., § 42 comment a.

The contract balance serves as the Sureties' security against a potential loss that they may incur if required to pay or otherwise perform under the Bond. The MTA's overpayment of Lockheed after terminating it for default is an improper release of the Sureties' security, impairing their subrogation right in those funds should they be required to act. *Id., see also Prairie State Nat'l Bank v. United States,* 164 U.S. 227, 233 (1896) (surety has equitable interest in retained funds under construction contract, and the obligee's disregard of this interest releases the surety).

The Restatement addresses this exact circumstance:

> B agrees to construct a building for O for $400,000. S issues a performance bond to O pursuant to which S agrees to be jointly and severally liable with B on the obligation to O. B defaults on the construction project, and S completes construction. At the time of B's default, O had paid B $100,000 in accordance with the terms of the construction contract. As "return performance," the remaining $300,000 owed by O to B under the contract serves as security for B's underlying obligation. Payment of any portion of that $300,000 to B is a release of collateral constituting impairment of collateral.

Restatement (Third) of Suretyship & Guar. § 42, illustration 3.

Federal and state courts in New York have long recognized that such improper payments to a contractor are "so antagonistic to the interests of the surety and the obligation assumed by [it] as to relieve [it] from further obligation to the owner upon his contract of suretyship." *St. John's College, Fordham v. Aetna Indem. Co.*, 201 N.Y. 335 (1911). While *St. John's College* concerns advance or premature payments (*i.e.,* payments that are made before the time they are due under the contract), the Second Circuit expanded the *St. John's College* doctrine to hold that a payment made by an obligee after a contract has been abandoned by a bond principal – an even

9

more egregious circumstance than an advance payment, where the contractor is still performing – operates to release the surety *pro tanto*. *Globe Indem. Co. v. Southern Pac. Co.*, 30 F.2d 580, 581 (2d Cir.). *cert. denied*, 279 U.S. 860 (1929). The court explained that "this sum, because it would have been available to complete the work if it had been withheld, as it should have been, must be treated as a credit to the surety company." *Globe Indem. Co.*, 30 F.2d at 581. In an earlier decision in the same case, the Second Circuit explained that

> [a]ny money due the [principal], which the [obligee] then held, must be deemed security which the [obligee] had against its damages for breach of contract. A release of such security would be an injury to the surety, but such injury would be measured by precisely the amount of the payment.

*Southern Pac. Co. v. Globe Indem. Co.*, 21 F.2d 288, 290 (2d Cir. 1927).

In other words, when a principal's contract is terminated, the obligee (in this case, the MTA) has an obligation to ensure that the remaining contract balance is applied to the cost of completing the contract, thereby mitigating the surety's and its own damages. A failure to do so damages the surety by the amount of the improper payment.

These seminal cases remain good law. As this court recently explained in *Nobel Insurance Co. v. City of New York,* 2006 WL 2848121 (S.D.N.Y. 2006), federal courts

> [r]ecognize the obligee's duty as a "stakeholder" to ensure proper application of collateral (contract funds and retainages) upon appropriate notice of the general contractor's default. Indeed, the entire doctrine of subrogation in suretyship is dependent upon the immediate investment of the creditor with the obligations of a trustee whenever any rights or interest of the debtor, applicable to the debt, are placed in his control. If, after appropriate notice of default, the government chooses to pay funds to the general contractor that are *or become* equitably owed to the surety, the government is liable for the actual loss visited upon the surety.

*Nobel,* 2006 WL 2848121 at *16 (emphasis in original).

The facts and considerations of *Globe* and *Nobel* are similar to those here. In *Globe,* an obligee made a payment to its contractor after the contractor abandoned the project and demand had been made against the surety's bond, knowing that work remained outstanding. In *Nobel,* the obligee made a payment to the contractor despite knowing that the contractor was in default due to its failure to pay its subcontractors and suppliers and knowing of the surety's equitable interest in the contract balance. In both cases, the obligee's payment was held to reduce the surety's obligation under its bond *pro tanto.* As in these cases, the Sureties here will have been deprived of the $5,468,907.83, which could have, and should have, served to offset any potential loss under the Bond, should the Court determine that Lockheed was, in fact, properly terminated and that the Sureties are obligated to pay or otherwise perform under the Bond. There is now nearly $5.5 million less available to offset a possible loss to the Sureties because the MTA made a payment that should not have been made.

An obligee also has a duty to mitigate its damages. *See, e.g., Tynan Incinerator Co. v. Int'l Fid. Ins. Co.,* 117 A.D.2d 796, 797, 499 N.Y.S.2d 118, 120 (2d Dep't 1986); N.Y. Jur. Bonds §117 (obligee required to mitigate damages upon contractor's default). The failure to mitigate bars recovery in the amount of the avoidable loss. *Wordie v. Chase Manhattan Bank, N.A.,* 140 A.D.2d 435, 436, 529 N.Y.S.2d 1, 2 (2d Dep't 1988). Of course, the MTA easily could have (and should have) avoided $5,468,907.83 of its alleged loss simply by not making any further payments to Lockheed after it had terminated Lockheed for purported default.

Applying these well-established principles to the uncontroverted facts in this matter, the Sureties are entitled to partial summary judgment dismissing the MTA's Counterclaim to the extent of $5,468,907.83 and/or awarding them a credit in this amount.

