UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOCKHEED MARTIN TRANSPORTATION
SECURITY SOLUTIONS, AN OPERATING UNIT
OF LOCKHEED MARTIN CORPORATION,                    09 Civ. 4077 (PGG)

                Plaintiff,

                -against-

MTA CAPITAL CONSTRUCTION COMPANY and
METROPOLITAN TRANSPORTATION
AUTHORITY,

                Defendants.

---

TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA, FEDERAL INSURANCE
COMPANY, AND SAFECO INSURANCE                      09 Civ. 6033 (PGG)
COMPANY OF AMERICA,

                Plaintiffs,

                -against-

METROPOLITAN TRANSPORTATION
AUTHORITY, MTA CAPITAL CONSTRUCTION
COMPANY, NEW YORK CITY TRANSIT
AUTHORITY, and LOCKHEED MARTIN
COOPERATION,

                Defendants.

## DEFENDANTS' RESPONSE TO SURETIES' STATEMENT OF UNDISPUTED MATERIAL FACT IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

       Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1 of

the Southern District of New York, Defendants Metropolitan Transportation Authority ("MTA")

and MTA Capital Construction Company ("MTACC" or, collectively, "Defendants") respond to

the Sureties' Statement of Undisputed Material Fact in Support of their Motion for Partial

Summary Judgment as follows:

1.      The Metropolitan Transportation Authority, MTA Capital Construction Company
(together, "the MTA") and Lockheed Martin Transportation Security Systems, an Operating Unit
of Lockheed Martin Corporation ("Lockheed") are parties to a contract (the "Contract") for the
delivery of an Integrated Electronic Security System (the "IESS Project") for the MTA (see
Declaration of Bruce L. Corriveau in Support of the Sureties' Motion for Partial Summary
Judgment ("Corriveau Declaration"), ¶ 3).

**Response:**  Undisputed.

2.      The Sureties and Lockheed, as principal, executed a performance bond in favor of
the MTA, as obligee, in connection with the Contract (the "Bond"). A copy of the Bond is
annexed to the Appendix to the Sureties' Rule 56.1 Statement of Undisputed Facts ("Sureties'
Appendix") as Exhibit 1 (*see* also Corriveau Declaration, ¶¶ 2 and 4).

**Response:**  Undisputed.

3.      The form of this Bond was drafted by the MTA (*see* Corriveau Declaration, ¶).

**Response:**  Undisputed.

4.      The penal sum of the Bond is $293,379,788.00 (*id.*, ¶ 6; Sureties' Appendix,
Exhibit 1).

**Response:**  Undisputed.

5.      On or about April 24, 2009, Lockheed commenced the action in this Court against
the MTA[1] under Docket No. 09 CV 4077 ("the Lockheed Action"). A copy of the Complaint in
the Lockheed Action is annexed to the Joint Appendix to the Parties' Rule 56.1 Statements of
Undisputed Facts as Exhibit 1[2] (*see* also Declaration of Adam P. Friedman in Support of the
Sureties' Motion for Partial Summary Judgment ("Friedman Declaration"), ¶ 2).

---

[1]      For purposes of the Sureties' motion, the term "MTA" also includes the New York City Transit Authority.
However, the New York City Transit Authority is not a party to the Lockheed Action.

[2]      By agreement of the parties, and for purposes of consistency, the exhibits attached to the Joint Appendix to
the Parties' Rule 56.1 Statements of Undisputed Facts shall be referred to as "Ex. J_". In addition, MTA refers to
exhibits specific to the Sureties' motion and MTA's response thereto as "Ex. S_". Exhibits added by MTA in
response to the Sureties' motion commence at Ex. S14. Also, all capitalized terms shall have the same meaning
assigned to them by the Sureties in their moving papers unless otherwise specified herein.

**Response:**  Undisputed.

6.      On or about May 26, 2009, the MTA filed its Answer and Counterclaim in the Lockheed Action (*see* Ex. J2; Friedman Declaration, ¶ 3).

