UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------

LOCKHEED MARTIN TRANSPORTATION
SECURITY SOLUTIONS, AN OPERATING UNIT
OF LOCKHEED MARTIN CORPORATION,

                     Plaintiff,

              -against-

MTA CAPITAL CONSTRUCTION COMPANY
and METROPOLITAN TRANSPORTATION
AUTHORITY,

                     Defendants.

-------------------------------------------------------------------

TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA, FEDERAL
INSURANCE COMPANY, and SAFECO
INSURANCE COMPANY OF AMERICA,

                     Plaintiffs,

              -against-

METROPOLITAN TRANSPORTATION
AUTHORITY, MTA CAPITAL CONSTRUCTION
COMPANY, and NEW YORK CITY TRANSIT
AUTHORITY,

                     Defendants.

-------------------------------------------------------------------

09 CIV 4077 (PGG) (GWG)

ECF CASE

**MEMORANDUM OF LAW IN
SUPPORT OF LOCKHEED
MARTIN'S MOTION FOR PARTIAL
SUMMARY JUDGMENT**

NO. 09 CIV 6033 (PGG) (GWG)

# TABLE OF CONTENTS

Page

I.    Preliminary Statement ............................................................................. 1

II.   The Facts Not In Dispute Support Granting Partial Summary Judgment In Favor
Of Lockheed Martin ............................................................................... 4

     A.    The MTA and its Agencies ................................................................ 4

         1.    The IESS System Was Intended to Replace Existing MTA
Agencies' Separate and Independent Systems with a Common
Security System. ................................................................ 5

         2.    In the RFP, MTA Specified a COTS System That Could Meet Its
"Limited" Resources. ........................................................ 5

         3.    MTA Knew That the IESS Project Would Create a "New Working
Environment" With a "Significant Impact on MTA and Its
Agencies". ........................................................................ 6

         4.    MTA Intended That the IESS System Would Obtain Additional
Capabilities As The COTS Software Improved Over Time. ...... 7

     B.    Lockheed Martin's Proposal .............................................................. 7

         1.    Lockheed Martin Proposed 100 Percent COTS Products With No
Software Development. ........................................................ 7

         2.    Lockheed Martin's Proposal Involved More Than Just COTS
Software. ........................................................................... 8

         3.    Lockheed Martin's Proposal Provided The Operator With Multiple
Open Applications, Rather Than A Single Application Into Which
All Information Flowed. ..................................................... 9

         4.    Lockheed Martin's Proposal Provided That Operators of the
System Would Select Responses to Security Events With the Aid
of Text Based Task Lists and Policies. .................................. 10

         5.    MTA Accepted Lockheed Martin's Proposal Without Exception. ........... 10

         6.    MTA Knew that Using COTS Products Meant that Functionality
Would Be Met by Business Rules, Training and Documentation ........... 11

         7.    The MTA Engineer Never Directed Lockheed Martin to Develop
Custom Software, a Direction Necessary Under the Terms of the
Contract. .......................................................................... 11

C.      The Problems MTA Experienced on the Project Resulted From MTA's
        and Its Agencies' Failures. ................................................................... 12

        1.      MTA's Independent Engineering Consultant Repeatedly Warned
                That MTACC Was Unable to Manage the Agencies, Was
                Significantly Understaffed and Lacked Sufficient Money For the
                Work. ......................................................................................... 12

        2.      The Independent Peer Review Team Hired by MTA Concluded
                That MTACC Failed to Get Agency Acceptance for an
                Overarching IESS System. .......................................................... 13

        3.      MTACC Failed to "Control" the Agencies Who Refused to
                Recognize MTACC's Authority as the Decision Maker for the
                Project. ....................................................................................... 14

        4.      MTACC Acknowledged The Benefits Lockheed Martin Provided. ........ 15

        5.      Testing on the Project Was a Free For All Lacking Any Unified
                Voice. .......................................................................................... 16

        6.      MTA Created New Testing Metrics to Which Neither MTA Nor
                Lockheed Martin Agreed. ........................................................... 17

D.      MTA Admitted That Lockheed Martin Closed All "Showstoppers". .................. 18

E.      MTACC Ran Out of Money and Patience with the Agencies ............................. 19

F.      MTA Delayed the IESS Project. .................................................................. 21

G.      The Default Letter and Cure Response. ........................................................ 22

H.      After Lockheed Martin's Termination, MTACC Acknowledged IESS
        System's Benefits, and Hired Lockheed Martin's Contractors but the
        Agency Problems Continued. ...................................................................... 24

I.      Procedural Posture ..................................................................................... 25

J.      MTA's Counterclaims .................................................................................. 26

III.    Argument ..........................................................................................................26

A.      The Applicable Legal Standard ...................................................................... 26

B.      MTA's First Counterclaim Is Based on Several Purported Breaches For
        Which There Is No Genuine Issue of Material Fact. ......................................... 27

        1.      Lockheed Martin Was Not Required to Develop Custom Software;
                Development of Custom Software Was Prohibited by the Terms of
                the Contract Without Express Approval and Direction from the
                MTA Engineer. ............................................................................ 28

ii

a.     MTA Approved the Test and Evaluation Master Plan ("TEMP") and it Governed Testing on the IESS project..............33

b.     MTA Agreed That Lockheed Martin Could Move Equipment to the Field Before Completion of FAT. ....................35

c.     MTA Waived Any Right to Terminate Lockheed Martin Based on Past Events. ..................................................36

     i.     MTA Asserted that Past Events were Defaults Sufficient to Terminate the Contract.................................37

     ii.     Lockheed Informed MTA Prior to Termination That Past Events Cannot Be Used to Terminate the Contract..........................................................................37

     iii.     Under New York Law, Past Events Cannot Be Used to Terminate a Contract .....................................40

d.     MTA Should be Barred From Relying on Work not Being Completed by August 31, 2008 as a Legal Justification for Termination...................................................................42

2.     An Additional Key Factual Issue For Which There is No Genuine Dispute of Material Fact is That The Testing "Showstoppers" Were Closed and Cannot Justify Termination. ......................... 46

e.     The Testing Showstoppers Were Declared "Closed" by MTA.......................................................................47

f.     Software Testing Issues That Were Considered "Closed" by the MTA Cannot Form the Proper Basis for Termination........48

IV.     Conclusion .....................................................................49

# TABLE OF AUTHORITIES

**Federal Cases**

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) .................................................................. 26-27

*Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556 (2d Cir. 1969)........................................... 40, 42-44

*Borghese Trademarks, Inc. v. Borghese*, 2013 U.S. Dist. Lexis 39827 (S.D.N.Y. Jan. 14, 2013) .............................................................................................................................27

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................. Passim

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola, Co.*, 650 F. Supp 2d 314 (S.D.N.Y. 2009)...........................................................................................................29

*Mastrangelo v. Howmedica*, 903 F. Supp. 439 (E.D.N.Y. 1995)..................................................27

*Matsushita Elec. Indust. Co. Ltd. v. Zenith Radio Corp.* 475 U.S. 574 (1986) ...........................27

*Nipponkoa Ins. Co., Ltd. v. C.H. Robinson Worldwide, Inc.*, 211 U.S. Dist. Lexis 17752 ..... 26-27

*Puma Indus. Consulting v. Dall Assocs.*, 1986 U.S. Dist. Lexis 20646 (S.D.N.Y. Sept. 9, 1986) ..............................................................................................................................34

*Rai v. WB Imico Lexington Fee, LLC*, 851 F. Supp. 2d 615 (S.D.N.Y. 2012) .............................27

*SEC v. Jadidian*, 2011 U.S. Dist. LEXIS 36485 (S.D.N.Y. Mar. 31, 2011) ...............................26

*U.S. Nat'l Ass'n v. Ables & Hall Builders*, 696 F.Supp. 2d 428 (S.D.N.Y. 2010) .......................27

*Ying Jing Gan v. City of N.Y.*, 996 F.2d 522 (2d Cir. 1993).......................................................27

**State Cases**

*B. Reitman Blacktop, Inc. v. Missirlian*, 52 A.D.3d 752 (2d Dep't 2008)....................................35

*DFI Communications, Inc. v. Greenberg*, 41 N.Y.2d 602 (N.Y. 1977) .......................................34

*Emigrant Indus. Sav. Bank v. Willow Builders, Inc.*, 290 N.Y. 133 (1943) ...........................40, 48

*General Supply & Constr. Co. v. Goelet*, 241 N.Y. 28 (1925)..............................................45-46

*Karel v. Clark*, 129 A.D.2d 773 (2d Dep't 1987)..................................................................34, 36

*Kass v. Kass*, 91 N.Y.2d 554 (1998).........................................................................................29

*Kenny v. Monahan*, 53 A.D. 421 (2d Dep't 1900), *aff'd,* 169 N.Y. 591 (1901).....................44-45

*Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 83 A.D.3d 804 (2d Dep't 2011) .........28

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 60 A.D. 2d 61 (1st Dep't 2009)
    *aff'd* ........................................................................................................................ 32-34

*Schuder v. Edward R. Ladew Co., Inc.*, 178 A.D. 458 (1st Dep't 1917) ......................................45

*Triax Capital Advisors, LLC v. Rutter*, 83 A.D.3d 490 (1st Dep't 2011) ................................ 29-30

*Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 308 A.D. 2d 33 (1st Dep't
    2004), *rev'd* ..........................................................................................................................32

## State Statutes

NY Gen. Oblig. L. 15-301 ................................................................................................. 34-35

## Rules

FED. R. CIV. P. 30(b)(6) ..................................................................................... Passim

FED. R. CIV. P. 56 ............................................................................................... 26-27, 47

FED. R. CIV. P. 56.1 .................................................................................................. 4-6

FED. R. CIV. P. 56(a) .......................................................................................... 1, 26-27

## I.      PRELIMINARY STATEMENT

Plaintiff Lockheed Martin Transportation Security Solutions, an operating unit of Lockheed Martin Corporation ("Lockheed Martin") respectfully submits this memorandum of law in support of its motion pursuant to Federal Rule of Civil Procedure 56(a) ("Fed. R. Civ. P. 56(a)") for an order in Lockheed Martin's favor granting partial summary judgment against Defendants MTA Capital Construction Company ("MTACC") and Metropolitan Transportation Authority ("MTA") (collectively, "MTA").

More than four (4) years after this litigation was commenced, it is now established through voluminous document productions, numerous depositions and several expert reports, that MTA wrongfully terminated Lockheed Martin as the contractor for the delivery of MTA's Integrated Electronic Security System ("IESS") and Security Operations Centers ("C3") (collectively "IESS System").  Lockheed Martin now moves for partial summary judgment on several discrete issues underlying MTA's wrongful termination.

MTA specified and Lockheed Martin proposed to deliver a security system that was common and unified across all five (5) of MTA's agencies.  MTA's agencies, however, posed obstacles at every turn.  As reflected in reports prepared by MTA's Independent Peer Review Team, the agencies did not buy into MTA's concept of a unified integrated system and demanded functionality well beyond the contract's scope.  The record also reflects that during testing of the IESS System, MTACC and the agencies, all had different opinions about the goals of the IESS project and could not agree on whether requirements under test should be declared passed or failed.

Frustrated by the agencies and out of money, MTA opted to make Lockheed Martin the scapegoat for MTA's failures.  Shortly after Lockheed Martin commenced this action, initially seeking a declaration that MTA breached the contract by *inter alia* delaying and preventing

Lockheed Martin's performance, MTA abruptly and wrongfully terminated Lockheed Martin. At the time of termination, Lockheed Martin was in the process of delivering an IESS System with the contractually required functionality, which MTA acknowledged to in writing in January 2009, five months before termination on June 12, 2009.

