UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------x

LOCKHEED MARTIN TRANSPORTATION SECURITY
SOLUTIONS, AN OPERATING UNIT OF LOCKHEED
MARTIN CORPORATION,

                          Plaintiff,

        -against-

MTA CAPITAL CONSTRUCTION COMPANY and
METROPOLITAN  TRANSPORTATION AUTHORITY,

                         Defendants.

---------------------------------------------------------------------------x

TRAVELERS CASUALTY AND SURETY COMPANY
OF AMERICA, FEDERAL INSURANCE COMPANY,
and SAFECO INSURANCE COMPANY OF AMERICA,

                         Plaintiff,

        -against-

METROPOLITAN TRANSPORTATION AUTHORITY,
MTA CAPITAL CONSTRUCTION COMPANY, and
NEW YORK CITY TRANSIT AUTHORITY,

                         Defendants.

---------------------------------------------------------------------------x

09 cv 4077 (PGG)(GWG)

ECF CASE

**LOCKHEED MARTIN'S
STATEMENT OF
UNDISPUTED MATERIAL
FACTS**

09 cv 6033 (PGG)(GWG)

       Pursuant to Local Rule 56.1, Plaintiff Lockheed Martin Transportation Security Solutions

("Plaintiff" or "Lockheed Martin") respectfully submits this Statement of Undisputed Material

Facts in support of its motion pursuant to Federal Rule of Civil Procedure 56(a) ("FRCP 56(a)")

for an order in Lockheed Martin's favor granting partial summary judgment against Defendants

MTA Capital Construction Company ("MTACC") and Metropolitan Transportation Authority

("MTA") (collectively, "MTA").

**The Relevant Parties**

        1.     Lockheed Martin is a global security company engaged by government

entities principally in the research, design, development, manufacture and integration of

technology systems, products and services.  (Ex. LM 1, http://www.lockheedmartin.com/us/who-we-are.html).[1]

2.      The MTA was formed in 1965 as a federation of various transportation entities in existence at that time.  (Ex. LM 2, http://www.mta.info/capconstr/about.htm).

3.      MTA and its subsidiary and affiliate agencies (MTA New York City Transit, MTA Metro-North Railroad, MTA Bridges and Tunnels and MTA Long Island Rail Road (collectively with MTA Police Department referred to herein as the "Agencies")) have a vast network of infrastructure and operations spanned over the entire Metropolitan Area to provide and support public transportation services (buses, subway, rail and tunnels and bridges for vehicular traffic).  (Ex. J11, Request for Proposal ("RFP"), Vol. 1A, Overview, p. 1).[2]

4.      As MTA's capital projects grew in size in complexity, the MTA's "loose structure" was becoming less effective and there was an increasing need for inter-agency coordination.  (Ex. LM 2, http://www.mta.info/capconstr/about.htm).

5.      To address this need, a new agency, MTACC, was formed in July 2003. (*id.*).

6.      MTACC's mission is to manage the mega-projects-system expansion and infrastructure transit projects.  (Ex. LM 2, http://www.mta.info/capconstr/about.htm).

7.      After the terrorist attacks of September 11, 2001, the MTA initiated many construction projects entailing separate security improvements as part of its capital security

---

[1] References to "Ex. LM__" refer to the exhibits attached to the Appendix to Plaintiff's Rule 56.1 Statement of Undisputed Facts, submitted herewith.

[2] References to "Ex. J__" refer to the exhibits attached to the Joint Appendix to the Parties' Rule 56.1 Statements of Undisputed Facts, submitted jointly by the parties.

program.  (Ex. LM 3, *NYS Comptroller's Progress Report*, November 2008, http://www.osc.state.ny.us/osdc/mta6-2009.pdf).

**The Project**

8.     One of the security-related capital construction projects undertaken by the MTA and overseen by MTACC was the delivery of an integrated electronic security system ("IESS") and Security Operations Centers ("C3") together with associated facility construction and renovation work at various MTA locations (collectively "IESS System").  (*id.*, 5; Ex. J10.2, RFP Vol. 1, Agreement, p. 1).

9.     MTACC issued the RFP in early May 2005 to retain a contractor to design, develop, furnish, install, test and implement the IESS System.  (Ex. J10.2, RFP Vol. 1, Agreement, p. 1).

10.     The MTA also intended that the IESS System would provide a "Common Operational Picture (COP) vertically within each Agency and horizontally across the Agencies." (Ex. J11, RFP Vol. 1A, Brief Description of the Work § 1.0).

11.     Lockheed Martin submitted a proposal dated July 22, 2005 ("Proposal") in response to MTA's RFP, which consisted in part of the following volumes identified as exhibits, setting forth a solution for the IESS System.  (Ex. J9.1, Proposal Vol. I, Proposal Summary; Ex. J9.2, Proposal Vol. II, Technical Proposal; Ex. J9.3, Proposal Vol. III, Management).

12.     After Lockheed Martin submitted its Proposal, MTA submitted questions to Lockheed Martin, Lockheed Martin met with MTA, Lockheed Martin responded to such questions, and the parties exchanged correspondence regarding Lockheed Martin's Proposal. (Ex. LM 4, Jul. 29, 2005 e-mail from Frank Salvato to Lockheed Martin with attached chart of questions (Bates No. MTACC E-00548207-09); Ex. LM 5, Aug. 1, 2005 e-mails from Lockheed Martin to Salvato with attached responses to questions).

13.     Lockheed Martin reviewed and responded in two separate responses each on August 1, 2005 to MTA's committees' questions.  (Ex. LM 5, Aug. 1, 2005 e-mails from Lockheed Martin to Salvato with attached responses to questions (Bates No. MTACC_E-00054210)).

14.     On August 31, 2005, MTA and Lockheed Martin entered into a written agreement for Lockheed Martin to design, install and implement the IESS System (the "Contract").  (Ex. J10.2, RFP Vol. 1 Agreement, p. 1).

15.     As per the terms of the Contract, Lockheed Martin's "Proposal submitted in response to the RFP was accepted by the Authority."  (Ex. J10.2, RFP Vol. 1, p. 1).

16.     The Contract by its terms incorporates not only MTA's Request for Proposals, but also includes as part of the Contract Documents, Lockheed Martin's "final, fully conformed Proposal as accepted by the [MTA]."  (*id*. 2).

17.     Pursuant to the Contract, the IESS System was to be substantially complete within thirty six (36) months from the date of the Contract was awarded.  (Ex. J10.4, Contract Terms and Conditions, Art.  2.01).

18.     The Contract was awarded to Lockheed Martin on August 31, 2005 (Ex. J10.2, RFP Vol. 1, Agreement, p. 1), which would set August 31, 2008 as the initial date for substantial completion.

19.     New York law governs the Contract, its interpretation and any disputes thereunder.  (Ex. J10.4, Contract Terms and Conditions, Art. 8.05).

**Lockheed Martin's Complaint and Termination**

20.     On April 24, 2009, Lockheed Martin commenced this action by filing its initial Complaint seeking a Declaratory Judgment that MTA breached the parties' Contract by, *inter alia*, unreasonably delaying, increasing the costs of, and preventing Lockheed Martin's

- 4 -

performance; willfully violating the Contract; and MTA not fulfilling its contractual obligations. (Ex. J1,  Compl., ¶ 1, ECF No. 1).

   21. In the initial complaint, Lockheed Martin reserved its rights to seek monetary damages until this Court could rule on MTA's breaches and default.  (*id*. ¶¶ 25, 51).

   22. After filing its initial Complaint, Lockheed Martin continued to perform its work under the Contract.  (Ex. LM 6, Lockheed Martin's Invoice 40 for Work Performed from Apr. 18, 2009 to May 22, 2009.  (Bates No. MTACC_E-00211700).

   23. On May 26, 2009, MTA filed its Answer and Counterclaim to the initial Complaint.  (Ex. J2, Answer and Countercl., ECF No. 10).

   24. On May 27, 2009, the day after MTA filed its Answer and Counterclaim (Ex. J2), MTA delivered a letter stating in substance that MTA considered Lockheed Martin to be in default of the Contract ("Default Notice"), which letter had the same date as MTA's Answer and Counterclaim.  (Ex. J6, May 26, 2009 Letter from MTA to Lockheed Martin; Ex. J7.1, Jun. 4, 2009 Letter from Lockheed Martin to MTA ("Cure Response"), p. 1 (stating Lockheed Martin received the Default Notice on May 27, 2009)).

   25. In the Default Notice, MTA notified Lockheed Martin of the purported defaults and threatened to terminate the Contract.  (Ex. J6, Default Notice, 1).

   26. The Default Notice was a contractual notice under Article 7.02 of the Contract that MTA was required to deliver to Lockheed Martin in advance of any termination of the Contract.  (Ex. J10.4, RFP Vol 1, Contract Terms and Conditions § 7.02, p. 43; Ex. J6, Default Notice, p. 1).

   27. Article 7.02 of the Contract's terms and conditions provided Lockheed Martin with a right and opportunity to respond to the contents of the Default Notice.  (Ex. J10.4, RFP Vol. 1, Contract Terms and Conditions § 7.02, p. 43).

- 5 -

28.     The Default Notice was the only default notice issued by the MTA to Lockheed Martin.  (Pezik Dep. 188).

29.     After receiving the Default Notice and right up to June 12, 2009 (the date of termination), Lockheed Martin continued to work on the IESS System.  (Shields Dep. at 297-98, Jul. 21, 2010; *see* Ex. LM 7, Invoice 42.  (Bates No. MTACC_E-00575803)).

30.     On June 4, 2009, Lockheed Martin responded to the Default Notice to "both refute the alleged instances of default and detail the path to completion of the project" with a thirty six (36) page letter addressing each purported default one-by-one, along with 148 pages of attachments setting forth the plan, schedule and other documentation for completion of the IESS System.  (Ex. J7, Cure Response).

31.     In its Cure Response, Lockheed Martin pointed out that a number of the claimed defaults of the Contract , if they were in fact breaches sufficient to support termination, had occurred in the past.  (Ex. J7.1, Cure Response, § II, 5).

32.     Lockheed Martin stated in the Cure Response that past defaults could not support termination where MTA elected to continue performance of the work by Lockheed Martin.  (*id*.).

33.     Included among the past events listed as defaults by MTA in its Default Notice are the following: "Lockheed's Failure to Satisfy its Design Obligation"; "Lockheed's Scheduling Breaches"; "Lockheed's Breach of its Contractual Obligation to Manage the Project"; and "Lockheed's Violation of the Contractually Mandated Testing Procedures."  (Ex. J6, Default Notice § I, p. 2; § II, p. 3; § III, p. 4; and § IV, p. 5).

34.     The Default Notice asserted that Lockheed Martin did not satisfy its design obligations because it "consistently failed to comply with contractual requirements governing the design portion of the Project," and that these "design flaws have resulted in over

- 6 -

120 field change notices . . .  illustrat[ing] significant gaps, errors and omissions in Lockheed's design . . . ."  (Ex. J6, Default Notice § I, p. 2).

35.     Other items MTA cited include how (i) Lockheed Martin performed surveys of existing conditions which MTA complained about in letters from February 16, 2007 and July 24, 2007, and (ii) equipment rack designs.  (*id.*, p. 3).

36.     Similarly, MTA in its Default Notice also complained that Lockheed Martin "persistently failed to satisfy its obligation to prepare, maintain and modify contractually compliant, detailed progress schedules."  (*id.* § II, p. 3).

37.     These purported deficiencies according to MTA include the monthly schedule updates that satisfied the Contract, the making of "self-serving changes in logic"  that MTA asserted were done to mask delay by Lockheed Martin and support claims to set up false impact claims which were not approved by MTA, and not delivering "Look-Ahead" reports.  (*id.*).

38.     Again, these claimed breaches occurred throughout the project according to the Default Notice.  (*id.*).

39.     Another series of defaults according to MTA included the assertion that "Lockheed [Martin] has consistently failed to manage its subcontractors, as required under the Contract," leading to "major inefficiencies, extensive delay and a waste of MTA's resources."  (*id.* § III, p. 4).

40.     There are no less than eight (8) specific events listed in the Default Notice concerning an asserted failure to manage subcontractors.  (*id.*, p. 4-5).

41.     The time frame for these eight (8) events concerning subcontractor management is as early as March 2007, more than two years before the Default Notice was delivered to Lockheed Martin.  (*id.* § III, p. 4).

- 7 -

42.     An additional category of past events concerns MTA's assertion that Lockheed Martin breached the Contract's testing requirements. (*id.* § IV, p. 5).

43.     MTA contended that Lockheed Martin's violations of the Contract started with Lockheed Martin's purported testing defaults, including not opening the Mitchel Field testing facility until June 2007, not delivering all the testing procedures when the testing facility was opened in June 2007, taking nine (9) months to do the testing at the facility when six (6) weeks had been planned and only passing 70 percent of the FAT testing requirements even after nine (9) months of testing. (*id.*).

