# Exhibit LM94



10 East 40th Street  Tel 212.689.8808
New York, New York 10016 Fax 212.689.5101
          www.hnrklaw.com

April 26, 2013

**By Fax**

Hon. Paul G. Gardephe
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

   Re: Lockheed Martin Corporation, et al. v. MTA, et al., 09 Civ. 04077 (PGG)

Dear Judge Gardephe:

   We represent the defendants Metropolitan Transportation Authority and MTA Capital Construction Company (collectively "MTA") in the above-referenced action. Pursuant to Your Honor's instructions at the pre-motion conference held on April 19, 2013, we set forth below our response to each of the arguments raised by counsel for Lockheed Martin ("Lockheed") in their letter of April 12, 2013, in support of their contemplated motion for partial summary judgment.

**1.a – Lockheed's "No Software Development" Defense**

   Lockheed completely ignores its contractual obligation to integrate the various components of the system, and misstates its obligations with regard to software development. Both the MTA's Request for Proposal ("RFP") and Lockheed's responding Proposal make it clear that MTA specified, and Lockheed promised to provide, a fully functioning IESS System that would meet all of the MTA's stated requirements. Lockheed merely proposed a "solution" for meeting all of the requirements which, according to the Proposal, would not *need* software development. That Lockheed may have intended to do this work without software development does not mean that it was not obliged to do so if development was necessary to meet the requirements of the Contract. In fact, the Contract contains myriad provisions regarding software development, including an entire section entitled "Software Development." These provisions contemplate the development of software if necessary to satisfy the contractual requirements. Lockheed management explicitly acknowledged this fact during the Project, stating, for example, in Lockheed's Quality Assurance Plan, that while they anticipated they would not need to develop software, "in the event that new or modified software is needed, it [would] be developed in accordance with defined software development methodology."

   Lockheed also asserts that, in lieu of integration and/or the development of software to meet the System requirements, Lockheed could instead satisfy requirements by forcing the MTA, including its Police Deportment, to change its policies and procedures. In other words, rather than develop a system to meet the needs of the MTA and its agencies as specified, Lockheed urges that the MTA needed to forgo requirements as specified in the Contract and change its longstanding business practices to conform to the System it would deliver. This theory is wholly contrary to the contractual scheme and is the exact opposite of what Lockheed promised to do. Indeed, Lockheed acknowledged in its

Honorable Paul G. Gardephe
April 26, 2013
Page 2

Proposal that, as part of its software development efforts, it would customize the system to meet the business and operational needs of the MTA's agencies. (*See, e.g.*, Proposal, Vol. II at §3.4.)

Lockheed was required to deliver a System that met the requirements of the Contract. They were to do this via the *use* of COTS products, the integration of those products, and whatever else was necessary to meet the requirements, including configuration and software development as necessary. Lockheed seeks to excuse itself by implicitly asserting that satisfaction of the requirements would have required software development which it was not bound to do. The Contract provides otherwise.

### 1.b – Lockheed's Premature Shipment of Racks to Field Sites

Lockheed misses the point in its argument regarding its shipment of equipment racks prior to completing factory acceptance testing ("FAT"). The racks contained computer hardware and related equipment, and were to be installed in "communication rooms." The equipment was supposed to receive various forms of data (*e.g.,* video, access control information, etc.) and both store and route that data to command centers. The Contract required that FAT testing be complete and all "variances" be fixed before shipment of these racks to field locations. Without passing the appropriate tests before being installed, MTA could not be assured that the equipment installed in the racks would operate appropriately or that it was properly integrated with the rest of the IESS System.

In defiance of the Contract, Lockheed nonetheless shipped racks to a field site (the new Police Department headquarters) without completing FAT and without securing approval from the MTA – a fact acknowledged by the Lockheed Project Manager in an internal email. Lockheed later pressed the MTA for approval to ship more racks to the field. This time, as an accommodation to Lockheed, MTA approved the request but with the proviso, issued to Lockheed in writing, that Lockheed continue FAT testing and fix all variances, notwithstanding MTA's accommodation.

