

1

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - - - - - x

5   LOCKHEED MARTIN TRANSPORTATION SECURITY
    SOLUTIONS, AN OPERATING UNIT OF LOCKHEED
6   MARTIN CORPORATION,

7           Plaintiff,
                              Civil Action No.
8       -against-            09 CIV 4077
                              (PGG)(GWG)
9   MTA CAPITAL CONSTRUCTION COMPANY and
    METROPOLITAN TRANSPORTATION AUTHORITY,

10

11          Defendants.
    - - - - - - - - - - - - - - - - - - - x
    TRAVELERS CASUALTY AND SURETY COMPANY OF
12  AMERICA, FEDERAL INSURANCE COMPANY and
    SAFECO INSURANCE COMPANY OF AMERICA,

13

14          Plaintiffs,
                              09 CV 6033
                              (PGG)(GWG)
        -against-

15

16  METROPOLITAN TRANSPORTATION AUTHORITY, MTA
    CAPITAL CONSTRUCTION COMPANY, and NEW YORK
    CITY TRANSIT AUTHORITY,

17

18          Defendants.
    - - - - - - - - - - - - - - - - - - - x

19      Oral deposition of 30(b)(6) witness, SEAN
    RYAN, taken pursuant to notice, was held at
20  the law offices of DUANE MORRIS LLP, 1540
    Broadway, New York, New York, commencing
21  April 17, 2012, 10:03 a.m., on the above
    date, before Leslie Fagin, a Court Reporter
22  and Notary Public in the State of New York.

23

            MAGNA LEGAL SERVICES
24        1200 Avenue of the Americas
            New York, New York 10026
25             (866) 624-6221

2

1

2       APPEARANCES:

3

4       DUANE MORRIS LLP
        Attorneys for Lockheed Martin Transportation
5       Security Solutions, an Operating Unit of
        Lockheed Martin Corporation, Travelers
6       Casualty and Surety Company of America,
        Federal Insurance Company and Safeco
7       Insurance Company of America
                    1540 Broadway
8                   New York, New York 10036-4086
        BY:         SANDRA A. JESKIE, ESQUIRE
9                   MICHAEL CHARTAN, ESQUIRE

10

11      HOGUET NEWMAN REGAL & KENNEY, LLP
        Attorneys for Metropolitan Transportation
12      Authority, MTA Capital Construction Company,
        New York City Transit Authority
13                  10 East 40th Street
                    New York, New York 10016
14      BY:         HELENE R. HECHTKOPF, ESQUIRE
                    MARC A. MELZER, ESQUIRE

15

16

17      WOLFF & SAMSON, P.C.
        Attorneys for Travelers Casualty and Surety
        Company of America, Federal Insurance Company
18      and Safeco Insurance Company of America
                    The Offices at Crystal Lake
19                  One Boland Drive
                    West Orange, New Jersey 07052
20      BY:         BRIAN KANTAR, ESQUIRE

21

22

23

24

25

3

1

2           IT IS HEREBY STIPULATED AND AGREED,

3      by and between counsel for the

4      respective parties hereto, that the

5      filing, sealing and certification of the

6      within deposition shall be and the same

7      are hereby waived;

8           IT IS FURTHER STIPULATED AND AGREED

9      that all objections, except as to the

10     form of the question, shall be reserved

11     to the time of the trial;

12          IT IS FURTHER STIPULATED AND AGREED

13     that the within deposition may be signed

14     before any Notary Public with the same

15     force and effect as if signed and sworn

16     to before the Court.

17

18

19

20

21

22

23

24

25

4

1          SEAN RYAN

2          (Notice of deposition marked Ryan

3      Exhibit 1 for identification.)

4      S E A N    R Y A N,   called as a

5   witness,  having been duly sworn by a Notary

6   Public, was examined and testified as

7   follows:

8   EXAMINATION BY

9   MS. JESKIE:

10      Q.   Good morning, Mr. Ryan, my name is

11   Sandra Jeskie and I'm counsel for Lockheed

12   Martin and I will be asking you questions

13   about the IESS-C3 project.  This is Brian

14   Kantar, who is representing the sureties, is

15   also here with me.

