UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA, FEDERAL
INSURANCE COMPANY, and SAFECO
INSURANCE COMPANY OF AMERICA,

               Plaintiffs,

– against –

METROPOLITAN TRANSPORTATION
AUTHORITY, MTA CAPITAL
CONSTRUCTION COMPANY, NEW
YORK CITY TRANSIT AUTHORITY, and
LOCKHEED MARTIN CORPORATION,

               Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 15, 2014

**MEMORANDUM
OPINION & ORDER**

09 Civ. 4077 (PGG)
09 Civ. 6033 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        In this action, No. 09 Civ. 6033 (PGG), Plaintiffs Travelers Casualty and Surety Company of America, Federal Insurance Company, and Safeco Insurance Company of America (the "Sureties") seek, inter alia, a "judgment declaring the present rights and obligations of the parties, if any, under [a performance bond]." (Cmplt. (Dkt. No. 1) at ¶ 37)  The performance bond was issued in favor of the Metropolitan Transit Authority in connection with a $300 million integrated electronic security system (the "Security System") that Lockheed Martin Corporation ("Lockheed") had agreed – pursuant to contract – to design and install throughout the Authority's transportation network (the "Security System Contract").  Defendants Metropolitan Transportation Authority, the MTA Capital Construction Company, and the New York City Transit Authority (collectively, the "MTA") have filed a counterclaim against the Sureties for breach of the Sureties' obligations under the performance bond.  (MTA Answer and Counterclaim (Dkt. No. 15) at 8-15)

Pending before the Court is the Sureties' motion for partial summary judgment on the MTA's counterclaim. (Dkt. No. 77) The Sureties assert that the MTA improperly made a post-termination payment to Lockheed to the detriment of the Sureties' rights as potential subrogees. The Sureties seek summary judgment on the MTA's counterclaim "to the extent of $5,468,907.83 and/or awarding them a credit in the sum of $5,468,907.83 against any recovery to which the MTA might otherwise be entitled under its Counterclaim." (Memorandum of Law in Support of the Sureties' Motion for Partial Summary Judgment ("Sureties Br.") (Dkt. No. 80) at 1) For the reasons stated below, the Sureties' motion will be denied.

## BACKGROUND

### I. THE SECURITY SYSTEM CONTRACT AND THE PERFORMANCE BOND

Lockheed and the MTA entered into the Security System Contract in August 2005. In connection with that contract, the Sureties executed a performance bond, with Lockheed as principal and in favor of the MTA as obligee (the "Bond"). (Sureties' Statement of Undisputed Material Facts ("Sureties R. 56.1 Stmt.") (Dkt. No. 81) ¶¶ 1-2)[1] The Bond is in the amount of $293,379,788.00. (Id. ¶ 4; see also Appendix to the Sureties' R. 56.1 Statement ("Sureties Appendix") (Dkt. No. 81), Ex. 1 (Bond))

On April 24, 2009, Lockheed commenced an action in this Court seeking a declaration that the MTA was in material breach of the Security System Contract and permitting

---

[1] To the extent that this Court relies on facts drawn from the parties' Local Rule 56.1 statements, it does so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). Where the MTA – the party opposing summary judgment – disagrees with the moving party's characterization of the cited evidence, and has presented an evidentiary basis for doing so, this memorandum relies on the non-moving party's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

Lockheed to withdraw from the same. (Id. ¶ 5; see Cmplt. (Dkt. No. 1), Lockheed v. MTA, No. 09 Civ. 4077 (PGG) (the "Lockheed Action")) On May 26, 2009, the MTA filed its Answer and Counterclaim, denying Lockheed's allegations and accusing it of, inter alia, defaulting on its own contractual obligations. (MTA Answer & Counterclaim (Lockheed Action, Dkt. No. 10)) The facts underlying that action are set forth in a separate summary judgment opinion bearing today's date.