11

B.     THE LANGUAGE OF THE MTA'S FORM OF PERFORMANCE BOND DOES NOT ALLOW THE MTA TO DISREGARD ITS OBLIGATIONS TO PROTECT THE CONTRACT BALANCE AND MITIGATE DAMAGES.

The Bond contains a clause stating, in relevant part:

> the obligation of said Surety, and its bond shall be in no way impaired or affected by any extension of time, modification, omission, addition, or change in or to the said Contract or the Project to be performed thereunder, or by any payment thereunder before the time required therein, or by any waiver of any provisions thereof . . . .

(*See* Sureties' Appendix, Exhibit 1).

In its pre-motion letter, the MTA argued that this clause bars the Sureties from making this motion. A mere cursory review of this language, however, reveals that the Sureties did not agree in the Bond to allow the MTA to impair its subrogation rights in the contract funds or relieve it of its duty to mitigate damages.

The plain text of the clause reveals that it concerns only payments made under the bonded contract "before the time required therein."[7] Inasmuch as the MTA terminated the bonded contract two weeks prior to the payment of the $5,468,907.83 to Lockheed, and facing anticipated completion costs that it contends dwarf the remaining contract balance, this was not merely a payment made "before the time required" by the IESS Contract. This was a payment that was not due, and would never have become due. The MTA terminated the contract, and the remaining contract funds would be eaten up in completing the IESS Project, according to the MTA's own numbers. This clause thus does not apply.

---

[7] The purpose of the clause is to allow an obligee to avoid application of the doctrine of *strictissimi juris,* pursuant to which a surety may be discharged by a modification of its bond obligation without its consent. *See, e.g., St. John's College,* 201 N.Y. at 341-42 (discussing application of the doctrine to a compensated surety). The clause does not grant an obligee license to impair the surety's equitable subrogation rights, nor does it relieve the obligee of its duty to mitigate damages.

12

In *Nobel,* this court held that this clause does not constitute a waiver of any rights or claims a surety may have arising from a post-default payment. There, the City of New York (the obligee) paid nearly $500,000 to the contractor for work performed and materials supplied, after having terminated the contract for convenience and subsequently having been advised that the contractor was in default for failing to pay its subcontractors. The contractor's surety notified the City that it faced exposure under its bonds as a result and demanded that no further contract funds be released to the contractor. Eventually, the surety issued payment to the claimants against its bonds and sought to recover the $500,000 from the City pursuant to its subrogation rights. The court rejected the City's argument that its post-termination payment to the contractor was a "premature payment" allowed by the bond, as it was made 9 months after termination of the contract. *Nobel,* 2006 WL 2848121 at *12. The surety thus had not waived its right to recover from the City for the damage resulting from the post-termination payment.

The MTA's reliance on *Aniero Concrete Co. v. New York City Construction Authority,* 1998 WL 148324 (S.D.N.Y. 1998), *aff'd,* 404 F.3d 566 (2005), is misplaced. In *Aniero*, the surety sought to be discharged from its bond obligations on account of *premature* payments made by the New York City School Construction Authority ("the SCA") to the bond principal, P.J. Carlin Construction Company, in the course of construction and while the SCA's contract with Carlin was still in force, for work that had yet to be completed and materials that had yet to be installed at the project. Because such payments were made during construction, before the time that they otherwise would have become due under the contract, the court held that the surety could not seek a discharge because it "waived its right to complain that payments were not made at the time or in the manner stipulated in the contract . . . ." *Aniero,* 1998 WL 148324 at *12.

13

*Aniero* is inapposite. *Aniero* does not involve payments made by the obligee after the contractor defaulted and the obligee terminated the contract, and knowing that the cost of completion will far exceed the remaining contract balance. As in *Nobel*, here the MTA did not make payment prematurely; it was not paying for work that had yet to be performed or materials that had yet to be installed. *See Nobel,* 2006 WL 2848121 at *12 n.12 (*Aniero* involved "premature payment because the construction projects were ongoing and neither contract had been terminated"). Payment was not due to Lockheed not because the time for payment simply had yet to arrive under the Contract (to the contrary, had the MTA not terminated the Contract for default, payment of Estimate No. 40 may have been appropriate), but because the payment could *never* have been due to Lockheed (if the MTA's allegations are to be accepted). As such, neither the subject clause nor the rationale of *Aniero* apply.

## **CONCLUSION**

For the reasons set forth above, the Sureties' motion for partial summary judgment should be granted, dismissing the Counterclaim against them to the extent of $5,468,907.83 and/or awarding them a credit in the sum of $5,468,907.83 against any recovery to which the MTA might otherwise be entitled under its Counterclaim, if any.

Dated: July 15, 2013

                                                Respectfully submitted,

                                                **WOLFF & SAMSON PC**
Attorneys for Plaintiffs
*Travelers Casualty & Surety Company of America, Federal Insurance Company, and Safeco Insurance Company of America*

By: /s Adam P. Friedman
      Adam P. Friedman (AF-5700)

140 Broadway, 46th Floor
New York, New York  10005
(212) 973-0572
afriedman@wolffsamson.com

15