**Response:**  Undisputed.

7.      By letter dated May 26, 2009, the MTA notified Lockheed that "multiple Events of Default have occurred, resulting in Lockheed being in material breach of its contractual obligations", and that it would deem the contract to be terminated a week later if Lockheed failed, *inter alia*, to cure these supposed "Events of Default" (*see* Ex. J6; Corriveau Declaration, ¶ 7).

**Response:**  Disputed insofar as the MTACC advised Lockheed that should it fail to *inter alia*,

"cure the Events of Default . . . within *seven business days* from the date of this letter" and

"provide an accurate schedule of the work to be performed which will demonstrate how

meaningful progress will be made towards beneficial use and substantial completion" "the

Contract will be deemed terminated on that date, *June 4, 2009*."  *See* Ex. J6 (Default Notice) at

p. 1 (emphasis added).  MTA also notes that the Sureties received the May 26, 2009 notice, as

the document indicates that they were copied on its distribution.  *Id.*

8.      Lockheed responded on June 4, 2009, contesting in detail the MTA's claim that events of default had occurred and that it was in material breach, and provided a plan to complete as requested by the MTA (*see* Ex. J7; Corriveau Declaration, ¶ 8).

**Response:**  Disputed to the extent that Lockheed did not provide a plan to complete that was

satisfactory as requested.  *See* Ex. J8 (Termination Notice) at p. 1.   In addition, Lockheed's June

4, 2009 response to the MTA's Default Notice consisted mainly of "conclusory statements"

restating positions previously disagreed with by the MTA.  *See* Ex. S14 (6/5/09 Letter from

Pezik to Gaughan); *see also* Ex. J8 (Termination Notice).

9.      By letter dated June 12, 2009, a mere eight days later, the MTA formally declared Lockheed to be in default and terminated the IESS Contract due to this supposed default (*see* Ex. J8; Corriveau Declaration, ¶ 9).

**Response:**  The MTA objects to the Sureties' characterization of the time between Lockheed's response to the MTA's notice as a "mere" eight days.

10.     By separate letter dated June 12, 2009, the MTA demanded that the Sureties complete the performance of Lockheed's obligations under the bonded contract (*see* Sureties' Appendix, Exhibit 2; Corriveau Declaration, ¶10).

**Response:**  Undisputed, except to note that the "bonded contract" was previously identified in S¶1 *supra* as the "Contract."

11.     Upon receipt of the MTA's claim, the Sureties immediately undertook an investigation (*see* Corriveau Declaration, ¶ 11).

**Response:**  Disputed.  The Sureties claim that they have been preparing for *litigation* since their receipt of the MTA's claim.  *See* Ex. S14 (Friedman Decl. in Support of Sureties' Privilege Motion) at ¶ 15.

12.     The Bond allowed the Sureties 20 days to conduct their investigation (*see id.*; Sureties' Appendix, Exhibit 1).

**Response:**  Disputed. The Bond did not allow the Sureties twenty (20) days to simply conduct an investigation.  The Bond required that the Sureties commence work of completion within twenty (20) days of notice to do so from the MTA. The Bond provides as follows:

> The Surety, for value received, hereby stipulates and agrees, if requested to do so by the Authority, to perform and complete the Project to be performed under the Contract, pursuant to the terms, conditions, and covenants thereof, if for any cause, the Contractor fails or neglects to so fully perform and complete such Project. The Surety further agrees to commence such work of completion within twenty (20) days after written notice thereof from the Authority and to complete such Project within such time as the Authority may fix.

4

*See* Ex. S1[3] (Performance Bond) at p. 2.

13.     By letter dated June 15, 2009, the Sureties requested information from the MTA in furtherance of their investigation of the MTA's claim including, among other things:

> 4. All payment applications, paid and unpaid, submitted by Lockheed Martin, and all copies thereof including all "marked up" versions as revised by the MTA;

> 5. Cancelled checks and other documentation demonstrating all payments issued by the MTA under the Contract;

> 6. A detailed accounting of the remaining contract balance and retainage on hand.

(*see* Sureties' Appendix, Exhibit 3; Corriveau Declaration, ¶ 12).