MTA's alleged bases for termination of Lockheed Martin are factually and legally unsupported and partial summary judgment in favor of Lockheed Martin on several key issues should be granted.  One issue ripe for summary judgment is the absence of any genuine dispute that the contract did not require Lockheed Martin to develop custom software.  MTA avers in its counterclaims that Lockheed Martin did not continuously and diligently prosecute the work because it failed to develop software necessary to satisfy MTA's requirements.  The development of custom software was, however, expressly prohibited by the terms of the contract. Instead, the contract required the use of Commercial Off the Shelf ("COTS") software, which is by definition, developed for the commercial marketplace at a lower cost than developing custom software unique for each customer.

There is also no issue that MTA was adamantly against the development of custom software for the IESS System.  The contract unambiguously prohibited Lockheed Martin from either modifying the COTS software or writing custom software unless there was a written modification to the contract in the form of a directive and written approval from the MTA. There is no dispute that MTA never delivered such a direction to Lockheed Martin prior to termination.  There is also no dispute that if Lockheed Martin had proposed to develop custom software, MTA would not have awarded the contract to Lockheed Martin.  Nor did MTA utilize custom software after it terminated Lockheed Martin.  Therefore, MTA's assertion that custom

software had to be developed to meet its requirements ignores the express terms of the contract, the project records, and the deposition testimony by MTA's own employees and consultants.

Another issue ripe for partial summary judgment is the lack of any genuine dispute that several of MTA's alleged bases for termination of the contract concerned events that occurred months, if not years, prior to termination.  MTA allowed Lockheed Martin to proceed with the work after these purported breaches without declaring Lockheed Martin in default at that time, The law in New York is well settled that the doctrine of election of remedies prevents a party from subsequently claiming that a breach supports termination of a contract after that party has elected to permit continued performance.  Therefore, MTA waived its right to terminate the contract and elected the remedy of damages, if any can be proven by MTA.

Lockheed Martin respectfully submits that the following additional issues are similarly ripe for partial summary judgment:

i)      The Test Evaluation Master Plan ("TEMP"), which is material to the issues in this case, was approved by MTA and governed all testing of the IESS System; and

ii)      Lockheed Martin did not materially breach the contract by moving equipment into the field because MTA granted Lockheed Martin permission to do so;

iii)      MTA wrongfully terminated Lockheed Martin for purported delay because after the original substantial completion date of August 29, 2008, MTA permitted Lockheed Martin to continue work, but failed to reinstate time is of the essence as an essential term of the agreement and establish a reasonable completion date;iv)      MTA agreed that certain requirements, called "showstoppers" because MTA viewed them as crucial to the functionality and future agency use of the IESS System, were resolved or closed prior to termination.  MTA cannot now rely on the showstoppers as a basis for termination.

Summary judgment in favor of Lockheed Martin on these discrete issues will streamline the trial to a significant degree thereby reducing witness testimony and introduction of documentary evidence.

## II.     THE FACTS NOT IN DISPUTE SUPPORT GRANTING PARTIAL SUMMARY JUDGMENT IN FAVOR OF LOCKHEED MARTIN

The following summary of the facts on which this motion is based is drawn from the pleadings, sworn testimony, and contemporaneous project documents.  A more complete statement of the facts on which Lockheed Martin relies is set forth in the accompanying Rule 56.1 Statement.

### A.     The MTA and its Agencies

The MTA was formed in 1965 as a federation of various transportation entities.  (56.1 Stmt. ¶ 2)[1].  MTA and its agencies (MTA Police Department, New York City Transit, MTA Metro-North Railroad, MTA Bridges and Tunnels, and MTA Long Island Rail Road) (respectively "MTAPD", "NYCT", "MNR", "B&T", and "LIRR") have a vast network of infrastructure and operations over the entire Metropolitan New York region that provide and support public transportation services (buses, subway, suburban commuter rail and tunnels and bridges for vehicular traffic). (*Id.* ¶ 3).  In July 2003, MTACC was formed with a mission to manage the mega-projects-system expansion and infrastructure projects for MTA and its agencies by coordinating the agencies' projects and overcoming the ineffectiveness of MTA's loose structure.  (*Id.* ¶¶ 4-6).

The formation of MTACC did little to remedy the problems at MTA.  In 2005, MTA readily acknowledged the continuing disjointed and inefficient nature of operations and equipment among the agencies. (*See id.* ¶ 69 ("Over the years, MTA transportation agencies

---

[1]     All references to (56.1 Stmt. ¶ ____) refer to paragraphs in Plaintiff Lockheed Martin Statement of Undisputed Material Facts in support of its motion pursuant to Local Rule 56.1.

have installed independent operational and communications systems using different technologies, manufacturers, and service providers"); *id*. ("There are many differences between the Agencies' operational policies, procedures, hardware, software, and communications capabilities.")).

### 1.   The IESS System Was Intended to Replace Existing MTA Agencies' Separate and Independent Systems with a Common Security System.

After the attacks on September 11, 2001, MTA, like other public bodies, focused on security. (56.1 Stmt. ¶¶ 7-8).  MTA sought to remedy the different security strategies and systems each of its agencies had been using by asking for proposals that would provide a "common" security system for use by all of the agencies. (*Id.* ¶¶ 10, 70).  In 2005, the result was the RFP for the IESS project.  (*Id.* ¶ 9).  When the RFP was issued for bid, MTACC President Mysore Nagaraja made clear that teamwork would be the key to the success of the IESS project and he expected the full cooperation of all MTA agencies (*Id.* ¶ 71), as well as consensus of the agencies on design elements. (*Id.* ¶ 72).

### 2.   In the RFP, MTA Specified a COTS System That Could Meet Its "Limited" Resources.

In its RFP, MTA specified a solution consisting of COTS products including software, as opposed to any custom software specifically developed for the MTA.  COTS software is commercially available in the marketplace and updated regularly by experienced COTS vendors who stay current with emerging technology. (56.1 Stmt. ¶¶ 111, 120).  The approach, as outlined by MTA, was intended to "ensure that the limited resources of the MTA and its agencies are most effectively utilized," (*id.* ¶ 92), and that the system will "incorporate[] new technologies as they mature and as funding becomes available."  (*Id.*).[2]

---

[2]     In addition to MTA's budgetary constraints, customers like MTA enjoy benefits from COTS products including more reasonable pricing, greater reliability due to the larger number of

MTA expressly "require[d] that the contractor use COTS" products and software (*id.* ¶ 73), and defined the successful bidder as a project "systems integrator", rather than a software developer. (*id.*; *see also id.* ¶¶ 74-75).[3]

Ashok Patel, MTA's Project Manager, who was responsible for putting the RFP together for MTA, testified at his deposition that a COTS solution was:

> a basic requirement that we [MTA] had specified in our scope of work . . . . MTA in general does not allow and does not prefer customized applications to be developed for us, because support and maintenance always become an issue . . . . And we always encourage, whether it be security program or any, use of COTS as a standard practice . . . ."

(*Id.* ¶ 77). Patel further testified that if Lockheed Martin had not proposed COTS, MTA would not have negotiated with Lockheed Martin. (*Id.* ¶¶ 78-79). Other MTA employees involved in the project also testified as FRCP 30(b)(6) witnesses testified at depositions that MTA did not want any custom software for the IESS System. (*Id.* ¶ 81). In addition, MTA employees and other witnesses who worked on the Project testified at their depositions that custom software development was not necessary for the IESS project. (*Id.* ¶ 82-90).

### 3. MTA Knew That the IESS Project Would Create a "New Working Environment" With a "Significant Impact on MTA and Its Agencies".

Recognizing that changes at MTA were necessary for the IESS System, the MTA's RFP stated (i) that the IESS System will have a "significant impact on the MTA and its Agencies" (56.1 Stmt. ¶ 99) and (ii) "[t]he C3 Centers will create a new security working environment for the MTA and its Agencies." (*Id.*). MTACC further recognized that the "establishment of

---

end product users and development following industry standards, improved quality due to longer term use of COTS products, regular updating by experienced COTS vendors that stay competitive leading to improvements when new versions of COTS software are released and lower maintenance costs. (*Id.* ¶¶ 113-20).

[3]      A systems integrator performs in systems integration work which involves "…combining separately developed modules of components so that they work together as a complete computer system." (*Id.* ¶ 76).

additional procedures and integration with existing procedures across the MTA and its Agencies" would be needed.  (*Id.* ¶ 100).  MTA also declared in the RFP that such change would be difficult for MTA because "[a]gency-specific, operating environments make it difficult to develop standard methods of addressing incidents and provide a Common Operational Picture (COP)."  (*Id.* ¶ 101).

> ### 4. MTA Intended That the IESS System Would Obtain Additional Capabilities As The COTS Software Improved Over Time.

MTA's RFP clearly provided that only core functionality from COTS products would be introduced initially and as the COTS products matured and funding became available to MTA, additional functionality would be added. (56.1 Stmt. ¶ 92) ("As these on-going programs mature, their capabilities can be brought on-line . . . additional capability can be added to the IESS/C3 SoS as additional funding becomes available . . . .  This approach will ensure that the limited resources of the MTA and its agencies are most effectively utilized.").

> ## B. Lockheed Martin's Proposal

> ### 1. Lockheed Martin Proposed 100 Percent COTS Products With No Software Development.

In the RFP, MTA recognized that the IESS System "lends itself to a variety of implementation approaches." (56.1 Stmt. ¶ 89).  On July 22, 2005, Lockheed Martin delivered its Technical Proposal ("Proposal") that described Lockheed Martin's approach to the IESS System. (*Id.* ¶ 11). The Proposal clearly informed MTA that Lockheed Martin's solution was 100 percent COTS, without software development.  (*Id.* ¶¶ 103-04).

Lockheed Martin's Proposal included two (2) primary COTS software products: (i) Lenel OnGuard ("Lenel") (interface and control of event-wide products supporting access control,

intrusion detection, and CCTV functions within IESS);[4] and (ii) Intergraph Public Safety Computer Aided Dispatch I/CAD product suite ("I/CAD")") supporting many of the requisite C2 functions and providing interfaces to other products. (*Id.* ¶ 105). As of July 22, 2005, Lenel and Intergraph had developed their COTS products for over ten (10) years for integrated security systems. (*Id.* ¶ 109). Intergraph has installed more than 600 public safety systems worldwide, including systems for The Port Authority of New York and New Jersey. (*Id.* ¶ 108). Lenel has more than 8,000 customers representing more than 10,000 systems. ( *Id.* ¶ 107). At the time of the Proposal, their products were already operational across Lenel's and Intergraph's worldwide customer base. (*Id.* at ¶ 109). Even though Lenel and Intergraph are used by thousands of commercial customers, they are "very configurable," meaning that they can be uniquely integrated for each customer without the need for any custom software development. (*Id.* ¶¶ 90, 130).

Notably, MTA's own litigation expert, Howard Reith from Dnutch Associates ("Dnutch"), admitted that Lockheed Martin selected appropriate COTS software products for the IESS System. (*Id.* ¶ 131). Lockheed Martin, therefore, proposed to provide MTA with the benefit of proven commercially available security products in use by thousands of other customers, including benefits in the future from product enhancements across the security system marketplace. (*Id.* ¶ 110).

### 2. Lockheed Martin's Proposal Involved More Than Just COTS Software.

Lockheed Martin's Proposal also provided that it could meet MTA's budgetary constraints with a multi-faceted "incremental" approach (56.1 Stmt. ¶¶ 124, 127), using

---

[4] Lockheed Martin is one of the top ten integrators of Lenel equipment, including its successful installation and operation at New York and New Jersey Port Authority sites. (*Id.* ¶ 106).

configured COTS software, together with COTS hardware, operator training, business rules, and policies and procedures. (*Id*. ¶ 124). These integrated components constituted the IESS System that Lockheed Martin proposed to deliver to the MTA. (*Id.* ¶ 125-26).

While the COTS vendors continued to update their COTS products by issuing new versions to the commercial market, Lockheed Martin reasonably expected and MTA expressly acknowledged, that MTA would "[a]llow and direct managers to change procedures that are based on historical precedent and legacy systems to better fit the functionality of the IESS system" and "[a]llow for business rules that are informed by the constraints of the system and that have mitigating steps for such constraints." (*Id.* ¶ 93; *see also id.* ¶ 125 ("[S]ystem effectiveness rests on people, policy, and hardware and software").