44.     According to the Default Notice, this state of events existed in March 2008, more than one (1) year before the Default Notice of May 26, 2009. (*id.*).

45.     Other purported testing deficiencies in the Default Notice included Lockheed Martin delivering racks of equipment to the Long Island City C3 facility in late 2007 before passing all FAT testing requirements and Lockheed Martin closing the Mitchel Field testing facility in early 2008. (Ex. LM 8, e-mail from James Gaughan to Ronald Pezik, dated April 15, 2008 (Bates No. MTACC_E 00532935) (Closing Mitchel Field Laboratory); Ex. LM 9, Letter from Kenneth Shields to James Gaughan, dated December 21, 2007, IESS MTA-CCM/LM – 00746 (Shipping of racks to the field); Pezik Dep. at 232-235, Aug. 31, 2010).

46.     Other past events and dates of purported occurrences are as follows: Removal of site representative at LIC – July 2007 (Ex. LM 10, Letter from MTA to Lockheed Martin, dated July 27, 2007, IESS MTA-CCM/LM-00450); Steinway tunnel incident – December 3, 2007 (Ex. J6, Default Notice § III p. 4); MTA inspector injury at LIC – March 2007 (*id.*); LIC improper installation – Summer 2007 (*id.*).

47.     Ronald Pezik, MTA's Program Manager responsible for the IESS System, at his deposition on August 31, 2012 testified that the events described above were past events as

of May 26, 2009 when the Default Notice was delivered to Lockheed Martin.  (Pezik Dep. at 202-06, 210-12; *see also*, Shields Dep. at 224-28).

48.     On June 11, 2009, MTA requested that Lockheed Martin submit a credit proposal for work that MTA asked to remove from the Contract thereby deleting work within the thirteen (13) under-river tunnels ("URT(s)") and twenty five (25) Communications Rooms originally procured in April 2006 under Additional Work Order ("AWO") Number 1.  (Ex. LM 11, Letter from Joe Paladino to Donato Antonucci regarding Notice to Proceed, dated Jun. 11, 2009 (Bates No. MTACC_E 00467598); Ex. LM 12, AWO Log at Lines 1-S-1 and 126, (Bates No. MTACC_E-00211700)).

49.     An agreement to perform the work for the URTs and Communications Rooms was never finalized.  (Ex. LM 13, Letter from Lockheed Martin to MTA (LM-MTA-CN-2008-10-30-1271R), dated October 30, 2008, regarding Request for an Extension of Time and Associated Impact Costs, p. 4, Item No. 5; Ex J7.2, Attachments to the Cure Response, Attachment (b) Monthly CPM Schedule Update for LM 37).

50.     Since the time AWO Number 1 was issued on July 12, 2005, until the time MTA requested a credit proposal from Lockheed Martin for the URT work on June 11, 2009, Lockheed Martin was not granted sufficient access to the URT areas to complete the work.  (Ex. LM 12, AWO Log at Lines 1-S-1 and 126, (Bates No. MTACC_E 00211700); Ex. LM 13, Letter from Lockheed Martin to MTA (LM-MTA-CN-2008-10-30-1271R), dated October 30, 2008, regarding Request for an Extension of Time and Associated Impact Costs, p. 4, Item No. 5; Ex. J7.1, Cure Response, p. 21. § (iv)).

51.     On June 12, 2009, MTA terminated Lockheed Martin based on the purported defaults set forth in the Default Notice.  (Ex. J8, Letter from Kenneth Shields to James Gaughan dated, Jun. 12, 2009, IES-MTA-CM/LM -01646 ("Termination Letter")).

- 9 -

52.     The Termination Letter stated that MTA's "reasons are set forth in the Default Notice." (*id*.).

53.     Continuing, MTA wrote that: "Lockheed has failed to provide MTACC with a viable plan to cure for the outstanding Events of Default detailed in the Default Notice. Lockheed is therefore in material breach of its contractual obligations." (*id*.).

54.     On July 7, 2009, Lockheed Martin filed and served its Amended Complaint seeking damages in the amount of $80,353,414.45 for breach of the Contract and $137,671,285.86 for MTA's bad faith termination. (Ex. J3, Am. Compl., ECF No. 21, ¶¶ 146, 150).

55.     Lockheed Martin sets forth in its Amended Complaint the bases for MTA's wrongful, improper and bad faith termination of Lockheed Martin, among other claims, included and in addition to those set forth in its initial complaint. (Ex. J3, *id*. ¶¶ 113-33).

56.     Moreover, Lockheed Martin sets forth in its Amended Complaint that several items listed in MTA's Default Notice constitute alleged defaults that occurred in the past, and for which MTA waived any right to terminate on any one of those past purported defaults. (Ex. J3, *id*. ¶ 117).

**MTA's Counterclaims and Lockheed Martin's Answers to the Counterclaims**

57.     MTA served and filed an Answer and Counterclaims to Plaintiff's Amended Complaint ("Answer" or "Counterclaim") on July 20, 2009. (Ex. J4, Answer and Countercl. to Pl.'s Am. Compl., ECF No. 23).

58.     In its first Counterclaim for breach of the Contract, MTA avers that Lockheed Martin materially breached the Contract and requests recovery of damages to complete the IESS System and an unspecified amount of liquidated damages for Lockheed Martin's alleged delay of the project. (*id*. ¶¶ 69-74).

- 10 -

59.     In its second Counterclaim, MTA seeks recovery of monies it paid to Lockheed Martin for additional design work based on the assertion that Lockheed Martin was previously paid for the work.  (*id*. ¶¶ 75-81).

60.     In its third Counterclaim, MTA seeks to recover damages based on allegations that Lockheed Martin failed to deliver materials paid for by MTA.  (*id*. ¶¶ 82-98).

61.     Specifically as to MTA's first Counterclaim and relevant to the instant motion and addressed in Lockheed Martin's Memorandum of Law at § III(B),[3] MTA bases such breach of contract claim upon the same grounds delineated in the Default Notice, including *inter alia*: (a) Lockheed Martin's failure to satisfy its design obligations (Ex. J6_, Default Notice § I, p. 2; Ex. J4, Countercl., ¶¶ 2(a), p. 40-43); (b) Lockheed Martin's scheduling breaches (Ex. J6_, Default Notice § II, p. 3; Ex. J4, Countercl. ¶¶ 2(b), p. 44-48); (c) Lockheed Martin's breach of its obligation to manage the project, specifically its subcontractors (Ex. J6, Default Notice § III, p. 4; Ex. J4, Countercl. ¶¶ 2(c), p. 49-51); (d) Lockheed Martin's violation of mandated testing procedures (Ex. J6, Default Notice § IV p. 5; Ex. J4, Countercl. ¶¶ 25-38; and (e) Lockheed Martin's failure to continuously and diligently prosecute the work (Ex. J6, Default Notice § V, p. 6; Ex. J4, Counterclaims ¶¶ 2(d), p. 52-55).

62.     Additionally, as relevant to the instant motion and addressed in Lockheed Martin's Memorandum of Law at § III(B)(1), MTA avers that Lockheed Martin breached the Contract in that it did not continuously and diligently prosecute the work by not "developing the software . . . necessary to create a system that satisfies all of the Contract's requirements."  (Ex. J4, Countercl. ¶ 54).

---

[3] References to sections of Lockheed Martin's Memorandum of Law refer to the Memorandum of Law in Support of Lockheed Martin's Motion for Summary Judgment submitted herewith.

63.     Moreover, as relevant to the instant motion and addressed in Lockheed Martin's Memorandum of Law § III(B)(1)(b), MTA avers that Lockheed Martin breached the Contract in that it did not continuously and diligently prosecute the work because the factory acceptance testing ("FAT") phase had to be complete before Lockheed Martin could install equipment in the field.  (*id*. ¶¶ 19-20, 32).

64.     Lastly, as relevant to the instant motion and addressed in Lockheed Martin's Memorandum of Law § III(B)(1)(b), MTA avers that the Contract required Lockheed Martin to ensure that all variances detected during FAT testing were documented and corrected prior to shipment of equipment to the field for installation.  (*id*. ¶¶ 19-20).

65.     Lockheed Martin served and filed its Answer to Defendants' Counterclaims on August 12, 2009.  (Ex. J5, Lockheed Martin's Answer to Defs.' Countercl., Aug. 12, 2009, ECF No. 30).

66.     Generally, Lockheed Martin denies the truth of MTA's allegations in support of its first, second and third Counterclaims.  (*id*. ¶ 69-74).

67.     Lockheed Martin sets forth as an affirmative defense *inter alia* MTA's inability to maintain the Counterclaims because it is barred by the doctrine of waiver where the acts complained of in MTA's Counterclaims are based on prior alleged defaults which were subsequently waived or cured.  (*id*. ¶ 100).

68.     Additionally, Lockheed Martin avers in its Answer to Defendants' Counterclaims that *inter alia* (a) Lockheed Martin has not breached the Contract or failed or refused to deliver the IESS System, and at all times was ready, willing and able to complete the Contract but for MTA's wrongful termination of Lockheed Martin (*id*. ¶ 1); (b) Lockheed Martin is in compliance with all contractual provisions except for those it has been prevented from completing as a result of MTA's own failures and breaches of the Contract (*id*. ¶ 2); (c)

- 12 -

Lockheed Martin has properly scheduled the work and managed its subcontractors, and continuously and diligently prosecuted the work (*id*. ¶¶ 2, 52-53, 55); (d) Lockheed Martin has not delayed the project and has not caused additional cost to MTA (*id*. ¶ 2); (e) certain portions of the work and necessary equipment were to be supplied by MTA as part of the Contract (*i.e.*, network and site access), without which Lockheed Martin was prevented from timely and fully performing its own work under the Contract such as performing SIST phase testing (*id*. ¶¶ 9, 35, 36); (f) the parties agreed that equipment could be installed in the field locations before FAT testing was completed (*id*. ¶¶ 19-20); (g) the Mitchell Field testing site was made ready consistent with the time testing was ready to proceed, and that any delay in the commencement of testing was caused by MTA's breaches of the Contract (*id*. ¶ 25); (h) MTA approved all of Lockheed Martin's designs and drawings, which were timely submitted by Lockheed Martin (*id*. ¶¶ 40-42); and (i) Lockheed Martin delivered schedule updates and baseline schedules to MTA, and any logic changes were made to mitigate any delay caused by MTA's own failures and breaches of the Contract (*id*. ¶¶ 45-46).

**The IESS System Was Intended to Replace Agencies' Existing Separate Systems with a Common Security System**

69.     In its 2005 RFP for the IESS project, MTA readily acknowledged the continuing disparate nature of its operations and equipment among the agencies.  (*See, e.g.,* Ex. J16, Vol. 6A, p. 6 ("[o]ver the years, MTA transportation agencies have installed independent operational and communications systems using different technologies, manufacturers, and service providers"); *id*. p. 7 ("There are many differences between the Agencies' operational policies, procedures, hardware, software, and communications capabilities")).

70.     In its RFP, MTACC sought to remedy the disparate nature of the individual agency operations and requested proposals that would provide a "common" COTS

system for use by all of the agencies.  (Ex. J16, Vol. 6A, p. 12; *id.* p. 8 (stating the IESS project

was predicated on a "uniform security strategy for all its Agencies.")).

71.     When the RFP was issued for bid, MTACC  President made clear that

teamwork would be the key to the success of the IESS project and he expected the full

cooperation of all MTA agencies (Ex. LM 14, Email from Kathleen Lapp to Mysore Nagaraja,

dated May 6, 2005 (Bates No. MTACC_E-00553738)).

72.     MTA's Independent Engineer Consultant also made it clear that consensus

of the agencies on design elements would be necessary to the project.  (Ex. LM_15, Email from

David Horn to Ashok Patel, dated May 26, 2006 (Bates No. MTACC_E-00433759)).

**MTA's Request for Proposal Specified a Commercial Off-The-Shelf (COTS) System**

73.     The RFP expressly "require[d] that the contractor use COTS," (Ex. J11

RFP, Vol. 1A, 5 of 11,), and that the successful bidder be a project "integrator" rather than a

software developer.  (*id.*; Countercl. ¶ 13; Dnutch 30(b)(6) witness, Oyekunle, Dep. at 31-32,

Jun. 6, 2012; Attachment to Ex. LM 16, dated December 14, 2008, p. 2 (Bates No.

Dnutche00012608)).

74.      MTA further requested in the RFP a solution comprised of COTS

products, as opposed to a custom software solution specifically developed for the MTA.  (*See*

Ex. J16 Vol. 6A § 4.0, p. 12-13; *id.* § 7.1, p. 37; *id.* App. B, 63)).

75.     As testified by MTA's on-project consultant and litigation experts,

"Lockheed has positioned itself as a system integrator and I'm sure MTACC understood this all

along."  (Oyekunle Dep. at 32:2-4; Attachment to Ex. LM 16, dated December 14, 2008, p. 2

(Bates No. Dnutche00012608); *see also* Ex. LM 17 Email from Suren Karavettil dated June 12,

2009, (Bates No. Dnutche00010091), p. 3, 11; Ex. J11, RFP Vol. 1A § 1.4, p. 5 of 11).