After additional racks were shipped, Lockheed, in bad faith, declared itself "complete" with FAT and took the position that it did not have to fix the FAT variances. Lockheed then shut down its factory testing facility and never fixed the myriad outstanding FAT variances – a fundamental breach unto itself. Having failed to live up to its end of the bargain regarding rack shipment, Lockheed stands in violation of the contractual provisions requiring that FAT variances be corrected prior to shipment of racks for field installation. This constitutes a distinct basis for default.

### 1.c – Lockheed's Refusal To Provide Software Maintenance and Updating Services

Pursuant to the Contract, Lockheed was obligated to maintain the software it was furnishing, which included the duty to provide updates for the software from the time of its installation up until the end of the "Software Warranty Period." (Agreement at Section IV.) The warranty period was to begin at "Substantial Completion" (*i.e.*, the point at which the MTA's Engineer deems the work to be "complete and fit for its intended purpose") and run for one year thereafter. Prior to the MTA's declaration of default, Lockheed took the position that it would not provide these maintenance services, including any software updates, until after the commencement of the warranty period (*i.e.,* not until after substantial completion). Lockheed insisted on this position even though software was already installed months (and, as it turned out, years) before substantial completion could be declared.

Honorable Paul G. Gardephe
April 26, 2013
Page 3

Lockheed's refusal to provide maintenance and updates constituted a breach for two reasons. First, the language in the above-cited section of the Contract is contained within the section governing "Furnishing Software and Hardware" and not the "Warranty" section. The intent was to impose upon the Contractor the duty to provide the latest software available, including all updates, until the Contractor's obligations under the Contract were concluded, which would be at the end of the warranty period. It is not a warranty provision and the obligations under this section have no relationship to the commencement of the warranty period. Lockheed's assumption that it could let the software go unmaintained and out of date after installation but prior to substantial completion because the warranty period does not run until substantial completion makes no sense and is contrary to the Contract.

Second, pursuant to the Contract, MTA could accept "Beneficial Use" of the portion of the Project associated with each agency, as it was ready, prior to Substantial Completion of the project. Beneficial Use is a declaration by the Engineer that a defined portion of the work is deemed "substantially complete." Significantly, the Contract specifically exempted software from agency Beneficial Use certification. Instead, acceptance of the software would not be given until Substantial Completion of the entire Project, including all site and system-wide testing. Lockheed, however, insisted that the contractual warranty provision begin at Beneficial Use rather than Substantial Completion, thereby depriving MTA of months or years of the software maintenance and updates it was entitled to under Section IV of the Agreement. Lockheed stated that it would provide these services for the period between Beneficial Use and Substantial Completion only if MTA paid extra money for this. By doing so, Lockheed rendered Beneficial Use meaningless and fundamentally breached the Contract.

**1.d – Breach of Agreement to Keep Security Sensitive Information Confidential**

MTA is willing to withdraw this claim.

**1.e. – The Failure to Properly Manage Its Subcontractors**

Lockheed's poor management throughout the Project resulted in its (and its subcontractors) failing to incorporate survey information in its drawings, providing drawings riddled with errors, incorrectly performing work, failing to plan access to the tunnels, and a host of other problems. MTA never waived the right to terminate Lockheed's contract by not immediately defaulting Lockheed based on any single instance of poor performance. While there are particular actions or omissions on the part of Lockheed that are proper grounds for default, Lockheed was defaulted not based on a single instance of poor performance, but based on a longstanding pattern of poor performance. There was no waiver here.