16          Have you ever had your deposition

17   taken before?

18      A.   Yes.

19      Q.   When?

20      A.   A few times over the years, I

21   suppose probably most recently 18 to 24

22   months ago.

23      Q.   What was that in connection with?

24      A.   That was a contract matter for a --

25   involving a previous employer I had.

1            SEAN RYAN

2    Metro-North did not support Capital

3    Construction's approval of the PDR documents?

4        A.    Correct.

5        Q.    Why?

6        A.    As I said, in general terms, the

7    preliminary design was not constructable in

8    Metro-North's view or not detailed enough to

9    be constructable in Metro-North's view.

10       Q.    Did Metro-North provide its support

11   for the approval of the CDR documents

12   prepared by Lockheed Martin?

13       A.    I don't remember.  At the moment, I

14   don't recall Metro-North's position on CDR

15   when we got to that point in the project.

16       Q.    So you don't know, as you sit here

17   today, whether Metro-North approved the CDR

18   documents?

19       A.    I don't recall, I'm sorry.

20       Q.    To the best of your knowledge, did

21   Capital Construction approve Lockheed

22   Martin's CDR documents?

23       A.    I'm not certain.

24       Q.    Do you have any reason to believe

25   that Capital Construction did not approve

```
 1                    SEAN RYAN
 2    those documents, I mean, Lockheed Martin
 3    couldn't have gone forward, correct?
 4              MS. HECHTKOPF:  Objection.
 5        A.    I don't know, as I say, I
 6    apologize, I just don't recall the status of
 7    the CDR approval at the moment.
 8        Q.    You had said in connection with the
 9    PDR documents that Capital Construction had
10    no authority to overrule Metro-North.  What
11    did you mean by that?
12              MS. HECHTKOPF:  Objection.
13        A.    Well, the relationship between
14    Metro-North and the Capital Construction
15    Company is not one of one having authority
16    over the other.  They're parallel
17    organizations but in the end, Capital
18    Construction Company managed the project and
19    managed the contract.
20        Q.    So did Capital Construction then,
21    in connection with this project, have the
22    ultimate authority to make a decision on
23    behalf of the agency, whether or not the
24    agency agreed with that decision?
25              MS. HECHTKOPF:  Objection.
```

1          SEAN RYAN

2          A.    Ultimate authority, I would say no.

3          Q.    Did anyone have ultimate authority

4     over Metro-North in connection with this

5     project?

6          A.    Ultimately the chair always has

7     that authority.

8          Q.    Who is the chair, when you say

9     that, are they with headquarters, not Capital

10    Construction?

11         A.    Correct.

12         Q.    Do you know if the chair or anyone

13    at headquarters ever came in and made

14    decisions in connection with the project?

15         A.    That's the whole question.

16         Q.    Yes.

17         A.    You know, I don't know what the

18    chair's and there were various people in that

19    role, I don't know what the chair's

20    decision-making process was vis-à-vis this

21    project.  But basically Mr. Morange was the

22    chair's representative.

23         Q.    Did Mr. Morange have authority to

24    overrule an agency's decision, for example?