On the same day that it filed its Answer and Counterclaim, the MTA also served a default notice on Lockheed (the "Default Notice"). (Sureties R. 56.1 Stmt. (Dkt. No. 81) ¶ 7) The Default Notice states that the MTA will consider the Security System Contract terminated if Lockheed does not cure its alleged defaults within seven business days. (Defendants' Response to Sureties' Statement of Undisputed Material Facts ("MTA R. 56.1 Resp.") (Dkt. No. 85) ¶ 7) On June 4, 2009, Lockheed provided the MTA with a 36-page response to the Default Notice, contesting the MTA's claims of default (the "Cure Response"). (Sureties R. 56.1 Stmt. (Dkt. No. 81) ¶ 8; Joint Appendix to the Parties' Rule 56.1 Statements ("Joint Appendix"), Ex. J7.1)[2] On June 12, 2009, the MTA nonetheless formally declared Lockheed to be in default and terminated the Security System Contract. (Sureties R. 56.1 Stmt. (Dkt. No. 81) ¶ 9)

In the Bond, the Sureties agreed,

> if requested to do so by the [MTA], to fully perform and complete the Project to be performed under the Contract, pursuant to the terms, conditions and covenants thereof, if for any cause the Contractor fails or neglects to so fully perform and complete such Project. . . . [and] to commence the work of completion within twenty (20) days after written notice thereof from the [MTA] and to complete such Project within such time as the [MTA] may fix.

---

[2] The Joint Appendix is Dkt. No. 163 in the Lockheed Action; it is not separately docketed in this action.

See Sureties Appendix (Dkt. No. 1), Ex. 1 (Bond). On June 12, 2009, the MTA notified the Sureties of Lockheed's default and requested that they undertake completion of the Project within 20 days. See MTA R. 56.1 Resp. (Dkt. No. 85) ¶ 39; see also Sureties Appendix, Ex. 2 (July 12, 2009 Ltr. from Ronald Pezik, MTA's Security System Program Manager, to Sureties).

On July 2, 2009, at the conclusion of the 20-day period, the Sureties notified the MTA that they

> have been unable to conclude that Lockheed is, in fact, in material breach of the subject Contract such that it could properly be terminated for default under the terms and conditions of that Contract. Therefore, the Sureties have been unable to conclude that the conditions triggering any obligation under the Bond have been met.

See Appendix to the MTA's Response to Sureties' Statement of Undisputed Material Fact ("MTA Appendix"), Ex. S16. That same day, the Sureties filed the instant action, seeking a determination of the parties' rights and obligations under the Bond. (Cmplt. (Dkt. No. 1)) This Court subsequently consolidated this case with the Lockheed Action. (July 29, 2009 Order (Dkt. No. 7))

The MTA filed its Answer and Counterclaim in the instant action on August 18, 2009. (Dkt. No. 15) In its Counterclaim, the MTA seeks damages arising from the Sureties' alleged default under the Bond. (Id., Counterclaim ¶ 1) On August 25, 2009, the Sureties filed their Reply to the MTA's Counterclaim alleging, inter alia, that the MTA failed to mitigate its damages and overpaid Lockheed. (Dkt. No. 16)

## II.   THE SURETIES' MOTION FOR PARTIAL SUMMARY JUDGMENT

The Sureties seek partial summary judgment in the form of an order "dismissing the Counterclaim against them to the extent of $5,468,907.83 and/or awarding them a credit in the sum of $5,468,907.83 against any recovery to which the MTA might otherwise be entitled

4

under its Counterclaim." (Sureties Br. (Dkt. No. 80) at 1) The Sureties contend that – after terminating the Security System Contract and demanding that the Sureties fulfill Lockheed's obligations under that contract – the MTA nonetheless paid Lockheed $5,468,907.83. In doing so, the Sureties contend that the MTA failed to mitigate its damages, to the ultimate detriment of the Sureties.