**Response:**  Undisputed.

14.     On July 2, 2009, at the end of the 20-day investigative period, the Sureties advised the MTA that they were unable to conclude that Lockheed was in material breach such that the Sureties would be obligated to perform under the Bond (*see* Corriveau Declaration, ¶ 20).

**Response:**  Disputed insofar as the Sureties improperly characterize the twenty (20) day period referenced in the Bond as the "investigative period".  As set forth in the MTA's response to S ¶12, the Sureties were required to commence completion work within this period.  *See* MTA response to S ¶12; *see also* Ex. S1 (Performance Bond) at p. 2.  It is undisputed that the Sureties advised the MTA by letter dated July 2, 2009, that "the Sureties have been unable to conclude that Lockheed is, in fact, in material breach of the subject Contract" and that "the Sureties have been unable to conclude that the conditions triggering any obligation under the Bond have been met."  *See* S16 (7/2/09 Letter from Shahinian to Lipton re IESS) at p. 2.  In its July 2, 2009 letter the Sureties also stated that "no notice has been received from the 'Authority' as defined in the Bond requesting that the Sureties do anything."  *See id.*  However, as set forth in Mr. Lipton's

---

[3] For consistency, the MTA has referred to exhibits contained in the parties' Joint Appendix to the Parties' Rule 56.1 Statements of Undisputed Facts as "Ex. J_".

letter of July 6, 2009 to Mr. Shahinian, counsel for the Sureties, the MTA deemed this

communication as notice that the Sureties would not perform and complete the Project as

required by the Bond.  *See* Ex. S18 (7/6/09 Letter from Lipton to Shahinian).  By way of further

response, at deposition, Mr. Corriveau, the regional claim officer for Travelers who was

responsible for managing the MTA's claim on the Bond, testified that the Sureties concluded that

they did not have an obligation to perform or take over the Project.  Corriveau Tr. at 5:23-6:23;

7:21-25; 98:15-20.

15.    Also on July 2, 2009, the Sureties commenced an action in this Court under
Docket No. 09 CV 6033 (now consolidated with the Lockheed Action) seeking a determination
of the parties' rights and obligations under the Bond. A copy of the Sureties' Complaint is
annexed to the Sureties' Appendix as Exhibit 4 (*see also* Friedman Declaration, ¶ 5; Corriveau
Declaration, ¶ 20).

**Response:**  Undisputed.

16.    By Order dated July 29, 2009, the action commenced by the Sureties was
consolidated with the Lockheed Action (*see* Sureties' Appendix, Exhibit 5; Friedman
Declaration, ¶ 6).

**Response:**  Undisputed.

17.    On July 7, 2009, Lockheed filed an Amended Complaint in the Lockheed Action
(*see* Ex. J3; Friedman Declaration, ¶ 7).

**Response:**  Undisputed.

18.    On July 20, 2009, the MTA filed an Answer and Counterclaims in response to
Lockheed's Amended Complaint ("the MTA Answer and Counterclaims") (*see* Ex. J4; Friedman
Declaration, ¶ 8).

**Response:**  Undisputed.

19.    In the MTA Answer and Counterclaims, the MTA alleged that its termination of
Lockheed arose because, for example, Lockheed "breached fundamental and material provisions
of the parties' contract . . . resulting in substantial delays to the job and monetary damages . . ."
(MTA Answer and Counterclaims, Counterclaims ¶ 1; Friedman Declaration, ¶ 9).

**Response:**  Undisputed, noting, however that the cited paragraph, Counterclaim ¶ 1, further

provides that:

> Lockheed failed, and refused, to deliver all of the security system functions
> Lockheed promised and MTA and MTACC contracted for. Yet Lockheed
> demanded that it be paid for 100% of the Work to be furnished, plus additional
> sums to which it was not entitled, despite its inability and failure to provide MTA
> and MT ACC with the complete Work it contracted to provide.