### 3. Lockheed Martin's Proposal Provided The Operator With Multiple Open Applications, Rather Than A Single Application Into Which All Information Flowed.

In this litigation, MTA has characterized the IESS System as deficient because it employs multiple software applications without information from all of the applications being displayed in a single software application viewable by the operator. (56.1 Stmt. ¶¶ 138-39). In doing so, MTA ignores that Lockheed Martin proposed a system that displayed all information through multiple software applications. Specifically, Lockheed Martin's Proposal includes the following statement:

> The C2 operator workstations are multidisplay units providing the ability to have many applications active while being able to monitor status change on any of the applications . . . .

(*Id.* ¶ 136).

During the testing of the IESS System, MTA, however, later failed tests because all the information was "not integrated into a single application." (*Id.* ¶ 137).

### 4. Lockheed Martin's Proposal Provided That Operators of the System Would Select Responses to Security Events With the Aid of Text Based Task Lists and Policies.

The IESS System proposed by Lockheed Martin and accepted by MTA also notified the operator of an incident or event and provided the operator with an action plan in the form of "business rules." (56.1 Stmt. ¶ 148). "Business rules" are steps that instruct system operators how to respond to alarms, incidents, events and system-generated messages. (*Id.* ¶ 146).

Lockheed Martin's Proposal includes multiple statements clearly stating that any response plan and decision aids would be in the form of "text based" policies and "business rules" developed by MTA. (*See id.* ¶ 149 ("[t]he Business Rules contribution to the program objectives include:  Development of policies and procedures that direct how people respond and interact to incidents . . . .   Information and task lists to be encoded in command and control systems and available to users")).

Nevertheless, during the project MTA also failed tests, because the system was not fully automated and required human interaction. (*See id.* ¶ 151 ("Instead of the system being a fully automated system that handled the agency business rules, it was a . . . hopscotch of manual activities and automated activities . . . which means that [it] was not really an automated system because of the interruption of a lot of manual operations that was involved. And this was totally unacceptable . . . ."); *id.* (Lockheed proposed a solution to have a human being implement the business rules).

### 5. MTA Accepted Lockheed Martin's Proposal Without Exception.

Following a number of meetings and correspondence between MTACC and Lockheed Martin about Lockheed Martin's Proposal (56.1 Stmt. ¶¶ 12-13), MTA accepted the Proposal without exception and awarded the contract to Lockheed Martin on August 31, 2005 ("Contract"). (*Id.* ¶ 14-16).  In moving forward, the MTA recognized that the IESS System

10

presents "some disadvantages over the [agencies'] current system; however, these disadvantages are more than offset by the new capabilities it provides." (*Id.* ¶ 102).  MTA never raised any concerns about Lockheed Martin's proposed solution.  (*Id.* ¶ 132).

### 6.   MTA Knew that Using COTS Products Meant that Functionality Would Be Met by Business Rules, Training and Documentation

The evidence further shows that MTA understood that COTS products alone would not provide all the functionality specified.  While the COTS products continued to mature, some of the specified functionality would be met by changes to business rules, policies, procedures, training and documentation. (*See* 56.1 Stmt. ¶ 94-95 (some of the limitations of COTS could be addressed by business rules; business rules should be informed by the constraints of the system so they might have to either modify the business rules or settle for less); *Id.* ¶ 96 ("it is reasonable to expect business people and IT to do workarounds");  *Id.* ¶ 97 (agreeing that not all requirements may be met by COTS)).

### 7.   The MTA Engineer Never Directed Lockheed Martin to Develop Custom Software, a Direction Necessary Under the Terms of the Contract.

In this litigation, MTA argues that custom software should have been, and had to be, developed to meet MTA's requirements. (56.1 Stmt. ¶¶ 62, 120).  In doing so, MTA relies on a section of the RFP titled "Division 25" which sets out the procedures to be followed if there was any development of custom software.  However, other portions of the Contract require that before the development of any custom software the MTA Engineer, Kenneth Shields, had to approve it in writing.[5] (*Id.* ¶¶ 121-22).  The Contract also prohibited modification of any COTS software by Lockheed Martin unless directed in writing by the MTA Engineer. (*Id.*).  During the

---

[5]     The MTA Engineer is appointed by MTA and is responsible for administering the Contract.  (*Id.* ¶ 322).  The MTA Engineer's responsibilities include initially determining questions about performance of the Contract. (*Id.*¶ 323).

IESS project, the MTA Engineer never directed Lockheed Martin to either develop custom software or to modify any COTS software.  (*Id.* ¶ 123).

### C. The Problems MTA Experienced on the Project Resulted From MTA's and Its Agencies' Failures.

#### 1. MTA's Independent Engineering Consultant Repeatedly Warned That MTACC Was Unable to Manage the Agencies, Was Significantly Understaffed and Lacked Sufficient Money For the Work.

MTA's many consultants repeatedly warned that MTA's flawed management negatively affected the IESS project.  For example, MTA's Independent Engineering Consultant ("IEC") warned MTA of MTACC's inability to manage the MTA agencies on the IESS project.  The IEC was hired by MTA to oversee the MTA's Capital Security Program, with an initial focus on the IESS project. (56.1 Stmt. ¶ 166).

Specifically, the IEC stated that "MTACC [was] unable to effectively manage five agencies and [the] entire Security Program," citing the "[p]arochial attitude of NYCT and MNR causing schedule (design delays) and cost (due to time extensions and claims)." (*Id.* ¶ 170).  The IEC's view was that "[c]oordination/cooperation from selective MTA agencies [was] not apparent" and, in fact, the "agencies [were] managing MTACC." (*Id.* ¶ 171).

Funding was also a significant problem identified by the IEC because "MTACC was aggressively progressing work which did not have established budgets and had, by the end of 2005, obligated MTA to an unexpected $130.08 million budget increase."  (*Id.* ¶ 169).  In addition, the IEC identified problems with MTA's failure to provide sufficient resources for the IESS Project and the fact that MTACC was "significantly understaffed to manage the IESS/C3 and the entire Security Program." (*Id.* ¶¶ 168, 173).  As discussed below, each of these MTA problems negatively impacted the Project.

      2.      **The Independent Peer Review Team Hired by MTA Concluded That MTACC Failed to Get Agency Acceptance for an Overarching IESS System.**

In late 2006, MTA's Board of Directors requested that an outside consultant review the IESS project. (56.1 Stmt. ¶¶ 174-75).  The Independent Peer Review Team included personnel from four (4) different companies experienced in the areas of enterprise architecture and communications infrastructure, electronic security systems engineering, operations analysis and physical security, and transit safety and security. (*Id.* ¶ 175).

The Independent Peer Review Team prepared several reports outlining its findings.  The Independent Peer Review Team identified common MTA problems, including: (i) a single entity was not responsible for the overarching direction of the IESS System; and (ii) MTA's various agencies did not buy-in to the concept of an overarching IESS to replace their separate and autonomous systems. (*Id.* ¶¶ 182-86).

The Independent Peer Review Team also conducted interviews with representatives from each of the MTA agencies. (*Id.* ¶ 187).  After these interviews, the Independent Peer Review Team summarized "Common Agency Issues" as follows: (i) each agency had a different view of what the IESS system will accomplish (*id.* ¶ 200) as well as a different view of the purpose and functionality of the IESS System (*id.* ¶ 209); (ii) MTA agencies preferred their current access control systems (*id.* ¶ 201); and (iii) the IESS project is being implemented without any real consideration of user agency desires (*id.* ¶ 193), leading to feelings of disenfranchisement by agencies. (*Id.* ¶ 190).

The Independent Peer Review Team was also told that the agencies believed that their needs were not addressed.  These included: (i) agencies had their own ongoing security initiatives and projects, some of which they expected to later interface with the IESS/C3 (*id.* ¶ 199), but were not included in the RFP; (ii) NYCT had specific reservations regarding

13

equipment, but the RFP did not require Lockheed Martin's design to use specific equipment (*id.*

¶ 211); (iii) equipment viewed as necessary by one agency would not be part of the IESS System,

leaving what they considered a blind spot for them (*id.*¶ 205); (iv) MTAPD was requested to

move away from its existing records management system and computer aided dispatch

information systems (*id.* ¶ 207); and (v) at least one (1) agency thought it had no input into

business rules and mobile command development efforts.  (*Id.* ¶ 206).  The Agencies also

contended that they never approved Lockheed Martin's preliminary design.  (*Id.* ¶ 203).  One

agency believed that the IESS System could not be put together.  (*Id.*¶ 210).

　　　　The Independent Peer Review Team further wrote that "[t]he IESS represents a major

modification to the MTA," (*Id.* ¶ 212), and "a new culture for the MTA operating agencies." (*Id.*

¶ 213).  Even after MTACC received the Independent Peer Review Team's findings, MTACC

still questioned the need for agency acceptance and involvement on the IESS project, stating

"[w]e question this finding that the MTA operating agencies must be included in the design

process and acceptance of CDR." (*Id.* ¶ 215).

　　　　In April 2007, MTACC Acting Program Manager, Joseph Christen, commenting on the

initial Peer Review Report, wrote:

> I believe given as much time as we wanted we still would not have
> yielded a completely agreed to unified design.  There is no way for
> all of the Agencies to get the customized installation they desire
> and keep the overall design unified and standardized.

(*Id.* ¶ 216).

### 3.　　MTACC Failed to "Control" the Agencies Who Refused to Recognize MTACC's Authority as the Decision Maker for the Project.

　　　　MTACC project leadership also had no control over the MTA agencies.  Almost

immediately after the IESS project was awarded, the agencies delayed Lockheed Martin's work.

(56.1 Stmt. ¶¶ 227-28).

During his deposition, MTACC's Project Manager Ashok Patel, admitted that "there was no central body that could control all these agencies." (*Id.* ¶ 220). At a MTA Board briefing, the comment was made that "MTA management needs to be strengthened no accountability, leadership or ownership . . . . [A]gencies say it is a MTACC project and no single person has decision making authority when agencies disagree." (*Id.*). Unable to "control" the agencies, (*Id.* ¶ 234), on July 8, 2008 MTA Project Manager Ronald Pezik (Patel's successor), wrote in frustration "[i]t seems no matter how many times you tell people that in order to complete this Contract it can't be business as usual . . . . the more it remains the same." (*Id.* ¶ 235).

### 4.    MTACC Acknowledged The Benefits Lockheed Martin Provided.

On January 29, 2008, MTA executives acknowledged the difficulties Lockheed Martin was experiencing with the agencies, but recognized that Lockheed Martin achieved significant accomplishments in spite of the these problems:

> The contractor has had to work with and attempt to integrate IESS into agency systems that were never designed to be coordinated. In addition, the agencies have sought to define specifications and requirements in ways that are closely aligned with their existing operations.   An early result of this was during the requirements phase of the contract when, despite intense efforts by the contractor, MTACC, and all operating agencies to define a unified set of business rules for the system, we still came away with over 4,500 functional requirements
>
> The contractor has responded positively to our actions by adding designers and engaging senior staff in the project.
>
> Basic software functionality exists today . . . .

(56.1 Stmt. ¶ 236).

One (1) year later on January 26, 2009, MTACC again acknowledged the benefits from Lockheed Martin's work at the IESS project.  In talking points prepared by Vice President and General Counsel Ronnie Hakim for MTA's board members, MTACC wrote as follows:

> In terms of Software Functionality, the system will work (as recently proven out at the <u>Central C3 Center</u> in <u>LIC</u>, and there may be further enhancements over time . . . .

(*Id.* ¶ 237).