76.     A systems integrator engages in systems integration work which involves "…combining separately developed modules of components so that they work together as a complete computer  system." (Ex. LM 18, McGraw-Hill Dictionary of Scientific and Technical Terms, p. 2093 (6th Ed. 2003)).

77.     MTACC's initial Project Manager, Ashok Patel, testified at his deposition taken on July 30, 2010 that a COTS solution was:

> a basic requirement that we [MTA] had specified in our scope of work. . . .   MTA in general does not allow and does not prefer customized applications to be developed for us, because support and maintenance always become an issue . . .   And we always encourage, whether it be security program or any, use of COTS as a standard practice…".

(Patel Dep. at 53:7-22, Jul. 30, 2010).

78.     Patel further testified at his deposition on July 30, 2010 that MTA "…always encourage[d]" COTS and had an aversion to custom development so "…you're not stuck with a particular vendor…." (*id*. at 53:13-22).

79.     However, if Lockheed Martin had not proposed COTS, the MTA would not have negotiated with Lockheed Martin. (*id*. at 109:3-13).

80.     The RFP included a section (Division 25) in the event a bidder proposed any custom software. (Ex. J15, RFP Vol. 2F – Division 25).

81.     MTAPD didn't want a custom solution. (Viviano Dep. at 128-29, 134-35, 137-38, 188-89, Apr. 25, 2012; *see also id.* 134-138 (post-termination work did not require custom software)).

82.     MTACC's second Project Manager Ronald Pezik testified at his deposition taken on August 31, 2010 that he had not been on any MTA projects that used

- 15 -

customized products or any projects where COTS products were modified.  (Pezik Dep. at 51, Aug. 31, 2010).

83.     NYCT's 30(b)(6) witness, Lisa Schreibman, testified that there would be minimal "customization," an example would be bridges between the COTS products. (Schreibman Dep. at 69-70, Mar. 5, 2012).

84.     NYCT also realized that some requirements might not be met and that the need for a requirement would depend its criticality.  (*id*. at 67-70, 152-153, 258:6-259:13).

85.     Representatives of the key COTS vendor, Intergraph, and MTA agencies testified that custom software was not necessary to meet MTA's requirements.  (Halsema Dep. at 84-85, Jun. 19, 2012; Thomas Dep. at 223-224, May 24, 2012; Viviano Dep. at 127-130, 134-135,  137-138, 186-189; *see also* Breitbeil Dep. at 359, 371 (post-Termination work did not require custom software to meet MTA's requirements)).

86.     John Halsema was one of Intergraph's representatives on the project, whose duties included *inter alia* defining an overall system architecture and approach, detailed architecture and engineering, and he was originally assigned as the lead technical director for the project on behalf of Intergraph.  (Halsema Dep. at 14, 22, June 19, 2012).

87.     Tammi Thomas was also one of Intergraph's representatives on the project, whose duties included *inter alia* oversight and supervision of all contracts in Intergraph's "critical protection" unit.  (Thomas Dep. at 24, May 24, 2012).

88.     A workaround may be as simple as pick up the phone or change a process or business rule.  (Hibri Dep. at 136-140, Sep. 24, 2010; Ex. LM 19, Email from Kleinbaum to Veronique Hakim and Ronald Saporita, dated April 30, 2008 (Bates No. MTACC_E-00586241), "Obj. No. 2").

89.   MTACC recognized that the IESS System "lends itself to a variety of implementation approaches."  (Ex. J16, Vol. 6A, p. 13).

90.   John Halsema, the former Chief Technology Officer for one of the COTS vendors (Intergraph) said, the IESS System was "very configurable" and "there are many ways to do" a task and "no necessarily right way to do it."  (*See* Halsema Dep. at 84).

91.   MTA's budget for software on the IESS project was limited and therefore, a COTS solution was appropriate. (Ex. J16, Vol. 6A, p. 5).

92.   The RFP also stated: "As these on-going programs mature, their capabilities can be brought on-line . . . . . [A]dditional capability can be added to the IESS/C3 SoS as additional funding becomes available . . . . . This approach will ensure that the limited resources of the MTA and its agencies are most effectively utilized."  (Ex. J16, Vol. 6A, p. 5; *see id*. at p. 13 ("It incorporates new technologies as they mature and as funding becomes available."); *id*. at p. 63 ("new and improved compatible releases over time")).

93.   In the meantime, MTACC recognized that it was necessary to "[a]llow and direct managers to change procedures that are based on historical precedent and legacy systems to better fit the functionality of the IESS system" and "[a]llow for business rules that are informed by the constrains of the system and that have mitigating steps for such constraints." (Ex. LM 20 "Brief Talking Sheet," dated April 27, 2008 (Bates No. MTAHQ HC 00012379)).

94.   While the COTS products continued to mature, some of the specified functionality would be met by changes to business rules, policies, procedures, training and documentation.  (*See* Hibri Dep. at 93-94, 144).

95.   Business rules should be informed by the constraints of the system so they might have to either modify the business rules or settle for less.  (*See* Hibri Dep. at 93-94, 144).

96.     Mr. Hibri also testified at his deposition that "it is reasonable to expect business people and IT people to work out these workaround[s] for the solutions."  (Hibri Dep. at 60-61).

97.     Mr. Patel agreed that "in his experience not all requirements may be met by COTS."  (Patel Dep. at 84:21-85:5).

98.     It is important to note, however, that at the time of Lockheed Martin's termination, the COTS vendors were still making changes to the COTS products to satisfy certain MTA requirements.  (Breitbeil Dep. at 272-276; Thomas Dep. at 170-171, 183, 200-202, 206-209).

**The IESS System Would Create a New Working Environment With an Impact on MTA and Its Agencies**

99.     Recognizing the necessary changes which would be dictated by the new IESS System, the RFP said "IESS/C3 SoS will have a significant impact on the MTA and its Agencies."  (Ex. J16, Vol. 6A, p. 39; *see also id*. at p. 17 ("The C3 Centers will create a new security working environment for the MTA and its Agencies.)").

100.     MTACC further recognized that the new environment necessitated the "establishment of additional procedures and integration with existing procedures across the MTA and its Agencies."  (Ex. J16, Vol. 6A, p. 37; *see also id*. (the IESS System would require a "Core Set of standard operating procedures for use by all MTA Agencies (which can be tailored by each Agency)"; *id*. at 39 (there will be "newly established operational priorities, guidance, direction and coordination"); *id*. at 17 ("a number of new policies and procedures must be established to coordinate information sharing within the MTA and its Agencies. . .  [that] will spell out how to coordinate the efforts of all MTA Agencies when responding to or recovering from a security event.").

- 18 -

101.    The RFP also recognized that such change would be difficult because "[a]gency-specific, operating environments make it difficult to develop standard methods of addressing incidents and provide a Common Operational Picture (COP)."  (Ex. J16, Vol. 6A, p. 7).

102.    MTA recognized that there the IESS/C3 SoS presents "some disadvantages over the [agencies'] current system; however, these disadvantages are more than offset by the new capabilities it provides."  (Ex. J16, p. 43).

**Lockheed Martin's Accepted Proposal Provided 100 Percent COTS With No Software Development**

103.    Lockheed Martin's Proposal includes numerous provisions proposing an one hundred percent (100 percent) COTS solution without any software development.  (Ex. LM 21, Chart listing Proposal excerpts regarding COTS; Ex. J9.1, Proposal Vol I; Ex. J9.2, Proposal Vol. II; Ex. J9.3, Proposal Vol III).

104.    MTA further asked that Lockheed Martin "confirm that all software components are COTS products," to which Lockheed Martin cited its Proposal and responded: "All software components of the system are Commercial off the Shelf (COTS) available products.  The major providers of the proposed system software are: Intergraph, Lenel, Oracle, and Microsoft.  It is also envisioned the selected Intelligent Video solutions will include COTS software that will be integrated with the system either via Intergraph's or Lenel's product suite." (Ex. LM 5, Response to Question 19, page 7).

105.    Lockheed Martin's solution included two primary COTS products: (1) Lenel OnGuard ("Lenel"), providing interface and control of event-wide products supporting access control, intrusion detection, and CCTV functions within IESS; and (2) Intergraph Public

Safety I/CAD product suite ("Intergraph") supporting the majority of the requisite C2 functions and providing interfaces to the other subsidiary products. (Ex. J9.2, Proposal Vol. II, p. 12).

106.    Lockheed Martin is one of the top ten integrators of Lenel equipment, including the successful installation and operation of New York and New Jersey Port Authority sites. (Ex. J9.2, Proposal Vol. II, p. 18).

107.    Lenel has more than 8,000 customers representing more than 10,000 systems. (Ex. J9.2, Proposal Vol. II, p. 13).

108.    Intergraph has installed more than 600 public safety systems worldwide, . . . include[ing] high-value installations such as The Port Authority of New York and New Jersey and Norfolk Naval Base, Virginia. (Ex. J9.2, Proposal Vol. II, p. 18).

109.    Lenel and Intergraph have evolved their products over ten (10) years on integrated security systems and public safety systems, and at the time of Lockheed Martin's Proposal, their products were already operational across Lenel and Intergraph's worldwide customer base. (Ex. J9.2, Proposal Vol. II, p. 13).

110.    MTA benefits from a COTS solution from future product enhancements across the security system marketplace that they will perform to the commercial standards. (Ex. J9.2, Proposal Vol. II Art. 2, p. 15).

111.    It was not feasible for custom software to be developed for MTA due to MTA's budget constraints identified in the RFP. (Ex. J 9.2, Proposal Vol. II, p. 34).

112.    The many benefits of COTS products are set forth below (*see* para 113 through para 119):

113.    COTS are more reasonably priced due to mitigating the costs and risks associated with developing customized interfaces and protocols (Ex. J9.2, Proposal Vol. II, p. 3);

- 20 -

114.    COTS are more reliable because the software has been proven through the use by other organizations and built on industry standards (Ex. J.9.1, Proposal Vol. I § 5, p. 14; Ex. J9.2 Proposal Vol. II § 3.1, p. 80);

115.    The use of COTS by other customers over a long period of time improves the quality (Ex. J9.1, Proposal Vol. I § 6, p. 16);

116.    COTS are more technically sophisticated because specialists within the given industry developed the software (Ex. J10.2, RFP Vol. 1, Agreement § IV(A)(3), p. 13; Ex. J16, Vol. 6A, Concept of Operations, App. B, Glossary, p. 63; *id*. § 4.0, p. 12-13; *id*. § 7.1, p. 37; *id*. App. B, p. 63);

117.    COTS are more technologically advanced because COTS vendors regularly update the software to stay competitive (Ex. J9.2, Proposal Vol. II, p. 15, § 2.2.1, p. 33);

118.    This design is truly cost-effective due to the availability of a COTS security management product line (Ex. J9.2, Proposal Vol. II, p. 1); and

119.    The COTS nature of the chosen product ensures performance to their expectations and maintenance by the manufactures in normal release cycles that keep the product fresh and compliant with technology improvements.  (Ex. J9.2, Proposal Vol. II, p. 12).

**MTA's Engineer Never Directed Lockheed Martin to Develop Custom Software**

120.    In this litigation, MTA contends that custom software should have been, and had to be, developed to meet MTA's requirements.  (Ex. J4 Counterclaims ¶ 54; *see also*, Ex. J6 Default Notice § V ("[F]ailing to prosecute includes[] developing the software . . . .").

121.    The contract required that "the modification for use of any COTS Software in the [project] shall be subject to the approval of the Engineer."  (Ex. J10.2, RFP Vol. 1, Agreement § IV(B)(2), p. 14).

DM1\4030184.1

122.    Moreover, the Contract required that "[u]nless prior MTA-CC approval is obtained, all Commercial-Off-The-Shelf (COTS) software products implemented in the [project] shall be utilized without modification."  (Ex. J13.11, RFP § 1AB.11, p. 2 of 4; *see* Ex. J10.2, RFP Vol. 1 Agreement § IV.B.3 ("The Contractor shall not implement any Software in the System, without prior approval of the Engineer, for which the only practical source available to the Authority for future maintenance and/or expansion is a single source vendor."); *see also*, Ex. J15.2, RFP Vol 2F Div. 25B § 3.0, p. 9 of 12 ("Software Development . . . Documentation for all [project] software shall be provided to MTA-CC for review and approval.")).

123.    At no time during the IESS project did MTA or the MTA Engineer ever direct Lockheed Martin to develop software or to modify COTS.  (Shields Dep. at 259:16 – 260:2; *see also*, Hibri Dep. at 101-03 (stating MTA never directed Lockheed Martin to write custom code or bolt ons)).

**COTS Was a Part of Lockheed Martin's Overall Proposal Solution**

124.    Lockheed Martin's Proposal provided that it would meet MTA's "budgetary constraints" with a multi-faceted "incremental" approach (Ex. J9.2, Proposal Vol. II Art. 2.2.1, p. 34), using configured COTS software, together with hardware, operator training, business rules, and policies and procedures.  (*id*. p. 6, 33).