**1.f. –Lockheed Delayed The Project**

Lockheed asserts that, since MTA's scheduling expert, PMA, found that there was an MTA-caused delay of 315 days from the contractual Substantial Completion date of August 31, 2008, until July 12, 2009, which was one month after Lockheed was defaulted, it cannot be liable for delay damages. Lockheed misconstrues PMA's finding, and it is legally incorrect in its assumptions. Contrary to Lockheed's assertion, PMA found that Lockheed delayed the project by at least *1396* days beyond the substantial completion date. This delay was the additional time it would take to re-engineer and re-test the System in order to meet the contractual requirements. PMA identified a 315-day delay

Honorable Paul G. Gardephe
April 26, 2013
Page 4

attributable to MTA's decision to relocate the Metro-North Command Communication and Control (C3) Center. Assuming Lockheed was entitled to an extension of time for C3 relocation (which we do not, as explained below), that delay is deemed under the contract to be "concurrent" with the 1396 days of delay. This has the effect of reducing Lockheed's liability for delay by 315 days, but leaving it liable for the remaining 1081 days. PMA also identifies many other Lockheed-caused delays that far exceed the 315 day delay due to the Metro-North C3 relocation. To the extent Lockheed believes that by virtue of its default, it is somehow spared damages for these delays, it is simply incorrect.

It also bears noting that PMA's attribution of 315 days of delay to MTA does not extend the Project's Substantial Completion date by 315 days, as Lockheed assumes. As noted by PMA in its report, this delay was made without regard to the notice and time extension provisions of the Contract. Articles 2.05 and 4.04 of the Contract place conditions on the allowance of an extension of time for MTA-caused delays. Lockheed failed to comply with these provisions and, therefore, is not entitled to a time extension. Accordingly, Lockheed is bound to the original Substantial Completion date, which means it is liable for the full 1396 days of delay identified by PMA.

## 2 – The Second Counter Claim for Overpayment

MTA seeks recovery of approximately $3.8 million, which represents a portion of a payment that was made to Lockheed for work Lockheed claimed was "extra work." In fact, the work was really part of Lockheed's "base" contract obligations, which Lockheed was obligated to fulfill for the Contract price. The terms of the parties' agreement expressly allows the MTA, a public agency, to recover payments made to a contractor to which it was not entitled.

Briefly, the work in question involved rack designs for installation in communication rooms in certain subway stations. The racks Lockheed submitted as part of their design did not fit in the allocated space. Lockheed was directed to resubmit designs, which were rejected for various reasons, including cost. Finally, a design was submitted which included housing equipment in enclosed boxes outside of the communication rooms, which made space in the rooms for the racks. This design work was clearly part of Lockheed's base contract obligations. Nevertheless, MTA paid Lockheed $3.8 million for this work. Lockheed asserts that since these sums were paid by the MTA as part of a "negotiated, written settlement," MTA may not recover the funds. We disagree. The Contract is very clear on the Authority's right to recover payments of public funds to which the Contractor was not entitled. For example, Article 3.11 of the Contract provides that the Authority may not be estopped by virtue of any payment made from showing that such payment was improperly made. That Article further provides that the Authority does not waive any of its contractual rights as a consequence of any payments made to the Contractor. If, as MTA contends, MTA paid additional compensation for work that was included in Lockheed's base contract obligations, Lockheed must return that money.

## 3.a – Lockheed's "Other Key Factual Elements" – The "TEMP"

Lockheed contends that a document it prepared called the Test and Evaluation Master Plan ("TEMP") governs software testing and acceptance on the Project. The TEMP submitted by Lockheed purported to be a plan for verifying that the implemented system met the Contract requirements, and included guides for the test organization, conduct of the tests, and sequence of tests, among other items.

Honorable Paul G. Gardephe
April 26, 2013
Page 5

First, the TEMP was never approved by the MTA.  In particular, MTA rejected Lockheed's attempt via language in the TEMP to secure acceptance of all or part of the System with less than a 100% pass rate.  Second, the Contract provides in any case that that the Contractor may not, via the submittal of documentation for MTA approval, relieve itself of any of its contractual obligations. Thus, notwithstanding any of its documentary submittals, the contractor remains duty-bound to satisfy all system functions in accordance with the Contract. (*See, e.g.* Contract §1AB12.3.)  The Contract itself is explicit that the tests were to prove that each requirement was met. (Contract §25T.)  Finally, although not part of Lockheed's contemplated motion, we hasten to add that the factual record will reveal that Lockheed completely failed to abide by the terms of its own TEMP.