25              MS. HECHTKOPF:  Objection.

```
1                      SEAN RYAN

2          A.    He would have -- I can't tell you

3    specifically what his authority level was in

4    that regard.  But what would have happened in

5    the dispute and frankly, I cannot think of a

6    single example of this, but to answer your

7    question, what would have happened is Mr.

8    Morange would have had a conversation with

9    the agency, in our case, it would have been

10   the Metro-North president, Peter Canido.

11         Q.    Ultimately, could Mr. Morange

12   change a decision of the Metro-North

13   president in connection with this project?

14              MS. HECHTKOPF:  Objection.

15         A.    No, the Metro-North president

16   reports to the chair as did Mr. Morange.

17              Again to be clear, I cannot think

18   of an instance that rose to that level but

19   you asked about the process and that's the

20   process.

21         Q.    To the best of Metro-North's

22   understanding, the only person who could

23   overrule an agency decision would be then the

24   chair at headquarters and that would be it,

25   not its representative?
```

SEAN RYAN

1
2    project coordination at the highest level was

3    done at the steering committee level.  That's

4    really it, in terms of new processes, not

5    that I can think of.

6         Q.    During the steering committee

7    meetings, were there ever instances in which

8    agencies disagreed on how to move forward?

9         A.    Certainly.

10        Q.    And how would that be addressed?

11        A.    Mr. Morange would have mediated any

12   disagreements there and we would have left in

13   agreement.

14        Q.    Mr. Morange did not have the

15   authority, though, to make a decision over

16   the objections of the agency, right?

17             MS. HECHTKOPF:  Objection.

18        A.    No, but as I said, I cannot recall

19   an instance that rose to the level where it

20   had to go beyond the steering committee

21   level.  But Mr. Morange would have mediated

22   any disagreement that occurred at that level

23   among the agencies.

24        Q.    So to the best of your

25   recollection, there was always a consensus

160

1              SEAN RYAN

2       Q.   Are you familiar with the test and

3   evaluation master plan which is often

4   referred to as the TEMP?

5       A.   I and.

6       Q.   Was it Metro-North's understanding

7   that that document governed the testing

8   program?

9            MS. HECHTKOPF:   Objection.

10      A.   Yes, that document governed the

11  testing.

12      Q.   Did Metro-North have any input into

13  the creation of the TEMP?

14      A.   No.

15      Q.   Did it have any input, in other

16  words, making comments on drafts of the TEMP

17  at all?

18           MS. HECHTKOPF:   Objection.

19      A.   I'm not sure if the creation of the

20  TEMP itself went through the normal document

21  submission and review process, so I can't

22  remember that specifically, but I would say

23  that if it did, then Metro-North had an

24  opportunity to provide comments on it.  I do

25  not remember specifically that document going

1              SEAN RYAN

2       A.   Yes.

3       Q.   At what point did the project

4  change from being called the IESS-C3 project

5  to the AAESP project?  It does not roll off

6  the tongue.

7       A.   No, it does not, I would have come

8  up with a much better term.  But when the

9  IESS project ended and was no more, a name

10  was needed for the balance of the work and so

11  for some reason this is what was decided.

12       Q.   So it was decided shortly after

13  termination then?

14       A.   Yes.

15       Q.   Who else would participate in the

16  testing that we were talking about?

17       A.   From Metro-North?

18       Q.   I think you just said Ms. Panzer

19  and perhaps one other person from Metro-North

20  but, just generally, who else would

21  participate?

22       A.   I can really only guess at that.  I

23  don't know who the other agencies assigned to

24  represent them at the testing.

25       Q.   What was Metro-North's

178

1             SEAN RYAN

2   would be assigned?

3        A.   I can't recite it for you verbatim,

4   but it has to do with the degree of severity

5   of the variance.

6        Q.   Would that be determined by looking

7   at the TEMP?

8        A.   Yes.

9        Q.   Let me rephrase and make it a

10  little bit easier.  Was there any requirement

11  for the number of passed FAT tests in order

12  to move forward in the testing process?

13       A.   I'm not aware of such a

14  requirement.

15       Q.   Let me show you what's been

16  previously marked as Martinez 13.  Which is

17  an email from Linda Martinez to April Panzer

18  dated December 8, 2008.  Would you take a

19  moment to review that?