The relevant facts may be summarized as follows: The MTA's construction manager for the Security System Project was Nino Pirraglia. (Sureties R. 56.1 Stmt. (Dkt. No. 81) ¶ 27) Pirraglia's responsibilities included reviewing and approving Lockheed's payment requisitions and arranging for the issuance of payments. (Id. ¶ 28) At his deposition, Pirraglia testified that on or about June 1, 2009 – approximately one week after the MTA had served its Default Notice on Lockheed – Lockheed submitted "Estimate No. 40" to the MTA for payment. (Id. ¶ 29; see also Sureties Appendix, Ex. 10) The amount requested by Lockheed in Estimate No. 40 – $5,468,907.83 – reflected the value of the work Lockheed estimated it had completed between April 18, 2009, and May 22, 2009. (Id. ¶ 30)

The MTA approved Estimate No. 40 for payment no later than June 5, 2009, and before issuing the June 12, 2009 termination notice to Lockheed. (MTA R. 56.1 Resp. (Dkt. No. 85) ¶ 50) The Security System Contract provides that payment is due to Lockheed within thirty days of the MTA's approval of a pay estimate. (Id. ¶ 51) The MTA issued Payment 40 to Lockheed within thirty days of June 5, 2009, although the precise date is not clear. (Id. ¶ 52) The Sureties never notified the MTA that it should not make further payments to Lockheed or that doing so would impair their interests. (Id. ¶¶ 56-57)

Article 7.03(b) of the Security System Contract's Terms and Conditions authorizes the MTA to mitigate its damages in the event of a breach by Lockheed: "If a Default

5

occurs, Contractor shall be liable for all damages resulting from the Default. . . . All damages may be deducted and paid out of such monies due the Contractor." (Joint Appendix, Ex. J10.4 (emphasis added))

## DISCUSSION

### I. LEGAL STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. G. E. Co., 252 F.3d 205, 216 (2d Cir. 2001).

### II. THE SURETIES' MOTION IS PREMATURE

The Sureties contend that the MTA's post-termination payment to Lockheed[3] was improper, notwithstanding that the payment was approved before Lockheed's termination. They argue that any balance the MTA owes Lockheed under the Security System Contract serves as the Sureties' collateral in the event that they are required to pay or otherwise perform under the Bond. (Sureties Br. (Dkt. No. 80) 8-9) According to the Sureties, if the MTA is correct that Lockheed materially breached the Security System Contract, then payment of Estimate No. 40 was an overpayment that impaired their interests in the unpaid balance of the contract price. (Id.)

---

[3] This Court assumes, for purposes of resolving the Sureties' summary judgment motion, that the payment at issue was made after the June 12, 2009 termination. The record is not clear on this point, however. Based on the current record, the most that can be said is that payment was made within 30 days of June 5, 2009. (MTA R. 56.1 Resp. (Dkt. No. 85) ¶ 52)

The Sureties further contend that, in the event that Lockheed is found liable and they are compelled to fulfill their obligations under the Bond, they are entitled to a damages offset under the doctrine of equitable subrogation. (Id.)

### A. Applicable Law

Because this action is brought under this Court's diversity jurisdiction, New York substantive law applies. See Erie R. R. Co. v. Tompkins, 304 U.S. 64 (1938). The Second Circuit has summarized the doctrine of equitable subrogation under New York law as follows:

> Subrogation is the right one party has against a third party following payment, in whole or in part, of a legal obligation that ought to have been met by the third party. The doctrine of equitable subrogation allows insurers to "stand in the shoes" of their insured to seek indemnification by pursuing any claims that the insured may have had against third parties legally responsible for the loss. In short, one party known as the subrogee is substituted for and succeeds to the rights of another party, known as the subrogor. The doctrine of subrogation, which is based upon principles of equity, has a dual objective as stated by New York courts: It seeks, first, to prevent the insured from recovering twice for one harm, as it might if it could recover from both the insurer and from a third person who caused the harm, and second, to require the party who has caused the damage to reimburse the insurer for the payment the insurer has made.

Allstate Ins. Co. v. Mazzola, 175 F.3d 255, 258 (2d Cir. 1999) (internal citations and quotation marks omitted). "[T]he decision to apply equitable subrogation is committed to the discretion of the trial court[.]" United States v. Baran, 996 F.2d 25, 29 (2d Cir. 1993).