*See* Ex. J4 (MTA Answer and Counterclaims) at Counterclaims ¶ 1.  In addition, as set forth in

the Default Notice, the MTA terminated Lockheed because Lockheed "failed to provide

MTACC with a viable plan to cure for the outstanding Events of Default detailed in the Default

Notice" and Lockheed did not demonstrate that it was capable of, and/or that it intended to,

provide the system promised under the contract.  *See* Ex. J8 (Termination Notice).


20.     The MTA Answer and Counterclaims identifies 9 specific supposed failures of
Lockheed (*see id.*, ¶ 2; Friedman Declaration, ¶ 10).

**Response:**  Disputed to the extent that the cited portion of the MTA Answer and Counterclaims,

Counterclaims ¶ 2, provides that "failures rising to the level of material breach include" the

failures listed in Counterclaims ¶ 2.  The remainder of the Counterclaims section identifies

Lockheed's breaches more thoroughly and provides many examples of those breaches.  *See* Ex.

J4 (MTA Answer and Counterclaims) at Counterclaims § III "Lockheed's Breaches", ¶¶ 17-68.


21.     The MTA Answer and Counterclaims alleges damages in excess of $88 million
(*see id.* at 33; Friedman Declaration, ¶ 11).

**Response:**  Undisputed, noting, however, that MTA Answer and Counterclaims seek an award

of damages in an amount in excess of $88 million in connection with the MTA's claim for

breach of contract.  *See* Ex. J4 (MTA Answer and Counterclaims) at p. 33, Prayer for Relief ¶ 3.

Other damages are alleged for other causes of action.  *See* Ex. J4.

22.     The MTA currently alleges that the cost of achieving "minimum System functionality" of the IESS system is $51,417,831.54 over and above the remaining contract funds (MTA's Fifth Supplemental Responses and Objections to Lockheed's First Set of Interrogatories, Sureties' Appendix, Exhibit 6 at 2-3; Friedman Declaration, ¶ 12).

**Response:**  Undisputed to the extent that the $51,417,831.54 figure represents the MTA's latest computation of its damages, which computation the MTA has reserved the right to revise as additional information became available to it.  *See* Ex. S6 (MTA's Fifth Supplemental Responses and Objections to Lockheed's First Set of Interrogatories) at Cover Letter, p. 1.  In addition, for clarity of the record, the MTA notes that this figure takes into account three (3) unilateral credits claimed by the MTA (which, together, total $31,650,811.54).  *See id.* at Defendants' Response to Interrogatory Number 6, p. 3.   In addition, the figure treats the retainage ($12,705,019.12) and amount paid to Con Edison on Lockheed's behalf ($316,650.59) as having been paid to Lockheed.  *See id.*

23.     The MTA further asserts that the cost of "bringing the System from the minimally functional state that MTA is currently seeking to achieve to a System that meets the requirements of the Contract" is an additional $117,730,000.00 (*id.* at 4; Friedman Declaration, ¶ 13).

**Response:**  Undisputed.

24.     On or about August 18, 2009, the MTA filed its Answer and Counterclaim against the Sureties (*see* Sureties' Appendix, Exhibit 7; Friedman Declaration, ¶ 14).

**Response:**  Undisputed.

25.     The Counterclaim against the Sureties seeks damages allegedly resulting from the Sureties' supposed default under the Bond (*see id.*).

**Response:**  Undisputed.  For clarity of the record, in its "Prayer for Relief", the MTA respectfully requests that judgment be entered as follows:

a.     declaring that, under the Bond, the Sureties are obligated to complete Lockheed's obligations under the Contract;

8

     b.     declaring that the Sureties are in material breach of their obligations under the Bond;

     c.     awarding damages to Defendants against the Sureties in an amount to be determined at trial; and granting such other relief as this Court deems just and proper.

26.     On or about August 25, 2009, the Sureties filed their Reply to the MTA's Counterclaim (*see* Sureties' Appendix, Exhibit 8; Friedman Declaration, ¶ 15).

**Response:**  Undisputed.

27.     On August 5, 2010, the MTA's construction manager for the Project, Nino Pirraglia, was deposed (*see* Sureties' Appendix, Exhibit 9 ("Pirraglia Deposition"); Friedman Declaration, ¶ 16).