### 5. Testing on the Project Was a Free For All Lacking Any Unified Voice.

During IESS System testing, MTA made demands for software functionality not contemplated by the Contract. Numerous agency representatives participated in testing, along with MTA consultants, the Commissioning Agent,[6] and Lockheed Martin. (56.1 Stmt. ¶ 247). Instead of making decisions based on the Contract requirements, MTA representatives and consultants held "votes" to decide if a test passed. (*See id.* ¶ 250 ("the posttest record would reflect that [the commissioning agent] were one vote of many"); *id.* ¶¶ 251, 256)("All agencies had a voice at testing" and it could be difficult for Lockheed Martin)).

Agencies also disagreed on testing results with one agency considering certain requirements "passed" and another agency declaring the very same test "failed." (*Id.* ¶ 253). In other instances, the Commissioning Agent and the agencies disagreed on the results of testing, each demanding something different. (*Id.* ¶ 254). In other situations, MTA agencies would agree to the testing success criteria for a specific requirement and then fail the requirement during testing despite the fact that the test produced the success criteria identified in the test plan. (*Id.* ¶ 255). On more than one occasion, a MTACC or an agency representative arrived for scheduled testing and declared that they were instructed to fail the test regardless of what they observed during testing. (*Id.* ¶ 252).

---

[6] The Commissioning Agent was to "develop detailed commissioning specifications, coordinate the execution of a testing plan, observe and document performance and verify whether systems are functioning in accordance with the documented design intent and in accordance with the accepted final design documents." (*Id.* ¶ 249).

MTA Agencies and some of MTA's consultants also imposed demands for functionality that it was later admitted were not included in the Contract.  MTA's project consultant, Dnutch, admitted at his deposition that requirements were failed during testing because Lockheed Martin did not include a publish/subscribe message bus architecture.  (*Id.* ¶ 248).  Dnutch further admitted that this item was not a requirement of the Contract. (*Id.*).

In January 2009, MTA executives warned that agency expectations were out of line with the functionality called for in the Contract, saying it is "important to have realistic expectations of what this system was intended to be - - primarily an extension of our eyes and ears at various critical facilities." (*Id.*¶ 265; *see also id.* ¶ 262 (MTA President's briefing discusses the need to "manage agency expectations to avoid scope creep and out of scope work"); *id.* ("Stop scope creep by controlling opening day functionality to what was originally planned.")).

Only days before termination, MTACC's Vice-President and General Counsel Veronique Hakim stated the main agency concerns were "not all LM problems."  (*Id.* ¶ 162; *see also id.* ¶ 159 (MTA is not perfect and bears some responsibility for the problems)).  According to the MTA Engineer, Kenneth Shields, even after termination, agencies were still attempting to add work to the IESS/Project.  (*Id.*¶ 266).[7]

### 6.     MTA Created New Testing Metrics to Which Neither MTA Nor Lockheed Martin Agreed.

The Test and Evaluation Master Plan ("TEMP"), which MTACC approved in writing for the IESS project, controlled software testing. (56.1 Stmt. ¶ 271). The TEMP sets forth how testing was to be conducted and also included a formula for calculating a pass rate.  (*Id.* ¶ 273). The TEMP did not include a minimum required pass rate or score for completion of a testing

---

[7]     In July 2009, shortly after Termination, MTA executives said "MTACC must take the lead but not let the individual agencies dictate direction at this stage, as we will continue to have nothing to show for our efforts." (*Id.* ¶ 226).

phase called Factory Acceptance Testing ("FAT").[8] (*Id.* ¶ 275). This fact was readily

acknowledged by MTA Program Manager, Ron Pezik, (*Id.* ¶ 279), the lead Commissioning

Agent, Linda Martinez, MTA's consultant, Dnutch, and MTA agencies, MNR and NYCT. (*Id.*

¶¶ 280-86). During the IESS project, MTA nevertheless insisted that to successfully complete

FAT testing, Lockheed Martin had to pass 100 percent of the tests. ( *Id.*¶¶ 287-88).

### D.   MTA Admitted That Lockheed Martin Closed All "Showstoppers".

In Spring 2008, Lockheed Martin offered to conduct a demonstration of the overall

functionality of the IESS System and to provide a qualitative view of its capabilities by

conducting an Operational Readiness Workshop ("ORW"). (56.1 Stmt. ¶ 289). The ORW

demonstration was attended by more than eighty (80) MTA representatives. (*Id.* ¶ 290).

Following the ORW demonstration, MTA identified four (4) areas of specific concern, which

were referred to as "showstoppers". (*Id.* ¶ 291 (stating July 18, 2008 letter number 1253

identified the four show stoppers)). The requirements related to the showstoppers were

considered important for MTA employees to start using the system. (*Id.* ¶ 291). On July 18,

2008, MTACC advised Lockheed Martin that the explanations and information provided to

MTACC during the ORW demonstration were acceptable. (*Id.* ¶ 293). MTACC directed

Lockheed Martin to proceed with the work. (*Id.* ¶ 294).

In an e-mail June 24, 2008, to several high level MTA officials, MTA Vice President and

General Counsel Veronique Hakim stated:

> Overall, we expect to be satisfied with the functionality [of FAT
> software testing], after working through certain issues with the

---

[8]    The approved TEMP only required that to consider the phase of testing called Site
Integration System ("SIST") complete, a 90% requirements pass rate overall across all tests was
required. (*Id.* ¶ 276). At the time of Lockheed Martin's termination, SIST testing was still
underway. (*Id.* ¶ 277). The approved TEMP also provided that Severity 3 variances would be
prioritized in a punch list and worked off in an agreed upon time frame and that Severity 4
variances did not constitute requirements non-compliance. (*Id.* ¶ 278).

> vendor.  We feel that the process which is currently underway provides a reasonable way to proceed and to assure that the system functionality will be consistent with the Agencies' expectations as recently demonstrated.

(*Id.* ¶ 294) .

As of February 25, 2009, Lockheed Martin completed the work necessary to close the "showstoppers" and reported this to MTA. (*Id.* ¶¶ 295-96).  On April 20, 2009, MTACC agreed that Lockheed Martin had resolved the showstoppers to its satisfaction, writing in an IESS Progress Meeting presentation:  that "[t]he FAT show-stoppers are closed."  (*Id*. ¶ 297).  Likewise, the MTA Engineer testified at his deposition that the showstoppers were "closed."  (*Id.* ¶ 299).  Closing the "showstoppers" meant that all requirements associated with each of the four (4) "showstoppers" would be closed. (*Id.* ¶ 300).  Even more importantly, closing the "showstoppers" meant that the testing phases called FAT and Site Integrated System Test ("SIST") would be completed to MTA's satisfaction. (*Id.* ¶ 301). MTA's Project Manager wrote "it has been agreed that the show stoppers have been satisfied to the point of allowing BU [beneficial use] to proceed . . . .".  (*Id.* ¶ 297).

### E.    MTACC Ran Out of Money and Patience with the Agencies

Another significant obstacle Lockheed Martin experienced was MTA's lack of money necessary for work to proceed  and MTA not completing work necessary for Lockheed Martin to work.  For example, MTACC's Security Program Executive, Richard Miras, who oversaw all MTACC's security project including the IESS project, stated that "2 major issues confronting the IESS project is funding and network availability".[9] (56.1 Stmt. ¶ 154; *see also*, *id.* ("[T]here are constraints that LM does not control.  There are 2 major dependencies that were planned to be

---

[9]    Network upgrades required to support the IESS project were still not completed as of June 12, 2009, when Lockheed Martin was terminated. (*Id.* ¶ 160).

completed . . . [network] and [Communications Rooms].”); *id.* ¶ 162 (Hakim says that its “not all

LM’s problems”)).

On January 10, 2009, Ms. Hakim explained why the network and communication rooms

often abbreviated as “comm rooms” were important for the IESS System.  According to

Ms. Hakim:

> However, there are constraints that LM does not control.  There are
> two major dependencies that were planned to be completed within
> the original period of the Lockheed contract, but have not
> occurred.  Notably, this project depends on the fiber optic network
> to be able to transmit ~~date~~data from the agency network ~~across the
> system by agency and~~ to the Long Island City facility.  That
> network upgrade project is being done by Siemens, and is not
> complete.  So, we have a partial work around which is to lease
> fiber from Verizon, but that only works at certain facilities and
> does not provide connections to the Under River Tunnels.  So,
> there, the cameras will record locally, but information cannot cross
> to the other agencies or the Central C3 center.  In addition, within
> the various locations Communication Rooms need to be upgraded
> to provide needed power and space for LM equipment.  This issue
> has significantly contributed to delays, but is slowly getting
> resolved.

(*Id.* ¶ 155) (deletions and emphasis in original).

In February 2009, MTACC prepared a memorandum outlining the funding needed to

continue the IESS project with an “IMMEDIATE NEED” for 31.6 Million to 52.4 Million

dollars for the under-river tunnel work.” (*Id.* ¶ 153).  In March 2009, MTACC declared the

“project out of money.” ( *Id.* ¶ 163; *see also id.* ¶ 158 (January 16, 2009 from MTA Project

Manager, Pezik stating  “It is official I have no money.”)).

MTA’s money problems were not resolved as of June 12, 2009, when Lockheed Martin

was wrongfully terminated. (*Id.* ¶ 157 (“I trust that you are not so optimistic (unrealistic?) that

you think you can cut scope to balance the budget”); *Id.* (“The project cannot afford any

additional costs for this new initiative without a commitment for funding.”)).

**F.**  **MTA Delayed the IESS Project.**

On August 31, 2005 when the Contract was entered into, the parties agreed that the IESS

System would be substantially complete by August 31, 2008. (56.1 Stmt. ¶¶ 17-18).   The

Contract further provided that "[t]ime is of the essence of this Contract," (*id*. ¶ 304), which

meant that if the IESS project was not complete by August 31, 2008, MTA might be able to

assess Lockheed Martin with liquidated damages at the rate of $10,000 for every day of delay

caused solely by Lockheed Martin limited to a maximum of $2.5 million.  (*Id.* ¶¶ 305-06).

The Contract also included provisions concerning the process for requesting an extension

of time if the IESS project was delayed and MTA's obligation to grant the extension and to pay

additional monies to compensate Lockheed Martin for MTA caused delay.  (*Id.*¶ 307).  In the

case of concurrent delay (*e.g.*, delay mutually caused by MTA and Lockheed Martin or separate

delays caused by MTA and Lockheed Martin that overlap in time with each other (*Id.* ¶ 308)),

Lockheed Martin was entitled to receive more time to complete the work, but would not be

entitled to the increased cost to perform.  (*Id.*).

Ultimately, the IESS project was delayed because, among other problems, MTA (i) added

work to the Contract, (ii) did not timely make decisions about paying for the added work,

(iii) did not provide access for performance of work, and (iv) did not timely deliver the site for

construction of a C3 facility for MNR. (*Id.* ¶¶ 309-11).  In 2007 and 2008, Lockheed Martin

delivered no less than four (4) notices informing MTA that completion would be delayed. (*Id.* ¶

310).

MTA failed to approve a single request for extension of time or agree to payment to

Lockheed Martin of any delay damage or acceleration costs. (*Id.* ¶ 311).  Therefore, at the time

of termination, the Contract substantial completion date remained August 31, 2008. (*Id.*¶ 312).

Lockheed Martin nevertheless continued to perform its work on the IESS project after August

31, 2008. (*Id.*¶ 313).  In fact, MTA paid Lockheed Martin the sum of $5,468,907.83 after

termination on June 12, 2009. (*Id.*).

      In an expert litigation report prepared by Gary Jentzen of PMA Consultants, LLC on

behalf of MTA ("Initial Jentzen Report"), which was later revised ("Revised Jentzen Report"),

Mr. Jentzen analyzed the impact of MTA not delivering a site for construction of MNR's

Regional C3 Building in North White Plains in a timely manner. (*Id.*¶ 314).  Mr. Jentzen wrote

as follows:

> One of the delays that Lockheed Martin alleged in both its October
> 30, 2008 Claim as well as its Amended Complaint was that the
> delay to the MNR Regional C3 Building was caused by the move
> to North White Plains. Lockheed Martin asserted that this change
> caused a three hundred eleven (311) calendar day delay based on
> their Analysis of the LM Schedule Update.  PMA agrees that there
> was a delay in providing a facility for the MNR Regional C3.