125.    Specifically, "system effectiveness rests on people, policy, and process, in addition to hardware and software."  (Ex. J9.2, Proposal Vol II, p. 6).

126.    Lockheed Martin made clear that its:

> approach recognizes that advanced technology and a well-implemented COTS product integration are only part of the overall effort toward achieving MTA's mission objectives of improving its security information.  The technologies and products that are selected and deployed must be supported by validated processes and operated by appropriately trained staff.

- 22 -

(Ex. J9.2, Proposal Vol. II, p. 34).

127. Lockheed Martin's "approach takes into account people, technology, business rules, and budgetary constraints." (*id*.; *see also*, *id*. (stating it is an "incremental solution that takes into account the relevant technology, people, business rules, and budgetary constraints").

128. Because it was an "incremental" solution (*id*.), all capabilities were not available in the COTS products initially and would have to be addressed through enhancements in future COTS releases, and through modification of policies, business rules and operator training. *id*.

129. Paragraph intentionally left blank.

130. The COTS products are "very configurable," meaning that the products can be uniquely configured for each customer without the need for developing custom software. (Halsema Dep. at 84-85, June 19, 2012; Thomas Dep. at p. 86, 223-24, May 24, 2012; Viviano Dep. at 129-30, April 25, 2012 ("No reason to build a custom piece of software when there's vendors . . . that can meet . . . requirements"); (Bonatucci Dep. at 63, Mar. 2, 2011; Breitbeil Dep. at 271, 331, 339-340, Mar. 15, 2012).

131. Another of MTA's own litigation experts, Howard Reith, stated in his report that Lockheed Martin selected appropriate COTS software products for the project. (Ex. LM 22, Reith Report, dated June 21, 2011, p. 30).

132. Not only was Lockheed Martin's Proposal accepted and made part of the Contract (Ex. J10.2, RFP Vol. 1, p. 1, 2), during the project, Dnutch (MTA's on-project consultant and litigation experts) wrote, "we also do not see any documented evidence from the customer [MTA] that rejects or raises concerns about the proposed architecture . . . ." (Ex. LM

- 23 -

17, June 12, 2009 email from Dnutch with draft project assessment attached, p. 7 of 49 (Bates

No. Dnutche00010091); Oyekunle Dep. at 76-77).

133.     Dnutch worked with MTA throughout the course of the project and their

role on the project was to witness testing, provide project management support and oversight, as

a subcontractor to Parsons, and provide assessments of the project and system integration, and to

report same to Parsons and MTACC regularly.  (Dnutch 30(b)(6) (Hughes) Dep. at 19-24).

**Lockheed Martin's Proposal Said It Was Providing the Operator with Multiple Open Applications, Rather Than a Single Application**

134.     Paragraph intentionally left blank.

135.     Paragraph intentionally left blank.

136.     Lockheed Martin's Proposal made clear that:

The C2 operator workstations are multidisplay units providing the
ability to have many applications active while being able to
monitor status change on any of the applications . . . .

(Ex. J9.2 Proposal Vol. II at p. 41).

137.     Despite the fact that the RFP made clear that there was no expectation that

the IESS System would be integrated into one single application, MTA nevertheless failed tests

because all the information was "not integrated into a single application."  (*See* Dnutch 30(b)(6)

(Hughes) Dep. at 137; *see also* Ex. LM 23 Email from Suren Karavettil to Terrence Fetters,

dated Jan. 2, 2009 (Bates No. Dnutche00012165) ("The lack of integration has resulted in a

series of application islands that don't communicate except through the operator's brain.");

(Dnutch 30(b)(6) (Oyekunle) Dep. at 42 ("This system was not well-integrated); Schreibman

Dep. at 134 ("many of the Lenel functional[ity] could not be seen through the Intergraph

[graphical user interface]").

138.    MTA contends in this litigation that Lockheed Martin's work was fatally deficient and could never meet the requirements of the Contract because all information was not displayed in a single screen application.  (Ex. LM 24, Trans. of Pre-Motion Hearing before Hon. Paul G. Gardephe on April 19, 2013, p. 18).

139.    MTA's expert, Howard Reith, criticized Lockheed Martin's solution of "desktop" integration stating: The Lockheed solution did not provide that common operational picture.  Their integration effort was what they call integration to the desktop where they would have different vendor's applications running on the desktop and the user would move between the different vendor's windows . . . .  (Reith Dep. at 376; *see also* Dnutch 30(b)(6) (Oyekunle) Dep. at 94-95 (the COTS products "should be integrated so that the two of them will appear as one single application on your desktop, but not two separate applications. . . .  Lockheed Martin's solution had] separate applications on the desktop."); Dnutch 30(b)(6) (Hughes) Dep. at 137 (all information was "not integrated into a single application"); NYCT 30(b)(6) (Schreiman) Dep. at 134 ("many of the Lenel functional[ity] could not be seen through the Intergraph [graphical user interface]"); *see also* Ex. LM 23, January 2, 2009 email attaching Dnutch memo (Dnutch email "The lack of integration has resulted in a series of application islands that don't communicate except through the operator's brain").

**Lockheed Martin's Proposal Provided That Operators Would Select Responses to Security Events With the Aid of Text Based Task Lists and Policies**

140.    Paragraph intentionally left blank.

141.    When a security event was detected, the IESS System aided trained operators by presenting them with text procedures or task lists that had been developed by each MTA agency to aid the trained operator to respond to security events.  (J9.2, Proposal Vol. II, p. 91).

- 25 -

142.    "For each security event . . . the C2 system generates a task list from an emergency action plan established by the Police and the agency managers.  The operator can initiate various tasks automatically or manually."  (Ex. J16, RFP Vol. 6A, p. 18).

143.    Additionally, "[t]he system will be able to display agency procedures and other aids . . . ."  (Ex. J16, RFP Vol. 6A, p. 57).

144.    The RFP also made clear that the operator, not the IESS System, would be responsible to take appropriate actions to a security event when it said "[i]t should not be assumed that the system would be involved in all aspects of a response to a security threat."  (Ex. J16, Vol. 6A, p. 48); *see also id.* at p. 19 ("Existing Agency SOPs and procedures previously embedded into the system act as the guide for the response plan.  This will provide suggested courses of action for a response but it will be the responsibility of the incident commander to determine and implement the final course of action")).

145.    Lockheed Martin proposed an IESS System that would include "displays" of certain text policies or procedures, called "business rules".  (Ex. J9.2, Proposal Vol. II p. 34).

146.    In the context of the IESS project, "business rules" are procedural steps that lay out the way system operators respond to alarms and incidents and system-generated messages.  (*See* MNR 30(b)(6) (Ryan) Dep. at 193).

147.    As set forth in the RFP, business rules are used to generate a Response Plan when incidents occur.  (Ex. J11, Vol. 1A § 1.4, p. 5 of 11).

148.    Acting on the business rules, the IESS/C3 System alerts the C2 operator to an incident and provides the operator with a suggested action plan.  (Ex. J9.2, Proposal Vol. II at p. 35).

149.    Lockheed Martin throughout its Proposal sets forth that any Response Plan and decision aids provided would be in the form of "text based" policies and procedures

developed by MTA which suggested how operators should respond to security incidents.  (*See, e.g.*, Ex. J9.3, Proposal Vol. III, p. 19 ("[t]he Business Rules contribution to the program objectives include:  Development of policies and procedures that direct how people respond and interact to incidents, . . . .  [I]nformation and task lists to be encoded in command and control systems and available to users."); Ex. J9.2 p. 88 ("[a]lthough the principal conveyance of the scenarios will be narratives, graphical formats will also be utilized where needed to provide additional clarity of scenarios"); *id*. p. 91 ("[t]he Business Rules-based situation management capabilities of our selected C2 determine and present a response plan when an incident occurs"); *id.* "A set of High Level Objectives are encoded for each security event/alarm type, along with task lists that identify the appropriate response"); *id*. at 88 ("[t]he ConOps and Business Rules activities will result in documents that describe all of the key aspects of the project, the  system and the operation, including.  . . [r]esponses to defined incident conditions");  Ex. J9.3 p. 19 ("[a] key aspect of ConOps process is development of the set of Business Rules that the MTA Agency personnel will use to monitor MTA facilities and operations and provide coordinated response to incidents"); Ex. J9.2 p. 4 ("[o]ur design applies decision-support tools to suggest or direct operator actions based on operational policies that will be captured collaboratively with MTA[CC] as Agency-specific business rules within the system")).

   150. Despite those clear statements about "desktop integration" and loose coupling of COTS products, in this litigation, as reflected in the MTA Board briefings, the "agencies believed that they were getting much more automation" (Ex. LM 25 Email from Wael Hibri to David Horn, dated Jan. 12, 2009 (Bates No. MTAHQ_HC 00006219).  MTA's expert, Howard Reith, criticized Lockheed Martin's solution of "desktop" integration stating:

> The Lockheed solution did not provide that common operational picture.  Their integration effort was what they call integration to the desktop where they would have different vender's applications

> running on the desktop and the user would move between the
> different vendor's windows. . . .

(Reith Dep. at 376; *see also* Dnutch 30(b)(6) (Oyekunle) Dep. at 94-95 (the COTS products

"should be integrated so that the two of them will appear as one single application on your

desktop, but not two separate applications . . . .  everything that Lockheed Martin deployed, they

appeared as separate applications on the desktop.")).

151.   Nevertheless, MTA failed tests because the system was not fully

automated and required some human interaction.  (*See, e.g.,* Dnutch 30 (b)(6) (Oyekunle) Dep. at

62 ("Instead of the system being a fully automated system that handled the agency business

rules, it was a . . . hopscotch of manual activities and automated activities. . . . which means that

was not really an automated system because of the interruption of a lot of manual operations that

was involved.  And this was totally unacceptable . . . ."); Dnutch 30(b)(6) (Hughes) Dep. at 66

(Lockheed proposed a solution to have a human being implement the business rules)).

**MTACC Was Unable to Manage the Agencies, Was Significantly Understaffed, and
Lacked Sufficient Budget For the Work**

152.   MTACC executive Mysore Nagaraja demanded that:

> The agencies must meet their responsibilities to support ambitious
> testing schedules, help MTACC avoid any unnecessary contract
> change orders . . . . 'perfect cannot stand in the way of 'good'. . . .
>
> [M]oving agency personnel past traditional lines of division will be
> a challenge. . . .
>
> The project team is projecting a significant overrun in contingency
> for change orders to meet agency design change requirements.
>
> [T]he project suffered from sometimes inadequate design or testing
> support from the agencies . . . .

(Ex. 56, Attached memo dated Jan. 29, 2008 at p. 1, 3 MTAHQ_HC 00023659, 00023661).

153.   In February 2009, MTACC prepared a memorandum outlining the funding

needed to continue the IESS System project with "IMMEDIATE NEED [for] . . . 31.6 Million to

- 28 -

52.4 Million dollars," the exact amount depending on the under-river tunnel work.  (Ex. LM 27

email from Richard Miras to Veronique Hakim, dated Feb. 10, 2009 (Bates No. MTACC_E-

00529907-00529908)).

      154.    MTACC's Security Program Executive, Richard Miras, who oversaw all

MTACC's Security projects including the IESS project (Schreibman Dep. 220) said that "2

major issues confronting the IESS project is funding and network availability".  (Ex. LM 28

Steering Committee Meeting Minutes, dated November 13, 2008 (MTAHQ_HC 00006559); *see*

Ex. LM 29, Email from Veronique Hakim to Michael Horodniceanu and Linda Kleinbaum,

dated January 22, 2009 (Bates No. MTAHQ_HC 00006187); *see also*, Ex. LM 30, Draft Security

Talking Points for the Joint Briefing to MTA Safety and Security Committees, attached to an

email from Pezik dated January 10, 2009, p. 2, Item No. 2 ("[T]here are constraints that LM does

not control.  There are 2 major dependencies that were planned to be . . . completed . . .

[network] and [Communications Rooms]")).

      155.    On January 10, 2009, Ms. Hakim explained why the network and

communication rooms often abbreviated as "comm rooms" were important for the IESS System:

> However, there are constraints that LM does not control.  There are
> two major dependencies that were planned to be _–resolved so as
> not to impede this project completed within the original period of
> the Lockheed contract, but have not occurred.   Notably, this
> project depends on the fiber optic network to be able to transmit
> data from the agency network across the system by agency and to
> the Long Island City facility.   That network upgrade project is
> being done by Siemens, and is not complete.  So, we have a partial
> work around which is to lease fiber from Verizon, but that only
> works at certain facilities and does not provide connections to the
> Under River Tunnels.  So, there, the cameras will record locally,
> but information cannot cross to the other agencies or the Central
> C3   center.   In   addition,   within   the   various   locations
> Communication Rooms need to be upgraded to provide needed
> power and space for LM equipment.  This issue has significantly
> contributed to delays, but is slowly getting resolved.