### 3.b – Lockheed's "Other Key Factual Elements" – The "Showstoppers"

Lockheed has misstated the purpose and significance of the "Showstoppers." In early 2008, the year that Lockheed was supposed to have completed its work, the Commissioning Agent for the Contract concluded that the System was in such a poor state, as reflected in the test results, that the entire testing program should be discontinued so that Lockheed could prepare a plan to fix the variances (*i.e.*, failures), implement the fixes, and embark upon a new testing program.  To avoid default, Lockheed was given the opportunity to establish functionality in four areas deemed critical – the "Showstoppers."  The Showstoppers were nothing more than a temporary stop-gap measure that would allow MTA to wrest some minimal use (referred to as "initial operating capability") out of what had proven to be a failed System.   They were neither intended to, nor did they, relieve Lockheed of the obligation to satisfy the functional requirements of the Contract.

Lockheed's assertion that MTA considered the Showstoppers "resolved" is incorrect.  While one or two MTACC personnel believed that Lockheed had established enough functionality in one of the Showstoppers to warrant continuing with the Project, few if any of the requirements associated with the Showstoppers were ever passed in formal testing.  Further, Project correspondence, internal MTA communications, and testimony clearly establish that MTA considered these Showstoppers to remain unresolved up until the time of default.  For example, one showstopper, known as the "maintenance mode," required Lockheed to provide a separate operational mode for the System that would allow MTA to perform maintenance on the System without affecting its live operations.  The need for such a maintenance mode is obvious given that the MTA is a 24-7 operation and always in need of security.  Lockheed never provided a maintenance mode.  To this day, the system is unable to be upgraded or maintained without being taken off-line.  Lockheed's claim that "MTA considered the Showstoppers resolved" is simply untrue.

Each of Lockheed's arguments for summary judgment in its favor either entitle *MTA* to summary judgment in connection with the points raised, or requires factual findings by the Court, thereby precluding summary judgment.

Respectfully submitted,

Ira J. Lipton

cc:     Michael Chartan, Esq. (by email)
        Adam Friedman, Esq. (by email)



10 East 40th Street
New York, New York 10016

Tel  212.689.8808
Fax  212.689.5101
www.hnrklaw.com

# FAX TRANSMISSION

| | | | |
|---|---|---|---|
| **To:** | Hon. Paul G. Gardephe | **Date:** | April 26, 2013 |
| **Fax #:** | 212-805-7986 | **Pages:** (including cover) | 6 |
| **From:** | Ira J. Lipton | | |

The information contained in this telecopy message is confidential and is intended only for the exclusive use of the individual or entity named above and may contain information that is attorney work product, privileged, confidential or exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you received this message in error, please notify us immediately by telephone (call collect) at 212-689-8808 to arrange for its return.  Thank you for your courtesy.

TRANSMISSION VERIFICATION REPORT

```
TIME  : 04/26/2013 12:20
NAME  : HOGUET NEWMAN REGAL
FAX   : 2126895101
TEL   : 2126898808
SER.# : BROA5J202100
```

```
DATE,TIME        04/26  12:18
FAX NO./NAME     12128057986
DURATION         00:02:08
PAGE(S)          06
RESULT           OK
MODE             STANDARD
                 ECM
```

# HOGUET NEWMAN
# REGAL & KENNEY,LLP

10 East 40th Street
New York, New York 10016

Tel  212.689.8808
Fax  212.689.5101
www.hnrklaw.com

## FAX TRANSMISSION

**To:**  Hon. Paul G. Gardephe

**Date:**  April 26, 2013

**Fax #:**  212-805-7986

**Pages:**  6
**(including cover)**

**From:**  Ira J. Lipton