20            Have you had a chance to review

21  Martinez 13?

22       A.   I have.

23       Q.   Mr. Ryan, does this refresh your

24  recollection that there were private

25  communications between Ms. Panzer on behalf

182

```
 1                    SEAN RYAN
 2   And so, Ms. Panzer, anyway, is fastidious and
 3   was interested in accurately recording the
 4   status of the test results.  And I don't know
 5   what's in the hearts of my MTACC colleagues
 6   but I suppose that they wanted to be more
 7   flexible in this regard in order to move this
 8   project ahead.
 9        Q.   How did Capital Construction convey
10   that they wanted Metro-North to be more
11   flexible in that regard?
12             MS. HECHTKOPF:  Objection.
13        A.   Well, based on what I'm reading in
14   the exhibit here, Ms. Panzer received this
15   message from someone who said on page 2, she
16   says, We were told that we had to push on.  I
17   infer that she is referring to somebody from
18   MTACC.  And then Ms. Martinez cites, As you
19   said, push-ahead mentality.
20        Q.   I'm asking you on behalf of
21   Metro-North, as you sit here today, was it
22   your understanding that Capital Construction
23   had conveyed this sense to the agencies,
24   particularly Metro-North, that they needed to
25   be a little more flexible in the
```

1               SEAN RYAN

2     interpretation of requirements in order to

3     get tests passed?

4          A.   Yes.

5          Q.   How did they convey that message?

6          A.   Again, I cannot recall the specific

7     conversations but I know that there were

8     conversations at the steering committee level

9     about this topic.  So agencies expressed

10    their viewpoint, as expressed here by Ms.

11    Panzer and Ms. Martinez for that matter, and

12    Capital company expressed their viewpoint.

13    And those conversations happened at the

14    steering committee.

15         Q.   I understand that you can't

16    remember specifics but, in general, what was

17    the message being conveyed by Metro-North and

18    the other agencies concerning the

19    interpretation of requirements and the

20    testing status, on this issue?

21         A.   Be more flexible, they'll get it

22    fixed, everything will be fine, we need to

23    move ahead.

24         Q.   What was intended, as you

25    understand it, on behalf of Metro-North when

SEAN RYAN

2  you hear a statement of be more flexible?

3      A.    That we shouldn't be as rigorous in

4  our application of the pass or fail criteria.

5      Q.    What was the reaction of

6  Metro-North and the other agencies at those

7  meetings to this kind of statement?

8      A.    Again, I can't speak for the other

9  agencies.

10     Q.    Okay.

11     A.    Metro-North always did everything

12  it could to support the project and to

13  facilitate progress on the project.  But in

14  Metro-North's estimation, a test either

15  passed or it didn't.  And if it didn't, it

16  should be reported -- I would like to modify

17  my response.

18          Metro-North believed that we should

19  apply the proper test result status to the

20  tests and if that -- if it passed, then

21  that's a pass, if it failed, then that's a

22  failure, and if it was something in-between,

23  then it should be statused correctly.

24     Q.    Just trying to understand your

25  response, was that viewed as essentially a

185

SEAN RYAN

1

2  disagreement with the instructions that

3  Capital Construction were providing in terms

4  of being flexible?

5      A.   I suppose we disagreed on how we

6  should interpret the test criteria and

7  here -- this is a case that illustrates the

8  different objectives that Capital company

9  had, the Capital company's objectives and how

10  they differed from the agencies' objectives.

11      Q.   What were the Capital

12  Construction's objectives, as you just

13  mentioned?

14          MS. HECHTKOPF:  Objection.

15      A.   You know, all of the agencies and

16  the Capital company's objectives were aligned

17  in terms of providing, getting the project

18  completed, delivered on time and on budget

19  and all those sorts of standard things.

20          But beyond that, the agencies would

21  have to live with these systems for a long

22  time and the Capital company had a lot of

23  pressure to bring the project in on time.

24  And once this project is done, they would be

25  moving on to another project.