"It is a prerequisite to the right of equitable subrogation that the party seeking subrogation must have paid another's obligation, and this payment must have fully satisfied the debt owed by the other party to that creditor." In re Suprema Specialties, Inc., 02-10823 JMP, 2006 WL 2583648, at *7 (Bankr. S.D.N.Y. June 8, 2006), aff'd, 370 B.R. 517 (S.D.N.Y. 2007), aff'd, 309 F. App'x 526 (2d Cir. 2009) (citing Grant Thornton v. Syracuse Sav. Bank, 961 F.2d 1042, 1047 (2d Cir. 1992) ("Subrogation may be utilized only after full payment of the debt owed by the subrogor.")). Indeed, "New York courts have repeatedly recognized that

7

subrogation rights accrue <u>only upon the payment of outstanding claims</u>." <u>Nobel Ins. Co. v. City of New York</u>, 00-CV-1328 KMK, 2006 WL 2848121, at *15 (S.D.N.Y. Sept. 29, 2006) (emphasis added) (citing and quoting <u>City of New York v. Cross Bay Contracting Corp.</u>, 93 N.Y.2d 14, 20 (1999) ("Because [the surety] had not paid all outstanding claims, any subrogation rights that may otherwise arise have not matured here."); <u>Fed. Ins. Co. v. Arthur Anderson & Co.</u>, 75 N.Y.2d 366, 372 (1990) (explaining that subrogation rights "accrue upon payment of the loss"); <u>Am. Sur. Co. v. Palmer</u>, 240 N.Y. 63, 67 (1925) ("It is not liability to pay, but an actual payment to the creditor which confers the right of subrogation."); <u>Restatement (3d) of Suretyship & Guaranty</u> § 27(1) ("Upon total satisfaction of the underlying obligation, the secondary obligor is subrogated to all rights of the obligee with respect to the underlying obligation. . . .")). As the Second Circuit explained in <u>Titan Indemnity Company v. Triborough Bridge and Tunnel Authority, Inc.</u>,

> Generally in a public improvement contract, the contractor is required to find a surety that will secure the performance of his contract. Upon default by the contractor, the surety, pursuant to a performance bond, completes the contract, at its own cost and expense. <u>It then becomes equitably subrogated</u> to the rights of the contractor and certain of the rights of the owner in the unpaid balance of the contract price.

135 F.3d 831, 834 (2d Cir. 1998) (emphasis added) (citing <u>Tri-City Electric Co., Inc. v. People</u>, 96 A.D.2d 146, 149 (4th Dept. 1983); <u>Scarsdale Nat. Bank & Trust Co. v. U.S. Fid. & Guar. Co.</u>, 264 N.Y. 159 (1934)).

While, under New York law, "a surety who performs under its bond upon the contractor's default has an equitable lien upon the funds held by the owner, and that this lien arises upon execution of the bond," such lien "does not become enforcible until the surety suffers a loss by making payments pursuant to its obligation under the bond." <u>Aetna Cas. & Sur. Co. v. United States</u>, 4 N.Y.2d 639, 644 (1958) (citing <u>U.S. Fid. & Guar. Co. v. Triborough Bridge</u>

8

Auth., 297 N.Y. 31, 33 (1947)); see also Scarsdale Nat. Bank & Trust, 264 N.Y. at 164 ("The equity in favor of the surety company arose at the time of the giving of its bond. The right became available when the surety company completed the work at a loss." (emphasis in original) (citing Prairie State Nat. Bank v. United States, 164 U.S. 227, 232, 237, 240 (1896))).