**Response:**  Undisputed.

28.     As construction manager, Mr. Pirraglia's responsibilities included reviewing and approving Lockheed's payment requisitions and arranging for the issuance of payments (*see* Pirraglia Deposition at 27 (lines 17-25), 28 (lines 2-3); Friedman Declaration, ¶ 17).

**Response:**  Undisputed.

29.     Mr. Pirraglia testified that, on or about June 1, 2009, approximately one week after the MTA advised Lockheed that "multiple Events of Default" had occurred, Lockheed submitted to the MTA "Estimate No. 40" for payment in the amount of $5,468,907.83 (*see* Pirraglia Deposition at 77 (lines 4-24), 82 (lines 13-19); Friedman Declaration, ¶ 18). A copy of Estimate No. 40 is annexed to the Sureties' Appendix as Exhibit 10.

**Response:**  Undisputed.

30.     The amount sought by Lockheed in Estimate No. 40 represented the value of the work Lockheed estimated it had completed between April 18, 2009, and May 22, 2009 (*see* Sureties Appendix, Exhibit 10 at 1; Friedman Declaration, ¶ 19).

**Response:**  Undisputed.

31.     After the MTA's formal declaration of default and termination of the IESS Contract, and its assertion of a claim against the Bond, all by letters dated June 12, 2009, the MTA approved Estimate No. 40 and paid Lockheed the sum of $5,468,907.83 on or about July 1, 2009, 30 days after Estimate No. 40 was submitted (Pirraglia Deposition at 83 (lines 11-25), 84 (line 2); Friedman Declaration, ¶¶ 20 and 24).

**Response:**  Disputed.  The MTA **did not approve** Estimate No. 40 **after terminating** Lockheed

and asserting a claim on the Bond.  *Compare* Ex. S10 (Estimate No. 40) at p. 2 (MTACC_HC

00072458) *with* Ex. S2 (6/12/09 MTA Letter to Sureties) and Ex. J8 (Termination Notice).  The

MTA formally approved Estimate No. 40 on June 5, 2009, close to one (1) week prior to the

MTA's termination of Lockheed.  *See* Ex. S10 (Estimate No. 40) at p. 2 (MTACC_HC

00072458).  Further, the amount payable under Estimate No. 40 was approved as early as June 1,

2009.

In addition, the cited material does not support the assertion that "the MTA paid

Lockheed the sum of $5,468,907.83 on or about July 1, 2009."  Mr. Pirraglia testified that the

payment was made **within thirty (30) days** of the date that the payment was approved and the

package was completed.  *See* Pirraglia Tr. at 83:11-25.  He confirmed that the payment was

made after termination, but did not testify that the payment was made "on or about July 1, 2009"

as asserted.  *See id.* at 84:2.  The material cited by the Sureties does not support this statement.

32.    When asked why the MTA paid Lockheed nearly $5.5 million after it had
terminated Lockheed for default, Mr. Pirraglia testified that he "wouldn't have paid Lockheed,
but that decision wasn't up to me" (*see* Pirraglia Deposition at 84 (lines 3-10); Friedman
Declaration, ¶ 21).

**Response:**  Disputed insofar as the quotation is taken out of context and, thereby, misconstrues

Mr. Pirraglia's testimony.  Mr. Pirraglia made the quoted statement during a line of questioning

concerning the Estimate No. 40 payment.  In this line of questioning, Mr. Pirraglia noted that

Estimate No. 40 was for work performed prior to the MTA's issuance of the Default Notice to

Lockheed.  He also testified that paying Lockheed "was a higher-up decision."  Counsel asked:

"Would it be fair to say that you don't know why others decided to go ahead and pay

Lockheed?"  In response, Mr. Pirraglia testified:  "**why the decision was made**, I cannot – **I**

**don't know specifically**."  *See* Pirraglia Tr. at 82:20-84:23.  Thereafter, Counsel asked why Mr.

10

Pirraglia "wouldn't have paid Lockheed".  Mr. Pirraglia explained that he wouldn't have paid

Lockheed because Estimate No. 40 was approved as a progress payment and thus, represents an

"estimate" of the amount.  *See* Pirraglia Tr. at 84:24-85:23.