(*Id.* ¶ 315).[10]

      MTA's own expert concluded in both reports that "MTA responsibility [for delay]

amounts to three hundred and fifteen (315) calendar days of this delay to July 12, 2009." (*Id.*

¶ 316).  Therefore, MTA concedes that at a minimum it was responsible for delaying completion

of the Contract and that its delay extends the Substantial Completion date to at least July 12,

2009, one month after Lockheed Martin was terminated on June 12, 2009.  (*Id.* ¶ 317).

      **G.**    **The Default Letter and Cure Response.**

      On or about May 26, 2009, one (1) month after Lockheed Martin commenced this action,

MTA delivered to Lockheed Martin a letter titled "Default Notice-Opportunity to Cure"

("Default Notice"). (56.1 Stmt. ¶ 24).   MTA admitted that this was the only Default Notice

delivered to Lockheed Martin prior to May 26, 2009.  (*Id.* ¶ 28).  The Default Notice is a

---

[10]    Jentzen states that Lockheed Martin notified MTA of the MNR C3 facility delay in its
October 30, 2008 claim.  (*Id.* ¶ 315). Lockheed Martin made the request for time and claimed
money due to this delay in its April 23, 2008 time extension request to MTA. (*Id.* ¶ 310).

contractually mandated document MTA was required to deliver to Lockheed Martin in advance of any termination of the Contract for cause.  (*Id.* ¶ 26).  Article 7.02 of the Contract's terms and conditions afforded Lockheed Martin an opportunity to respond to the Default Notice. (*Id.* ¶ 27).

On June 4, 2009, Lockheed Martin responded to the Default Notice with a thirty-six (36) page letter and several attachments ("Cure Response"). (*Id.* ¶ 30).  In its Cure Response, Lockheed Martin submitted a detailed plan and schedule to complete its work as requested by MTA.  (*Id.*).  The Cure Response also explained why the events described in the Default Notice either did not violate the Contract or did not support termination of the Contract.  (*Id.*).  Lockheed Martin also pointed out that a number of the reasons claimed by MTA as a basis for the default of the Contract had occurred in the past.  (*Id.* ¶¶ 31-32).  It further explained that past defaults could not support termination where MTA elected to continue performance of the work by Lockheed Martin.  (*Id.*).

During depositions, MTA witnesses admitted that events described in the Default Notice were past events as of May 26, 2009, that when they occurred no default notice was issued to Lockheed Martin or that they could not remember anything about the purported events.  (*Id.* ¶ 47).  This is also confirmed by the contents of the Default Notice and project documents.  (*Id.* ¶¶ 33-46).

On June 12, 2009, MTA terminated Lockheed Martin by letter ("Termination Letter").  (*Id.* ¶ 51).  The Termination Letter relied on MTA's Default Notice as a basis for termination.  (*Id.*)  Continuing, MTA wrote that:

> Lockheed has failed to provide MTACC with a viable plan to cure for the outstanding Events of Default detailed in the Default Notice.  Lockheed is therefore in material breach of its contractual obligations.

(*Id.*¶ 52-53).

**H.      After Lockheed Martin's Termination, MTACC Acknowledged IESS System's Benefits, and Hired Lockheed Martin's Contractors but the Agency Problems Continued.**

After termination, Lockheed Martin offered to assign all its agreements and purchase orders to MTA. (56.1 Stmt. ¶ 239).  MTA refused to accept the assignment. (*Id.* ¶ 240). After it refused the assignment offer, MTA, however, hired the very same Lockheed Martin contractors and vendors it had previously rejected. (*Id.* ¶ 241).  Representatives of the key COTS vendor, Intergraph, and MTA agencies testified that the work they were doing post-termination did not require custom software to meet MTA's requirements. (*Id.* ¶¶ 81, 86).

After termination, MTA also did not test each and every requirement with all of the agencies present because MTA now determined that "the requirements were not needed to become operational." (*Id.* ¶ 242).  Instead of relying on formal testing with the agencies present as it had done while Lockheed Martin was working on the IESS project, MTA used an acceptance procedure that only required system stability for thirty (30) days. (*Id.* ¶ 243).

MTA also acknowledged that the problems caused by the agencies interfered with Lockheed Martin's work on the IESS project.  Specifically, in meeting minutes from July 9, 2009 Chief William Morange, MTAPD's Director of Security, said "MTACC must take the lead but not let the individual agencies dictate direction at this state, as we will continue to have nothing to show for our efforts."  (*Id.* ¶ 245; *see also id.* ¶ 246 (stating that the agencies need one voice to "control" improvement/changes to IESS; past attempts to "control" IT-type actions at individual agencies did not work; need firm commitment from agencies to follow one path – perhaps utilize a renewable MOU [Memorandum of Understanding] agreed to by Agency Presidents)).

Only a month after Lockheed Martin's termination, MTA also again acknowledged that Lockheed Martin's work had value and was nearing "beneficial use" at termination. (*Id.* ¶ 244).

Minutes reflect that MTA agreed that the current "approach is to complete portions of IESS work that are close to BU." (*Id.*).

I.     **Procedural Posture**

On April 24, 2009, Lockheed Martin commenced this action by filing its initial Complaint seeking a Declaratory Judgment that MTA breached the Contract by, *inter alia*, unreasonably delaying Lockheed Martin's performance; willfully violating the Contract; and not fulfilling its contractual obligations. (56.1 Stmt. ¶ 20).  After filing the Complaint, Lockheed Martin continued to perform its work under the Contract (*Id.* ¶¶ 22, 29), reserving its rights to seek monetary damages until this Court could rule on MTA's breaches and default.  (*Id.* ¶ 21).

On May 27, 2009, the day after MTA filed its Answer and Counterclaim to the initial Complaint, MTACC delivered the Default Notice to Lockheed Martin threatening to terminate the Contract ("Default Notice").  (*Id.* ¶¶ 23-25).  On June 4, 2009, Lockheed Martin responded to the Default Notice with its Cure Response in which Lockheed Martin extensively detailed why it was not in default. Lockheed Martin also delivered a comprehensive plan to complete the Contract as requested by MTACC.  (*Id.* at ¶ 29).  On June 11, 2009, MTA requested that Lockheed Martin submit a proposal to delete work in areas to which Lockheed Martin had previously complained MTA had denied access.  (*Id.* at ¶¶ 48-50).  The next day, June 12, 2009, MTA terminated Lockheed Martin based on the purported defaults set forth in the Default Notice.  (*Id.* at ¶ 51).

On July 7, 2009, Lockheed Martin filed and served its Amended Complaint seeking damages in the amount of $80,353,414.45 for breach of Contract and $137,671,285.86 for MTA's bad faith termination. (*Id.* ¶¶ 54-56).  Subsequently, MTA served and filed an Answer and Counterclaims to Plaintiff's Amended Complaint. ("MTA Counterclaims").  (*Id.* ¶ 57).  On

August 12, 2009, Lockheed Martin filed and served its Answer to Defendant's Counterclaims. (*Id.* ¶ 65).

### J.     MTA's Counterclaims

In its first Counterclaim for breach of contract, MTA avers that Lockheed Martin materially breached the Contract based upon events described in the Default Notice and requests recovery of damages to complete the project and liquidated damages for delay. (56.1 Stmt. ¶ 58). In its second Counterclaim, MTA seeks recovery of monies it paid to Lockheed Martin for additional design work based on the assertion that Lockheed Martin was previously paid for the work.  (*Id.* ¶ 59).  In its third Counterclaim, MTA seeks to recover damages based on allegations that Lockheed Martin failed to deliver materials paid for by MTA.  An injunction is also requested by MTA in connection with the materials. (*Id.* ¶ 60).

## III.     ARGUMENT

### A.     The Applicable Legal Standard

One of the principal purposes of summary judgment is to eliminate factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  FRCP 56(a) provides that "[s]ummary judgment is warranted when the moving party shows that 'there is no genuine dispute as to any material fact' and that it 'is entitled to judgment as a matter of law.'"  *SEC v. Jadidian*, 2011 U.S. Dist. LEXIS 36485, * 11 (S.D.N.Y. Mar. 31, 2011)[11]  Where, as in this case, "'the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.'" *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986); *see also, Nipponkoa Ins. Co., Ltd. v. C.H. Robinson Worldwide, Inc.*, 211 U.S. Dist. Lexis 17752 * 2-3.

---

[11]     Internal citations are omitted throughout this memorandum and, unless otherwise indicated, the emphasis is in the original.

Only disputes over material facts – facts that might affect the outcome of the suit under the governing law - will properly prevent the entry of summary judgment. *Anderson,* 477 U.S. at 248.  A non-movant cannot survive a motion for summary judgment "merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Nipponkoa Ins. Co., Ltd. v. C.H. Robinson Worldwide, Inc.,* 211 U.S. Dist. Lexis 17752 * at 3; *Mastrangelo v. Howmedica*, 903 F. Supp. 439, 441 (E.D.N.Y. 1995); *Rai v. WB Imico Lexington Fee, LLC*, 851 F. Supp. 2d 615 (S.D.N.Y. 2012) citing *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010); *U.S. Nat'l Ass'n v. Ables & Hall Builders*, 696 F.Supp. 2d 428, 438 (S.D.N.Y. 2010).  Where a party has brought a properly supported motion for summary judgment, the non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts," and may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible. *Matsushita Elec. Indust. Co. Ltd. v. Zenith Radio Corp*. 475 U.S. 574, 587 (1986); *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 532 (2d Cir. 1993).

FRCP 56 also allows a court to grant partial summary judgment on part of a claim or defense.  *See* FRCP 56(a). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment.  *See id*.

### B.     MTA's First Counterclaim Is Based on Several Purported Breaches For Which There Is No Genuine Issue of Material Fact.

When measured against the standards to survive a motion for summary judgment, MTA's first Counterclaim for breach of contract is based on certain factual assertions that cannot be substantiated.  Without evidence to support all of the essential elements for a breach of contract claim under New York law, dismissal as a matter of law is required.  *See*, *e.g.*, *Borghese Trademarks, Inc. v. Borghese*, 2013 U.S. Dist. Lexis 39827, *53-54 (S.D.N.Y. Jan. 14, 2013)

("To prevail on a claim for breach of contract, a party must prove: (1) the existence of a contract; (2) performance by the party seeking recovery; (3) nonperformance by the other party; and (4) damages attributable to the breach . . . .  A movant's inability to prove any one element, either because of an absence of a 'genuine issue of material fact' or because of a lack of support, will 'require an award of summary judgment."  (citations omitted)); *see also, Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 83 A.D.3d 804, 806-7 (2d Dep't 2011).[12]

Lockheed Martin submits that each of the issues discussed below are not material breaches of the Contract sufficient to terminate the Contract.  They are better addressed at summary judgment than at trial, thereby streamlining the trial.

**1.  Lockheed Martin Was Not Required to Develop Custom Software; Development of Custom Software Was Prohibited by the Terms of the Contract Without Express Approval and Direction from the MTA Engineer.**

In its Counterclaims, MTA avers that Lockheed Martin did not diligently prosecute the work because it did not develop custom software to satisfy the MTA's requirements. (56.1 Stmt. ¶ 62).  In other words, MTA argues that if the COTS software coupled with business rules, training and documentation could not meet every one of its thousands of requirements, then Lockheed Martin was required to develop custom software to meet each of those requirements. As discussed below, the development of custom software was expressly prohibited by the terms of the Contract unless there was a written modification to the Contract in the form of a directive as well as written approval by the MTA Engineer.  Such direction and approval was never delivered and Lockheed Martin was not required to develop custom software by the terms of the Contract.  As a matter of law, Lockheed Martin cannot have breached a non-existent Contract

---

[12]     New York law applies to the parties' dispute based on the choice of law provision in the Contract.  (*See* 56.1 Stmt. ¶ 19).