- 29 -

(Ex. LM 30, Draft Security Talking Points for the Joint Briefing to MTA Safety and Security Committees, attached to an email from Pezik dated January 10, 2009, p. 2, Item No. 2 (deletions and emphasis in original)).

156.   Network upgrades required to support the IESS project were still not completed as of June 12, 2009, when Lockheed Martin was terminated.  (Shields Dep. at 44-46).

157.   The funding concerns continued for the months leading up to termination. (*See e.g.*, Ex. LM 31 Email from Ronald Saporita to Veronique Hakim, dated December 11, 2008 MTAHQ_HC 00019670 ("I trust that you are not so optimistic (unrealistic?) that you think you can cut scope to balance the budget"); Ex. LM 32 Email from Ronald Pezik to Ronald Saporita, dated Dec. 12, 2008 (Bates No. MTAHQ_HC 00010458) ("The project can not afford any additional costs for this new initiative without a commitment for funding.")).

158.   On January 16, 2009, MTA Project Manager, Pezik stated, "It is official I have no money."  (Ex. LM 33 Email from Ronald Pezik to Veronique Hakim and Richard Miras, dated January 16, 2009 (Bates No. MTACC_E-00 589063)).

159.   Viviano testified that MTA is not perfect and bears some responsibility for the problems.  (MTAPD 30(b)(6) (Viviano) Dep. at 298:20-299:8; 300:23-301:4), *see also*, Ex. LM 28 Steering Committee Meeting Minutes, dated Nov. 13, 2008 MTAHQ_HC 00006559; Ex. LM 29 Email from Veronique Hakim to Michael Horodniceanu and Linda Kleinbaum, dated Jan. 22, 2009  MTAHQ_HC 00006187)).

160.   MTACC Project Manager, Ron Pezik, testified that MTA failed to provide the network, which was still not in place as of June 2009.  (Pezik Dep. at 108-109).

161.   Further, there were "2 major dependencies that need to be resolved so as not to impede this project network . . . ."  (Ex. LM 34 Email from Veronique Hakim to David Horn, dated June 5, 2009 (Bates No. MTAHQ_HC 00023101)).

162.    Only days before termination, the MTA's Vice-President and General

Counsel Veronique Hakim stated the main agency concerns were "not all LM problems".  (*id*.).

163.    In March 2009, MTA's Independent Consulting Engineer similarly

declared the "project out of money."  (Ex. LM 35, IEC Background Briefing on MTA Capital

Security Program, by David Horn (Bates No. MTAHQ_HC 00033575-618) at MTAHQ_HC

00033613, p. 39).

164.    Paragraph intentionally left blank.

165.    Paragraph intentionally left blank.

166.    MTA hired David Horn from Carter & Burgess as the Independent

Consulting Engineer for oversight on MTA's Capital Security Program, with an initial focus on

the critical IESS/C3 project.  (Ex. LM 36, December 2005 Draft of the Executive Summary

(Bates No. MTAHQ_E 00008028)).

167.    Horn warned MTA of the following internal problems (Ex. LM 36, Carter

Burgess Report (Bates No. MTAHQ_E 00008028); Ex. LM 37, MTA Capital Security Program,

MTA Independent Engineering Consultant Review, dated March 26, 2007; Ex. LM 38,

December 12, 2006 MTA Capital Security Program, MTA Independent Engineering Consultant

Review (Bates No. MTAHQ_E 00008097); Ex. LM 39, December 16, 2006 MTA Capital

Security Program MTA Independent Engineering Consultant Review (Bates No. MTACC_E-

00586206) at p. 3);

168.    The MTACC team appeared to be significantly understaffed to manage the

IESS project and the entire security program (*See* Ex. LM 36, 12/05 Carter Burgess Report,

p. 25);

169.    MTACC was aggressively progressing work for which it did not have established budgets and had, by that time, obligated MTA to an unexpected $130.08 million budget increase (*id*. at p. 3);

170.    "MTACC [was] unable to effectively manage five agencies and entire Security Program," citing the "[p]arochial attitude of NYCT and MNR causing schedule (design delays) and cost (due to time extensions and claims)," and referencing MTACC as understaffed (Ex. LM 38, December 12, 2006 MTA Capital Security Program, MTA Independent Engineering Consultant Review (Bates No. MTAHQ_E 00008097) p. 4, 6);

171.    "Coordination/cooperation from selective MTA agencies [was] not apparent" and, in fact, the "agencies were managing MTACC."  (Ex. LM 39, December 16, 2006 MTA Capital Security Program MTA Independent Engineering Consultant Review (Bates No. MTACC_E-00586206) at p. 3);

172.    There were significant challenges in managing the complex IESS project because "coordination / cooperation from selective MTA agencies not apparent – agencies managing MTACC," and there was "no centralized, agency-wide, coordination of IT-related design choices leading to IESS/C3 System of Systems (SoS) functionality and capability risks from unresolved design issues."  (Ex. LM 39, December 16, 2006 MTA Independent Engineering Consultant Review, p. 3); and

173.    MTA failed to provide sufficient resources for the project , including a "lack of experienced MTACC managers and adequate number of project controls staff," which had the impact of "MTACC not effectively controlling project schedules, managing F/A costs, or performing effective oversight on projects."  (Ex. LM 39 12/12/2006 MTA Independent Engineering Consultant Review page 3).

- 32 -

**An Independent Peer Review Team Hired by MTA Found That MTACC Failed to Get Agency Acceptance to the Concept of an Overarching IESS System**

174.   In approximately late 2006, the MTA Board of Directors requested that a Peer Review Team be retained to review the progress of the IESS/C3 project.  (Horn Dep. at 21-22).

175.   In response, the Independent Engineering Consultant David Horn retained the company of SYColeman to lead an Independent Peer Review Team which consisted of personnel from SYColeman, ManTech International, Raul V. Bravo + Associates (RVB+A), and Integrated Strategic Resources (ISR), LLC, all of whom had experience in the areas of enterprise architecture and communications infrastructure, electronic security systems engineers, operations analysis and physical security specialists, and transit safety and security.  (Ex. LM 37 MTA Integrated Electronic Security System (IESS) Peer Review Interim Report at p. 1).

176.   As set forth below, there were three common themes of the problems created by the MTA and identified by the Peer Review Team.  (Ex. LM 37; Ex. LM 40; Ex. LM 41):

177.   First, the Peer Review Team concluded based on the findings set forth below that MTACC failed to establish an overall vision for the project (Ex. LM 37; Ex. LM 40):

178.   The RFP failed to define "an overall vision statement for the system, the high-level objectives, and operational, system and technical views."  (Ex. LM 37 Peer Review at 2, Item 1.2.3);

179.   MTACC's failure to develop a vision for the IESS System, in the form of an Enterprise Architecture ("EA") "precludes system definition for the purposes of integration, interoperability, and mitigation of legacy systems into the IESS."  (Ex. LM 40 MTA ITESS Peer Review Report, at 12, item 3.1.2 (MTACC_HC 0004873); and

- 33 -

180.    The lack of a complete EA can also lead to myriad other problems, including a lack of understanding of the overarching purpose of the system among the MTA's agencies and stakeholders.  (*id*.; *see also id*. at A-4 ("The EA functionality, missing [was] vital to developing a complex system such as the IESS/C3 SoS.") (Ex. LM 37, 3/26/2009 Horn Report at A4).

181.    Notably, the scope of work did not require LM to create an overall Enterprise Architecture.  (Ex. LM 41 Email from Ronald Pezik to David Horn dated August 8, 2008 (Bates No. MTAHQ_HC 00015970)).

182.    Second, the Peer Review Team concluded that ("[t]here is no one entity responsible for the overarching direction of the IESS/C3 SoS."  (Ex. LM 37 3/26/2007 Peer Review at 10, Item 2.7; *see also id*. at B-3 ("there [was] no agency level direction for security").

183.    Third, the Peer Review Team concluded based on the findings below that "the operating agencies appear to lack buy-in to the concept of an overarching IESS."  (Ex. LM 37 3/26/2007 Peer Review at 10, Item 2.7; *see also id*. at E1, Section 3 there is ("general lack of buy-in by the operating agencies of an overarching IESS"); Ex. LM 39).

184.    "The IESS represents a major modification to the MTA. . . .  Successful change programs occur because the organization gets the buy in of its members. . . ."  (Ex. LM 37, 3/26/07 Peer Review at E-2);

185.    "[T]he initial vision has not been sustained or well communicated to the operating agencies."  (Ex. LM 100, 4/12/2007 Peer Review, MTAHQ-E 00006348, Item 2.7); and

186.    MTA's security program was suffering from a "departure from the common strategic focus."  (Ex. LM 37, 3/26/2007 Peer Review at A-3).

187.    As part of its work, the Peer Review Team also conducted interviews with each of the agencies prior to writing its report.  (Ex. LM 37, 3/26/07 Peer Review, § 1.2.7, Appendix C).

188.    After conducting agency interviews, the Peer Review Team summarized and reported on the following similar "Common Agency Issues" (Ex. LM 37):

189.    Fundamental change management principles must be addressed to gain stakeholder buy in and support of the IESS System (Ex. LM 37 Peer Review Report 1 at 10);

190.    There is a feeling of disenfranchisement by agencies (*id*. at 10, referencing Appendix C to report);

191.    A consistently applied definition of what constitutes IESS is lacking (*id*.);

192.    LM was no longer able to speak with MTA operating agency directly per direction of the MTACC engineer (*id*.);

193.    IESS is being implemented without any real consideration of user agency desires (*id*., Appendix C; Peer Review Report 1 at A-3);

194.    For example:  agencies were only allowed 10 working days to review and comment or implementation would proceed as described in the documents (*id*. at A-2);

195.    IESS lacked internal consistency (*id*. at A3.);

196.    There is no integration plan that includes all legacy equipment (*id*.);

197.    There is no decision on how maintenance or system upgrades will be accomplished (*id*.);

198.    There were concerns about developing a network that will meet all of the agency's needs when each agency has different operating rules (*id*. at 1 at C-11);

199.    Agencies had their own ongoing security initiatives and projects, some of which they expected to later interface with the IESS/C3 (*id*. at Appendix C "Stakeholder Meeting Notes");

200.    Each agency has a different view of what the IESS System will accomplish (*id*. at § 1.2.7, Appendix C);

201.    MTA operating agencies prefer their current access control systems (*id*. at Appendix C);

202.    MTAPD had strong concerns that their mandated responsibilities have not yet been accounted for in the IESS development (*id*. at p. 10.);

203.    Agencies never approved preliminary design review (*id*. at 1 at A-2);

204.    One agency wants to create an electronic fence to protect critical assets (*id*.);

205.    Equipment viewed as necessary by one agency is to be dropped by IESS, leaving a blind spot for that agency (*id*. at Appendix C);

206.    Agency has no input into business rules and mobile command development efforts (*id*. at Appendix C);

207.    MTAPD presented its records management system and computer aided dispatch information for consideration to MTACC and LM and it was requested that they move away from their present system (*id*. at Appendix C);

208.    Agencies had divergent views on the purpose of the IESS SoS in terms of what the protected assets are (people or infrastructure) and the purpose of the IESS System (incident prevention or forensic data gathering) (Ex. LM 40, 12/3/07 Peer Review at 4, 8, 10-11);

209.    Each agency had a different view of the purpose and functionality of the IESS (*id*. at E-1, p. 4, 8, 10-11);

- 36 -

210.    One agency believed IESS/C3 could not be built (Ex. LM 37 at C-23); and

211.    NYCT had specific reservations regarding equipment.  (*id*. at C13-15).

212.    Further the Peer Review Report stated that "[t]he IESS represents a major modification to the MTA" and "[m]ost of the common theme concerns expressed by the agencies in Appendix C [of the Peer Review Report] are a direct result of a breakdown in the change management strategy for the organization."  (Ex. LM 37 3/26/07 Peer Review at E-2).

213.    The report went on to state that "the IESS/C3 effort represented a new culture for the MTA operating agencies."  (*id*. at A-2).

214.    Moreover stating, "There have been significant issues raised involving people, approaches to the technology integration, and information sharing needs to be dealt with."  (*id*. at A-1, Item A.2).

215.    Even after the Peer Review was submitted to MTACC for review, MTACC failed to recognize the importance of coordinating the needs of the agencies, stating "[w]e question this finding that the MTA operating agencies must be included in the design process and acceptance of CDR." (Ex. LM 43, Bates No. MTACC_E 00435826 at 4).

216.    In April 2007, MTACC Acting Program Manager, Joseph Christen, commented on the initial Peer Review Report and stated:

> I believe given as much time as we wanted still would not have yielded a completely agreed to unified design.  There is no way for all of the Agencies to get the customized installation they desire and keep the overall design unified and standardized."

(Ex. LM 43 email from Joseph Christen to Ronald Pezik., dated April 3, 2007 (Bates No. MTACC_E 00435826) at 2).