SEAN RYAN

1

2      Q.   Where was Capital Construction

3    getting the pressure to bring the project in

4    on time?

5             MS. HECHTKOPF:   Objection.

6      A.   Well, from MTA headquarters, from

7    headquarters.

8      Q.   So would it be fair to say that

9    Metro-North and Capital Construction

10   disagreed, then, in connection with the

11   interpretation of the test criteria?

12            MS. HECHTKOPF:   Objection.

13     Q.   And how to -- whether to pass or

14   fail tests?

15            MS. HECHTKOPF:   Objection.

16     A.   I would say that we disagreed in

17   the application of the different status

18   levels.

19     Q.   As a result of these conversations

20   with Capital Construction, did Metro-North

21   make any changes in the way it viewed the

22   requirements and test pass/fails, or did they

23   continue to strictly interpret the

24   requirements and the test criteria?

25     A.   I don't recall that we changed

1                    SEAN RYAN

2      course in the way we handled the test

3      criteria.

4          Q.    You had mentioned that these were

5      topics that had come up at the steering

6      committee meeting, is that right?

7          A.    Yes.

8          Q.    And you participated in those

9      steering committee meetings?

10         A.    Yes.

11         Q.    What were the other agencies'

12     response in connection with this request by

13     Capital Construction to be more flexible in

14     terms of the requirements and the test

15     status?

16         A.    I don't remember the other

17     agencies' position on this.

18         Q.    Do you remember discussion by the

19     other agencies about this?

20         A.    Yes.  So I will warn you in

21     advance, again, I cannot give you a specific

22     example but I remember in general terms,

23     generally, the agencies were aligned on this

24     issue.

25         Q.    And when you say aligned, they were

1                    SEAN RYAN

2    from a process point of view?

3              MS. HECHTKOPF:  Objection.

4         Q.   Did you think it was fair,

5    reasonable?

6              MS. HECHTKOPF:  Objection.

7         A.   As I said earlier, our view was

8    that the processes were not strictly adhered

9    to.

10        Q.   What processes were you referring

11   to?

12        A.   Again, the issues that call for

13   regression testing, issues that resulted in a

14   configuration change of some sort, mid-test

15   without retesting.

16        Q.   So the concerns that you were

17   referencing are related to regression testing

18   only?

19        A.   The specific examples I'm recalling

20   now are related to regression testing.  But,

21   again, if I thought about it some more, I may

22   come up with other examples.  But that's what

23   I recall now.

24        Q.   What's your understanding of what a

25   business rule is?

                    SEAN RYAN

1

2      A.    A business rule is a -- business

3   rules are procedural steps that lay out the

4   way -- in the context of this project,

5   anyway, they lay out the way system operators

6   respond to alarms and incidents and

7   system-generated messages.

8      Q.    Did the agency develop its own

9   business rules for the project?

10     A.    No, there were business rules

11  development workshops.  Again, this predates

12  me.  There were business rule development

13  workshops that were facilitated by one of the

14  consultants on the project, I don't recall

15  who it was.

16     Q.    It wasn't Lockheed Martin's role to

17  develop business rules, was it?

18           MS. HECHTKOPF:  Objection.

19     A.    I believe it was one of the other

20  consultants on the project.

21     Q.    Did Metro-North participate in what

22  was called the operational readiness

23  workshop?

24     A.    Yes.

25     Q.    Is that often referred to as the

1                    SEAN RYAN

2    ORW as well?

3         A.    I suppose.

4         Q.    And what did Metro-North do in

5    connection with the ORW?

6         A.    We attended the ORW, we observed

7    the demonstration there of the systems, I

8    believe it was held at Long Island City.

9         Q.    What was the purpose of the ORW?

10        A.    To demonstrate that the system

11   operated properly and was ready to execute, I

12   suppose, execute the business rules.  I think

13   there were canned scenarios that walked

14   through business rule execution.

15        Q.    Who on behalf of Metro-North

16   attended the ORW?