### B. Analysis

The Sureties' motion for partial summary judgment must be denied as premature. The time for asserting a right to equitable subrogation is either "when the surety compan[ies] complete[ ] the work at a loss," Scarsdale Nat. Bank & Trust, 264 N.Y. at 164, or "suffer[ ] a loss by making payments pursuant to [their] obligation[s] under the bond." Aetna Cas. & Sur. Co., 4 N.Y.2d at 644. Here, it is undisputed that the Sureties have neither undertaken performance of the Security System Contract themselves nor financed the project's completion. The Sureties' lack of performance to date precludes them from asserting an equitable subrogation claim at this time for any improper payments that the MTA purportedly made to Lockheed. See Admiralty Const. by Nat. Am. Ins. Co. v. Dalton, 156 F.3d 1217, 1222 (Fed. Cir. 1998) ("[T]o maintain a claim for equitable subrogation, a surety must either take over contract performance or finance the completion of the defaulted contract under its performance bond."). Given that the Sureties have chosen not to perform under the Bond, equity does not favor, much less require, granting them the relief they seek.

The Sureties assert, however, that they "have an interest in the contract balance, as [a] potential subrogee of the owner (the MTA), should they be required to pay or otherwise perform under their Bond." (Sureties Br. (Dkt. No. 80) at 8 (emphasis added)) But the Sureties have cited no case from New York or any other jurisdiction recognizing a surety's right to obtain relief of the sort requested here based on status as a "potential subrogee." While the Sureties

argue that "New York courts have upheld [a] surety's standing to assert its inchoate right of subrogation before performing under its bond" (Reply Memorandum of Law in Further Support of the Sureties' Motion for Partial Summary Judgment ("Sureties Reply Br.") (Dkt. No. 82) at 6 (emphasis in original)), the case law they cite does not support that proposition.

Nobel Insurance Company v. City of New York, 00-CV-1328 KMK, 2006 WL 2848121 (S.D.N.Y. 2006), cited by the Sureties (Sureties Reply Br. (Dkt. No. 82) at 6), involves very different facts and supports the MTA's argument that the instant motion is premature. In Nobel, the surety (Nobel) had issued a payment bond on behalf of a general contractor in favor of the City as obligee. On June 23, 1997, the City terminated the underlying contract with the general contractor. On February 24, 1998, Nobel sent the City a letter stating that subcontractors and suppliers of the general contractor had asserted claims for payment against the payment bond Nobel had issued. Nobel asked the City not to release to the general contractor any further funds under the contract. A week later, the City issued a $492,229.77 payment to the general contractor. Nobel, 2006 WL 2848121, at *1-2. Nobel subsequently paid out $86,743.31 to the general contractor's subcontractors and suppliers pursuant to its obligations under the payment bonds. It then sued the City, claiming a right to equitable subrogation. Id. at *15.

The central issue in Nobel is whether the City – by virtue of Nobel's February 24, 1998 letter – "was bound by equitable subrogation principles to act as a stakeholder of the payments allegedly due to the [general] contractor":

> In support of this theory of recovery, Nobel cites to a number of cases for the proposition that "the government becomes a 'stakeholder' for remaining contract proceeds when a payment and performance bond surety notifies the government that the surety's interest is in jeopardy because of default by the contract or . . . based upon the reasoning that once the surety notified the government of the contractor's default, the surety could assert the equitable doctrine of subrogation." Ransom v. United States, 900 F.2d 242, 245 (Fed. Cir. 1990) (citing Balboa Ins. Co. v. United States, 775 F.2d 1158, 1160-63 (Fed. Cir. 1985)); see also Newark

> Ins. Co. v. United States, 144 Ct. Cl. 655, 169 F. Supp. 955, 957 (Ct. Cl. 1959) (denying defendant's motion for summary judgment on the grounds that if government officials, after due notice of facts giving rise to equitable right in surety, paid out the money without a valid reasons for doing so, surety would be entitled to judgment against the United States). That is, "a surety has an equitable right of subrogation to contractor funds retained by the government when the surety pays debts of the contractor to subcontractors pursuant to a payment bond." Int'l Fid. Ins. Co. v. United States, 25 Cl. Ct. 469, 473 (1992) (citing Pearlman v. Reliance Ins. Co., 371 U.S. 132, 141-42, 83 S. Ct. 232, 9 L.Ed.2d 190 (1962)).