33.     In an email dated June 19, 2009, a copy of which is annexed to the Sureties'
Appendix as Exhibit 11, Mr. Pirraglia stated that the MTA should "hold the money in escrow
until we get a better understanding of the cost of the remaining work" (*see* Friedman Declaration,
¶ 22).

**Response:**  Undisputed.

34.     In an email dated June 24, 2009, a copy of which is annexed to the Sureties'
Appendix as Exhibit 12, Mr. Pirraglia stated the MTA should "hold the electronic transfer of
funds to Lockheed Martin under Payment 40" (*see* Friedman Declaration, ¶ 23).

**Response:**  Disputed.  The quoted language is taken out of context and misconstrues the email

includes as Ex. S12.  Ex. S12 consists of two (2) emails from Mr. Pirraglia.  In the earlier email,

Mr. Pirraglia is asking Henry Chin to "[p]lease hold the electronic transfer of funds to Lockheed

Martin under Payment 40."  Mr. Pirraglia also states in that email the he "undesrtand[s] that the

electornidc transfer of funds can be held until June 30 without any penalties to the MTA", thus

indicating that he understood that after June 30, the MTA believe it may suffer penalties for

withholding the payment.  In the later email, Mr. Pirraglia communicates to Ron Pezik that the

Estimate No. 40 payment "was set to be released tomorrow", i.e. on June 25, 2009.  The Sureties

have not set forth any evidence indicating that the payment was not released on this date or that it

was released simply because it was "set" to be released before the MTA terminated Lockheed.

*See* Ex. S12 (6/24/209 Emails from Mr. Pirraglia).

35.     Although the Sureties had requested information regarding the status of the
contract funds at the time of termination, the MTA never advised the Sureties that it intended to
pay (and did pay) $5,468,907.83 to Lockheed after it terminated Lockheed for default and
asserted a claim against the Bond (*see* Corriveau Declaration, ¶ 13).

**Response:**  Disputed.  Mr. Pirraglia testified:  "I believe [the Sureties] requested the – all payment information.  I believe we gave them all the – all copies of all the payment documents.  And I'm pretty sure they would know that . . . the payment would . . . made to Lockheed Martin for the $5 million."  He also testified that if Estimate No. 40 "was the last payment made to Lockheed . . . I would inform the bonding company because they wanted to know all the that [sic] were made to Lockheed."  *See* Pirraglia Tr. at 98:12-99:19.  ¶ 13 of Mr. Corriveau's Declaration only indicates that "the MTA never **advised** the Sureties that it intended to pay (and did pay) the sum of $5,468,907.83 to Lockheed after having terminated Lockheed for purported default and asserting a demand against the Bond."  *See* Corriveau Declaration at ¶ 13.  Mr. Corriveau did not state that the Sureties did not receive the Estimate No. 40 from the MTA or Lockheed.  *See* Corriveau Declaration.

36.     The Sureties never consented to this payment (*see* Corriveau Declaration, ¶ 18).

**Response:**  Disputed.  The Sureties waived any right to object to payments or any other transfer of money in the Bond.  *See* Ex. S1 (Performance Bond) at p. 2.

37.     At the time the MTA terminated Lockheed, there was approximately $71.6 million in contract funds remaining, according to the MTA (*see* Sureties' Appendix, Exhibit 13; Friedman Declaration, ¶ 25).

**Response:**  Disputed.  The cited material does not support the assertion set forth in S¶37 that "there was approximately $71.6 million in contract funds remaining, according to the MTA".  Ex. S13 indicates that there was $66.2 million remaining "bid/contingency" funds as of August 19, 2009.  The bid/contingency does not equate to the Contract price at the time the MTA terminated Lockheed.  As indicated in the response to S¶22 *supra* and the MTA's Fifth Supplemental Responses and Objections to Lockheed's First Set of Interrogatories the Total Contract Price must be adjusted by the three (3) unilateral credits claimed by (which, as stated,

together, total $31,650,811.54).  *See* S¶22 *supra*; *see also* Ex. S6 (MTA's Fifth Supplemental

Responses and Objections to Lockheed's First Set of Interrogatories) at p. 1.  In addition, Ex.