"requirement".  *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola, Co.*, 650 F. Supp 2d

314, 320 (S.D.N.Y. 2009) (Obligations not in the agreement cannot be created).

　　The Court must decide whether the Contract is clear or ambiguous as to whether

Lockheed Martin was required to develop custom software under the terms of the Contract.

Whether or not a contract is ambiguous is under New York law "a question of law for the trial

court." *Kass v. Kass*, 91 N.Y.2d 554, 556 (1998).  In *Triax Capital Advisors, LLC v. Rutter*, 83

A.D.3d 490 (1st Dep't 2011), the Appellate Division, First Department was asked to decide

whether a specific term of an agreement was ambiguous.  Holding that there was no ambiguity,

the appellate court succinctly explained as follows:

> Whether a contract is ambiguous is a question of law for the court
> and is to be determined by looking "within the four corners of the
> document". . .   A contract is unambiguous if "on its face [it] is
> reasonably susceptible of only one meaning". . .   Conversely, "[a]
> contract is ambiguous if the provisions in controversy are
> reasonably or fairly susceptible of different interpretations or may
> have two or more different meanings"

> The existence of ambiguity is determined by examining the  "entire
> contract and consider[ing] the relation of the parties and the
> circumstances under which it was executed," with the wording to
> be considered "in the light of the obligation as a whole and the
> intention of the parties as manifested thereby" . . .   The "intent of
> the parties must be found within the four corners of the contract,
> giving the practical interpretation to the language employed and
> the parties' reasonable expectations".

83 A.D. 3d at 492-3.

　　Applying these principles to this Contract, there is no ambiguity that (i) MTA specified

the use of COTS products including software, (ii) Lockheed Martin proposed the use of COTS

products including software and (iii) MTA and Lockheed entered into the Contract agreeing that

only COTS products including software would be used.  Lockheed Martin did not propose to

develop custom software for MTA and MTA did not want custom software developed for it.

This is found within the four (4) corners of the Contract and there is no other reasonable meaning to be given to the Contract. In addition, any other meaning would be inconsistent with the expectation of Lockheed Martin and MTA at the time the Contract was entered into by them in August 2005 that there would be no development of custom software. MTA's own witnesses clearly and unequivocally testified that they did not want custom software for the IESS System and that they would not have accepted any proposal if it included custom software development.

MTA's RFP, which is incorporated by reference into the final signed Contract, (56.1 Stmt. ¶ 16), specified a system comprised of COTS software, not custom software specifically developed for the MTA. (*Id.* ¶ 73) ("require that the contractor use COTS")). MTA Project Manager, Ashok Patel, made clear at his deposition that the use of COTS was a "basic requirement that [MTA] specified in our scope of work" because "MTA in general does not allow and does not prefer customized applications to be developed". (*Id.* ¶¶ 77-78). In addition, Mr. Patel was very explicit that Lockheed Martin would not have been awarded the Contract if it proposed custom software. ( *Id.* ¶ 79). Other Fed. R. Civ. P. 30(b)(6) deposition witnesses stated that custom software was not required for the IESS project. (56.1 Stmt. ¶¶ 81, 83, 85).

Lockheed Martin' Proposal, which also was incorporated by reference in the final signed Contract, (*id.* ¶ 16), was accepted by the MTA without exception. The Proposal is replete with unambiguous statements that Lockheed Martin proposed the use of 100 percent COTS software with no custom software development. (*Id.* ¶¶ 103-04). The Proposal made clear that MTA's requirements would be met by a combination of COTS software and hardware, training, documentation and changes to MTA agencies' policies and procedures, *i.e.,* business rules, (*id.* ¶ 124), stating that COTS software was "only part of the overall effort toward achieving MTA's mission objectives" and that it had to be supported by validated processes and trained staff). (*Id.*

¶ 125).  As such, the COTS software was part of Lockheed Martin's overall solution for the IESS System to achieve MTA's requirements but COTS software alone was not going to meet each and every requirement, as MTA now alleges.

The Contract, including the RFP and Lockheed Martin's Proposal, unambiguously provides that the IESS System sought by the MTA, proposed by Lockheed Martin, and accepted by MTA would not include custom software development or modification of COTS software.[13] If MTA wanted custom development or modification of COTS software, a Contract modification in the form of an express directive and written authorization by the MTA Engineer was required. (*Id.* ¶¶ 121-22).  Lockheed Martin had no right to develop custom software or modify COTS software until it was directed to do so.  The necessity of written direction before custom software is developed or any modifications of COTS software is not only necessary, but also clear and unequivocal.  There is no dispute that the MTA Engineer never directed Lockheed Martin to either develop custom software or modify the COTS software for the IESS System.  (*Id.* ¶ 123).

By asserting that Lockheed Martin was not progressing work because it did not develop custom software, MTA is attempting to impose an obligation after termination that did not exist before termination.  MTA, by asking the Court to sustain a termination based on an "obligation" that did not exist, is really asking the Court to rewrite the Contract. New York law, however, is well settled that the Court should not interpret an agreement to include a term the parties did not include.

> Hence, 'courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a

---

[13]     Customized COTS software should be distinguished from configuration of COTS software, which was performed by Lockheed Martin and did not require approval by the MTA engineer.  Unlike the configuration of COTS, customization of COTS software itself by anyone other than the COTS vendor required express written direction by the MTA Engineer. (*Id.* ¶¶ 121-22).

> new contract for the parties under the guise of interpreting the
> writing …'.

*Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 308 A.D. 2d 33 (1st Dep't 2004),

*rev'd*, N.Y. 2d 470, 475 (2004); *see also, Riverside S. Planning Corp. v. CRP/Extell Riverside,*

*L.P.*, 60 A.D. 2d 61 (1st Dep't 2009) *aff'd* N.Y. 3d 398, 404 (2010).

 If this termination is upheld because Lockheed Martin did not develop software, then the

Court would have to add a requirement to the Contract imposing upon Lockheed Martin, an

obligation to develop software in the absence of a written directive.  MTA was free to include

this language, but chose not to include such language in the Contract.  As a result, MTA cannot

now have the Court add this language to the Contract.

 The unambiguous terms of the Contract expressly provide that custom software was an

exception to the Contract and the lack of written approval and direction of the MTA Engineer

can only lead to the conclusion that Lockheed Martin was not required to develop custom

software.  For these reasons, partial summary judgment that Lockheed Martin was not required

to develop custom software on this Project.

 MTA's assertion that Lockheed Martin did not progress work because custom software

was not developed is a red-herring.  Any problems on the IESS project did not result because

custom software was not developed; instead, those problems were created by MTACC's failure

to obtain the MTA's agencies buy-in to the IESS project, which MTA knew was going to have a

"significant impact on the MTA and its Agencies", (56.1 Stmt. ¶ 99), and "create a new security

working environment."  (*Id.*).  Although the RFP expressly recognized that "[a]s these on-going

[COTS software] programs mature, their capabilities can be brought on-line", (*id.* ¶ 92), the

MTA agencies had expectations that far exceeded the contractual realities of the IESS project.[14]

Even shortly before Lockheed Martin was terminated, in January 2009, MTA executives warned

that agency expectations were out of line with the functionality called for in the RFP, saying it is

"important to have realistic expectations of what this system was intended to be - - primarily an

extension of our eyes and ears at various critical facilities." (*Id.* ¶ 265).  In the face of MTA

obstacles, Lockheed Martin was able to complete significant and substantial work.  MTA has

conceded this as they worked with the same vendors Lockheed Martin hired prior to termination.

(*Id.* ¶ 241).  Unfortunately, MTA conveniently opted to blame Lockheed Martin through

termination  in order to mask MTA's own failings.

        a.        **MTA Approved the Test and Evaluation Master Plan ("TEMP") and it Governed Testing on the IESS project**

A significant issue in this litigation is the status of the software testing.  All testing on the

IESS project was governed by a contract deliverable called the TEMP which was approved by

MTACC for use on this Project. (56.1 Stmt. ¶ 270).  In this litigation, MTA tries to disavow the

TEMP it approved and instead rely on contrived software test pass rate formulae and other test

related matters that were neither in the TEMP, nor approved by the parties during the course of

the IESS project. (*Id.* ¶ 288).  MTA's attempt to do so is not supported by New York law.

Lockheed Martin, therefore, seeks partial summary judgment that the approved TEMP governed

all testing on the IESS project.

---

[14]      MTA agencies demanded full automation.  (*See id.* ¶ 150 ("agencies thought they were getting more automation" than was commercially available)).  Agencies and MTA consultants also demanded that the IESS system be fully "integrated", such that COTS software products "appear as one single application on your desktop, but not two separate applications" (*Id.* ¶¶ 137-39).  MTA's consultant, Dnutch, nevertheless, also acknowledged in writing and during his deposition that a specific technology ("standard bus architecture") that would be required to have the level of integration MTA desired was "not a strict requirement of the contract." (*Id.* ¶ 248).  He further admitted that the lack of this technology is "why we had problems passing some of the requirements."  (*Id.*)

The Contract required Lockheed Martin to develop and submit a TEMP for MTA approval. (*Id.* ¶ 269).  The TEMP went through numerous iterations before it was approved by MTACC on September 6, 2007.  (*Id.* ¶ 271).  The TEMP:

> applies to the development, delivery and acceptance of the IESS/C3 System.  The TEMP defines the plan for validating and verifying that the implemented system meets the requirements, documents the test program strategy to meet the requirements, and describes a set of integrated tests of systems hardware and Commercial Off the Shelf (COTS) software.  In addition, this document defines the test plans that will be submitted, the sequence of tests and the scope of the test to be performed under this contract.

(*Id.* ¶ 274).

Because the TEMP was required by the terms of the Contract and was approved by MTA in writing, the TEMP is a written modification to the Contract.  *Karel v. Clark*, 129 A.D.2d 773, 773 (2d Dep't 1987) ("When a written agreement provides that it cannot be changed orally, a subsequent written amendment or modification . . . may be effective if signed by the party against whom enforcement is sought . . . .").

MTA's written approval of the TEMP on September 6, 2007 made it an enforceable written modification to the Contract and satisfies the requirements of NY Gen. Oblig. Law § 15-301 (requiring enforcement of  contractual 'no oral modification' clauses).  *DFI Communications, Inc. v. Greenberg*, 41 N.Y.2d 602, 606 (N.Y. 1977) (Signed minutes of a board meeting that recorded  board agreement to modify a contract were enforceable as a contract modification).

Moreover, the parties' course of conduct and course of dealing, which readily acknowledged that the TEMP governed testing on the project,[15] modified the contract.  *Puma Indus. Consulting v. Dall Assocs.,* 1986 U.S. Dist. Lexis 20646 (S.D.N.Y. Sept. 9, 1986); *see*

---

[15]     (56.1 Stmt. ¶ 272).

*also*, *e.g.*, *B. Reitman Blacktop, Inc. v. Missirlian*, 52 A.D.3d 752, 753 (2d Dep't 2008) (Notwithstanding the 'statute of frauds' requirement under NY Gen. Oblig. L. 15-301, the parties' course of conduct may have the effect of an enforceable contract modification).  Thus, the MTA is bound by the TEMP, to which it agreed in writing and by its conduct, and it cannot disavow either the clear terms of the TEMP, which governed all testing on the IESS project, or the TEMP's enforceability.

### b.   MTA Agreed That Lockheed Martin Could Move Equipment to the Field Before Completion of FAT.

MTA's breach of contract Counterclaim also asserts that Lockheed Martin did not diligently prosecute the work because the FAT phase had to be completed before Lockheed Martin could install equipment in the field.  MTA claims that Lockheed Martin was required to ensure that all variances detected during FAT were documented and corrected prior to shipment of equipment to the field for installation. (56.1 Stmt. ¶¶ 45, 63-64).  Partial Summary Judgment is appropriate because: (1) MTA granted Lockheed Martin permission to move the equipment into the field, thereby waiving any such requirement; and (2) the express terms of the Contract did not require Lockheed Martin to correct all variances prior to shipment of equipment to the field.