**The Peer Review Team Also Found that MTA Failed to Provide the Required Network**

217.   Acquisition of the network and appropriate bandwidth was MTACC's responsibility.  (Ex. LM 37 3/26/07 Peer Review at C-32).

218.   For example, the Peer Review Team reported that there was no assurance that the backbone would be sufficient and that an insufficient backbone would negatively affect the initial operability capability (IOC) and any future expansion.  (*id*. at 12, Item 2.10).

219.   MTACC and several agencies raised similar concerns about MTA's ability to deliver a suitable network.  *id*. at C-32 ("MTA CC is concerned that the network… lacks sufficient bandwidth," "LIRR has identified that their fiber optic network does not have sufficient capacity," "NYCT also does not have sufficient bandwidth"); *id*. at 10, Item 2.7 ("MTAPD's needs were not met due to the network to be supplied by MTACC").

**MTACC Was Not Able to "Control" the Agencies Who Refused to Recognize MTACC's Authority as the Decision Maker on the Project**

220.   MTACC Project Manager testified that "there was no central body that could control all these agencies".  (Patel Dep. at 197); *see also* (Ex. LM 44 Talking Points for the Joint Briefing to the MTACC and MTA Safety and Security Committees, dated Jan. 2009 (Bates No. MTABT_E-0000228528) (IESS is "the first project that involves all of the agencies and MTAPD, and as such, lacked centralized leadership"); see also Ex. LM 26 (Bates No. MTAHQ_HC 00006218) (in MTA Board briefing, MTA "management of the project needs to be strengthened. . . (leadership, accountability, and ownership) . . . agencies [say] it is an MTACC project [and] no single person has . . . decision making authority when agencies disagree").

221.   Because this was the first "all agency" project, MTA relied on the use of committees to coordinate decisions between the agencies.  (Horodniceaneu Dep. at 34-37).

222.     No one person took charge; instead, MTA's steering committee was run by "majority vote".  (MTAPD 30(b)(6) (Viviano) Dep. at 213); *see also* B&T 30(b)(6) (Hansen) Dep. at 79) (referring to the steering committee, "all the Agency's voices and opinions were heard, we collectively made decisions"); (LIRR 30(b)(6) (Hyland) Dep. at 178 (same); (NYCT 30(b)(6) (Shreibman) Dep. at 129-30) (same); *see also* (MNR 30(b)(6) (Ryan) Dep. at p. 99-100, 102) (steering committee did not overrule a decision made by an agency, nor did it have the authority to do so).

223.     Finally, in January 2009, MTA acknowledged the problems with its decision making style.  (Ex. LM 45 Email from Kleinbaum to Veronique Hakim and Michael Horodniceanu, dated January 14, 2009 (Bates No. MTAHQ_HC 00006198) ("while working by committee is good, it's not good enough to resolves these issues and bring this system on line")).

224.     At that time, the MTA Independent Consulting Engineer noted a lack of trust between MTACC and the agencies.  See Ex. LM 35 MTA Independent's Consulting Engineer's Report, dated March 2009 (Bates No. MTAHQ_HC 00033577) ("MTACC wants to make unilateral changes"; " [l]ack of [a]gency trust").

225.     In [2008], the Comptroller Report recognized the problems at MTA and MTA executives wrote "Comptroller is putting us in a contractual bind.  They should delete the language saying 'since the MTA never imposed uniform standards on the operating agencies for… the operating agencies have had to overcome their reluctance to adopt new standards.'" (Ex. LM 46 Email form Ronald Saporita to Veronique Hakim dated October 23, 2008 (Bates No. MTAHQ_HC 00009317)).

226.     In July 2009, shortly after termination, MTA executives said "MTACC must take the lead but not let the individual agencies dictate direction at this state, as we will

- 39 -

continue to have nothing to show for our efforts".  (Ex. LM 47 Meeting Minutes, dated July 9, 2009 (Bates No. MTAHQ_HC 00025614)).

227.    MTA and all agencies agreed to a ten (10) day review time of Lockheed Martin's deliverables, including design documents, which was necessary to meet the aggressive project duration (Patel Dep. at 170; Ex. LM 48 Email from Ashok Patel to Joseph Christen, dated Sept. 25, 2005 (Bates No. MTACC_E-00452902)).

228.    On October 28, 2005, a mere sixty (60) days after the IESS/C3 contract was awarded, a Lockheed Martin employee reported that NYCT was holding up the business rules because NYCT did not "see benefit" to the IESS System (Ex. LM 49 Email from Lovitt to Mark Gaffney, Terrence Fetters, April Panzer, and Joseph Christen, dated October 30, 2009 (Bates No. PTG_E 00076100)).

229.    When pressed to comply with the ten (10) day review period, agencies such as NYCT pushed back and could not fulfill the commitment.  (Ex. LM 50 Email from Ronald Pezik to Richard Miras and Veronique Hakim, dated March 27, 2009 (Bates No. MTACC_E-00528016)  ("I contend NYCT can not fulfill  their commitment to support … so they changed the rules to suit themselves.")  Pezik Dep. at 421-23,465-466:10 (NYCT out of control).

230.    "[I]t is scary at best that we have no comments from anyone [on test procedures] . . . .  [Lockheed Martin] is going to have a case that they followed the review process and the Testing is being delayed due to no cause of their own."  (Ex. LM 51 Email from Kenneth Shields to Terrence Fetters, dated April 23, 2007 (Bates No. URS_E-00164819); *see also* (Ex. LM 52 Email from Terrence Fetters to Ronald Pezik, dated August 7, 2007 (Bates No. PTG_E 00041630)).

231.    On September 15, 2005, LIRR stated that it "has not committed to a 10 day turn-around for submittal review."  (Ex. LM 48 Email from Ashok Patel to Joseph Christen, dated Sept. 25, 2005 (Bates No. MTACC_E-00452902)

232.    In one instance, NYCT was supposed to deliver documentation regarding legacy systems but after more than 12 months of nonperformance, MTACC was forced to direct Lockheed Martin to investigate site conditions and reverse engineer to identify the legacy systems.  (Ex. LM 60 Email from Donato Antonucci to Kenenth Shields, dated Feb. 9, 2007) (Bates No. LM-E-00106058-00106060); *see also*, Ex. LM 101, MTACC response to RFI 268 at ProjectSolve C-52038 - Design and Installation of an Integrated Electronic Security System & Security Operations (C3) Centers > 08 RFI's > MTA RFI's > MTA RFI 268 - NYCT 13 URT Legacy Systems_Resp.Doc)).

233.    MTACC initial project manager, Joe Christen, voiced his concern about NYCT's commitment to the project saying that "this could kill us" and "we [MTACC] still have selling to do on the CC side".  (Ex. LM 54, Email from Bradley Lovitt to Joseph Christen and others, dated October 30, 2005 (Bates No. MTACC_E 00298535) at p. 4)).

234.    MTA was unable to "control" the agencies.  (Patel Dep. at 196-197).

235.    MTA Project Manager, Pezik, wrote in frustration "[i]t seems no matter how many times you tell people that in order to complete this Contract it can't be business as usual . . . the more it remains the same."  (Ex. LM 55 Email from Ronald Pezik to Stanley Grill dated July 8, 2008 (Bates No. MTATA_E 00709105)).

**MTACC Recognized The Benefits Lockheed Martin Provided**

236.    In January 2008, MTA executives commented on the difficulties Lockheed Martin experienced with the agencies but recognized that Lockheed Martin had made significant accomplishments in spite of the internal problems at MTA:

The contractor has had to work with and attempt to integrate IESS into agency systems that were never designed to be coordinated. In addition, the agencies have sought to define specifications and requirements in ways that are closely aligned with their existing operations.  An early result of this was during the requirements phase of the contract when, despite intense efforts by the contractor, MTACC, and all operating agencies to define a unified set of business rules for the system, we still came away with other 4,500 functional requirements . . . .

The contractor has responded positively to our actions by adding designers and engaging senior staff in the project.

Basic software functionality exists today . . . .

(Ex. LM 56, January 29, 2008 Draft Memorandum from Mysore Nagaraja (Bates No.

MTAHQ_HC23659) at p. 3-4 of memo.

237.   One (1) year later on January 26, 2009, in talking points prepared by Vice

President and General Counsel Veronique Hakim for MTA's board members, MTACC wrote as

follows:  "In terms of Software Functionality, the system will work (as recently proven out at the

Central C3 Center in LIC), and there may be further enhancements over time . . . ."  (Ex. LM 30,

Draft Talking Points for the Joint Briefing to the MTA Safety and Security Committees, p. 2,

Item No. 2).

238.   MTA official testified that before the Lockheed Martin termination,

progress and positive results were being made on the project.  (*See* Hibri Dep. at 53-54, 122-124,

134-136, 296 (stating he was disappointed LM terminated because progress being made,

termination was not the better option; positive results being attained).

239.   After termination, Lockheed Martin offered to assign all its agreements

and purchase orders to MTA (Ex. LM 57, Letter from Michael Chartan to Ira Lipton dated July

29, 2009; Ex. LM 58, Letter from Michael Chartan to Ira Lipton, dated July 30, 2009).

240.    MTA refused to accept the assignment offer.  (Ex. LM 59, Letter from Ira Lipton to Michael Chartan, dated August 5, 2009).

241.    MTACC independently retained the very same contractors and vendors which had engaged by Lockheed Martin.  (Breitbeil Dep. at p. 327, 352; Christen Dep. at 78-80).

242.    MTA also abandoned the testing of each and every requirement with all of the agencies present because MTA now determined that "the requirements were not needed to become operational."  (*See* MTAPD Rule 30(b)(6) (Viviano) Dep. at 102-03 ("we didn't rely on the existing requirements.  We basically said this is what we need to become operational . . . . we never looked to compare them, whether or not they met their requirements"); Ex. LM 61, Executive Summary of Path Forward, dated January 7, 2010 (Bates No. MTAHQ_HC 00026263) ("Once the system has the basic operational functionality a plan forward to get a system meeting the originally envisioned goals, but not the specific requirements can be developed"); Breitbeil Dep. at. 352:5-15; 366:19-367:13).

243.    MTA also abandoned the formal testing phases of FAT and SIST and instead, developed an acceptance procedure so that after the IESS System was stable for 30 days, the agencies would be deemed to have accepted the IESS System.  (MTAPD Rule 30(b)(6) (Viviano) Dep. at 106-07).

244.    Only a month after Lockheed Martin's termination, MTA recognized that Lockheed Martin's work had provided value and was nearing "beneficial use" at termination. (Ex. LM 47 Meeting Minutes dated July 9, 2009 (Bates No. MTAHQ_HC 00025614) (minutes reflect that MTA agreed that the current "approach is to complete portions of IESS work that are close to Beneficial Use")).

245.    In meeting minutes from July 9, 2009, Chief Morange (MTA's Director of Security) said that "MTACC must take the lead but not let the individual agencies dictate

direction at this state, as we will continue to have nothing to show for our efforts."  (Ex. LM 47

Meeting Minutes, dated July 9, 2009 (Bates No. MTAHQ_HC 00025614)).

       246.    Notes from Pre-Steering Committee Meetings with agencies reflect the

following observations:  The "agencies need one voice to 'control' improvements/changes to

IESS[;] past attempts to "control" IT-type actions at individual agencies did not work; need firm

commitment from agencies to follow one path [–] perhaps utilize a renewable MOU agreed to by

Agency Presidents".  (Ex. LM 62 Email from David Horn to William Morange attaching Notes

(Bates No. MTAHQ_HC 00006710)).

**Testing on the Project was a Free For All Because There was No One Voice for the**
**Agencies and Failed Tests Before They Were Run**

       247.    Numerous agency representatives participated in testing, along with MTA

consultants, the commissioning agent and Lockheed Martin.  (Viviano Dep. at 232:7-233:10).

       248.    Moreover, MTA's consultants demanded that a specific technology (called

a standard bus architecture) required to have the level of integration MTA wanted but recognized

that it was "not a strict requirement of the contract."  (Ex. LM 23 Email from Suren Karavettil to

Terrence Fetters, dated Jan. 2, 2009, memo p. 2; Dnutch 30(b)(6) (Oyekunle) Dep. at 55-56

(Dnutch admitted that the lack of this technology is "why we had problems passing some of the

requirements.")).

       249.    As per the Contract, the Commissioning Agent was to "develop detailed

commissioning specifications, coordinate the execution of a testing plan, observe and document

performance and verify whether systems are functioning in accordance with the documented

design intent and in accordance with the accepted final design documents."  (Ex. J12, RFP, Vol.

2A, "Specification Section IX," § 1.2(a)); Martinez Dep. 326:25-327:10 (The commissioning

agent on this project was SYSTRA Engineering, Inc. and its lead representative assigned to the project was Linda Martinez ("Commissioning Agent").)).

250.    MTA representatives and consultants were able to "vote" on their view of test results.  (*See* Fetters Dep. at 173 (the posttest record would reflect that [the Commissioning Agent] were one vote of many)).