17        A.    April Panzer, primarily.  I was

18   there.  I don't recall who else.

19        Q.    What was Metro-North's view of the

20   outcome of the ORW?

21        A.    It was the view was dim,

22   demonstration was poor.

23        Q.    Why was the demonstration poor?

24        A.    The systems did not perform as

25   intended.

```
 1                    SEAN RYAN
 2        Q.   Did Metro-North express that
 3   concern at the ORW?
 4        A.   Everyone did.
 5        Q.   To who?
 6        A.   Well, formally, I suppose, to the
 7   MTACC personnel.
 8        Q.   Did you have anything positive to
 9   say about the ORW?
10        A.   Lunch was provided.
11        Q.   Is that it?
12        A.   That's all I recall.
13        Q.   Are you familiar with the term
14   showstoppers?
15        A.   Yes.
16        Q.   What are the showstoppers?
17        A.   Well that's a complicated question.
18   Showstoppers were the product of a process
19   called the path forward and there was a
20   committee was formed called the path forward
21   committee.  The path forward committee
22   evaluated the status of all the test results
23   and made a determination, made determinations
24   about classifications of many of the test
25   results.
```

```
1                    SEAN RYAN
2             And one of the results of that
3    committee's efforts was identifying for
4    so-called showstoppers.  They were data
5    segmentation, the provision of a maintenance
6    mode.  As I said earlier, there were other
7    modes that didn't function either.  The
8    provision of Lenel client software on every
9    workstation and a function called
10   publish-subscribe which was a communications
11   functionality.
12        Q.   What was the path forward
13   committee?
14        A.   What was the path forward
15   committee?  The path forward committee was an
16   effort to try to scrutinize the current state
17   of performance of the system, based on test
18   results and find a way to establish sort of a
19   stepping stone stage where we could work
20   together with Lockheed Martin to develop a
21   very basic level of functionality.
22        Q.   Who participated in the path
23   forward committee?
24        A.   Path forward committee was headed
25   by Whiel Hibri.  I represented Metro-North,
```

Magna Legal Services

```
 1                    SEAN RYAN
 2   Lisa Schreiber represented New York City
 3   transit, Dave Horn from Carter-Burgess was
 4   there.  I won't be able to give you the
 5   complete list, I'm pretty sure John Hyland
 6   from Long Island Railroad, there are a number
 7   of other people, Terry Fetters.
 8        Q.   Were all the agencies represented
 9   ultimately?
10        A.   Yes.
11        Q.   Was the path forward committee a
12   process that came out of the direction by
13   Capital Construction to be more flexible and
14   to get this process moving?
15        A.   I think it was more of an
16   acknowledgment of the fact that many of these
17   requirements were not going to pass testing
18   no matter what color we painted them, no
19   matter how we classified them, that it
20   wouldn't change the fact that they were not
21   going to perform the way the contract
22   intended them to perform.
23             The functionality was not going to
24   spontaneously emerge because we said a test
25   hadn't failed.  So I think the path forward
```

```
 1                    SEAN RYAN
 2    with?
 3        A.    According to the sign-in sheet,
 4    this is a monthly all-agency meeting that we
 5    were doing at that time at Penn Plaza.
 6        Q.    What was the purpose of the monthly
 7    all-agency meetings?
 8        A.    All-agency status update,
 9    coordination, so on.
10        Q.    Would Capital Construction normally
11    provide a status of what happened previous
12    and going forward?
13        A.    Yes.
14        Q.    This is a meeting that you
15    participated in then on April 20, 2009?
16        A.    Yes.
17        Q.    Turn to page 38, as we just
18    referenced, it says, The FAT showstoppers are
19    closed, and it lists published-subscribe,
20    Lenel, data of segmentation and maintenance.
21              Do you see that?
22        A.    Yes.
23        Q.    Do you recall Capital Construction
24    reporting that the FAT showstoppers had been
25    closed as of this April 20, 2009 all-agency
```

```
 1                    SEAN RYAN
 2   meeting?
 3            MS. HECHTKOPF:  Objection.
 4       A.   I don't recall the specific
 5   meeting.  Obviously, I was in attendance
 6   because I signed the sign-in sheet.
 7       Q.   And would you agree with me that
 8   Capital Construction reported that the FAT
 9   showstoppers are closed at this meeting?
10            MS. HECHTKOPF:  Objection.
11       A.   I would agree that written on this
12   slide are the words, The FAT showstoppers are
13   closed, yes.
14       Q.   Do you recall any objections to the
15   statement that were written on that slide 38
16   about the FAT showstoppers being closed?
17       A.   I don't recall the conversations
18   during this meeting.
19       Q.   Does this refresh your recollection
20   that the four FAT showstoppers that we
21   discussed earlier in your deposition were, in
22   fact, closed?
23            MS. HECHTKOPF:  Objection.
24       A.   It does not.
25       Q.   Would you have any reason to
```