Id. at *5-6. The Nobel court concluded that Nobel had presented a "legally viable" "theory of recovery." Id. at *7. The court then held that the City's obligation to act as a stakeholder was triggered by "notice alone" – i.e., Nobel's February 24, 1998 letter – and that payment to the subcontractors was not required to impose "stakeholder" status on the City. Id. at *15-16. The court went on to deny the City's summary judgment motion, except to the extent that the City argued that its liability was limited to the $86,743.31 that Nobel had paid to the subcontractors and the general contractor's suppliers. Id. at *21.

Nobel is of little assistance to the Sureties. As an initial matter, the issue in Nobel – as noted above – is whether Nobel's letter to the City triggered the City's obligation to act as a stakeholder, not whether Nobel had a ripe claim for equitable subrogation. See id. at *15 ("Nobel maintains that the City became a stakeholder regardless of whether Nobel's equitable subrogation rights were ripe.") At the time Nobel filed its action, there was no issue as to whether its equitable subrogation claim was ripe, because "Nobel [had] paid $86,743.31 to subcontractors in connection with the project before filing th[e] action to enforce its equitable subrogation rights." Id. at *15. Moreover, the Nobel court acknowledged that "New York courts have repeatedly recognized that subrogation rights accrue only upon the payment of outstanding claims." Id. Finally, to the extent that the Nobel court concluded that the City was obligated to take steps to protect the surety in that case, it reached this decision because the

11

surety had notified the City of its interest in the contract balance. Here, it is undisputed that the Sureties did not inform the MTA of their potential interest in the contract balance prior to the MTA's $5,468,907.83 payment to Lockheed. (MTA R. 56.1 Resp. (Dkt. No. 85) ¶¶ 56-57).

In sum, Nobel does not demonstrate that the Sureties are entitled to summary judgment at this time concerning the alleged post-termination payment made to Lockheed. Stated another way, Nobel does not demonstrate that a surety may seek recovery on an equitable subrogation claim prior to performance.

The other case cited by the Sureties (see Sureties Reply Br. (Dkt. No. 82) at 6 n. 5) – Menorah Nursing Home, Inc. v. Zukov, 153 A.D.2d 13 (2d Dept. 1989), is likewise inapposite. The issue addressed in that case is whether a defendant-surety, prior to fulfilling its obligations under a performance bond, has standing to bring third-party claims against the principal's subcontractors. In answering that question in the affirmative, the Appellate Division noted that "[i]t seems only equitable to permit [the surety], which is potentially liable to the plaintiffs as a result of its principal's default, to seek indemnification from the third-party defendants whose misconduct allegedly caused the default." Menorah Nursing Home, 153 A.D.2d at 18. The court went on to note that "the Court of Appeals has already sustained the viability of a contingent third-party claim based on subrogation," id. (internal quotation marks omitted) (citing Krause v. Am. Guarantee & Liab. Ins. Co., 22 N.Y.2d 147 (1968)), and concluded that "[i]n the interest of judicial economy, [the surety] should be permitted to assert third-party causes of action which might be considered technically premature." Id.

Menorah Nursing Home likewise does not assist the Sureties, because their potential claim is against the obligee, not "third-party defendants whose misconduct allegedly caused the default." Id. at 18. Nothing in that case requires this Court to grant the Sureties

summary judgment on their equitable subrogation claim in a context in which they have taken no steps towards performance under the Bond.

## CONCLUSION

For the reasons stated above, the Sureties' motion for partial summary judgment is denied. The Clerk of the Court is directed to terminate the motion (Dkt. No. 125, No. 09 Civ. 4077; Dkt. No. 77, No. 09 Civ. 6033). The Clerk is further directed to terminate the Sureties' motion for leave to file excess pages for their reply brief (Dkt. No. 115, No. 09 Civ. 4077; Dkt. No. 76, No. 09 Civ. 6033) as moot.

Dated: New York, New York  
       September 15, 2014

SO ORDERED.

_____  
Paul G. Gardephe  
United States District Judge