S13 does not indicate that the Estimate No. 40 payment (of approximately $5.4M) was not

deemed paid per the MTA's records as of the termination date.  *See* Ex. S13.  As indicated on

Estimate No. 40, the MTA's records designated this amount as "paid" as of June 5, 2009.  *See*

Ex. S10 at p. 3, "To Date" column.  The only authority cited in connection with the statement in

¶ 25 of Mr. Friedman's Declaration and the calculation set forth therein is Ex. S13.  Therefore,

the Sureties have not set forth any evidence to support the assertion in S¶37.

### DEFENDANTS' SUPPLEMENTAL STATEMENT
### OF UNDISPUTED MATERIAL FACT IN OPPOSITION
### TO THE SURETIES' MOTION FOR PARTIAL SUMMARY JUDGMENT

      38.      Under the terms of the Bond, the Sureties were required "if requested to do so by

the [MTA], to fully perform and complete the Project to be performed under the Contract,

pursuant to the terms, conditions and covenants thereof, if for any cause the Contractor fails or

neglects to so fully perform and complete such Project," and "to commence the work of

completion within twenty (20) days after written notice thereof from the [MTA] and to complete

such Project within such time as the [MTA] may fix."  *See* Ex. S1 (Performance Bond) at p. 2.

      39.      MTA requested that the Sureties perform their obligations under the Bond on June

12, 2009.  *See* Ex. S6 (6/12/2009 Letter from Pezik to Sureties).

      40.      Despite MTA's request, pursuant to the terms of the Bond, the Sureties did not

commence the work of completion within twenty (20) days of MTA's written notice to do so.

*See* Second Lipton Decl. at ¶4.

41.      Additionally, the Sureties did not notify the MTA that it should not make any additional payments to Lockheed; nor, did the Sureties direct the MTA to make any payments to the Sureties.  *See* Second Lipton Decl. at ¶ 11.

42.      The Sureties did not advise the MTA that it would impair the Sureties' interest in the collateral by making payments to Lockheed prior to the MTA's June, 2009 payment to Lockheed.  *See* Second Lipton Decl. at ¶ 12

43.      To date, the Sureties have not performed under the Bond. *See* Second Lipton Decl. at ¶ 7.

44.      The Sureties have at all times maintained that they have no obligations to the MTA under the Bond. *See* Second Lipton Decl. at ¶ 8.

45.      The only action taken by the Sureties in response to the MTA's request that the Sureties commence the work of completion was to allegedly investigate the Sureties' obligations under the Bond. *See* Second Lipton Decl. at ¶ 9; *see also* Ex. S3 (Letter from Corriveau to Pezik (undated)).

46.      The Sureties counsel stated that, "Since receipt of the MTA's bond claim, the Sureties have been preparing for litigation involving the subject matter of the claim."  *See* Ex. S15 (Friedman Decl. in Support of Sureties' Privilege Motion) at ¶ 15.

47.      The Sureties have not performed any work on the Project, provided funding to the MTA for completion of the work or advised the MTA that they would reimburse the MTA for costs incurred by the MTA which are excess of the Contract price in performing the remaining work on the Project.  *See* Second Lipton Decl. at ¶ 10.

48.      Lockheed invoiced the MTA, on or about June 1, 2009, for work performed between April 18, 2009 and May 22, 2009.  *See* Ex. S10 (Estimate No. 40) at p. 2.

14

49.     This invoice, Pay Estimate No. 40, sought payment in the amount of $5,468,907.83.  *Id.*

50.     MTA approved Pay Estimate No. 40 no later than June 5, 2009, prior to terminating Lockheed.  *Id.*

51.     MTA's Contract with Lockheed provides that payment is due within thirty (30) days of the MTA's approval of a pay estimate.  *See* Ex. J10.4 (Contract Terms and Conditions) at Arts. 3.04(b), 3.05(a).