The record indisputably shows MTA granted Lockheed Martin permission to move equipment into the field before FAT was complete, as made clear by the MTA Vice-President, MTA Engineer and MTA Independent Engineering Consultant. (*Id.* ¶¶ 321, 324-25).  MTA's counsel even concedes that MTA granted permission to move equipment into the field, but argues that MTA did so only with the proviso that Lockheed Martin continue FAT and fix all variances. (*Id.* ¶ 327).  MTA counsel's concession is important because it shows that MTA readily admits that there is no dispute that MTA gave Lockheed Martin permission to move

equipment into the field.  Therefore, the only issue is whether Lockheed Martin was required to

continue FAT and fix all FAT variances.  That question should be answered by looking to the

TEMP, which, as discussed above, is a written modification to the Contract.  *Karel*, 129 A.D.2d

at 773.

There is no dispute by MTA witnesses that the TEMP governed testing on the IESS

project. (56.1 Stmt. ¶ 272).  Nor can there be any genuine dispute that MTA approved the TEMP.

(*Id.* ¶ 271).  The TEMP did not require Lockheed Martin to continue FAT until it fixed all

variances.  Specifically, the TEMP did not include any minimum required pass rate for the

completion of FAT testing.  (*Id.* ¶¶ 275, 326).  Most importantly, MTA's Project Manager,

Commissioning Agent, the MTA Vice President, MTA agencies, NYCT and MNR, and MTA's

consultant and litigation expert, Dnutch, readily acknowledged that there was no minimum pass

rate required to complete FAT.  (*Id.* ¶¶ 279-86).  There is therefore no genuine issue of material

fact that MTA granted permission for Lockheed Martin to move equipment into the field and the

express terms of the Contract did not require Lockheed Martin to correct all variances prior to

shipment of equipment to the field for installation.  Partial summary judgment on these

undisputed issues is therefore appropriate.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106

S.Ct. 2548, 2552 (1986) (moving party entitled to summary judgment where "nonmoving party

has failed to make a sufficient showing on an essential element of her case with respect to which

she has the burden of proof").

### c. MTA Waived Any Right to Terminate Lockheed Martin Based on Past Events.

In its first counterclaim for breach of Contract, MTA further complains that Lockheed

Martin breached the Contract by:  (i) not satisfying design responsibilities; (ii) by not properly

scheduling as required by the Contract; (iii) by not properly managing the project; and (iv) by not

following the Contract when testing was conducted.  These purported breaches all occurred well before June 12, 2009, the date Lockheed Martin was terminated, evidencing that MTA elected to allow Lockheed Martin to continue work on the IESS project and continued to pay for that performance.  Under New York law, MTA cannot terminate the Contract based on the occurrence of purported defaults after which it elected to allow Lockheed Martin to continue its performance.

> **i.    MTA Asserted that Past Events were Defaults Sufficient to Terminate the Contract.**

On or about May 26, 2009, MTA sent a Default Notice notifying Lockheed Martin that MTA considered Lockheed Martin in material breach of the Contract. (56.1 Stmt. ¶ 24).  The Default Notice is a contractually mandated document MTA was required to deliver in advance of any termination of the Contract for cause.  (*Id.* ¶ 26).  Article 7.02 of the Contract's terms and conditions afforded Lockheed Martin an opportunity to respond to the Default Notice. (*Id.* ¶ 27).

> **ii.   Lockheed Informed MTA Prior to Termination That Past Events Cannot Be Used to Terminate the Contract.**

On June 4, 2009, Lockheed Martin responded to the Default Notice with a thirty-six (36) page Cure Response accompanied by several attachments ("Cure Response"). (56.1 Stmt. ¶ 30). In its Cure Response, Lockheed Martin delivered a detailed plan and schedule to complete the work requested by MTA.  (*Id.*).  Lockheed Martin also explained why the events described in the Default Notice did not violate the Contract or did not support termination of the Contract.  (*Id.*).

**Design Obligations**

In describing how Lockheed Martin ostensibly failed to satisfy its design obligations, MTA wrote that Lockheed Martin "consistently failed to comply with contractual requirements governing the design portion of the Project" and that these "design flaws have resulted in over 120 field change notices . . . illustrat[ing] significant gaps, errors and omissions in Lockheed's

design . . . ." (56.1 Stmt. ¶ 34).  Other items MTA cited included how (i) Lockheed Martin

performed surveys of existing conditions which MTA complained about in letters from February

16, 2007 and July 24, 2007, and (ii) equipment rack designs for various communication

rooms.  (*Id*. ¶ 35).  It is evident from MTA's Default Notice that the complaints about design

performance refer to past events and that MTA opted for Lockheed Martin to continue work after

these events occurred.

### Scheduling Obligations

Similarly, MTA wrote that Lockheed Martin "persistently failed to satisfy its obligation

to prepare, maintain and modify contractually compliant, detailed progress schedules." (56.1

Stmt. ¶ 36).  According to MTA, these purported deficiencies included (i) the monthly schedule

updates that satisfied the Contract; (ii) the making of "self-serving changes in logic" that MTA

asserted were done to mask delay by Lockheed Martin and support claims for extensions of time,

that were not approved by MTA, and (iii) not delivering certain schedule reports known as Look-

Ahead reports.  (*Id.* ¶ 37).  Again, these purported violations occurred in the past according to

the Default Notice.  (*Id.* ¶ 38).

### Subcontractor Management

Another category of purported default according to MTA included "Lockheed [Martin]

. . . consistently fail[ing] to manage its subcontractors, as required under the Contract." (56.1

Stmt. ¶ 39).  There are no less than eight (8) specific events listed in the Default Notice.  (*Id.*

¶ 40).  The time frame for these events is as early as March 2007, more than two years before the

Default Notice was delivered to Lockheed Martin.  (*Id*. ¶ 41).

**Testing Issues**

The final category of past events concern MTA's assertion that Lockheed Martin breached the Contract's testing requirements.  (56.1 Stmt. ¶ 42).  Stated briefly, MTA contended that Lockheed Martin's violations (i) started with Lockheed Martin not opening the Mitchel Field testing facility until June 2007; (ii) not delivering all the testing procedures when the testing facility was opened in June 2007; (iii) taking nine months to do the testing at the facility when six weeks had been planned; and (iv) only passing 70 percent of the FAT requirements even after nine months of testing.  (*Id.* ¶ 43).  According to MTA, this state of events existed in February 2008, fifteen months before the Default Notice of May 26, 2009.  (Id. ¶ 44). Other testing related deficiencies included Lockheed Martin delivering racks of equipment to the Long Island City C3 facility in late 2007 before completion of FAT testing and Lockheed Martin closing the Mitchel Field testing facility in early 2008. (*Id.* ¶ 45).

During depositions, MTA witnesses responsible for the IESS project, admitted that the events described above were past events as of May 26, 2009, that when they occurred no default notice was issued or that they had no memory of the events.  (*Id.* ¶ 47).  On June 12, 2009, MTA sent Lockheed Martin a Termination Letter which said the "reasons for termination are set forth in the Default Notice" and that "Events of Default [are] detailed in the Default Notice."  (*Id.* ¶¶ 52-53).  There is therefore no genuine issue of material fact that MTA's Default Notice expresses the grounds relied upon by MTA to terminate Lockheed Martin and that numerous grounds concern past events after which MTA permitted Lockheed Martin to continue performance of the Contract.

### iii.  Under New York Law, Past Events Cannot Be Used to Terminate a Contract

New York courts have established and followed the principle that a party claiming a breach has two options when the breach occurs: (1) terminate the contract at the time of breach or (2) permit performance to continue and sue for damages caused by the breach.  The doctrine of election of remedies prevents a party from subsequently claiming that a breach supports termination of a contract after that party has elected to permit continued performance.  *Emigrant Indus. Sav. Bank v. Willow Builders, Inc.*, 290 N.Y. 133, 148 (1943) (" '[w]here a contract is broken in the course of performance, the injured party has a choice presented to him of continuing the contract or of refusing to go on.'  If the injured party chooses to go on, he loses his right to terminate the contract because of the default'").

Applying this principle, the Second Circuit in *Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556 (2d Cir. 1969), held that a pool manufacturer could not terminate its contract with its salesman for not meeting his sales quota when the manufacturer elected to allow the salesman's continued performance even though he did not meet his sales quota.  The Court explained as follows:

> [E]lection in this context does not depend upon an intention to surrender a right; the point is that 'The law simply does not, under the circumstances, permit a party to exercise two alternative or inconsistent rights or remedies,' . . . .  Nor is it necessary to the binding character of such an election that the other party rely thereon to his detriment. It is enough to show that the electing party has continued to accept benefits under the contract. Id. at §§ 687, 688.

*Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556, 562 (2d Cir. 1969) *citing* 5 Williston Contracts (Rev. ed. 1961) §§ 684, 687, 688.

Despite the fact that MTA elected to continue performance by Lockheed Martin after the events described in the Default Notice occurred, MTA complains in this litigation that these very

40

same events are breaches of the Contract.  These past events are listed and their locations in the

Default Notice and MTA's Counterclaims are as follows:

| Past Event | Default Notice | MTA Counterclaims |
|---|---|---|
| FAT Testing Site Opened Late in Mitchel Field (June 2007) | § IV at 5 | ¶ 25 |
| FAT Testing Site Unilaterally Closed (April 2008) | § IV at 5 | ¶ 28 |
| Equipment Racks Shipped to Site without MTA Approval or Completion of FAT (Late 2007) | § VI at 5 | ¶ 32 |
| Breach of Design Obligations.  (Improper surveys of existing conditions (February 16, 2007 and July 24, 2007) ; problems with equipment rack designs for communication rooms (unspecified date but MTA witness stated it was resolved) | § I at 2-3 | ¶¶ 40-43 |
| Breach of Obligations to Prepare and Abide by Schedule Documents.  (Purported persistent failure to properly schedule including deficient monthly schedule updates, self-serving logic changes to mask delay and support claims and not delivering look-ahead reports) | § II at 3-4 | ¶¶ 44-48 |
| Breach of Obligations to Manage the Project, *i.e.*, Subcontractors. [16] | § III at 4-5 | ¶¶ 49-51 |

There is no dispute that when MTA declared Lockheed Martin in default and terminated

the Contract, MTA relied on events that occurred in the past for which MTA elected at the time

of those events to permit continued performance by Lockheed Martin.  New York law does not

permit a party to elect to continue performance after a purported breach occurs and to later end

---

[16]     Past events and dates of purported occurrences are as follows:  Removal of site representative at LIC – July 2007;  Steinway tunnel incident – December 3, 2007; MTA inspector injury at LIC – March 2007; LIC improper installation – Summer 2007.  The balance of the purported occurrences are not date specific but deposition testimony from MTA witnesses evidences that they were resolved prior to May 26, 2009.  (56.1 Stmt. ¶ 46).

performance based on those very same events. Because MTA made an election to continue

performance by Lockheed Martin following these purported breaches, MTA had no legal right to

end the Contract based on these past events. As a result, the Court should grant partial summary

judgment as a matter of law in favor of Lockheed Martin that the past events set forth in the

Default Letter, (*id.* ¶ 33), and in MTA's Counterclaims, (*id.* ¶¶ 23, 61), cannot be used to justify

the termination of the Contract by MTA. Therefore, the termination of the Contract was

wrongful as a matter of law based on these past events.

### d. MTA Should be Barred From Relying on Work not Being Completed by August 31, 2008 as a Legal Justification for Termination

In its Default Notice, MTA asserted that the purported events of default included delays

by Lockheed Martin. These events include not properly managing the IESS project, causing ". . .

major inefficiencies, extensive delays and a waste of MTA's resources" (56.1 Stmt. ¶ 39), and

not establishing the Mitchel Field testing facility until June 2007. (*Id.* ¶ 4). In its first

Counterclaim, MTA alleges that it terminated the Contract because of Lockheed Martin's delay

in completing the IESS project. In that regard, MTA also seeks an unspecified amount of

liquidated damages. (*Id.* ¶ 58).