251.    "All agencies had a voice at testing."  (Viviano Dep. at p. 233, 296-298).

252.    On more than one occasion an MTACC or agency representative arrived for scheduled testing and declared that they were instructed to fail the test regardless of what they saw during testing.  *See e.g.,*  Ivanic Dep. at 45:11-23 (Commissioning Agent said "I will fail everything today, before we start doing a test").

253.    Agencies also disagreed on testing results with one agency considering certain requirements as "passed" and another agency declaring the very same test as "failed". (Ex. LM 63 Email from Ben Oyekunle to Terrence Fetters, dated April 22, 2009 (Bates No. PTG_E-00023657)).

254.    In other instances, the Commissioning Agent and the agencies disagreed on the proper testing result, each demanding something different.  (Ivanic Dep. at p. 41-42; Ex. LM 102, Huggins Ex. 33 excerpt at 4; *e.g.*, Viviano Dep. 283:14-285:21 (testifying about an email chain wherein Michael Lee of MTAPD agreed that a requirement was passed, and Linda Martinez the Commissioning Agent, stated that "[i]n looking at these requirements and the justification for changing the outcome to pass from fail the [Commissioning Agent] is not in agreement at all."); Ex. 64, Email from Linda Martinez to Terrence Fetters and Avery Huggins, dated November 08, 2007 PTGE00046288; Ex. LM 49, Email from Lovitt to Fetters and Gaffney, dated October 30, 3009 (Bates No. PTG_E 00076100) (NYCT sees no benefit to IESS System).

- 45 -

255.     In other situations, MTA agencies would agree to the testing success criteria for a specific requirement and then, fail the requirement during testing because the MTA disagreed with the validity of the evaluation metric after the testing had occurred.  (Steinbock Dep. at 30-31; Ex. LM 65, Email from John Steinbock to Jim Williamson, dated March 12, 2009 (Bates No. LM-E-00808498)).

256.     At his deposition, MTACC's initial Project Manager, Mr. Patel, acknowledged that the agencies were difficult and there were opinions expressed that they were not cooperating.  (Patel Dep. at 195-196; Ex. LM 66 "MTA Capital Security Program – MTA Independent Engineering Consultant dated December 2006 (Bates No. MTACC_E-00586206)).

257.     MTACC's second Project Manager Mr. Pezik testified at his deposition that MTAPD "raised issues that may have gone beyond the boundaries of the contract."  (Pezik Dep. at 619:10-619:19, 630:14-630:18; *see also* Ex. LM 67 April 21, 2009 email written by Pezik (Bates No. MTACC_E-00506992) ("it is imperative that we look at the determination of [MTAPD beneficial use] in a fair and reasonable way recognizing that the contract is not explicit in many of the issues that we have been establishing as a gate for [beneficial use]"); *see also* Patel Dep. at 51:6-52:18 (after RFP released, agencies had a wish list of items they wanted to include that were not originally considered or items that they changed their minds).

258.     Eventually, MTACC instructed the agencies to be more flexible in their interpretation of the contract requirements.  However at least one agency disagreed with MTACC's approach and refused to change their course of conduct.  (MNR (30(b)(6)) (Ryan) Dep. at 182:20-187:3).

259.     As reflected in the testimony of an executive of one of the COTS vendors, Intergraph, even if additional resources were available for the project, the lack of agency concurrence on the interpretation of requirements would render additional resources ineffective.

(Thomas Dep. at 231; *see also* Martinez Dep. at 118-19 (there were disagreements regarding agency interpretation of requirements)).

260.    In a board briefing, it was stated that "agencies thought they were getting more automation."  (Ex. LM 26 Email from Wael Hibri to David Horn, dated Jan. 12, 2009 (Bates No. MTAHQ_HC 00006218)).

261.    On April 3, 2009, only months before Lockheed Martin was terminated, MTA executives met with NYCT because over $10M in scope had been added to the project as a result of NYCT design/construction changes.  (Pezik Dep. at 464-474 (discussion related to Exhibits 19-23 regarding MTACC's difficulties with NYCT)).

262.    The MTA President's Briefing references the need to "[m]anag[e] [a]gency [e]xpectations to avoid scope creep and out of scope work."  (Ex. LM 68 President's Briefing Sheet, dated January 14, 2008 (Bates No. MTAHQ_HC 00024228); Ex. LM 45 MTAHQ_HC 00006198 ("[S]top scope creep by controlling opening day functionality to what was originally planned")).

263.    Also in April 2009, MTACC was drafting a letter to Lockheed Martin about "the final requirements for MTAPD, BU [Beneficial Use]" for MTAPD's Long Island City Central C3 facility, and MTACC asked MTAPD to comment on the draft letter proposal by Ron Pezik, MTACC's Project Manager.  (Ex. LM 69, email from Pezik dated April 23, 2009 to Viviano and others at MTAPD (Bates No. MTACC_E-0531236-37)).

264.    After receiving MTAPD's comments, Mr. Pezik wrote on May 1, 2009 to MTA executives that MTAPD was "establishing criterions [sic] that is not supported by the Contract" and "[a]s such we can not respond to LM for BU."  (Ex. LM 69, email from Pezik to Veronique Hakim, Richard Miras dated May 1, 2009 (Bates No. MTACCC_E-053126-37)).

- 47 -

265.   In January 2009, only months before termination, MTA executives warned that agency expectations were out of line with the functionality expected in the RFP, saying "important to have realistic expectations of what this system was intended to be - - primarily an extension of our eyes and ears at various critical facilities."  (Ex. LM 29 Email from Veronique Hakim to Michael Horodniceanu and Linda Kleinbaum dated January 22, 2009 (Bates No. MTAHQ_HC 00006187)).

266.   According to the MTA's Engineer, Kenneth Shields of record even after termination, agencies were still attempting to add work to the project.  (Shields Dep. at 557-58).

267.   Nevertheless, the evidence reflects that at least the one agency did not want the "common" approach contemplated by the IESS System and instead preferred to use their existing systems.  (Ex. LM 61, Executive Summary of Path Forward (Bates No. MTAHQ_HC 00026263) at p. 3 (stating that MTA decided that MTAPD would stay with its existing Tiburon system for dispatch)).

268.   Another agency not only preferred their own system but also turned the equipment furnished for IESS to be used as "spare parts".  (*See*, Ex. LM 61, Executive Summary of Path Forward (Bates No. MTAHQ_HC 00026263) stating that Bridges & Tunnels "decided to incorporate the IESS monitored locations into their existing AW-34 system . . . .  The equipment furnished by IESS that are now not needed as a result will be given back to the project to complete potions left undone or to be used as spare parts")).

**MTA Created New Testing Metrics Which Had Not Been Agreed by the Parties or Included in the Approved Test and Evaluation Master Plan Which Governed Testing**

269.   The Contract required Lockheed Martin to develop and submit a TEMP for MTA approval.  (Ex. J. 10.2 RFP Vol. I, § I.B.2 at p. 3-4).

270.     Testing was supposed to be controlled by the Test and Evaluation Master Plan ("TEMP"), which was approved by MTACC for this project.  (Ex. LM 70, September 6, 2007 letter from MTA to Lockheed Martin (IESS MTA-CCM/LM – 00533)).

271.     The TEMP went through numerous iterations before it was approved by MTACC on September 6, 2007.  (Ex. LM 71 Test and Evaluation Master Plan E.2 dated April 16, 2007; Ex. LM 72 Test and Evaluation Master Plan Rev. F.1, dated July 23, 2007).

272.     The TEMP governed testing.  (Martinez Dep. at 274; Viviano Dep. at 220-221, 238; Ryan Dep. at 160; Hyland Dep. at 194-195; Hansen Dep. at 151).

273.     The TEMP set forth how testing was to be conducted and how the testing would be measured by using an agreed up test metric.  (Ex. LM 72, TEMP p. 22, 42).

274.     The approved TEMP stated in relevant part that it:

> [A]pplies to the development, delivery and acceptance of the IESS/C3 System.  The TEMP defines the plan for validating and verifying that the implemented system meets the requirements, documents the test program strategy to meet the requirements, and describes a set of integrated tests of systems hardware and Commercial Off the Shelf (COTS) software.  In addition, this document defines the test plans that will be submitted, the sequence of tests and the scope of the test to be performed under this contract.

(Ex. LM 72 TEMP, Rev. F.1, July 23, 2007).

275.     The TEMP did not include a minimum pass rate or score required for completion of FAT testing.  (EX. LM 72 Temp. Rev. F.1, dated July 23, 2007)

276.     The approved TEMP only required that through all testing phases including Site Integration System Testing ("SIST") complete a 90 percent requirements pass rate overall across all tests was required.  (Ex. LM 72 TEMP Revision F.1 at 23).

277.     At the time of Lockheed Martin's termination, SIST testing was still underway.  (Ex. J6 June 5, 2009 Default Notice p. 6).

- 49 -

278.     The approved TEMP also provided that at SIST Severity 3 variances would be prioritized in a punch list and worked off in an agreed upon time frame and that Severity 4 variances did not constitute requirements non-compliance.  (Ex. LM 72 TEMP Revision F.1 at 24).

279.     MTA's Program Manager Ronald Pezik acknowledged in a Steering Committee Meeting that "MTA has no minimum acceptance rate for FAT testing."  (Ex. LM 73, March 20, 2008 Steering Committee Meeting Minutes (Bates No. MTAHQ_HC 00020466-69) at MTAHQ_HC 00020468, Item No. 062.03).

280.     The Commissioning Agent for the project Linda Martinez "in no way recommended or promoted a hundred percent pass prior to leaving FAT [testing] and moving forward."  (Martinez Dep. at 267:5-268:8).

281.     30(b)(6) witness for NYCT testified that there was no exit criteria for completion of the FAT testing phase.  (Schreibman Dep. at 166:11-166:16).

282.     30(b)(6) witness for MNR also testified that he was unaware of a requirement that a certain number of tests in the FAT testing phase must be passed before moving forward.  (Ryan Dep. at 178:9-14).

283.     This fact was readily acknowledged by MTA Program Manager, Pezik, the Commissioning Agent Linda Martinez, MNR, NYCT and MTA's consultant.  (Ex. LM 73 MTAHQ_HC 00020468; Martinez Dep. at 267:5-268:8; Schreibman Dep. at 166:11-166:16; Ryan Dep. at 178:9-14; Oyekunle Dep. at 82-83).

284.     Regarding a high pass rate to exit FAT testing phase, MTA's consultant and litigation expert, Dnutch, testified that didn't "expect any body to write that type of requirement in any RFP."  (Oyekunle Dep. at 82-83).

285.     MTA's Vice President Veronique Hakim wrote during the project that "[h]aving open issues during Software testing is not unusual or unanticipated . . . .  [The] goal is to achieve an initial operating capability with the system while other less critical deviations are worked."  (Ex. LM 74, June 11, 2008 email from Hakim with draft talking points memo attached (Bates No. MTAHQ_HC 00009059-61) at MTAHQ_HC 00009060).

286.     Hakim wrote in an email to Lockheed Martin that "[r]egarding software acceptance we agreed to interpret the contract in a manner in which [Lockheed Martin] could proceed with SIST [testing] by agency absent all functionality issues being resolved."  (Ex. LM 75, January 14, 2009 email from Hakim to Lockheed Martin (Bates No. LM-E-00527359).

287.     MTA nevertheless demanded in its Default Notice that to successfully complete FAT testing, Lockheed Martin had to pass 100 percent of the tests.  (Ex. J6, Default Notice § IV(A), p. 5).

288.     MTA erroneously places substantial reliance in this litigation on contrived software test pass rate formulas, industry practice and its litigation expert's experience, none of which were in the TEMP nor methods and formulas approved by the parties during the course of the project.  (*See*, Ex. J4 Counterclaims ¶¶ 27-29; Ex. LM 22, June 21, 2011 MTA's Expert Report on Deficiencies in the IESS/C3 Project and the Cost of Remediation by Howard Reith, p. 29; Ex. LM 76, November 29, 2012 Lockheed Martin's Supplemental Report/Expert Rebuttal to the Report of Howard Reith § II(D) p. 13, p. 14 ¶ 1).

**The Showstoppers Were Satisfied and Closed**

289.     In May 2008, Lockheed Martin recommended that it conduct a demonstration of the overall functionality of the IESS System to provide a qualitative view of its capabilities through an Operational Readiness Workshop (ORW).  (Blizzard Dep. at 307:4-308:2)

290.    The ORW was attended by more than (80) MTA representatives.  (Fetters Dep. at 421-423; Ex. J7, Cure Response).

291.    From that meeting, MTA identified four (4) areas of specific concern, referred to as "show stoppers".  (Fetters Dep. at 421-423; Ex. J7, Cure Response; *see also* Hibri Dep. at 94 (showstoppers were key to initial operating capability to start using the system)).