1                    SEAN RYAN
2    believe they were not closed as of April 20,
3    2009, based on what is written here by
4    Capital Construction, who was the manager of
5    the project?
6              MS. HECHTKOPF:  Objection.
7         A.    They aren't closed as of today, so
8    I know that they weren't closed as of April
9    20, 2009.
10        Q.    Did you recall raising any
11   disagreement with the slides, as written,
12   during that meeting?
13        A.    Again, I don't recall what my
14   response was during that meeting.
15        Q.    Do you have any recollection of
16   discussing after the fact that this slide was
17   wrong, shortly after the meeting?
18        A.    I don't recall what my response was
19   at the time.
20        Q.    Why is it you say publish-subscribe
21   is not closed as of today?
22        A.    At Metro-North, we still do not
23   have this publish-subscribe function as
24   service.
25        Q.    How would you describe the

1               SEAN RYAN

2    publish-subscribe function?

3         A.    It's basically a software

4    capability where, I know this is not the

5    technical explanation but my words, sort of

6    like a switchboard function where people

7    subscribe to certain messages, the messages

8    are transmitted to people who subscribe to

9    them.

10        Q.    What is your understanding of the

11   problem that's still exists today why this

12   hasn't been resolved since Lockheed Martin's

13   termination?

14        A.    Frankly, I don't recall technically

15   what the problem was with it in 2009, other

16   than it wasn't provided.

17        Q.    And is this something that has been

18   included as a requirement on the AAESP

19   project?

20        A.    No, it is not because, as I said,

21   we did not -- the AAESP project is -- was

22   designed to simply close out the work that

23   Lockheed Martin had begun.

24        Q.    Didn't you say this was part of the

25   work that Lockheed Martin had begun?

253

1

2                        CERTIFICATE

3

4          I HEREBY CERTIFY that the witness
    was duly sworn by me and that the deposition
    is a true record of the testimony given by
5    the witness.

6          _____

7          Leslie Fagin,
           Registered Professional Reporter
           Dated:  April 17, 2012
8

9

10

11          (The foregoing certification of
    this transcript does not apply to any

12    reproduction of the same by any means, unless

13    under the direct control and/or supervision

14    of the certifying reporter.)

15

16

17

18

19

20

21

22

23

24

25

254

1

2                ACKNOWLEDGMENT OF DEPONENT

3

            I,                        , do hereby
4    certify that I have read the foregoing pages,
     and that the same is a correct transcription
5    of the answers given by me to the questions
     therein propounded, except for the
6    corrections or changes in form or substance,
     if any, noted in the attached Errata Sheet.

7

8

9    WITNESS NAME                 DATE

10

11   Subscribed and sworn
     to before me this
12        day of              , 2011.

13   My commission expires:

14

     Notary Public
15

16

17

18

19

20

21

22

23

24

25