52.     MTA issued Payment 40 to Lockheed within thirty (30) days of June 5, 2009.  *See* Pirraglia Tr. at 83:11-25.

53.     Intentionally omitted.

54.     The Answer and Counterclaims filed by the MTA against Lockheed on May 26, 2009 did not set forth a dollar figure for the MTA's damages.  *See* Ex. J2 (MTA Answer and Counterclaims to Lockheed's Complaint) at p. 21, "Prayer for Relief".

55.     The Contract does not require that the MTA withhold an approved payment upon termination of Lockheed for default.  *See* Ex. J10.4 at Art. 7.03(b).

56.     At no time did the Sureties notify the MTA that it should not make any additional payments to Lockheed; nor, did the Sureties direct the MTA to make any payments to the Sureties.  *See* Second Lipton Decl. at ¶ 11.

57.     The Sureties did not advise the MTA prior to its June, 2009 payment to Lockheed that MTA would impair the Sureties' interest in the collateral by making payments to Lockheed.  *See* Second Lipton Decl. at ¶ 12.

58.     Under the terms of the Bond the obligations of the Sureties are not affected by any transfer of money due or to become due: "the obligation of said Suret[ies] and [their] bond

shall be in no way impaired or affected by . . . any payment thereunder before the time required therein, or by any waiver of any provision thereof . . . or other transfer thereof or of the Project to be performed or any monies due or to become due thereunder." *See* Ex. S1 (Performance Bond) at p. 2.

59.     The Sureties and Lockheed reached an agreement to cooperate following Lockheed's termination. *See* Ex. S15 (Friedman Decl. in Support of Sureties' Privilege Motion) at ¶ 14.

60.     Lockheed and the Sureties put in place indemnity agreements prior to the execution of the Bonds (the "Indemnity Agreements"), protecting the Sureties from any actual liability in the event of Lockheed's default. *See* Ex. S17 (Indemnity Agreements).

61.     While the Sureties initially filed claims to enforce their rights under Indemnity Agreements which Lockheed executed in consideration of the Sureties' execution of the Bond, the Sureties dismissed those claims once Lockheed confirmed their obligations to the Sureties to the Sureties' satisfaction. *See* S15 (Friedman Decl. in Support of Sureties' Privilege Motion) at ¶¶ 12-13; *see also* Ex. S17 (Indemnity Agreements).

62.     In his declaration supporting the Sureties' privilege motion, Adam Friedman stated, "On July 1, 2009, just prior to the Sureties' filing of their Complaint, my office received a letter from counsel for Lockheed.  This letter withdrew the position stated in Lockheed's counsel's letter of June 15, 2009, contesting the Sureties' indemnity rights in the event the Sureties completed the Contract in response to the MTA's claim." *See* Ex. S15 at ¶12.

63.     In his declaration supporting the Sureties' privilege motion, Adam Friedman stated, "After the three co-sureties considered counsel's letter, they reached the conclusion that it substantially satisfied their concerns regarding Lockheed's intent to satisfy a future indemnity

16

obligation, and the Sureties agreed in principle to withdraw the claims asserted in their

Complaint against Lockheed, without prejudice." *Id.* at ¶13.

       64.     In his declaration supporting the Sureties' privilege motion, Adam Friedman

stated, "The Sureties and Lockheed also embarked upon the preparation of a formal Joint

Defense Agreement, to memorialize, inter alia, that they were acting in furtherance of a common

interest with respect to the MTA's bond claim." *Id.* at ¶14.


Dated:    September 10, 2013
           New York, New York

                                        HOGUET NEWMAN REGAL &
                                        KENNEY, LLP

                           By: _____
                                    Ira J. Lipton (IL-4835)
                                    Marc Melzer (MM-0677)
                                    Helene Hechtkopf (HH-7402)
                                    Susan Shaw (SS-9243)

                                    10 East 40th Street
                                    New York, NY 10016
                                    Phone: 212-689-8808