MTA's reliance on delay as a reason for termination is meritless for two reasons. First,

MTA admits it was responsible for 315 days of delay, which extended the original substantial

completion Date of August 31, 2008, to at least July 13, 2009, one month after MTA terminated

the Contract. Second, MTA permitted Lockheed Martin to continue working after the original

substantial completion date without establishing a new and reasonable completion date and paid

Lockheed Martin for its work after August 31, 2008, thereby waiving time as an essential

element of performance. (*Id.* ¶ 313).

On August 31, 2005, when the Contract was entered into, the parties agreed that the IESS project would be substantially complete by August 31, 2008. (*Id.* ¶¶ 17-18).  Substantial completion is the date when the work ". . . is complete and fit for its intended purpose . . . ." (*Id.* ¶ 303).  The Contract further provided that "[t]ime is of the essence of this Contract" (*Id*. ¶ 304), which meant that if the IESS project was not complete by August 31, 2008, MTA might be able to assess Lockheed Martin with liquidated damages at the rate of $10,000 for every day of delay caused solely by Lockheed Martin. (*Id.*).  In no event could MTA recover liquidated damages in excess of $2,500,000 because the Contract expressly limited the amount to one calendar year not including Saturdays, Sundays and legal holidays.  (*Id*. ¶ 306)

Consistent with the terms of the Contract, Lockheed Martin delivered no less than four (4) extension of time requests and claims for moneys on account of MTA's delays.  (*Id.* ¶ 310). One of Lockheed Martin's time extension requests included a request for additional time because MTA did not timely deliver a site for construction of a new MNR C3 facility.  (*Id.* ¶ 309).  MTA denied each request submitted by Lockheed Martin.  (*Id.* ¶ 311).  Therefore, at the time of termination, the Contract Substantial Completion date remained August 31, 2008.  (*Id.* ¶ 313). Lockheed Martin continued to perform at the IESS project after August 31, 2008.  MTA paid Lockheed Martin the sum of $5,468,907.83 after termination on June 12, 2009. (*Id.* ¶ 313).

Gary Jentzen, MTA's litigation expert for scheduling, analyzed the impact of MTA not delivering a site for construction of MNR's Regional C3 Building in North White Plains in a timely manner in two (2) expert reports.  (*Id.* ¶ 314).  Mr. Jentzen wrote that:

> One of the delays that Lockheed Martin alleged in both its October 30, 2008 Claim as well as its Amended Complaint was that the delay to the MNR Regional C3 Building was caused by the move to North White Plains. Lockheed Martin asserted that this change caused a three hundred eleven (311) calendar day delay based on

their Analysis of the LM Schedule Update.  PMA agrees that there
was a delay in providing a facility for the MNR Regional C3.

(*Id*. ¶ 315).

Mr. Jentzen concluded that "MTA responsibility amounts to three hundred and fifteen

(315) calendar days of this delay to July 12, 2009."  (*Id.* ¶ 316).  Therefore, MTA concedes that

at a minimum it was responsible for delaying completion of the IESS project and that its delay

extends the Substantial Completion date to at least July 12, 2009, one month after Lockheed

Martin was terminated on June 12, 2009.

Well settled law in New York, however, does not permit a party to a contract to delay

performance by the other party and then terminate the contract because work is not complete by

the agreed upon completion date.  This principal is explained in *Kenny v. Monahan*, 53 A.D. 421,

423 (2d Dep't 1900), *aff'd,* 169 N.Y. 591 (1901).  In *Kenny*, the appellate court held that because

the owner was responsible for work being added to the contractor's scope of work, the owner

could not terminate the contractor based on the contractor not completing by the original

completion date.

> "As was said in the case of Dunn v. Steubing (120 N.Y. 232, 24
> N.E. 315) upon the failure of the plaintiff to perform the contract
> by the date fixed, the defendant might have insisted upon his strict
> legal rights, and then put an end to the contract, but this he did not
> do, but permitted the plaintiffs to continue the work, and for this
> reason he cannot now insist upon the delay as a defense to an
> action brought to recover the price of the contract.  There was a
> change in the plans and specifications by substituting different iron
> girders than those originally contemplated, made with the consent
> of the defendant, which entailed considerable delay . . . ."

53 A.D. at 423.

The undisputed facts now before the Court are that the contract substantial completion

date of August 31, 2008 was never extended by MTA, and that, according to MTA's own expert,

MTA delayed completion of the Work to at least July 12, 2009, one (1) month after termination

44

on June 12, 2009.  *Kenny* requires that MTA be barred from justifying termination of Contract because Lockheed Martin did not finish by August 31, 2008.

MTA is also barred from using as a basis for termination of the Contract Lockheed Martin not completing the Contract by August 31, 2008, the Contract substantial completion date, because MTA permitted Lockheed Martin to continue its work after August 31, 2008 without establishing a new and reasonable completion date.

As discussed below, in New York, it is well settled that if the completion date fixed in the agreement is not met and the performance of the contract continues after the completion date, the time for performance is waived.  Before untimely performance can be used to end a contract, unequivocal notice must be given of a new completion date.  The new completion date must allow for a reasonable time to finish taking into account all project circumstances.  Finally, the new completion date must again be made an essential term of the agreement.  *General Supply & Constr. Co. v. Goelet*, 241 N.Y. 28 (1925); *Schulder v. Edward R. Ladew Co., Inc.*, 178 A.D. 458 (1st Dep't 1917).

For example, in *General Supply*, the New York Court of Appeals refused to uphold the owner's termination of a contract based on the contractor not finishing by the completion date where the owner had permitted continued performance after the completion date and no notice was given to the contractor to complete in a reasonable period of time.  In doing so, the Court wrote as follows:

> …. Though time was waived as an essential element of the contract, it could be restored by notice to complete within a reasonable time, stated in said notice.  Taylor v. Goelet, supra. Having indicated a purpose to keep the contract alive in spite of delays on the part of the contractor, the owner could not suddenly abandon the purpose and treat as essential an element in the contract which he had previously waived, as ground for

> termination . . . .   The termination of the contract in this case,
> without the required previous notice . . . was wrongful.

241 N.Y. at 34.

Similar to the owner in *General Supply*, MTA cannot let the time pass, permit Lockheed

Martin to continue performance and then ten (10) months later end the Contract because

Lockheed Martin did not complete by the original date for completion.  Termination of

Lockheed Martin is therefore wrongful as a matter of law because it did not finish by August 31,

2008 based on the following facts which are not in dispute: (i) the completion date of August 31,

2008 passing; (ii) continued work by Lockheed Martin after August 31, 2008, (iii) MTA's failure

to set a new completion date in accordance with the terms of the Contract, including a reasonable

time to finish given the circumstances; and (iv) no notice reinstating time as essential.  For these

reasons, not finishing work by August 31, 2008 as a basis to terminate the Contract is wrongful

under New York law thereby making summary judgment on this issue in favor of Lockheed

Martin proper.

> **2.      An Additional Key Factual Issue For Which There is No Genuine
> Dispute of Material Fact is That The Testing "Showstoppers" Were
> Closed and Cannot Justify Termination.**

Software testing was a contentious issue during the IESS project and the crucial software

testing issues were placed by the MTA into four (4) categories of issues, which the MTA called

"showstoppers".  Although the showstoppers were resolved by Lockheed Martin and declared

"closed" by MTACC, MTA improperly relied on these very same software testing issues as a

basis to terminate Lockheed Martin from the IESS project.  MTA's reliance is therefore

unjustified and not legally supported.  Lockheed Martin seeks partial summary judgment on the

following two (2) issues related to the showstoppers: (1) the showstoppers were closed during

the course of the IESS project; and (2) the doctrine of election of remedies prevents MTA from

subsequently claiming that software testing issues were an appropriate basis for termination of the Contract after MTA elected to permit continued performance.

### e.      The Testing Showstoppers Were Declared "Closed" by MTA

One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  *Celotex*, 477 U.S. at 325.  Partial summary judgment on the factual issue that MTA declared the showstoppers "closed" will significantly streamline this case for trial because each of the showstoppers consisted of numerous requirements, so if a particular showstopper were resolved, then all of the requirements identified within that showstopper were then to be considered "closed-out" by the MTA. (56.1 Stmt. ¶ 300).  Even more importantly closing "showstoppers" meant that the testing phases called FAT and SIST would be completed to MTA's satisfaction.  (*Id.* ¶ 301).

There can be no genuine dispute that the showstoppers were declared closed by MTACC. Specifically, shortly after a demonstration by Lockheed Martin of its strategy for closing the showstoppers, on July 18, 2008, MTACC advised Lockheed Martin that the explanations and information provided were acceptable and directed Lockheed Martin to proceed with the Work. (56.1 Stmt. ¶ 292-93).  Lockheed Martin thereafter completed the work and reported to MTA that "as of 25 February 2009, LM has successfully completed the demonstration and associated regression test for the four [showstopper] issues.").  (56.1 Stmt. ¶ 295).  On April 20, 2009, MTACC agreed that Lockheed Martin had resolved the showstoppers to MTA's satisfaction, writing in an IESS Progress Meeting presentation that "The FAT show-stoppers are closed." (56.1 Stmt. ¶ 297).  MTA's Project Manager also concurred with that the showstoppers were closed, writing "it has been agreed that the show stoppers have been satisfied to the point of allowing BU [beneficial use] to proceed . . . ."  (56.1 Stmt. ¶ 297).  Likewise, the MTA Engineer

confirmed at his deposition that the showstoppers were "closed." (56.1 Stmt. ¶ 299).  There can

therefore be no genuine factual dispute that the showstoppers were "closed" by MTACC during

the course of the IESS project.

> **f.**     *Software Testing Issues That Were* **Considered "Closed" by the MTA Cannot Form the Proper Basis for Termination**

The doctrine of election of remedies prevents MTA from subsequently claiming that

software testing issues were an appropriate basis for termination of the Contract after MTA

elected to permit Lockheed Martin's continued performance.  *Emigrant Indus. Sav. Bank*, 290

N.Y. at 148.  Between July 2008, when MTA directed Lockheed Martin with the proposed plan

to resolve the showstoppers, and April 2009, when MTA declared the showstoppers closed,

MTA elected to continue performance by Lockheed Martin to resolve the showstoppers.

MTACC readily admitted that Lockheed Martin had satisfied its obligations on the Showstoppers

and advised at an MTA progress meeting that the showstoppers were "closed".  (56.1 Stmt. ¶

296-97).  Nevertheless, in the Default Letter, MTA relied upon software testing issues to

terminate the Contract. (56.1 Stmt. ¶ 298).

MTA's later reliance on software testing issues, which it declared "closed", as a basis for

termination is not proper as a matter of law.  New York law does not permit MTA to elect to

continue performance after a purported breach occurs and to later end performance based on

those very same events.  *Emigrant Indus. Sav. Bank*, 290 N.Y. at 148.  MTA made an election to

allow Lockheed Martin to continue on the IESS project following purported breaches related to

software testing issues.  MTA had no legal right to end the Contract based on these past events.

This Court should therefore grant partial summary judgment in favor of Lockheed Martin on this

issue as a matter of law.

## IV.    CONCLUSION

For the reasons set forth above, MTA will be unable to come forward with evidence to support essential elements of its claims, and partial summary judgment should therefore be granted.

Dated:        July 15, 2013
              New York, New York

                                        Respectfully submitted,

                                        DUANE MORRIS LLP

                                        By:   /s/ Matthew A. Taylor
                                              Matthew A. Taylor (MT 2914)
                                              Sandra A. Jeskie (Pro Hac Admission)
                                              Michael Chartan (MC 4609)
                                              1540 Broadway
                                              New York, NY  10036
                                              (212) 692-1000
                                              Attorneys for Plaintiff
                                              Lockheed Martin Corporation