292.    In mid-2008, MTA placed the testing failures into four (4) categories, or buckets, and called them "Showstoppers".  (Ex. LM 77, July 18, 2008 letter number 1253 from MTA to Lockheed Martin; Pezik Dep. at 88:6-17, 90:14-91:5; Fetters Dep. at 232 (stating July 18, 2008 letter number 1253 identified the four show stoppers (Bates No. LM-E 00577948)).

293.    On July 18, 2008, MTACC advised Lockheed Martin that the explanations and information that was provided to MTACC during the ORW was acceptable and that Lockheed Martin could proceed with the approaches presented.  (Ex. LM 77,  LM-E-00577948).

294.    In an e-mail to several high level project personnel, MTA's Vice President and General Counsel, Veronique Hakim stated:

> Overall, we expect to be satisfied with the functionality [of FAT software testing], after working through certain issues with the vendor.  We feel that the process which is currently underway provides a reasonable way to proceed and to assure that the system functionality will be consistent with the Agencies' expectations as recently demonstrated.

(Ex. LM 78, Email from Veronique Hakim to Linda Kleinbaum, Richard Miras, Ronald Pezik, dated June 24, 2008 (Bates No. MTACC_E-00534451-52)).

295.    LM thereafter completed the work to close the showstoppers and reported the same to MTA.  (Ex. LM 80, April 30, 2009 letter from Lockheed Martin to MTA ("[A]s of 25 February 2009, LM has successfully completed the demonstration and associated regression test for the four issues."; Ex. LM 79, Hibri Exhibit 4).

296.     Lockheed resolved the Showstoppers and MTACC advised the Governance Committee that the Showstoppers were now "closed".  (Ex. LM 80, April 30, 2009 letter from Lockheed Martin to MTA ("[A]s of 25 February 2009, LM has successfully completed the demonstration and associated regression test for the four issues."; Ex. LM 79, 4/7/09 email from Pezik to Agencies).

297.     On April 20, 2009, MTACC acknowledged Lockheed Martin's work to resolve the showstoppers to MTA's satisfaction, writing in a IESS/C3 Progress Meeting presentation that stated "The FAT show-stoppers are closed."  (Ex. LM 99, Meeting Minutes dated 4/20/09); *see also* Ex. LM 79, MTAHQ_E 00001756 (MTA Project Manager wrote "it has been agreed that the show stoppers have been satisfied to the point of allowing BU [beneficial use] to proceed…").

298.     Nevertheless, in the Default Notice, MTA relied upon FAT phase software testing issues to terminate the Contract.  (Ex. J6 Default Notice, p. 5-6).

299.     Likewise, the MTA Engineer, Shields, confirmed at his deposition that the showstoppers were "closed".  (Shields Dep. at 408:16–409:15).

300.     One Showstopper solution would close out all requirements embedded within that Showstopper (Hibri Dep. at 185; *see also* Viviano Dep. at 252-53).

301.     Closure of the Showstoppers would mean that the testing phases called FAT and SIST would be completed to MTA's satisfaction.  (Viviano Dep. at 176-77).

**Delays Were Caused By MTA**

302.     The parties agreed that the project would be substantially complete by August 31, 2008.  (Ex. J10.4, Contract Terms and Conditions, Art. 2.01; Ex. J10.2, RFP Vol. 1, Agreement, p. 1).

303.   "Substantial Completion" was defined in the Contract as follows: "Substantial Completion shall be declared by the Engineer upon his determination that the Scope of Work with respect to the IESS/C3 as set forth in Section III of the Agreement, and all other Work (including all construction and installation work) except for Remaining Work, as defined in ARTICLE 1.02, DEFINITIONS, is complete and fit for its intended purpose . . . ." (Ex. J10.4, RFP Vol. 1, Contract Terms and Conditions Art. 2.02 (a), p. 12).

304.   The Contract further provided that "[t]ime is of the essence," which meant that if the IESS System was not complete by August 31, 2008, MTA might be able to charge Lockheed Martin with Liquidated Damages at the rate of $10,000 for every day Lockheed Martin solely  caused delay.  (*id*. Art. 2.04 (a), p. 15).

305.   MTA claims liquidated and additional damages in excess of $28 million. (Ex. J4, Counterclaims ¶ 73).

306.   However, in no event can MTA recover Liquidated Damages in excess of $2.5 million because the Contract expressly limited liquidated damages to a "total delay of not more than one calendar year," and excluded Saturdays, Sundays and legal holidays.  (Ex. J10.4, RFP Vol. 1, Contract Terms and Conditions Art. 2.04 (a), p. 15).

307.   The Contract also included provisions concerning the process for how Lockheed Martin would request an extension of time from MTA to complete its work should the project be delayed, MTA's obligations to provide the extension and the damages Lockheed Martin was entitled to receive if MTA caused delay.  (Ex. J10.4 Contract Terms and Conditions, Arts. 2.05, 2.06, 2.07).

308.   In the case of "Concurrent Delay," *e.g.*, delay mutually caused by MTA and Lockheed Martin or separate delays caused by MTA and Lockheed Martin that overlap in time with each other, Lockheed Martin was entitled to receive more time to complete the work

- 54 -

but would not be entitled to the increased cost to perform.  (Ex. J10.4 Contract Terms and Conditions, Art. 2.07).

309.    The IESS project was delayed because, among other problems, MTA (i) added work to the Contract, (ii) did not timely make decisions about paying for the added work, (iii) did not provide access for performance of work, and (iv) did not timely deliver the site for construction of a C3 facility for MNR.  (Ex. LM 82, LM-MTA-CN-2007-09-19-380; Ex. LM 83, LM-MTA-CN-2008-04-09-872; Ex. LM 84, LM-MTA-CN-2008-04-23-895; Ex. LM 13, LM-MTA-CN-2008-10-30-1271R.

310.    In support of request for extensions of time related to LM 16 and subsequent project delays, Lockheed Martin submitted the following time extension and delay damage claims: i) Ex. LM 82, September 19, 2007 letter from Lockheed Martin to MTA regarding Impact Costs/Extra Work for Base Contract Schedule Delay, (LM-MTA-CN-2007-09-19-380); ii) Ex. LM 83, April 9, 2008 letter from Lockheed Martin to MTA regarding NYCT URTs Changes Implementation Proposal (LM-MTA-CN-2008-04-09-872); iii) Ex. LM 84, April 23, 2008 letter from Lockheed Martin to MTA regarding AWO #87 MNR Regional C3 (LM-MTA-CN-2008-04-23-895); and iv) Ex. LM 13, October 30, 2008 letter from Lockheed Martin to MTA regarding Request for Extension of Time and Associated Impact Costs (LM-MTA-CN-2008-10-30-1271R).

311.    MTA failed to approve Lockheed Martin's requests for extension of time or agree to payment of any delay damage costs to Lockheed Martin.  (Ex. LM 85, Letter from MTA to Lockheed Martin dated November 16, 2007 (IESS MTA-CCM/LMTSS-00663); Ex. LM 86, Letter from MTA to Lockheed Martin dated May 19, 2008 (IESS MTA-CCM/LM-

- 55 -

01121); Ex. LM 87, Letter from MTA to Lockheed Martin dated June 9, 2008 (IESS MTA-

CCM/LM-01174); Ex. LM 103, Letter from MTA to Lockheed Martin dated November 26, 2008

(IESS MTA-CCM/LM-01466)).

312.    On May 4, 2009 when Lockheed Martin delivered its monthly schedule

update ("LM 36") to MTA, the Contract Substantial Completion date remained August 31, 2008.

(Ex. LM 88, LM-MTA-CN-2009-05-04-1731 with Update No. 36 CPM Submittal Status as of

May 1, 2009 at pg. 5 of the Update).

313.    The Contract's Substantial Completion date of August 31, 2008 was never

extended, however once passed, Lockheed Martin continued to perform its work at the project

receiving payment of $5,468,907.83 from MTA even after termination on June 12, 2009.  (Ex.

LM 6 Invoice 40; Ex. LM 95, DCB Base Contract Worksheet).

314.    In an expert litigation report prepared by Gary Jentzen of PMA

Consultants, LLC on behalf of MTA ("Initial Jentzen Report"), which was later revised

("Revised Jentzen Report"), Mr. Jentzen analyzed the impact of MTA not delivering a site for

construction of MNR's Regional C3 Building in North White Plains in a timely manner.  (Ex.

LM 97, Initial Jentzen Report at 91-2; Ex. LM 98, Revised Jentzen Report at 111-12).

315.    Both of Mr. Jentzen's reports state as follows:  "One of the delays that

Lockheed Martin alleged in both its October 30, 2008 Claim as well as its Amended Complaint

was that the delay to the MNR Regional C3 Building was caused it being moved to North White

Plains.  Lockheed Martin asserted that this change caused a three hundred eleven (311) calendar

day delay based on their Analysis of the LM 29 Schedule Update.  PMA agrees that there was a

delay in providing a facility for the MNR Regional C3."  (*id*.).

316.    Mr. Jentzen has determined that "MTA responsibility [for delay] amounts to three hundred and fifteen (315) calendar days of this delay to July 12, 2009."  (Ex. 97, p. 6 at ¶ 11; Ex. 98 p. 6-7 at ¶ 12).

317.    Adding 315 calendar days to the Substantial Completion date of August 31, 2008 extends Substantial Completion to at least July 12, 2009.  (Ex. 97 p. 91; Ex. 98 p. 111-12).

318.    MTA terminated Lockheed Martin on June 12, 2009, one month prior to the extended Substantial Completion Date.  (Ex. J8, June 12, 2009 Letter from MTA to Lockheed Martin  ("Termination Letter")).

319.    The Peer Review Team also attributed delays on the project relating to these same issues to MTA, not Lockheed Martin.  *See, e.g.,* Ex. LM 37, 3/26/07 Peer Review at E-1 ("The lack of specificity on the part of the MTA with respect to some important issues such as migration of legacy systems into the IESS [was] delaying the project"; *id*. at 4, Item 2.1 (Legacy systems "may cause further delays"); Ex. LM 90, Health Assessment at 13("[D]elays in design decisions for equipment and the C3 centers will further delay this contract beyond January 3, 2009"); *id*. at 4, Item 2.1 (the urgency evident in the "highly accelerated procurement" had fallen off).

320.    MTA itself also acknowledged that its own internal problems caused project delays.  *See* Ex. LM 91 MTAHQ_HC 00015998 (2007 email from the MTA Independent Consulting Engineer stating that MTA "relationships and dependencies . . . resulted in delay and massive change requests during the implementation/build of the IESS"); LM 45 MTAHQ_HC 00006198 (in January 2009, "Communication rooms upgrade[s] …  to power and space …  has significantly contributed to delays . . . .").

- 57 -

**Lockheed Martin Was Allowed to Move Equipment Into the Field**

321.    The MTA Engineer of record Kenneth Shields testified that Lockheed

Martin and MTA had jointly agreed to move equipment to the field prior to demonstrating some

testing requirements in the FAT testing phase, which requirements were later demonstrated

during the SIST testing phase.  Shields Dep. at 235, July 21, 2010).

322.    The MTA Engineer is appointed by MTA and is responsible for

administering the Contract.  (Ex. J10.4, Terms and Conditions, p. 2).

323.    The MTA Engineer's responsibilities include initially determining

questions about performance of the Contract.  (Ex. J10.4, Terms and Conditions Art 8.02 at p.

45).

324.    Additionally, David Horn from Carter & Burgess, who was hired as the

Independent Consulting Engineer for oversight on MTA's Capital Security Program, stated in

June 2008 that "[i]nstallation of equipment racks in field locations allowed before end of FAT"

testing.  (Ex. LM 92, Email from David Horn to MTA dated June 24, 2008 (Bates No.

MTAHQ_HC 00012569)).

325.    MTA's Senior Vice President and General Counsel Veronique Hakim

testified that MTA agreed to allow Lockheed Martin to ship racks prior to the completion of

testing.  (Hakim Dep. at 172:23-174 (discussing Ex. LM 93, May 27, 2008 email from Carlaine

Blizzard to Ms. Hakim with attached letter regarding C3 Beneficial Use)).

326.    Moreover, there was no requirement that Lockheed Martin continue FAT

testing until every last variance was deemed "passed" by MTA.  (Ex. LM 72, TEMP p. 23-24).

327.    MTA has further admitted that it granted such permission to move

equipment into the field but now claims that it did so only with the proviso that Lockheed Martin

- 58 -

continue FAT testing and fix all variances.  (Ex. LM 94, April 26, 2013 letter from MTA's

Attorney I. Lipton at § 1.b, p. 2).




Dated:          July 15, 2013
                New York, New York

                              Respectfully submitted,

                              DUANE MORRIS LLP

                              By:   /s/ Matthew A. Taylor                    
                                   Matthew A. Taylor (MT 2914)
                                   Sandra A. Jeskie (Pro Hac Admission)
                                   Michael Chartan (MC 4609)
                                   1540 Broadway
                                   New York, NY  10036
                                   (212) 692-1000
                                   Attorneys for Plaintiff
                                   Lockheed Martin Corporation