UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOCKHEED MARTIN
TRANSPORTATION SECURITY
SOLUTIONS, AN OPERATING UNIT OF
LOCKHEED MARTIN CORPORATION,

Plaintiff,

- against –

MTA CAPITAL CONSTRUCTION
COMPANY and METROPOLITAN
TRANSPORTATION AUTHORITY,

Defendants.

TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA, FEDERAL
INSURANCE COMPANY, and SAFECO
INSURANCE COMPANY OF AMERICA,

Plaintiffs,

– against –

METROPOLITAN TRANSPORTATION
AUTHORITY, MTA CAPITAL
CONSTRUCTION COMPANY, NEW
YORK CITY TRANSIT AUTHORITY, and
LOCKHEED MARTIN CORPORATION,

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 16, 2014

**MEMORANDUM
OPINION & ORDER**

09 Civ. 4077 (PGG)

09 Civ. 6033 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

These actions involve a dispute over a \$300 million integrated electronic security

system that the Metropolitan Transit Authority and the MTA Capital Construction Company

(collectively, the "MTA") contracted Lockheed Martin Transportation Security Solutions

("Lockheed") to design and install throughout the MTA's expansive transportation network.

On April 24, 2009, Lockheed filed Civil Action No. 09 Civ. 4077 (PGG) seeking a declaration that the MTA was in material breach and permitting Lockheed to withdraw from the parties' contract.[1] The MTA denied the allegations and counterclaimed, accusing Lockheed of, inter alia, defaulting on its contractual obligations. On June 12, 2009, the MTA terminated Lockheed.

In the Amended Complaint, Lockheed seeks damages of more than $200 million for breach of contract and bad faith termination. In its counterclaims, the MTA seeks damages of at least $92 million.

Both sides have moved for summary judgment on certain claims, issues, and defenses. While the parties agree on little, both sides acknowledge that Lockheed never delivered the integrated security system described in the underlying contract. This litigation will determine who bears responsibility for that failure.

Lockheed contends that infighting among the MTA's agencies impeded its ability to perform and that the MTA terminated the contract prematurely. (Memorandum of Law in Support of Lockheed Martin's Motion for Partial Summary Judgment ("LM Br.") (Dkt. No. 138) at 2 ("At the time of termination, Lockheed Martin was in the process of delivering an IESS System with the contractually required functionality. . . ."); id. at 14 ("Almost immediately after the IESS project was awarded, the agencies delayed Lockheed Martin's work."); id. at 32 ("Any

---

[1] On July 29, 2009, this Court consolidated the Lockheed action with No. 09 Civ. 6033 (PGG), in which Travelers Casualty and Surety Company of America, Federal Insurance Company, and Safeco Insurance Company of America (the "Sureties") seek, inter alia, a "judgment declaring the present rights and obligations of the parties, if any, under [a performance bond]." (Cmplt. (Dkt. No. 1, No. 09 Civ. 6033) at ¶ 37) The facts underlying that action are set forth in a separate summary judgment opinion issued by this Court on September 15, 2014. (Dkt. No. 154, No. 09 Civ. 6033)

problems on the IESS project . . . were created by the MTACC's failure to obtain the MTA's

agencies buy-in to the IESS project. . . ."))

    The MTA claims that the project failed because of conceptual problems in

Lockheed's design and because of Lockheed's refusal to invest the necessary resources to correct

those deficiencies.  (Defendants' Memorandum of Law in Support of Motion for Partial

Summary Judgment ("MTA Br.") at 5 ("The root of Lockheed's ultimate failure . . . began at the

Proposal stage. . . ."), id. at 19 ("Rather than abide by the [Commissioning Agent's instructions]

and invest in the Project to fix the defects . . . Lockheed decided to do the opposite."))

    In support of their motions for partial summary judgment, both sides have

submitted voluminous Local Rule 56.1 statements and exhibits.  The Rule 56.1 statements

demonstrate that there are numerous issues of material fact that preclude summary judgment on

most of the claims and issues raised in the parties' motions.

## BACKGROUND

    The MTA operates a vast transportation network that spans the New York

metropolitan area.  (Lockheed Martin's Statement of Undisputed Material Facts ("LM R. 56.1

Stmt.") (Dkt. No. 139) ¶ 3)[2]  After the September 11, 2001 terrorist attacks, the MTA and its

subsidiary agencies (MTA New York City Transit, MTA Metro-North Railroad, MTA Bridges

and Tunnels, and MTA Long Island Rail Road (together with the MTA Police, the "MTA

---

[2]  To the extent that this Court relies on facts drawn from the parties' Local Rule 56.1 statements, it does so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where the party opposing summary judgment disagrees with the moving party's characterization of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-moving party's characterization of the evidence.  See Cifra v. G. E. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

agencies")) undertook several construction projects aimed at improving the security of the

MTA's transportation infrastructure. (Id. ¶¶ 3, 7)  One of those projects – the Integrated

Electronic Security System and Command, Communications, and Control System (the "Security

System" or the "Project") – is the subject of this lawsuit.  This project was overseen by the MTA

Capital Construction Company.  (Id. ¶ 8)

## I.      THE MTA'S REQUEST FOR PROPOSALS

In May 2005, the MTA Capital Construction Company issued a Request for

Proposals ("RFP") seeking bids for the Security System project.  (Id. ¶ 9)  The RFP contains

both the contract that the MTA sought to award as well as the Project's technical specifications.

(Joint Appendix of Exhibits ("JA") Ex. 10.1 (Dkt. No. 163-66), RFP Table of Contents;

Defendants' Statement of Material Facts Pursuant to Rule 56.1 ("MTA R. 56.1 Stmt.") (Dkt. No.

150) ¶¶ 93-94)

As described in the RFP, the purpose of the Security System is to ensure the

safety of MTA employees and customers by "enhanc[ing] the ability of the MTA and affiliated

Agency personnel to effectively deter, detect, delay, prevent, alert, protect, respond, and recover

from any situation, threat, or incident . . . ."  (JA Ex. 11 (Dkt. No. 163-66), RFP Vol. 1A § 1.0

("Brief Description of the Work"))  In furtherance of that goal, the MTA sought a security

system that would be "comprised of access control devices, intrusion detection sensors, CCTV

cameras and their recording devices, existing chemical sensors and less-than-lethal systems," all

of which would "report[ ] to a series of [Command, Communications, and Control] Centers."

(Id. at § 1.1(a) ("IESS/C3 System of Systems Overview"))  The MTA envisioned an integrated

security system that would include three "echelons" of Command, Communications, and Control

Centers:  a central location at the MTA Police Department; four regional centers at each agency,

4

and local centers.  (Id. at §§ 1.1(a), 2.2 ("C3 Centers"))  The Command, Communications, and

Control Centers would be "interconnected so that they c[ould] share voice, video and data. . . ."

(Id. at § 2.5 ("Communication Network Enhancements"))

         The contractor's role, according to the RFP, would be to act as the "systems

integrator," which meant ensuring "the seamless integration of the new systems, as well as

integration of specified legacy systems at various facilities."  (Id. at § 1.4 ("Software and

Systems Integration"))

         The RFP also outlined the MTA's requirements for the software to be used on the

Project:

> The Contract Documents require that the Contractor use commercial-off-the-shelf
> (COTS) products and software.  Use of a middleware application is expected for
> seamless integration of various systems.  The software is specified to be of COTS,
> open architecture that shall be configured using standard programming languages.
> The software shall be developed such that it does not limit future expansions of
> the system as well as other legacy systems integration without major
> reconfiguration and upgrades.

(Id.)  COTS is "a standardized package or platform regularly used for the deployment of specific

applications" that "includes proprietary products that have already been developed and/or are

owned by the Contractor or by third parties."  (JA Ex. 13.9 (Dkt. No. 163-70), Specification

Section 1AB19 – Abbreviations, Definitions and Standards:  Appendix B: Glossary, at 25 of 31)

The Project's "end result," according to the RFP, would be "a common[ ] [COTS-] based

architecture for all Agencies."  (JA Ex. 16 (Dkt. No. 163-76), RFP Vol. 6A § 4.0 ("Unified

Approach to Procurement"))

         The MTA's Program Manager at the time, Ashok Patel, explained at his

deposition why "[u]se of COTS on th[e] project was a basic requirement that [the MTA] ha[d]

5

specified in [its] scope of work." (Deposition of Ashok Patel ("Patel Dep.") (Dkt. No. 162-36),

Tr. 53:10-12) According to Patel, the

> MTA in general does not allow and does not prefer customized applications to be
> developed . . . , because support and maintenance always becomes an issue
> because [the software] becomes proprietary. And we always encourage, whether
> it be [a] security program or any [other program], use of COTS as a standard
> practice because then you're not stuck with a particular vendor and it also spares
> you from develop[ing] [a] system from scratch.

(Id. at 53:13-22)

## II.    LOCKHEED'S PROPOSAL

Lockheed submitted its bid for the Security System project on July 22, 2005 (the

"Proposal"). (LM R. 56.1 Stmt. (Dkt. No. 139) ¶ 11) The "primary feature" of Lockheed's

proposed system was that it would be "integrated from the user's point of view," meaning that

"the screens that the users dealt with would be integrated." (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶

188 (quoting Deposition of Lockheed Program Executive James Gaughan ("Gaughan Dep.")

(Dkt. No. 162-11), Tr. 59:17-20)) Lockheed believed that it could deliver the promised

functionality using a "100% COTS solution" that would "require[ ] no software development."

(JA Ex. 9.1 (Dkt. No. 163-19), Proposal Vol. 1, Proposal Summary § 1.1 ("Key Program

Personnel")) Lockheed further represented that it took "no exceptions to the contract" and that

its Proposal was "100% compliant with the requirements of the RFP." (Defendants' Response to

Lockheed Martin's Statement of Undisputed Material Facts ("MTA R. 56.1 Resp.") (Dkt. No.

147) ¶ 103 (quoting JA Ex. 9.1 (Dkt. No. 163-19), Proposal Vol. 1, Proposal Summary § 7

("Contract Exceptions")))

Lockheed characterized its technical approach as "a COTS-based incremental

solution that takes into account the relevant technology, people, business rules, and budgetary

constraints." (JA Ex. 9.2 (Dkt. No. 163-24), Proposal Vol. 2, Technical Proposal § 2.2.1

6

("Incident Management/Decision Support")) The Proposal relies on the use of two primary

COTS products: (1) the Integraph Public Safety I/CAD product suite, which provides computer-

aided dispatch functionality that, among other things, supplies the security operator with the

computer screen display (known as the graphical user interface); and (2) the Lenel "On Guard"

system, which is described as the "heart" of the proposed security system, and which manages

security monitoring and related sub-systems. (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 158)

> Although Lockheed's proposed solution "relie[d] on a COTS-based design-build

approach," Lockheed acknowledged in its Proposal that "the integrated products don't just work

'out of the box,'" and therefore COTS products would have to be "configured to meet the

business and operational needs of the users and stakeholders." (JA Ex. 9.2 (Dkt. No. 163-31),

Proposal Vol. 2, Technical Proposal § 3.4 ("Software Development and Subsystem Integration"))

> During the proposal stage, Lockheed personnel discussed internally whether

"glue/adaptation" code would be necessary to integrate Lockheed's proposed solution into

existing MTA systems. (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 221) Glue code is "a code that

facilitates the integration of components." (Id. ¶ 225 (quoting Deposition of Lockheed System

Architect Ken Turner ("Turner Dep.") (Dkt. No. 162-47), Tr. 38:9-14)) In an internal email,

Lockheed's System Architect for the Proposal, Ken Turner, describes Lockheed's approach as

"all COTS, all the time," and explains that "these [COTS] components provide interfaces that

already exist to interface to each other and to external systems." (Id. ¶¶ 44, 222 (quoting MTA

Ex. 17 (Dkt. No. 150-28), May 15, 2005 Turner email)) Lockheed's chief engineer on the

Proposal, Fred Robinson, testified that he and others who worked on the Proposal "had an

expectation that we would not have to develop any software to establish interfaces as part of the

project." (Id. ¶ 226 (quoting Deposition of Fred Robinson ("Robinson Dep.") (Dkt. No. 162-40),

7

Tr. 96:12-19)) Similarly, during the RFP process, Lockheed told the MTA that its "proposed

solution require[d] no new software development." (MTA Ex. 3 (Dkt. No. 150-14), Response to

Questions Received July 29, 2005, at 8)

> In the Proposal, Lockheed represented that it had

> developed and integrated reliable software, a claim that will be proven through
> independent software verification and validation (SVV) of all software. This will
> be accomplished through a comprehensive SVV Plan in accordance with Division
> 25 requirements for SVV plan and reporting and Software Testing.

(MTA R. 56.1 Resp. (Dkt. No. 147) ¶ 80 (quoting JA Ex. 9.3 (Dkt. No. 163-40), RFP Vol. 3 §

9.3 ("Software Verification and Validation") (emphasis added)))[3]   Lockheed further represented

that its software verification and validation plan would, inter alia, "ensure that all COTS and re-

used, non-COTS resources included in the system perform properly[, regardless of] whether the

software is used as-is or is modified for this purpose." (JA Ex. 9.3 (Dkt. No. 163-40), RFP Vol.

3 § 9.3 ("Software Verification and Validation"))

## III.   THE CONTRACT

On August 31, 2005, the MTA issued a Notice of Award notifying Lockheed that

the MTA had accepted Lockheed's Proposal without exception. The MTA agreed to pay

Lockheed $212,752,788.[4]   (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 20; LM R. 56.1 Stmt. (Dkt. No.

139) ¶ 15) In exchange, Lockheed took on the obligation to "design, develop, furnish, install,

test and implement [the Security System] and [Command, Communications, and Control]

---

[3] As explained below, "Division 25" refers to a section of the parties' contract that addresses
requirements for computer software.

[4] One or more Additional Work Orders increased the scope of the work and the contract price.
(MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 24; Lockheed Martin's Response to MTA's Proposed
Statement of Material Facts Pursuant to Rule 56.1 and Lockheed Martin's Additional Statements
of Facts ("LM R. 56.1 Resp.") (Dkt. No. 161) ¶ 24)  The parties disagree, however, as to the
nature of the Additional Work Orders and the adjusted contract price. The Court need not
consider this issue, however, as the Additional Work Orders are not material to the parties'
summary judgment motions.

Centers at various locations together with associated facility construction and renovation work."

(MTA R. 56.1 Resp. (Dkt. No. 147) ¶ 14 (quoting JA Ex. 10.2 (Dkt. No. 163-44), Agreement, at

1)) The parties agreed that New York law would govern any disputes arising from their

agreement. (LM R. 56.1 Stmt. (Dkt. No. 139) ¶ 19)

### A.   **The Contract Documents**

The parties' contractual agreement is set forth in multiple documents, including a

21-page "Agreement." The Agreement lists the documents that – together with the Agreement –

govern the parties' contractual relationship. These documents are referred to in the Agreement

(and will be referred to in this opinion) as the "Contract Documents." (MTA R. 56.1 Stmt. (Dkt.

No. 150) ¶ 54) The Contract Documents include:

1. the Agreement;

2. the agreed-upon "Special Conditions" and "Terms and Conditions";

3. "the documents/items comprising the Scope of Work of th[e] Project . . . including those portions of, or attachments/exhibits to, [the MTA's] Request For Proposals which describe [the MTA's] objectives, systems functional and performance requirements, constraints, space, other capacities and process descriptions and other criteria and requirements of [the MTA] . . . ;"

4. the MTA's "[RFP], consisting of Volumes 1 through 6, inclusive, as well as all attachments, exhibits, and appendices, including Addenda #1 through #10;"

5. Lockheed's "final, fully conformed Proposal as accepted by [the MTA];"

6. Lockheed's "Best and Final Price Proposal (also referred to as 'the Price Schedule') as accepted by [the MTA];" and

7. the performance bonds approved by the MTA.

(Id. ¶ 55; LM R. 56.1 Resp. (Dkt. No. 161) ¶ 55; JA Ex. 10.2 (Dkt. No. 163-44), Agreement §

I.A)

The Agreement provides that, in the event of any inconsistency between or among

the provisions of the Contract Documents, the more stringent provision will control unless the

9

the MTA "Engineer" directs otherwise.[5] (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 58; LM R. 56.1

Stmt. (Dkt. No. 139) ¶ 322) Where none of the conflicting provisions is clearly more stringent,

the following order of preference applies:

1.  the Agreement;

2.  the Special Conditions and Terms and Conditions;

3.  the Scope of Work;

4.  Lockheed's fully conformed Technical Proposal, except that "to the extent that the Technical Proposal exceeds the requirements of the Scope of Work, [at the MTA's option] such Technical Proposal shall take precedence over such Scope of Work;"

5.  the remaining RFP documents.

(MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 59; JA Ex. 10.2 (Dkt. No. 163-44), Agreement § II.D)

**B.    Commercial Off-the-Shelf Software (COTS)**

The Agreement requires Lockheed to "incorporate and integrate Software into the

[Security System] that addresses all functional and performance requirements as defined

throughout the Contract Documents," and to furnish the MTA "with the latest versions of all

[COTS] Software and 'Non-COTS' Software used to produce and support the [Security

System]." (JA Ex. 10.2 (Dkt. No. 163-45), Agreement §§ IV.A.1 & IV.A.3)

The specifications for the Security System are largely set forth in Specification

Division 1AB, which is found in RFP Volume 2B. (MTA R. 56.1 Stmt. (Dkt. No. 161) ¶ 93)

---

[5] In the Contract Documents, the parties define "Engineer" as "the individual designated in the Notice of Award to administer the Contract and performing those functions required by the [MTA], (except for those business functions reserved for the Transit Authority Division of Materiel's designee), or his designee or successor." (JA Ex. 10.4, Contract Terms and Conditions (Dkt. No. 163-48) at 2) The August 31, 2005 award letter informed Lockheed that Joseph Christen would be the "Construction Manager/Engineer." (MTA R. 56.1 Stmt. (Dkt. No. 161) ¶¶ 26-27) On May 4, 2006, the MTA notified Lockheed that Kenneth Shields would replace Christen as "Engineer." (Id. ¶ 28) Shields remained in that position through Lockheed's termination. (JA Ex. 8 (Dkt. No. 163-18) June 12, 2009 Ltr. from Shields to Gaughan)

Section 1AB11 in Specification Division 1AB is entitled "Software." (Id. ¶ 94)  Specification

1AB11 states:

> This section, along with the software requirements specified in Division 25 and
> applicable requirements within other sections of the Contract, describe
> requirements for Integrated Electronic Security System/Command, Control and
> Communications (IESS/C3) System of Systems (SoS) software. . . .
>
> The Contractor shall produce and enforce a comprehensive software development
> process that includes methodologies as specified in Division 25, for all [Security
> System] software utilizing the specified standards as applicable.
>
> Unless prior MTA-CC approval is obtained, all Commercial-Off-The-Shelf
> (COTS) software products implemented in the [Security System] shall be utilized
> without modification. . . .

(JA Ex. 13 (Dkt. No. 163-68), Vol. 2B, Specification Section 1AB11 ("Software") (emphasis

added))  The parties do not contend that Lockheed ever sought approval for – or that the MTA's

Engineer ever authorized Lockheed to undertake – the development of software or the

modification of COTS software.  (LM R. 56.1 Stmt. (Dkt. No. 139) ¶ 123; MTA R. 56.1 Resp.

(Dkt. No. 147) ¶ 123)

   Division 25 is found in RFP Volume 2F and is entitled "Software Design and

Management."[6]  (JA Ex. 10.1 (Dkt. No. 163-43), RFP Table of Contents)  Division 25A,

"Software Development," states, in pertinent part:

---

[6] Lockheed asserts that Division 25 "was not applicable to Lockheed['s] work" (LM R. 56.1
Resp. (Dkt. No. 161) ¶ 95) because Lockheed proposed, and the MTA accepted, an all-COTS
solution requiring no software development.  (Reply Memorandum of Law in Further Support of
Lockheed Martin's Motion for Partial Summary Judgment ("LM Reply Br.") (Dkt. No. 142) at 3
n.1)  As discussed below, it appears clear from the Contract Documents that Division 25 is, in
fact, part of the parties' contractual agreement.  Division 25 is found in RFP Volume 2F and RFP
Volumes 1-6 are part of the definition of Contract Documents.  See JA Ex. 10.2 (Dkt. No. 164-
44), Agreement at 2 (listing "the Authority's Request for Proposals, consisting of Volumes 1
through 6, inclusive" among the "Contract Documents" that make up the parties' contractual
agreement).

This Section, 25A, describes the detailed software requirements for the Contract referred [to] within this Division as the [Security System]. Detailed functional and hardware requirements are provided in Section 1AB of this Contract.

The Contractor shall provide all software necessary to satisfy the functional, safety, reliability, availability, maintainability, and performance requirements contained elsewhere within this Contract. This Division defines the software development process and submittal requirements.

This Division outlines the level of software process and documentation for specific software functionality based on two main software classifications:

1. Commercial-off-the-Shelf (COTS) software requiring no modifications for the [Security System]

2. New software that has been specifically developed for the System, pre-existing software, or COTS software modified for use on the [Security System]

(JA Ex. 15.1 (Dkt. No. 163-74), Specification Section 25A, § I ("Introduction"))

Division 25A further states that "[t]he Contractor shall deliver complete software required for the [Security System] to operate correctly and fulfill the requirements defined in this Contract," and outlines a "Development Methodology," that includes design, implementation, and testing for all software used on the Project. (Id., §§ 1.2 ("General Software Development Responsibilities") & 1.3 ("Development Methodology"))

RFP Volume 1A, which contains a section entitled "Project Overview," provides that the Security System shall "seamlessly integrate security function into [each] Agency's core operations, exploit to the fullest extent possible and integrate legacy systems, and utilize open architecture standard [COTS] products." (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 72 (quoting JA Ex. 11 (Dkt. No. 163-66), RFP Vol. 1A § 1.1.a ("IESS/C3 System of Systems Overview"))) Section 1.4 of Volume 1A describes the software and systems integration work for the Project and requires that "the Contractor use [COTS] products and software." This section also provides, however, that "[u]se of a middleware application is expected for seamless integration

of various systems." (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 74 (quoting JA Ex. 11 (Dkt. No. 163-66), RFP Vol. 1A § 1.4 ("Software and Systems Integration")))

Ken Turner, Lockheed's System Architect, testified that to satisfy the MTA's RFP requirements, configuration work would be necessary, meaning that Lockheed would have "to set up the interfaces[ ] to operate and provide the information that is identified in the RFP that the system is responsible for." (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 232 (quoting Turner Dep. (Dkt. No. 162-47), Tr. 97:8-13)) Turner also stated, however, that Lockheed "is not in the job of building our manufacturers' interfaces." (Id. ¶ 233 (citing id. at 97:24-98:2)) When asked whether the COTS software manufacturers would have had to write middleware to set up the necessary interfaces, Turner responded that "it's up to the manufacturer how they solve their interface issues." (Id. ¶ 234 (citing id. 98:3-11))

Finally, Lockheed was required to provide the MTA with a Software Quality Assurance Plan. (JA Ex. 13.12 (Dkt. No. 163-68), Specification Section 1AB12.4.1 ("C3 Software/Hardware Quality Assurance Plan (C3QAP)"); JA Ex. 15.2 (Dkt. No. 163-74), Specification Section 25B2.2 ("Software Configuration Management Plan")) In the Quality Assurance Plan that Lockheed provided, Lockheed stated that, "[a]t the present time, it is anticipated that there will not be any new software that needs to be specifically developed for the system, [for] pre-existing software, or [for] COTS software modified for use on the [Security System]. In the event that new or modified software is needed[,] it will be developed in accordance with a defined software development methodology, based on the following IEEE

standards as appropriate."[7]  (MTA R. 56.1 Resp. (Dkt. No. 147) ¶ 346 (quoting MTA Ex. 159 (Dkt. No. 147-19)))

### C.     System Testing and Commissioning

The Contract Documents require that the Security System undergo "formal testing and commissioning." (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 77 (quoting JA Ex. 11 (Dkt. No. 163-66), RFP Vol. 1A § 1.5 ("Testing and Commissioning")))  Lockheed was required to retain a Commissioning Agent to "develop detailed commissioning specifications, coordinate the execution of a testing plan, observe and document performance and verify whether systems are functioning in accordance with the documented design intent and the accepted final design documents." (Id. ¶ 123 (quoting JA Ex. 12 (Dkt. No. 163-67), Specification Section 1X at 1.2(a) ("Commissioning Agent"))

Lockheed chose Systra, an engineering and consulting company, to act as the Project's Commissioning Agent.  (Id. ¶ 202)  Systra employee Linda Martinez served as the lead Commissioning Agent.  (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 49)

One of Lockheed's testing obligations was to set up a "requirements traceability matrix" to document (1) the requirements for the Security System, as set forth in the Contract Documents (Id. ¶ 101; LM R. 56.1 Resp. (Dkt. No. 161) ¶ 101); and (2) the "derived requirements (e.g., hardware, software, interface) identified during the requirements analysis and design phases of development." (LM R. 56.1 Resp. (Dkt. No. 161) ¶ 103 (quoting JA Ex. 13.12 (Dkt. No. 163-68), Specification Section 1AB12.5.4 ("Requirements Traceability Matrix

---

[7] The Institute of Electrical and Electronics Engineers ("IEEE") is a national professional association that promulgates best practices and methodologies for the development of software systems. See Second Declaration of Craig Hughes, Chief Architect for Dnutch, Associates Inc. ("Hughes Decl.") (Dkt. No. 147-2) ¶ 5.

(RTM)")))  The Contract Documents require Lockheed to "test or demonstrate every requirement in the [requirements traceability matrix]."  (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 108)

The Contract Documents further provide that software testing will be performed periodically, including during implementation of the Security System, factory acceptance testing, installation and site testing, and availability demonstration testing – the final testing phase that involves a 30-day system demonstration with no down time.  (Id. ¶ 110)  Under the Contract Documents, Lockheed is required to perform "complete and comprehensive testing of all [Security System] software during all phases of development," in order to "prove that each requirement in the [requirements traceability matrix] (and the Contract Documents) has been met."  (Id. ¶ 111 (quoting JA Ex. 15.5 (Dkt. No. 163-74), Specification § 25T at 1.0 ("General") and 2.0 ("Software Test Program")))

As part of its testing obligations, Lockheed is also required to develop and submit a "Test and Evaluation Master Plan" ("Test Master Plan") for MTA approval.  (LM R. 56.1 Stmt. (Dkt. No. 139) ¶ 269)  The Test Master Plan that Lockheed submitted was intended to "define[ ] the plan for validating and verifying that the implemented system meets the requirements, document[ ] the test program strategy to meet the requirements, and describe[ ] a set of integrated tests of system hardware and [COTS] software."  (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 116 (quoting MTA Ex. 12 (Dkt. No. 150-20), Test Master Plan § 1 ("Scope")))  To that end, the Test Master Plan describes how tests are to be conducted as well as the metrics, i.e., pass-rate formula, that will be used to evaluate the functionality of the Security System's components. (MTA Ex. 12 (Dkt. No. 150-20), Test Master Plan § 3.2.3 ("Requirements Statusing")) Lockheed submitted the final version of the Test Master Plan to the MTA on July 23, 2007. (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 114)

15

The Test Master Plan provides that "[t]he test baseline for the MTA program" will be "based upon all of the requirements identified in the . . . [requirements traceability matrix],'" (MTA Ex. 12 (Dkt. No. 150-20), Test Master Plan § 3.2.2 ("Test Baseline")), and that testing will proceed according to "four major phases: Factory Tests, Site Tests, Site Integration System tests, and [the] System of Systems test period." (Id. § 5 ("Test Phases"))

The Test Master Plan also states that, "[p]rior to entering Phase 2, [factory acceptance testing] will be completed for the components or subsystems being deployed in Phase 2." (Id. at 23 of 46 ("Test Progression and Acceptance")) Although Lockheed's Test Master Plan did not include a minimum pass rate for factory acceptance testing, it does state that Phase 3 (site integration system tests) will be considered complete only when "each of the Tests (collection of test procedures) that compose it have been executed and meets the following criteria: 90% requirements pass rate overall across all tests up to and including Phase 1 – Phase 3 tests." (Id. (emphasis added)) Phase 3 (site integration system) testing was ongoing at the time of Lockheed's termination.[8] (LM R. 56.1 Stmt. (Dkt. No. 139) ¶ 277)

The MTA denies that it ever formally approved Lockheed's Test Master Plan. (Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment ("MTA Opp. Br.") (Dkt. No. 146) at 18-19) On September 6, 2007, the MTA Engineer, Kenneth Shields, sent a letter to Lockheed Program Executive James Gaughan approving a "milestone payment" for a series of 27 document submittals, including the Test Master Plan. (LM Ex. 70 (Dkt. No. 140-100), Sept. 6, 2007 Shields Ltr.) The letter also

---

[8] The MTA disputes this statement insofar as Lockheed informed the MTA that (1) it had "completed the [site integration system tests] for the [MTA Police Department]" and (2) "[a]ll [Bridges & Tunnels] site integration system tests RFRs [Runs for Record tests] are complete." (MTA R. 56.1 Resp. (Dkt. No. 147) ¶ 277) Accordingly, the MTA does not deny that site integration system testing was ongoing for some portion of the Security System at the time of termination.

included attached comments from the MTA's Agencies and the MTA Capital Construction

Company, however. The MTA Capital Construction Company stated that while it was

"approving the CDRL [Contract Deliverable Requirements List] documents with comments,

resubmittal [is] required for some of the documents." (Id. (emphasis added)) Lockheed

contends that the MTA's September 6, 2007 letter constitutes MTA approval of the Test Master

Plan, and several MTA employees testified that they understood that the Test Master Plan

governed testing of the Project. (Memorandum of Law in Support of Lockheed Martin's Motion

for Summary Judgment ("LM Br.") (Dkt. No. 138) at 33-35; LM R. 56.1 Stmt. (Dkt. No. 139) ¶

272) The MTA asserts, however, that it never approved the Test Master Plan because Lockheed

never resubmitted the Test Master Plan with the requested changes. (MTA Opp. Br. (Dkt. No.

146) at 18-19)

What is not in dispute, however, is that Commissioning Agent Martinez had not

commissioned any part of the Security System for beneficial use at the time of Lockheed's

termination. Indeed, early in the Project, Martinez identified "significant problems" and "major

quality issues" with Lockheed's "software design description documents." (Deposition of Linda

Martinez ("Martinez Dep.") (Dkt. No. 162-31), Tr. 367:20-368:15)

The MTA Capital Construction Company nevertheless decided to move forward

with the Project despite the software design problems (id. at 374:4-8), and factory acceptance

testing began on July 26, 2007. (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 326) In a September 27,

2007 letter to MTA Engineer Shields, Martinez expressed "grave concerns about the currently

proposed plan by Lockheed to complete [factory acceptance testing] by Dec. 21, 2007." (MTA

Ex. 55 (Dkt. No. 150-42), Sept. 27, 2007 Martinez Ltr. at 1) In her letter, Martinez recommends

that the testing program be halted and calls for a reassessment of the testing plan. (MTA R. 56.1

17

Stmt. (Dkt. No. 150) ¶ 332)  Martinez's letter warns that "at this time the Commissioning Agent team has determined that the probability of failure to complete [factory acceptance testing] satisfactorily under the current plan is unacceptably high."  (Id.)

Lockheed Executive James Gaughan acknowledges that "[t]here were some areas of validity that [Lockheed] needed to work [on resolving]."  However, his "overriding impression was that [Lockheed and Martinez] had a disagreement in how quickly to move through the test program."  (Gaughan Dep. (Dkt. No. 162-11), Tr. 127:3-7)

In a February 11, 2008 email to the MTA and Lockheed, Martinez expressed "grave concerns about [Lockheed's] ability to successfully achieve Stage I Beneficial Use in August 2008 given the ongoing failure of [factory acceptance testing]."  (MTA Ex. 58 (Dkt. No. 150-44), Feb. 11, 2008 Martinez Email)  In an attached letter dated February 10, 2008, Martinez noted that

> [t]he [factory acceptance testing] program planned and executed by [Lockheed] which began in early 2007 is still less than 50% complete, the number of variances recorded and still open is unacceptably high, additional defects are being recorded, and the failure rate continues at more than 30%.

(Id., Feb. 10, 2008 Martinez Ltr. at 1)[9]

Lockheed arranged an internal telephone conference to discuss Martinez's concerns.  (LM R. 56.1 Resp. (Dkt. No. 161) ¶ 339)  After the teleconference, Lockheed senior manager Barbara McKenna wrote in an internal email: "No further action [is] required from this group.  In general, letters from the [Commissioning Agent] to the MTA do not require a formal response. . . . This letter is an FYI and reflects a fundamental disagreement between the [Commissioning Agent] and [Lockheed] on how the program should proceed with respect to

---

[9] "Variances" are "problems," i.e., "[s]omething that would prevent a requirement from passing."  (LM R. 56.1 Resp. (Dkt. No. 161) ¶ 117 (quoting Gaughan Dep. (Dkt. No. 162-11), Tr. 154:25-155:7))

18

[factory acceptance testing]."  (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶¶ 340-41 (quoting MTA Ex.

59 (Dkt. No. 150-44), Feb. 12, 2008 McKenna Email))

The MTA and Lockheed also disagreed as to how the testing program should

proceed.  That disagreement is set forth in a February 8, 2008 email from Bill Krampf –

Lockheed's Director of Engineering for Secure Enterprise Solutions and the manager who

oversaw testing on the Project – to other Lockheed executives.  Krampf wrote:

> We have completely different approaches for how to run a test program. . . .
>
> MTACC:  PASS 100% requirements and close all variances.  Not only is this in
> the contract but they fully expect this to happen.  The COTS products selected are
> [Lockheed's] design and they expect the COTS products, our integration /
> configuration, processes, and documentation to 100% satisfy the requirements.
>
> [Lockheed]:  Run the [factory acceptance testing] program, document failures and
> variances, ensure you don't have any major show stoppers . . . , move to the
> next/bigger phase of the program to drive out the next tier of problems and work
> off the punchlist.  Note – The punchlist never gets closed because there is always
> something that won't get fixed.

(MTA Ex. 61 (Dkt. No. 150-44), Feb. 8, 2008 Krampf email)[10]

In a February 14, 2008 email, Lockheed Vice President Carlaine Blizzard

conveyed similar thoughts to her supervisor:

> I . . . had another session with [LM Vice President of Engineering, Technology,
> and Operations] Chris [Horne], Bill [Krampf] and James [Gaughan] on how badly
> we are managing customer expectations.  We are failing test at 30% rate because
> [the] customer doesn't understand COTS integration and the FFP [firm fixed
> price] COTS baseline of this program – they are construction people.  They truly
> think we are going to fix everything they write a problem report on – and we
> aren't telling them anything different.

(MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 347 (quoting MTA Ex. 62 (Dkt. No. 150-44), Feb. 14,

2008 Blizzard email))

---

[10] "Show stoppers" are requirements that the MTA and Lockheed viewed as critical to ensuring
initial operating capability.  (Deposition of MTA Chief Information Officer Wael Hibri ("Hibri
Dep.") (Dkt. No. 162-16), Tr. 94:21-25)

On March 4, 2008, Lockheed began utilizing a horizontal column in the requirements traceability matrix (Column "C") to dispute test results that had previously been recorded as failed tests. (Id. ¶ 362) In a March 14, 2008 email to Blizzard, Krampf wrote, "[w]e are fighting for every reqt [requirement] in the lab. We are queuing up the next round of disputes. We will also dispute many of the CWR [contract waiver request] rejections. But I also know the odds of winning these disputes and escalations is small." (Id. ¶ 365 (quoting MTA Ex. 69 (Dkt. No. 150-44), Mar. 14, 2008 Krampf email))

In April 2008, Lockheed scheduled an internal meeting to discuss a document entitled "the MTA De-Staffing spreadsheet." (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 373) In an email to invitees, Lockheed Director of Engineering Phillip Thurston stated: "Most of you have seen the budget numbers for the MTA going forward. We can't afford to be slow at rolling people off the program who we are expecting to roll off." (Id. (quoting MTA Ex. 76 (Dkt. No. 150-45), Apr. 4, 2008 Thurston email)) At about this time, Lockheed also decommissioned the factory acceptance testing lab. (MTA Ex. 77 (Dkt. No. 150-45), Apr. 15, 2008 Gaughan email)

In a June 10, 2008 letter to the MTA, Lockheed asserted that it had "completed [factory acceptance testing] as of [June 5, 2008]." (MTA Ex. 78 (Dkt. No. 150-45), June 10, 2008 LM Ltr. at 1) The MTA responded the next day, requesting that Lockheed account for 280 requirements not addressed in its letter. (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 381) The MTA's letter noted that, "by [Lockheed's] own accounting, [factory acceptance testing] cannot be considered complete until all fixes are in place and all the required regression is completed and passed, no matter where in the time line [Lockheed] intends to do this work." (MTA Ex. 79 (Dkt. No. 150-45), June 11, 2008 MTA Ltr.) Over the following year, the parties continued to dispute whether Lockheed had satisfactorily completed factory acceptance testing.

20

On August 14, 2008, Linda Gooden, head of Lockheed's Information Systems
and Global Security division, asked Lockheed Finance Manager Joe Trench for a Project update.
Trench replied, "[w]e have unfavorable financial exposure and we are at an impasse with the
customer on the path forward." (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 391 (quoting MTA Ex. 84
(Dkt. No. 150-48), Aug. 14, 2008 Trench email)) In an August 21, 2008 email to Gaughan and
Thurston, Krampf wrote,

> If we agree that there is no way we ever plan on coming close to addressing issues
> like driving to 100% reqts [requirements], then the [engineering risk] number is
> high. . . . When Jim/I did this in March, my agreement was that I did NOT
> account for any time beyond July 2009 . . . . I had to cap it somewhere or the cost
> became infinite (impossible to get to 100% reqts pass).

(MTA Ex. 86 (Dkt. No. 150-48), Aug. 21, 2008 Krampf email) The next day, Gaughan replied,
"I agree with Bill's note: Groundrule is: through July 2009. Beyond that is programmatic
closure." (Id., Aug. 22, 2008 Gaughan email)

On October 10, 2008, Intergraph – a Lockheed subcontractor on the Project
(MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 288) – expressed concerns about the state of the Project to
Thurston: "My question to you is this . . . does [Lockheed] have the Intergraph budget of 1.5
million fully funded? My assumption is 'no'. I'm assuming LM used the Intergraph budget to
cover other areas of the program." (Id. ¶ 410 (citing MTA Ex. 96 (Dkt. No. 150-54), Oct. 10,
2008 Breitbeil Email)) A few days later, Thurston told Intergraph that "Lockheed Martin has
been forced to conserve money wherever possible. Accordingly, the budget picture is not very
bright going forward." (Id. ¶ 411, Oct. 15, 2008 Thurston email)

In an April 30, 2009 letter to the MTA, Lockheed claimed that "1220 of the 1306
[factory acceptance testing] requirements (93.4%) pass" and that Lockheed would "continue to
resolve the remaining variances consistent with the [Test Master Plan]." (MTA Ex. 121 (Dkt.

No. 150-72), Apr. 30, 2009 LM Ltr. at 1)  Less than a month later, the MTA sent a letter to

Lockheed entitled "Default Notice – Opportunity to Cure."  (MTA R. 56.1 Stmt. (Dkt. No. 150)

¶ 472)  The Default Notice informed Lockheed that the MTA believed the Security System had

failed system testing at both the factory acceptance testing and site integration system testing

stages.  (JA Ex. 6 (Dkt. No. 163-4), May 26, 2009 Default Notice at 5-6)  The MTA further

asserted that Lockheed was either "unable" or had "simply refused to perform the work

necessary to satisfy these requirements."  (Id. at 6)  The MTA cited Lockheed's late start in

factory acceptance testing, its shipment of system hardware racks to field sites prior to

completing the factory acceptance tests, and its decision to close down its factory acceptance

testing lab at Mitchel Field on Long Island as examples of Lockheed's failure to adhere to

testing-related specifications.  (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 476)

### D.      Equipment Shipments

The Contract Documents require Lockheed to "perform complete and

comprehensive Factory Acceptance Testing as defined under the TP/P [Test Plan/Procedures]."

(LM R. 56.1 Resp. (Dkt. No. 161) ¶ 120)  This provision requires Lockheed to "ensure that all

variances detected during [factory acceptance testing] are documented and corrected prior to

shipment for installation."  (JA Ex. 13.12 (Dkt. No. 163-68), Specification Section 1AB12.2.5

("Factory Acceptance Test (FAT)"))

The MTA does not dispute that on May 21, 2008, it "accommodated Lockheed"

by allowing Lockheed to make a shipment of equipment racks to the field prior to the completion

of factory acceptance testing.  (MTA R. 56.1 Resp. (Dkt. No. 147) ¶ 369)  In a letter of that date,

the MTA explains that

> [a]s requested, the MTACC will allow [Lockheed] to deliver 9 racks of equipment
> to MNR's [Metro North Railroad's] GCT[Grand Central Terminal]

22

> Communication rooms, notwithstanding that [factory acceptance testing] related
> to software for this equipment has not been completed.

(MTA Ex. 164 (Dkt. No. 147-22), May 21, 2008 Shields Ltr.)  The letter further explains that the

MTA is making the allowance as an "accommodation" based on Lockheed's "assurance that the

equipment and associated software . . . will provide [the] functionality . . . required by the

Contract," and that the allowance "does not constitute a waiver" by the MTA of any of

Lockheed's contractual obligations.  (Id.)

### E.    Substantial Completion

In the Contract Documents, the parties agree that the Project will be substantially

complete within thirty-six months from the date that the contract was awarded – i.e. August 31,

2008.  (LM R. 56.1 Stmt. (Dkt. No. 139) ¶¶ 17-18)  It is undisputed that Lockheed did not

deliver the Security System as promised on August 31, 2008, and that the MTA never agreed to

extend the substantial completion date.  (Id. ¶ 313)

The Contract Documents define "substantial completion" as the point at which the

MTA Engineer determines "that the Scope of Work . . . set forth in Section III of the Agreement,

and all other Work . . . except for Remaining Work, as defined in **ARTICLE 1.02,**

**DEFINITIONS,** is complete and fit for its intended purpose. . . ."  (LM R. 56.1 Stmt. (Dkt. No.

139) ¶ 303 (quoting JA Ex. 10.4 (Dkt. No. 163-49), Contract Terms and Conditions, Art. 2.02(a))

(emphasis in original))  The Contract Documents further provide that "[t]ime is of the essence"

and that, "[i]n the event of a delay . . . beyond the Substantial Completion Date," Lockheed will

be obligated to pay the MTA liquidated damages of "$10,000 per day, up to a total delay of not

more than one calendar year. . . ."  (MTA R. 56.1 Resp. (Dkt. No. 147) ¶ 304 (quoting same))

The Contract Documents also contain provisions (1) authorizing Lockheed to

request an extension of time from the MTA should the project be delayed; (2) setting forth the

23

conditions under which the MTA would be required to grant an extension; and (3) the damages
Lockheed would be entitled to receive in the event of a delay caused by the MTA. (JA Ex. 10.4
(Dkt. No. 163-50), Contract Terms and Conditions, Art. 2.05, 2.06, 2.07)

Article 2.05 of the Contract Terms and Conditions limits extensions of time to
situations involving "Excusable Delay." (MTA R. 56.1 Resp. (Dkt. No. 147) ¶ 307) A delay is
an Excusable Delay if "the Contractor is actually and necessarily delayed in the progress of the
Work to the extent that the delay will extend the Substantial Completion Date" as the result of
certain identified causes, provided that the conditions listed in Article 2.05(a) are met. (Id.
(quoting JA Ex. 10.4 (Dkt. No. 163-50), Contract Terms and Conditions, Art. 2.05(a))) The
Contract Documents do not allow for damages in the event of a "Concurrent Delay," which is
defined as "the period of delay during which an Excusable Delay overlaps with a non-excusable
delay." (Id. ¶ 308 (quoting same))

The parties do not dispute that the Project was delayed and that the MTA never
agreed to Lockheed's requests for time extensions and damage costs related to delay allegedly
caused by the MTA. (Compare LM R. 56.1 Stmt. (Dkt. No. 139) ¶ 309-311 with MTA R. 56.1
Resp. (Dkt. No. 147) ¶ 309-11) They strenuously disagree, however, as to the causes of the
delay.

Gary Jentzen of PMA Consultants, LLC ("PMA") – an expert retained by the
MTA – has analyzed the impact of MTA's failure to deliver a site for construction – Metro North
Railroad's Regional C3 Building in North White Plains – in a timely manner. (LM R. 56.1 Stmt.
¶ 314) In a section entitled "Concurrent Delay," Jentzen's report states:

One of the delays that Lockheed Martin alleged in both its October 30, 2008
Claim as well as its Amended Complaint was that the delay to the MNR Regional
C3 Building was caused by it being moved to North White Plains. Lockheed
Martin asserted that this change caused a three hundred eleven (311) calendar day

24

> delay based on their Analysis of the LM 29 Schedule Update. PMA agrees that
> there was a delay in providing a facility for the MNR Regional C3.

(LM Ex. 98 (Dkt. No. 141-7), Revised Jentzen Report at 111-12)  Jentzen determined that "[a]

concurrent delay caused by [the MTA] occurred as a result of a delay providing the MNR

Regional C3 Building. This delay . . . amounts to a forecasted delay of three hundred sixty (360)

calendar days, three hundred and fifteen (315) of which are the responsibility of [the MTA]."

(LM Ex. 98 (Dkt. No. 141-5) Revised Jentzen Report at 7)  Jentzen cautions, however, that his

opinion does not take into account "the various requirements for providing notice and submitting

time extension requests with accurate and complete supporting documentation in a timely

manner" as required by Article 2.05.  (MTA R. 56.1 Resp. (Dkt. No. 147) ¶ 314 (quoting LM Ex.

98 (Dkt. No. 141-7), Revised Jentzen Report, at 111-12))

### F.   **Warranties**

Section III of the Agreement contains warranty provisions, including the

following:

1.  the equipment and software shall satisfy the MTA's business requirements and be fit for the MTA's intended uses as described in the Scope of Work and Contract Documents;

2.  the equipment and software shall individually and as an integrated system be free from defects in design, material and workmanship and function properly and in conformity with the Contract Documents;

3.  "all of the functions which are operational on the date of Final Acceptance of the System of Systems shall operate as described in the Contract Documents. . . .";

4.  "the software shall perform accurately and reliably, shall perform at least the functions described in and in accordance with the Contract Documents and in accordance with any warranty or representation made in literature, drawings, descriptions or specifications accompanying or referred to in the Contractor's technical Proposal;"

5.  any software program provided by the Contractor "will be fully compatible and will interface completely with each other Software program provided hereunder and with the Equipment, such that the Equipment and Software combined, will perform as a fully functioning System of Systems meeting all of the requirements of the Contract Documents"; and

6. the software will interface with other software programs as required by the Contract. (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 60; LM R. 56.1 Resp. (Dkt. No. 161) ¶ 60; JA Ex. 10.2 (Dkt. No. 163-44), Agreement §§ III.A ("Warranty of Title, Ownership and Fitness of the Equipment and Software") & III.B ("Specific Software Warranties")) The warranty period begins on the date of substantial completion and runs for one year. (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 61) It is undisputed that Lockheed never achieved substantial completion.

## IV.    THE MTA'S NOTICE OF DEFAULT AND LOCKHEED'S RESPONSE

On May 27, 2009, the MTA delivered a letter to Lockheed stating that the MTA considered Lockheed to be in default ("Default Notice"). (LM R. 56.1 Stmt. (Dkt. No. 139) ¶ 24; MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 472) In its Default Notice, the MTA states that "multiple Events of Default have occurred . . . ." (LM R. 56.1 Resp. (Dkt. No. 161) ¶ 473 (quoting JA Ex. 6 (Dkt. No. 163-4) May 26, 2009 Default Notice))

Article 7.01 of the Terms and Conditions defines "Event of Default" as "a material breach of the Contract by either party." (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 87 (quoting JA Ex. 10.4 (Dkt. No. 163-53), Contract Terms and Conditions, Art. 7.01 ("Event of Default"))) Events of Default include, inter alia, "a determination that: (i) performance of th[e] Contract is unnecessarily or unreasonably delayed; (ii) either party is willfully violating any provisions of the Contract Documents or is not executing the same in good faith and in accordance with th[e] Contract; [and/or] (iii) the Contractor has abandoned the Work." (JA Ex. 10.4 (Dkt. No. 163-53), Contract Terms and Conditions, Art. 7.01) The MTA's Default Notice contains a list of purported defaults, but also states that the list does "not constitute the entirety of Lockheed's failure," but merely "highlights some of the major breaches and deficiencies in Lockheed's work to date. . . ." (MTA R. 56.1 Resp. (Dkt. No. 147) ¶ 25 (quoting JA Ex. 6 (Dkt. No. 163-4) May 26, 2009 Default Notice, at 1))

26

The MTA's Default Notice asserts that "Lockheed has consistently been deficient in such critical areas as schedule, quality, design, management and testing, and has proven incapable of meeting the performance standards and requirements set forth in the Contract." (JA Ex. 6 (Dkt. No. 163-4) May 26, 2009 Default Notice, at 1) The MTA alleges several categories of purported breaches, including Lockheed's (1) failure to satisfy design obligations, (2) scheduling breaches, (3) failure to manage the Project, (4) violation of the contractually mandated test procedures, (5) failure to continuously and diligently prosecute the work, and (6) failure to maintain the Security System software. (Id. at 2-8)

The Default Notice further claims that Lockheed "consistently failed to comply with contractual requirements governing the design portion of the Project," and that these "design flaws . . . resulted in over 120 field change notices . . . illustrat[ing] significant gaps, errors and omissions in Lockheed's design, and of its inability to proffer a design that meets the requirements of the Contract." (Id. at 2)

The Default Notice also alleges that Lockheed had violated the contractually mandated testing procedures:

> To complete [factory acceptance testing], the software and related equipment must pass each of the 1,408 contractually mandated testing categories. Lockheed failed to satisfy this requirement. To date, 315 remaining [factory acceptance testing] requirements have been documented as variances and have not passed [factory acceptance testing] – a 22% failure rate.

(Id.) The Default Notice further faults Lockheed for delay in setting up a local test site facility at Mitchel Field in Long Island, for shipping racks to the MTA Police Department Long Island facility prior to completion of factory acceptance testing, and for shutting down the Mitchel Field facility without the MTA's approval. (Id.)

27

The MTA also asserts that "Lockheed has failed, and is continuing to fail" to adhere to the requirement that it continuously and diligently prosecute the work. (Id. at 6) The Default Notice sets forth a list of work that Lockheed has purportedly failed to prosecute, including "developing the software and performing the integration work necessary to create a system that satisfies all of the Contract's requirements, including resolution of outstanding [factory acceptance testing] and [site integration system test] failures[.]" (Id. at 7)

On June 4, 2009, Lockheed sent the MTA its Cure Response. (JA Ex. 7.1 (Dkt. No. 163-5), June 4, 2009 LM Cure Response) In a thirty-six page letter, Lockheed addresses each purported default individually. Lockheed also provides 148 pages of attachments setting forth a plan, schedule, and other documentation for completing the Security System. (LM R. 56.1 Stmt. (Dkt. No. 139) ¶ 30 (citing JA Ex. 7.1 (Dkt. No. 163-5), June 4, 2009 LM Cure Response))

In its Cure Response, Lockheed notes that a number of the claimed defaults had occurred in the past and thus could not support termination, given that the MTA had elected to continue with Lockheed's performance of the work. (LM R. 56.1 Stmt. (Dkt. No. 139) ¶ 32) Lockheed further asserts, inter alia, that (1) "there is work which simply cannot be completed because the [MTA] has not completed crucial obligations and necessary work areas have not been made available to LM" (JA Ex. 7.1 (Dkt. No. 163-5), June 4, 2009 LM Cure Response, at 1-2); (2) "there were multiple design changes initiated by the [MTA] that impacted the completion of design" (Id. at 7); and (3) Field Change Notices "were issued as a result of [MTA-] initiated AWOs [Additional Work Orders] and changed field conditions. . . ." (Id.)

28

## V.    THE MTA'S TERMINATION OF LOCKHEED

On June 12, 2009, the MTA terminated Lockheed based on (1) the alleged material breaches listed in the MTA's Default Notice; and (2) Lockheed's failure "to provide . . . a viable plan to cure the outstanding Events of Default detailed in the Default Notice." (JA Ex. 8 (Dkt. No. 163-18), June 12, 2009 MTA Termination Ltr. at 1)

*          *          *          *

In this action, Lockheed seeks damages for breach of contract and bad faith termination (LM July 7, 2009 Am. Cmplt. (Dkt. No. 21)), while the MTA has counterclaimed for breach of contract, overpayment, and conversion. (MTA Answer & Counterclaim (Dkt. No. 23))

## DISCUSSION

## I.    LEGAL STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable [trier of fact] could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. G. E. Co., 252 F.3d 205, 216 (2d Cir. 2001).

"The same standard applies where, as here, the parties filed cross-motions for summary judgment . . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citing Terwilliger v. Terwilliger, 206 F.3d 240, 244 (2d Cir. 2000)). "[W]hen both parties move

for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993); Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

## II.    **LOCKHEED'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Lockheed asserts that it is entitled to summary judgment on certain issues related to the MTA's first counterclaim for breach of contract. Lockheed asks this Court to rule, as a matter of law, that (1) Lockheed was not required to develop any custom software for the Project (LM Br. (Dkt. No. 138) at 28-33); (2) the MTA waived any right it might have had to terminate Lockheed based on past events by electing to permit Lockheed to continue its performance (id. at 36-42); and (3) the MTA could not default Lockheed for delaying the Project past the contractual completion date of August 31, 2008, because the MTA permitted Lockheed to continue to work on the Project without establishing a new completion date or reasserting that time was of the essence (id. at 42-46). Lockheed also claims that this Court should rule, as a matter of law, that (1) the Test Master Plan governed testing on the Project (id. at 33-35); (2) the MTA waived its right to default Lockheed for moving equipment to the field before completion of factory acceptance testing, because it expressly permitted Lockheed to do so (id. at 35-36); and (3) the MTA declared certain testing metrics called "showstoppers" closed, thus precluding the MTA from "claiming that software testing issues were an appropriate basis for termination of the Contract after the MTA elected to permit continued performance" (id. at 46-48).

30

## A.    The Contract Documents Require Lockheed
## to Develop Custom Software if Necessary

### 1.    Applicable Law

"Under New York law, 'an action for breach of contract requires proof of (1) a

contract; (2) performance of the contract by one party; (3) breach by the other party; and (4)

damages.'" Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc., 361 F. Supp. 2d 283, 290

(S.D.N.Y. 2005) (quoting First Invs. Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir.

1998)). "A fundamental principle of contract law provides that the material breach of a contract

by one party discharges the contractual obligations of the non-breaching party." Id. at 291

(citing In re Lavigne, 114 F.3d 379, 387 (2d Cir. 1997); Medinol Ltd. v. Boston Scientific Corp.,

346 F. Supp. 2d 575, 618 (S.D.N.Y. 2004); Restatement (Second) of Contracts § 237 (1981)).

Where a breach of contract is alleged, "there may be circumstances in which the

question of materiality is a question of law for the judge." Id. at 295 (citing Frank Felix Assocs.,

Ltd. v. Austin Drugs, Inc., 111 F.3d 284, 284 (2d Cir. 1997); Jafari v. Wally Findlay Galleries,

741 F. Supp. 64 (S.D.N.Y. 1990); McDonald's Corp. v. Robert A. Makin, Inc., 653 F. Supp. 401

(W.D.N.Y. 1986)). "However, in most cases, the question of materiality of breach is a mixed

question of fact and law – usually more of the former and less of the latter – and thus is not

properly disposed of by summary judgment." Id. at 295-96; see also F. Garofalo Elec. Co., Inc.

v. New York University, 300 A.D.2d 186, 189 (1st Dept. 2002) ("The question of whether there

has been substantial performance – or a breach – is to be determined, whenever there is any

doubt, by the trier of fact[.]").

"'Under New York law, a written contract is to be interpreted so as to give effect

to the intention of the parties as expressed in the unequivocal language they have employed.'"

Rockland Exposition, Inc. v. Alliance Of Auto. Serv. Providers Of N.J., 08-CV-7069 (KMK),

31

2009 WL 1154094, at *5 (S.D.N.Y. Mar. 19, 2009) (quoting Terwilliger, 206 F.3d at 245).

"Typically, the best evidence of intent is the contract itself; if an agreement is 'complete, clear and unambiguous on its face[, it] must be enforced according to the plain meaning of its terms.'" Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (quoting Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002)).   Accordingly, "[w]here a 'contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.'" RJE Corp. v. Northville Indus. Corp., 329 F.3d 310, 314 (2d Cir. 2003) (quoting De Luca v. De Luca, 300 A.D.2d 342, 342 (2d Dept. 2002)).

"If the contract is ambiguous, extrinsic evidence may be considered 'to ascertain the correct and intended meaning of a term' or terms." Eternity Global Master Fund Ltd., 375 F.3d at 177-78 (quoting Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England, 136 F.3d 82, 86 (2d Cir. 1998)).   "An ambiguity exists where the terms of [a] contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Morgan Stanley Grp. Inc. v. New England Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000) (quoting Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997) (citation and internal quotation marks omitted)).   "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990).   "Where there are alternative, reasonable constructions of a contract, i.e., the contract is ambiguous, the issue should be submitted to the trier of fact."

K. Bell & Associates, Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996) (internal quotation marks and citation omitted).

### 2.    **Analysis**

Lockheed maintains that the MTA improperly defaulted it for failing to develop custom software.  According to Lockheed, "[t]he Contract, including the RFP and Lockheed Martin's Proposal, unambiguously provides that the [Security System] sought by the MTA, proposed by Lockheed Martin, and accepted by the MTA would not include custom software development or modification of COTS software."  (LM Br. (Dkt. No. 138) at 31)  As such, Lockheed argues that it "cannot have breached a non-existent Contract 'requirement.'"  (Id. at 28-29 (citing Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola, Co., 650 F. Supp. 2d 314, 320 (S.D.N.Y. 2009)))

Lockheed mischaracterizes the reasons it was defaulted, however, as well as the nature of its obligations under the Contract Documents.  First, Lockheed incorrectly asserts that "the MTA avers [in its counterclaims] that Lockheed [ ] did not diligently prosecute the work because it did not develop custom software to satisfy the MTA's requirements."  (Id. at 28)  In reality, the MTA's counterclaim states that Lockheed did not diligently prosecute the work – and thereby committed breach of contract – by not "developing the software and performing the integration work necessary to create a system that satisfies all of the Contract's requirements, including resolution of outstanding [factory acceptance testing] and [site integration system tests] failures."  (MTA Amended Counterclaims (Dkt. No. 27) ¶ 54 (emphasis added))

Second, the Contract Documents unambiguously require Lockheed to "incorporate and integrate Software into the [Security System] that addresses all functional and performance requirements as defined throughout the Contract Documents," and to furnish the

MTA "with the latest versions of all [COTS] Software and 'Non-COTS' Software used to produce and support the [Security System]." (JA Ex. 10.2 (Dkt. No. 163-45), Agreement, § IV.A.1 & A.3 ("Furnishing Hardware and Software") at 12-13)  While it is true that Lockheed proposed delivering the promised functionality using a "100% COTS solution" that would "require[ ] no software development" (JA Ex. 9.1 (Dkt. No. 163-19), Proposal Vol. 1, Proposal Summary § 1.1 ("Key Program Personnel")), Lockheed also represented that it took "no exceptions to the contract" and that its Proposal was "100% compliant with the requirements of the RFP." (MTA R. 56.1 Reply ¶ 103 (citing JA Ex. 9.1 (Dkt. No. 163-19), Proposal Vol. 1, Proposal Summary § 7 ("Contract Exceptions")))  The Specifications set forth in the RFP, moreover, require the contractor to "produce and enforce a comprehensive software development process that includes methodologies as specified in Division 25 for all [Security System] software utilizing the specified standards as applicable" (JA Ex. 13.11 (Dkt. No. 163-68), Specification 1AB.11 ("Software")), and provide the MTA with a Software Quality Assurance Plan.  In the Software Quality Assurance Plan that Lockheed provided to the MTA, Lockheed noted that "[a]t the present time, it is anticipated that there will not be any new software that needs to be specifically developed for the system, [for] pre-existing software, or [for] COTS software modified for use on the [Security System]."  Lockheed further promised, however, that "[i]n the event that new or modified software is needed[,] it will be developed in accordance with a defined software development methodology, based on the following IEEE standards as appropriate." (MTA R. 56.1 Reply ¶ 346 (quoting MTA Ex. 159 (emphasis added)))  Accordingly, Lockheed's argument that the parties' agreement did not contemplate Lockheed developing new software for the Security System is belied by explicit language in the Contract

34

Documents acknowledging this possibility, in the event that the COTS software proved inadequate.

Lockheed now contends that "Division 25 does nothing more than provide procedures and requirements should software development ultimately be used on the [Security System] project." (LM Reply Br. (Dkt. No. 142) at 3 n.1)  Because the parties envisioned an "all-COTS" solution, Lockheed contends that "the MTA's arguments about Division 25 are immaterial to summary judgment." (Id.)  Lockheed further asserts that although "COTS software was part of Lockheed Martin's overall solution for the [Security] System to achieve the MTA's requirements[,] . . . COTS software alone was not going to meet each and every requirement, as the MTA now alleges." (LM Br. (Dkt. No. 138) at 31)

Lockheed's arguments are unpersuasive.  The Contract Documents unambiguously provide that Lockheed must satisfy all the requirements set forth in the RFP. Indeed, Lockheed promised that "any Software program it provides will be fully compatible and will interface completely with each other Software program provided hereunder and with the Equipment, such that the Equipment and Software combined, will perform as a fully functioning System of Systems meeting all of the requirements of the Contract documents." (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 60; LM R. 56.1 Resp. (Dkt. No. 161) ¶ 60; JA Ex. 10.2 (Dkt. No. 163-44), Agreement § III.A (emphasis in original))  Lockheed took on the obligation to "incorporate and integrate Software into the [Security System] that addresses all functional performance requirements as defined throughout the Contract documents." (JA Ex. 10.2 (Dkt. No. 163-44), Agreement § IV.A (emphasis added))  Having taken on these obligations, whether Lockheed "anticipated" or hoped that these requirements would be met through an all-COTS system is immaterial.

Division 25 – which Lockheed acknowledged and agreed to abide by – provides that "[t]he Contractor shall provide all software necessary to satisfy the functional, safety, reliability, availability, maintainability, and performance requirements contained elsewhere within this Contract." (JA Ex. 15.1 (Dkt. No. 163-74), Specification Section 25A.1 ("Introduction")) Division 25 also "outlines the level of software process and documentation required" for both "Commercial-off-the-shelf (COTS) software requiring no modifications" and "[n]ew software that has been specifically developed for the System, pre-existing software, or COTS software modified for use on the[Security System]." (Id.) In sum, in the Contract Documents, Lockheed took on the obligation to (1) provide all software necessary to insure that the MTA received a functional, integrated security system; and (2) secure new custom software in the event that COTS software proved inadequate to achieve this objective.

Lockheed also contends that it was not required to develop custom software because the MTA never "directed" it to do so. (LM Br. (Dkt. No. 138) at 11) This argument is likewise not persuasive. The Contract Documents require Lockheed to obtain the MTA Engineer's approval for modification of COTS software; the Contract Documents do not, however, impose any duty on the MTA to direct Lockheed to develop custom software. (LM R. 56.1 Stmt. (Dkt. No. 139) ¶ 122 (quoting JA Ex. 13.11 (Dkt. No. 163-68), Specification 1AB.11 ("Software"))) It was Lockheed's responsibility, and not the MTA's responsibility, to provide software that satisfied the MTA's requirements for the Security System, as set forth in the Contract Documents. While Lockheed may have hoped that an all-COTS system would satisfy the MTA's requirements for the Security System, in the event that an all-COTS system did not satisfy the MTA's requirements, Lockheed remained obligated to satisfy those requirements through other means, including by providing custom software if necessary.

In sum, Lockheed is not entitled to summary judgment on its claim that its obligations under the Contract Documents do "not include custom software development or modification of COTS software." (LM Br. (Dkt. No. 138) at 31)

## B.    The Election of Remedies Doctrine Does Not Bar the MTA's Breach of Contract Counterclaim

### 1.    Applicable Law

"The New York doctrine of election of remedies provides that upon learning of a breach, a party must choose between terminating the contract and continuing performance. If a party chooses to continue performance, it must give notice of the breach to the other side, or it waives its rights to sue the breaching party." Medinol Ltd. v. Boston Scientific Corp., 346 F. Supp. 2d 575, 620 (S.D.N.Y. 2004) (internal citations omitted). "Once a party recognizes contractual benefits in the wake of a material breach, that particular breach can no longer be considered the antithesis of the contract, and it can no longer serve as the basis for termination." ESPN, Inc. v. Office of Com'r of Baseball, 76 F. Supp. 2d 383, 392 (S.D.N.Y. 1999). However, "if a party chooses to continue with the contract and the other party subsequently commits another material breach, the party has the right to terminate based on the new breach." Id.; see also Apex Pool Equip Corp. v. Lee, 419 F.2d 556, 562 (2d Cir. 1969) ("[D]eciding to continue a contract despite a breach does not necessarily foreclose future terminations if there are succeeding breaches.").

"Under New York law, election of remedies is an affirmative defense." MBIA Ins. Corp. v. Patriarch Partners VIII, LLC, 842 F. Supp. 2d 682, 709 (S.D.N.Y. 2012) (citing Lumber Mut. Cas. Ins. Co. of N.Y. v. Friedman, 28 N.Y.S.2d 506 (1941)). Fed. R. Civ. P. 8(c) requires a defendant to "affirmatively state any avoidance or affirmative defense." "'The general rule in federal courts is that a failure to plead an affirmative defense results in a waiver.'" MBIA

37

Ins. Corp., 842 F. Supp. 2d at 709 (quoting Travellers Int'l, A.G. v. Trans World Airlines, 41

F.3d 1570, 1580 (2d Cir. 1994)). "The main objective of Rule 8(c)," however, "is to give the

opposing party notice of the affirmative defense and the opportunity to rebut it." Carnley v. Aid

to Hospitals, Inc., 975 F. Supp. 252, 254 (W.D.N.Y. 1997) (citing United States v. Cont'l Ill.

Nat. Bank & Trust Co. of Chicago, 889 F.2d 1248, 1255 (2d Cir. 1989) ("[O]ne of the main

reasons for the rule stated in Fed. R. Civ. P. 8(c) is to avoid surprise to the plaintiff.")).

Accordingly, "courts have allowed affirmative defenses to be raised in summary judgment

motions where the party opposing the motion was not prejudiced in its ability to respond." Id.;

see also Oz v. Lorowitz, 09 CIV. 5532 RJH, 2011 WL 723534, at *2 (S.D.N.Y. Feb. 25, 2011)

("[A] district court may still entertain affirmative defenses at the summary judgment stage in the

absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the

defendant, futility, or undue delay of the proceedings. . . . In such circumstances [ ] a district

court, may construe the motion for summary judgment as a motion to amend defendant[']s

answer." (citing Saks v. Franklin Covey Co., 316 F.3d 337, 350-51 (2d Cir. 2003))).

### 2. **Analysis**

Lockheed contends that the MTA's breach of contract counterclaim is premised

on, inter alia, Lockheed's purported failure to (1) "satisfy[ its] design responsibilities;" (2)

adhere to the Contract's scheduling requirements; (3) "properly manag[e] the project;" and (4)

"follow the Contract when testing was conducted." (LM Br. (Dkt. No. 138) at 36-37) According

to Lockheed – under the election of remedies doctrine – the MTA may not rely on these defaults

because they all "occurred well before June 12, 2009, the date Lockheed [ ] was terminated," and

the MTA "elected to allow Lockheed [ ] to continue work on the [Security System] project and

continued to pay for that performance." (Id. at 37) Lockheed seeks a ruling that "termination of

the Contract was wrongful as a matter of law," because "the past events set forth in [the MTA's]

Default Letter, and in the MTA's Counterclaims, cannot be used to justify the termination of the

Contract by the MTA." (Id. at 42 (internal citations omitted))

In opposing Lockheed's motion, the MTA argues – as a preliminary matter – that

Lockheed may not present an election of remedies defense to its breach of contract counterclaim,

because Lockheed did not plead that affirmative defense in its Answer. (MTA Opp. Br. (Dkt.

No. 146) at 30) Lockheed maintains that it appropriately pled this affirmative defense, citing the

following paragraph in its Answer:

> 100.   As the acts complained of in the Counterclaims are based on prior alleged
>        defaults which have been subsequently waived or cured, Defendants may
>        not maintain the Counterclaims because it is barred, in whole or in part, by
>        the doctrines of waiver, release, estoppel, accord and satisfaction, laches
>        and unclean hands.

(LM Reply Br. (Dkt. No. 142) at 15 (citing Ex. J5 p. 18-19))

This language is not sufficient to plead the affirmative defense of election of

remedies. The doctrines of waiver and election of remedies are not synonymous. "In contrast to

a waiver of contractual rights, an election is simply a choice among remedies by the party; it is a

decision by that party as to how it should proceed in the wake of the breaching party's

nonperformance. In other words, 'an election is not a waiver of any rights under the contract but

rather a choice between two inconsistent remedies for breach of the contract.'" ESPN, Inc., 76

F. Supp. 2d at 389 (quoting Bigda v. Fischbach Corp., 898 F. Supp. 1004, 1014 (S.D.N.Y.

1995)).

Lockheed's failure to adequately plead the affirmative defense of election of

remedies does not, however, preclude this Court from considering this defense at summary

judgment. As noted above, where an affirmative defense is not properly pled but is nonetheless

raised at summary judgment, courts construe the summary judgment motion as a motion to

amend the answer. Such a motion may be granted where the adversary has not shown "undue

prejudice . . . , bad faith or dilatory motive on the part of the [movant], futility, or undue delay of

the proceedings." Oz, 2011 WL 723534, at *2.

Here, the MTA has not articulated any unfair prejudice it would suffer from this

Court's consideration of Lockheed's election of remedies defense. From the outset of this

litigation, the MTA has been on notice that Lockheed intended to raise an election of remedies

defense. Indeed, Lockheed's June 4, 2009 Cure Response states:

> Seven (7) categories of purported defaults refer to past events. Significantly, at
> the time any of these past events occurred, the [MTA] did not threaten to default
> LM. We understand that by allowing LM to continue to perform after these
> events occurred, the [MTA] may not under New York law terminate based on
> purported events of default that have come and gone.

(JA Ex. 7.1 (Dkt. No. 163-5), June 4, 2009 LM Cure Response)  Accordingly, this Court will

consider the merits of Lockheed's election of remedies defense.

Insofar as the MTA seeks to justify its termination of Lockheed based on past

material breaches, the election of remedies doctrine bars such a claim. The MTA's

Counterclaims allege numerous material breaches by Lockheed that occurred well before

Lockheed's June 12, 2009 termination, including the following:

- Lockheed's late opening of the Mitchel Field factory acceptance testing site;

- Lockheed's unilateral decision to close the factory acceptance testing site;

- Lockheed's decision to ship equipment racks without the MTA's approval and before
  completion of factory acceptance testing;

- Lockheed's breach of certain design obligations, including improper surveys of existing
  conditions; and

- Lockheed's breach of its obligation to properly manage the Project, including, inter alia,
  Lockheed's removal of its on-site representative at the Central [Command,
  Communications, and Control] site, failure to supervise a subcontractor performing
  conduit installation work inside a subway tunnel, and failure to notice a subcontractor's
  use of an incorrect wiring design.

40

(MTA Answer & Counterclaims (Dkt. No. 27) ¶¶ 25, 28, 32, 40-43, 49-51)  The MTA knew of all these alleged breaches, yet it permitted Lockheed to continue its performance.  Because the MTA continued to perform and accept performance under the Contract Documents well after these purported breaches occurred, the MTA may not rely on these breaches to justify its termination of Lockheed.

The breaches alleged by the MTA do not refer only to past events, however, but include ongoing or recurrent breaches as well.  For example, in a section of its Default Notice entitled "Lockheed's Failure to Satisfy its Design Obligations," the MTA lists three "egregious examples" of Lockheed's design failures, all of which are alleged ongoing breaches.  See, e.g. JA Ex. 6 (Dkt. No. 163-4), May 26, 2009 Default Notice at 2 ("New York City Transit Legacy Design Integration: . . . To date, Lockheed has not submitted a complete design to the [MTA] to demonstrate how the legacy systems will be integrated into the final design.").  The Default Notice further states that "[t]he foregoing [examples are] part of a long-standing pattern of Lockheed's failure to satisfy its contractual obligation to properly design and manage the Project."  (Id. at 3; see also id. (citing "Lockheed's persistent failure to satisfy its contractual design requirements"))  In short, the MTA did not rely solely on past events in asserting that Lockheed's alleged failure to satisfy its design obligations justified termination.  The same is true of the other categories of alleged contractual breach – scheduling, management, and testing – that are referenced in the Default Notice and cited in Lockheed's brief.  Accordingly, to the extent that Lockheed seeks a ruling that "termination of the Contract was wrongful as a matter of law" (LM Br. (Dkt. No. 138) at 42), that motion will be denied.

41

C.    **The Record Does Not Unequivocally Establish that**
       **the MTA Waived Its Right to Terminate Lockheed for Delay**

        Lockheed offers two reasons why the MTA should be precluded from relying on

delay as a justification for terminating Lockheed:

> First, the MTA admits it was responsible for 315 days of delay, which extended
> the original substantial completion date of August 31, 2008, to at least July 13,
> 2009, one month after the MTA terminated the Contract. Second, the MTA
> permitted Lockheed Martin to continue working after the original substantial
> completion date without establishing a new and reasonable completion date and
> paid Lockheed Martin for its work after August 31, 2008, thereby waiving time as
> an essential element of performance.

(Id.)

        The MTA argues, however, that Lockheed was not terminated because of its

failure to complete the Project by August 31, 2008. Rather, "it was Lockheed's continued lack

of progress as of [the date] the Default Notice was issued . . . that provided the grounds for

termination." (MTA Opp. Br. (Dkt. No. 146) at 38) The MTA also contends that it never

waived its right to terminate Lockheed for delay. "[F]ar from waiving the contractual substantial

complet[ion date]," the MTA asserts that it "repeatedly notified Lockheed that the original date

was still operative, that time was of the essence, and that [Lockheed] remained potentially liable

for liquidated damages." (Id. at 42)

       1.    **Applicable Law**

        New York law provides that "where time is of the essence, performance on the

specified date is a material element of the contract, and failure to perform on that date constitutes

. . . a material breach of the contract." New Colony Homes, Inc. v. Long Island Prop. Grp., LLC,

21 A.D.3d 1072, 1073 (2d Dept. 2005) (citations omitted). New York courts have also held,

however, "that a party, by acquiescence or failure to pursue rights diligently under a time of the

essence provision, eliminates or waives the provision as a term or implied term of the contract."

42

Gould v. Bantam Books, Inc., 83 CIV 5121 (LBS), 1984 WL 684, at \*4 (S.D.N.Y. July 31, 1984)

(citing Schenectady Steel Co., Inc. v. Bruno Trimpoli Gen. Const. Co., Inc., 43 A.D.2d 234, 237

(3d Dept.), aff'd, 34 N.Y.2d 939 (1974) (though contract provided "time is of the essence," by

failing to assert right diligently, party "waived its right to cancel for an untimely performance");

Ring 57 Corp. v. Litt, 28 A.D.2d 548 (2d Dept. 1967) ("acquiescence in [a] series of delays"

waives default); Schneider v. Rola Construction Co., 16 Misc. 556, 559 (N.Y. Sup. Ct. 1959)

(same)).

  "'A party may be deemed to have waived the right to timely performance, even

where the parties have agreed that time is of the essence, by accepting performance after

expiration of the time limit.'" Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC, 07

CV 6665 (HB), 2009 WL 1803458, at \*21 (S.D.N.Y. June 23, 2009), aff'd, 402 F. App'x 623

(2d Cir. 2010) (quoting Franklin Pavkov Const. Co. v. Ultra Roof, Inc., 51 F. Supp. 2d 204, 217

(N.D.N.Y. 1999)). "[O]nce such a waiver has occurred, the time-is-of-the-essence provision of

the contract may not be unilaterally reinstated: it is improper for a party who has waived its right

to timely performance to attempt suddenly to cancel the contract without first notifying its

counterparty that time is of the essence and re-setting the time for performance within a

reasonable time by 'clear, distinct, and unequivocal notice.'" Id. (quoting Moray v. DBAG, Inc.,

305 A.D.2d 472 (2d Dept. 2003)).

  "'Waiver is the intentional relinquishment of a known right and should not be

lightly presumed.'" Random Ventures, Inc. v. Advanced Armament Corp., LLC, 12 CIV. 6792

KBF, 2014 WL 113745, at \*38 (S.D.N.Y. Jan. 13, 2014), on reconsideration, 12 CIV. 6792

KBF, 2014 WL 2082124 (S.D.N.Y. May 2, 2014) (quoting Gilbert Frank Corp. v. Fed. Ins. Co.,

70 N.Y.2d 966, 968 (1988) (citations omitted)); see also Jefpaul Garage Corp. v. Presbyterian

Hosp., 61 N.Y.2d 442, 446 (1984) (noting that waiver "is essentially a matter of intent which must be proved"). While such a "waiver may be express or implied, the intent to waive 'must be clearly established and cannot be inferred from doubtful or equivocal acts or language, and the burden of proof is on the person claiming the waiver of the right.'" 200 E. 87th St. Assocs. v. MTS, Inc., 793 F. Supp. 1237, 1251 (S.D.N.Y.), aff'd, 978 F.2d 706 (2d Cir. 1992) (internal citations omitted) (quoting E. 56th Plaza, Inc. v. Abrams, 91 A.D.2d 1129, 1130 (3d Dept. 1983)).

It is well-established that "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent," and "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Greenfield, 98 N.Y.2d at 569. Where, as here, "an agreement contains a no-waiver provision . . . , 'a party's failure to insist upon strict compliance is not considered a waiver of his right to demand exact compliance.'" Fin. Technologies Int'l, Inc. v. Smith, 247 F. Supp. 2d 397, 407 (S.D.N.Y. 2002) (quoting Subaru Distrib. Corp. v. Subaru of Am., Inc., 98 CIV. 5566 (CM), 2002 WL 413808, at *16 (S.D.N.Y. Mar. 18, 2002)). However, New York law does permit "parties to waive such a no-waiver provision by a subsequent course of conduct." Travellers Int'l AG v. Trans World Airlines, Inc., 722 F. Supp. 1087, 1098 (S.D.N.Y. 1989).

## 2. **Analysis**

Here, the Contract Documents set a substantial completion date of August 31, 2008, and expressly state that "[t]ime is of the essence." (LM R. 56.1 Stmt. (Dkt. No. 139) ¶¶ 302, 304) It is likewise undisputed that the MTA did not agree to Lockheed's requests to extend the substantial completion deadline. (Id. ¶¶ 311, 313) Given this record and the fact that

44

Lockheed did not substantially complete the Project by August 31, 2008, it committed a breach, absent conduct by the MTA that waives or excuses Lockheed's failure to complete the Project in a timely fashion. Lockheed argues that the MTA could not properly default it for delay, however, because (1) the MTA admitted its responsibility for a 315 day delay, and (2) the MTA waived the "time-is-of-the essence" provision. (LM Br. (Dkt. No. 138) at 42-46) Neither argument provides an appropriate basis for this Court to grant Lockheed summary judgment on the MTA's breach of contract counterclaim.

First, as noted above, the MTA does not contend that Lockheed was defaulted because of its failure to meet the deadline for substantial completion. "Rather, Lockheed was defaulted for delaying the Project by its failure to continuously and diligently prosecute the work, as set forth in the Default Notice." (MTA Opp. Br. (Dkt. No. 146) at 38 (citing JA Ex. 6 (Dkt. No. 163-4), Default Notice at 6-7)) Accordingly, Lockheed's motion for partial summary judgment will be denied as moot insofar as it seeks a ruling that it could not be defaulted for failing to meet the substantial completion deadline.

Second, the parties dispute the materiality of the 315-day delay that PMA attributed to the MTA. Lockheed contends that the PMA report operates as a concession that the MTA was "at a minimum[,] . . . responsible for delaying completion of the [Security System] project and that its delay extend[ed] the Substantial Completion date to at least July 12, 2009 . . . ." (LM Br. (Dkt. No. 138) at 44) The MTA notes, however, that "PMA identified the 315-day . . . delay as 'concurrent delay,'" and that, "[u]nder the terms of the Contract, Lockheed was not entitled to a time extension in connection with the MNR [Metro North Railroad] Regional [Command, Communications, and Control Center] delay because Lockheed failed to comply with the requirements for obtaining a time extension as set forth in Article 2.05." (MTA Opp.

Br. (Dkt. No. 146) at 39 & n.20) There are material issues of fact as to whether Lockheed complied with the requirements for obtaining an extension of time.

Third, Lockheed has not put forward sufficient evidence to demonstrate that the MTA waived its right to terminate Lockheed for delay. The Contract Documents provide that "[n]either the permitting of the Contractor to proceed with the Project subsequent to" the Substantial Completion date, "the making of any payments to the Contractor, nor the issuance of any Change Order, shall operate as a waiver on the part of [the MTA] of any rights under this Contract, including but not limited to the assessment of liquidated damages or declaring Contractor in default." (JA Ex. 10.4 (Dkt. No. 163-50), Contract Terms and Conditions, Art. 2.05(g)) As noted above, it is undisputed that (1) Lockheed was required to substantially complete the work by August 31, 2008; (2) its requests for extensions of time were denied; and (3) Lockheed did not substantially complete the work by the August 31, 2008 deadline. While it is true that the MTA permitted Lockheed to continue with the work well past the deadline for substantial completion, it did not expressly waive its right to timely completion of the Project. To the contrary, the MTA repeatedly notified Lockheed that the MTA considered the original date to be operative and that Lockheed was potentially liable for liquidated damages.

Accordingly, insofar as Lockheed seeks summary judgment on its claim that the MTA waived its right to terminate Lockheed for delay, that motion will be denied.[11]

---

[11] Lockheed argues that "New York law is well-settled that when time is of the essence and the date to perform is passed, time must be reinstated as an essential term and a reasonable time to complete must be set." (LM Reply Br. (Dkt. No. 142) at 17) The cases that Lockheed cites in support of this argument are distinguishable, however. See, e.g., Gen. Supply & Constr. v. Goelet, 241 N.Y. 28, 33 (1925); Taylor v. Goelet, 208 N.Y. 253, 258-59 (1913). For example, unlike here, the contracts at issue in those cases did not contain a no-waiver clause. Moreover, waiver in those cases could be fairly inferred from the parties' conduct. Here, the MTA repeatedly reiterated that it was not waiving its rights and remedies related to Lockheed's failure to timely complete the Project.

**D.    Factual Disputes Remain as to Whether the MTA Approved the
Test Master Plan and Whether the Test Master Plan Modified the Contract**

Lockheed argues that, "[b]ecause the [Test Master Plan] was required by the

terms of the Contract and was approved by the MTA in writing," it constitutes "a written

modification of the Contract." (LM Br. (Dkt. No. 138) at 34)  Lockheed further argues that "the

parties' course of conduct and course of dealing, which readily acknowledged that the [Test

Master Plan] governed testing on the project, modified the contract." (Id. at 34)  The MTA

denies that it provided written approval of the Test Master Plan or that it acquiesced in its use

such that the parties' contractual agreement was thereby modified.  As discussed below, this

issue cannot be resolved as a matter of law at this stage of the proceedings.

### 1.    Applicable Law

N.Y. Gen. Oblig. Law § 15-301(1) provides:

> A written agreement or other written instrument which contains a provision to the
> effect that it cannot be changed orally, cannot be changed by an executory
> agreement unless such executory agreement is in writing and signed by the party
> against whom enforcement of the change is sought or by his agent.

"As a general rule, where a contract has a provision which explicitly prohibits oral modification,

such clause is afforded great deference." Healy v. Williams, 30 A.D.3d 466, 467 (2d Dept.

2006) (citations omitted).  "However, it is equally true that any written agreement, even one

which provides that it cannot be modified except by a writing signed by the parties, can be

effectively modified by a course of actual performance." Rosen Trust v. Rosen, 53 A.D.2d 342,

352 (4th Dept. 1976), aff'd sub nom. Rosen's Trust v. Rosen, 43 N.Y.2d 693 (1977) (citing All-

Year Golf, Inc. v. Products Investors Corp., Ltd., 34 A.D.2d 246 (4th Dept. 1970)).

## 2.   Analysis

Here, the parties agreed that,

> [e]xcept to the extent expressly set forth in the Contract, no change in or
> modification, termination or discharge of this Contract, in any form whatsoever,
> shall be valid or enforceable unless it is in writing and signed by the party to be
> charged therewith or its duly authorized representative.

(JA Ex. 10.4 (Dkt. No. 164-51), Contract Terms and Conditions, Art. 4.01)

Summary judgment on this issue is not appropriate, because there are material
issues of fact as to whether the MTA ever approved the Test Master Plan in writing. Lockheed
contends that MTA Engineer Shields approved the Test Master Plan in a September 6, 2007
letter. (LM Br. (Dkt. No. 138) at 34)  The MTA points out, however, that the September 6, 2007
letter includes attached comments from the MTA's Agencies as well as Engineer Shields's
statement that, while the MTA Capital Construction Company was "approving the CDRL
[Contract Deliverable Requirements List] documents with comments, resubmittal is required for
some of the documents." (LM Ex. 70 (Dkt. No. 140-100), Sept. 6, 2007 Shields Ltr. (emphasis
added))  The letter goes on to state that "[i]t is the [MTA's] assessment that [Lockheed] has met
the intent of the requirements and that it is appropriate to approve these documents, with a
resubmittal to address the outstanding punchlist items." (Id.)  The "punchlist items" for the Test
Master Plan include seven comments from the MTA Long Island Rail Road ("LIRR"). (MTA
Ex. 14 (Dkt. No. 150-20), Mar. 20, 2008 Gaughan email)  The LIRR states that "[t]h[e] passing
criteria needs to be clarified as it is totally unacceptable to the LIRR in its current interpretation.
It is assumed that these systems should pass ALL tests 100% of the time." (Id., attached IESS
Test and Evaluation Master Plan comment form)

Under these circumstances, this Court cannot find, as a matter of law, that the
Test Master Plan modified Lockheed's testing obligations under the Contract Documents. It is

obvious from the factual account presented above that at least one branch of the MTA was unwilling to accept any testing plan that provided for a pass rate less than "all tests 100% of the time." (Id.) The evidence presented concerning the parties' course of conduct likewise does not permit this Court to resolve this issue as a matter of law.

Even if this Court could find as a matter of law that the MTA approved the Test Master Plan, it is not clear that such approval would constitute "an enforceable written modification to the Contract," as Lockheed argues. See LM Br. (Dkt. No. 138) at 34. To the extent Lockheed contends that the MTA's approval of the Test Master Plan operates as a waiver of the MTA's right to demand strict compliance with the Terms and Conditions previously agreed to, that argument appears to be foreclosed by the Contract Documents' "no waiver" provisions. See, e.g., JA Ex. 10.4 (Dkt. No. 163-51), Art. 3.11(b) ("Neither the acceptance by the [MTA] or the Engineer or any employees of the [MTA] . . . nor acceptance of, the whole or part of the Work . . . shall operate as a waiver of any portion of this Contract"); Art. 8.02 ("Any review, acceptance or approval by the Engineer shall be construed merely to mean that the Engineer was unaware of any reason, at that time, to object thereto. No such acceptance or approval by the Engineer . . . shall . . . change any of the requirements of the Contract Documents or relieve the Contractor of any responsibilities under the Contract, including without limitation, the accuracy of drawings or any obligation under any warranty provision."); JA Ex. 13.12 (Dkt. No. 163-68), Specification Section 1AB12.3 ("Review and approval by the [MTA] shall not relieve the Contractor of its overall responsibilities to satisfy system functions in accordance with the Contract."). In sum, Lockheed has not demonstrated that it is entitled to summary judgment on its claim that the MTA approved the Test Master Plan and thereby waived its right to demand that Lockheed strictly comply with the testing provisions of the Contract

49

Documents.  Accordingly, Lockheed's motion for partial summary judgment on this issue will be denied.

### E.    The MTA Did Not Waive its Rights Concerning Lockheed's Alleged Improper Equipment Shipments

Lockheed argues that the MTA's breach of contract counterclaim should be dismissed insofar as it faults Lockheed for moving equipment into the field prior to correcting all testing variances.  Lockheed contends that "(1) the MTA granted Lockheed [ ] permission to move the equipment into the field, thereby waiving any such requirement; and (2) the express terms of the Contract did not require Lockheed Martin to correct all variances prior to shipment of equipment to the field." [12]  (LM Br. (Dkt. No. 138) at 35)  Neither argument is convincing.

As to Lockheed's first argument, while the MTA permitted Lockheed to move nine racks of equipment to Grand Central Terminal, it did so "based on [Lockheed's] assurance that the equipment and associated software will be installed and will provide functionality as required by the Contract."  (MTA Ex. 164 (Dkt. No. 147-22), May 21, 2008 Shields Ltr.)  Moreover, the letter approving this "accommodation" warned that it "d[id] not constitute a waiver by the MTACC of any of [Lockheed's] obligations under the Contract including, without limitation, [Lockheed's] obligation to meet [factory acceptance testing] and all other contractual testing and commissioning requirements . . . and [Lockheed's] contractual obligation to resolve all outstanding variances detected and to achieve full functionality."  (Id.)  Thus, there is no basis to conclude that the MTA "waived" its contractual right to insist that Lockheed correct all variances prior to shipping equipment to the field.

---

[12]  The MTA's breach of contract counterclaim states, in pertinent part:  "Despite having not passed [factory acceptance testing], and without MTA approval, Lockheed shipped racks of equipment to the MTA [Police Department Central Command, Communications, and Control] site, in violation of the Contract."  (MTA Answer & Counterclaims (Dkt. No. 27) ¶ 32)

Lockheed's second contention – that it was not obligated to correct all variances prior to shipping equipment to the field – is contradicted by express language in the Contract Documents. Specification Section 1AB12.2.5, which governs factory acceptance testing, provides that "'[t]he Contractor shall ensure that all variances detected during Factory Acceptance Testing are documented and corrected prior to shipment in the field.'" (MTA Opp. Br. (Dkt. No. 146) at 28 (quoting JA Ex. 13.12 (Dkt. No. 163-68))) While Lockheed argues that the Test Master Plan does "not include any minimum required pass rate for the completion of [factory acceptance testing]" (LM Br. (Dkt. No. 138) at 35), this Court cannot find as a matter of law – for the reasons discussed above – that the Test Master Plan constitutes a written modification of the contract. Accordingly, Lockheed is not entitled to summary judgment on its claim that the MTA cannot justify termination based on Lockheed's shipment of equipment racks to the field prior to completion of factory acceptance testing.

**F.     Disputed Issues of Material Fact Remain Regarding "Showstoppers"**

Lockheed states that "crucial software testing issues were placed by the MTA into four (4) categories of issues [that] MTA called 'showstoppers.'" (Id. at 46) Lockheed contends that it resolved all issues regarding "showstoppers," that the MTA declared these issues "closed," and that the MTA nonetheless "improperly relied on these . . . software testing issues as a basis to terminate Lockheed [ ] from the [Security System] project." (Id.) In its summary judgment motion, Lockheed seeks a ruling that "(1) the showstoppers were closed during the course of the [Security System] project; and (2) the doctrine of election of remedies prevents [the] MTA from subsequently claiming that software testing issues were an appropriate basis for termination of the Contract after [the] MTA elected to permit continued performance." (Id. at 46-47) The MTA contends that the parties' treatment of "[s]howstoppers did not relieve

51

Lockheed of any of its obligations under the Contract," and that, in any event, "the requirements associated with the 'showstoppers' were not, in fact, satisfied as of the time Lockheed was terminated." (MTA Opp. Br. (Dkt. No. 146) at 43-44)  This Court concludes that material issues of fact as to these issues preclude summary judgment.

As an initial matter, Lockheed's contention that the four "showstopper" categories reflect all the software testing failures is contradicted by record evidence. As the MTA notes in its Rule 56.1 Response, "the 'showstoppers' related only to the 'functionality concerns raised by the [MTA] in the areas of Publish/Subscribe, Data Segmentation, Maintenance and Lenel." (MTA R. 56.1 Resp. (Dkt. No. 147) ¶ 292 (citing LM Ex. 77 (Dkt. No. 140-111), July 18, 2008 the MTA Ltr.) (emphasis in original))  In short, Lockheed is not entitled to a blanket ruling precluding the MTA from justifying its termination of Lockheed on the basis of software testing failures other than "showstoppers."

Moreover, the evidence does not support Lockheed's contention that the "showstoppers" were, in fact, "closed."  Lockheed contends that the MTA "acknowledged Lockheed['s] work to resolve the showstoppers to the MTA's satisfaction," citing (1) an internal MTA progress meeting slide stating that "[t]he [factory acceptance testing] show-stoppers are closed," and (2) an internal MTA email in which Ronald Pezik, the MTA's Program Manager for the Security System, states that "it has been agreed that the show stoppers have been satisfied to the point of allowing BU [Beneficial Use] to proceed. . . ."  (LM R. 56.1 Stmt. ¶ 297; see LM Ex. 99 (Dkt. No. 141-14), Apr. 20, 2009 Meeting Minutes at 38; LM Ex. 79 (Dkt. No. 140-117), Apr. 7, 2009 Pezik email))[13]

---

[13] Lockheed's Rule 56.1 Statement incorrectly cites to LM Ex. 67.

At deposition, however, several MTA employees – including Pezik – testified that the "showstoppers" had not been closed. See, e.g., Deposition of Ronald Pezik ("Pezik Dep.") (Dkt. No. 162-37), Tr. 91:21-25 ("Q. Were the show stoppers resolved? A. No. Q. Were any of the show stoppers resolved? A. No."); Hibri Dep. Tr. 143:12-21 ("Q. And ultimately the show stoppers were closed, right? A. No, they weren't closed. The show stoppers – as I just said, Lockheed presented solutions to the show stoppers, table solutions, just across the table or in a PowerPoint presentation, but none of these show stoppers were demonstrated to have been closed, meaning the solutions were not implemented in the system itself."); Shields Dep. Tr. 247:21-248:11 ("Q. Was there any point prior to the termination of Lockheed [ ] where the show stoppers were closed? . . . A. I don't think all the show stoppers were closed.")).

Given the conflicting evidence on this point, Lockheed is not entitled to summary judgment on its claim that the MTA is precluded from relying on software testing failures to justify its termination of Lockheed.[14]

## III.   THE MTA'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The MTA contends that it is entitled to summary judgment on (1) its breach of contract counterclaim; (2) Lockheed's bad faith termination and quantum meruit claim; and (3) Lockheed's breach of contract claim.

### A.   The MTA's Motion for Summary Judgment on its Breach of Contract Counterclaim

The MTA contends that the undisputed facts demonstrate that Lockheed committed both material breaches and specific "events of default" listed in Article 7.01 of the

---

[14]   Lockheed's election of remedies argument regarding software testing fails for the same reasons discussed earlier. The MTA's termination of Lockheed, and its current breach of contract counterclaim, is not based solely on past performance issues, but instead is based on Lockheed's continuing failure to correct and remedy deficiencies associated with its software testing.

contract's Terms and Conditions.  The MTA argues that Lockheed (1) "fail[ed] to satisfy the warranty obligations of the Contract, which include the warranty that Lockheed's integrated software solution meets all of the Contract's requirements"; (2) "fail[ed] to get the system it was delivering formally 'commissioned' by the Contract's independent Commissioning Agent"; and (3) "willfully violat[ed] . . . the provisions of the Contract Documents" – an Event of Default under Article 7.01 – by "remov[ing] staff, disinvest[ing], and plann[ing] to close out its contractual commitment without regard to the sufficiency of the work."  (MTA Br. (Dkt. No. 149) at 30-31, 39)  As explained below, none of these arguments provides a sufficient basis for this Court to grant the MTA summary judgment on its breach of contract counterclaim.

### 1.    **Breach of Warranty**

As to the MTA's breach of warranty claim, the record demonstrates that the warranty provisions set forth in the contract's Terms and Conditions were not yet operative at the time of Lockheed's termination.  The Contract Documents provide for a "Software Warranty Period" that begins to run one year <u>after</u> Substantial Completion.  (Memorandum of Law in Opposition to MTA's Motion for Partial Summary Judgment ("LM Opp. Br.") (Dkt. No. 153) at 15 (citing JA Ex. 10.4 (Dkt. No. 163-49), Contract Terms and Conditions, Art. 2.02))  The parties further agreed that the MTA's Engineer would declare Substantial Completion once he determined that the required work was "complete and fit for its intended purpose."  (<u>Id.</u> (citing same))

It is undisputed, however, that (1) Lockheed never informed the MTA that its work met the requirements for Substantial Completion; (2) the MTA's Engineer never declared that the criteria for Substantial Completion had been met; and (3) the MTA never issued a Certificate of Substantial Completion.  (LM R. 56.1 Resp. (Dkt. No. 161) ¶¶ 81, 848)

Accordingly, the warranty provisions were never triggered, and Lockheed cannot be held liable for having breached these provisions.

Although the MTA concedes that the warranty period had not commenced prior to Lockheed's termination (Defendants' Reply Memorandum of Law in Support of Motion for Partial Summary Judgment ("MTA Reply Br.") (Dkt. No. 151) at 6), it nonetheless maintains that Lockheed was properly defaulted for breaching the warranty provisions, because Lockheed had "repudiat[ed] . . . its fundamental obligations under the Contract." (Id. at 11) This argument fails for several reasons. First, the MTA has offered no evidence that Lockheed affirmatively repudiated its obligations under any specific warranty provision. Second, the MTA cites no case in which a party has been defaulted because of anticipatory breach of a warranty where – under the terms of the governing contract – the warranty period had not yet been triggered. Ordinarily, the purpose of a warranty provision is to provide a remedy to a buyer of non-conforming goods. Such a remedy presupposes delivery of those goods. Finally, assuming arguendo that such a claim could be maintained here, this Court would be required to make factual findings concerning Lockheed's intentions regarding its contractual obligations. For its part, Lockheed maintains that it intended to deliver a contractually-compliant security system and that it was diligently prosecuting the work until its termination. (LM Opp. Br. (Dkt. No. 153) at 2, 27, 28) There are material issues of fact concerning this point that preclude summary judgment. For all of these reasons, the MTA is not entitled to summary judgment on its breach of contract counterclaim on the ground that Lockheed anticipatorily breached the warranty provisions set forth in the Contract Documents.

## 2.     Failure to Obtain Commissioning Agent's Approval

The MTA also argues that it is entitled to summary judgment on its breach of contract counterclaim because Lockheed did not obtain the Commissioning Agent's approval of the Security System or its components. (MTA Br. (Dkt. No. 149) at 37-39) Lockheed asserts, however, that it was terminated before commissioning was required under the Contract Documents. (LM Opp. Br. (Dkt. No. 153) at 4, 36-38)

The MTA's claim contradicts express language in the Contract Documents. Specification Section 1X states that "the commissioning process shall commence during design development and continue through construction/installation." (JA Ex. 12 (Dkt. No. 163-67), Specification Section 1X at 1.1(b) (emphasis added)) While it is undisputed that the Commissioning Agent never commissioned any part of the Security System for beneficial use, construction and installation were not complete at the time of Lockheed's termination. (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 544) Moreover, the MTA has not cited any contractual provision that requires Lockheed to seek or obtain commissioning by a specific date. Indeed, Lockheed promised only that the Commissioning Agent would "ensure[ ] compliance with all goals and requirements at the end of the project through an independent agent assigned full time from the beginning." (Id. ¶ 201 (quoting JA Ex. 9.2 (Dkt. No. 163-33), Proposal Vol. 2 § 4.2.5 ("Commissioning Agent") (emphasis added))) Commissioning Agent Martinez testified that she could not say whether the operational modes were functional in the Security System, "because the fully tested and commissioned [S]ystem[,] we didn't get there." (Martinez Dep. (Dkt. No. 162-31), Tr. 374:14-15)

The MTA also complains that Lockheed "consistently ignored the Commissioning Agent's directions and recommendations." (MTA Br. (Dkt. No. 149) at 38)

Under the Contract Documents, however, Lockheed was only required to deliver a

commissioned system, not to follow the Commissioning Agent's directions or recommendations

for achieving that goal. Accordingly, the MTA is not entitled to summary judgment on its

breach of contract counterclaim on the ground that Lockheed failed to obtain commissioning of

the Security System or its components.

### 3.   **Willful Violation**

Article 2.01 of the Terms and Conditions provides that "[t]he Contractor shall

begin work within ten (10) days after the date of issuance of the Notice of Award, and shall

thereafter prosecute the Work continuously and diligently." (JA Ex. 10.4 (Dkt. No. 163-49),

Contract Terms and Conditions, Art. 2.01)  The "Events of Default" listed in Article 7.01(a)

include (1) performance that is "unreasonably or unnecessarily delayed"; (2) a party's "willful[ ]

violat[ion] [of] any provisions of the Contract Documents or [a failure to] execut[e] the same in

good faith and in accordance with this Contract"; and (3) a Contractor's abandonment of the

work. (JA Ex. 10.4 (Dkt. No. 163-53), Contract Terms and Conditions, Art. 7.01 ("Event of

Default")))

The MTA contends that Lockheed willfully violated the Contract Documents by

not prosecuting its work continuously and diligently, and complains that Lockheed "removed

staff, disinvested, and planned to close out its contractual commitment without regard to the

sufficiency or completeness of the work." (MTA Br. (Dkt. No. 149) at 39)

As an initial matter, the parties disagree about the meaning of "willful" as used in

the Terms and Conditions.  Lockheed argues that a breach is willful only if it is committed

maliciously, while the MTA contends that "willful" merely means "intentional." (Compare LM

Opp. Br. (Dkt. No. 153) at 38-39 with MTA Reply Br. (Dkt. No. 151) at 14-15)  On the present record, this issue is not susceptible to resolution as a matter of law.

In support of its interpretation, Lockheed cites Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc., 84 N.Y.2d 430 (1994).  In Metropolitan Life, the New York Court of Appeals considered a "broad limitation of liability clause" that required proof of "intentional misrepresentations, or damages arising out of [the defendant's] willful acts or gross negligence" before liability could be imposed.  84 N.Y.2d at 433 (emphasis in original).  The New York Court of Appeals concluded that "the term willful acts as used in this contract was intended by the parties to subsume conduct which is tortious in nature, i.e., wrongful conduct in which defendant willfully intends to inflict harm on plaintiff at least in part through the means of breaching the contract between the parties."  Id. at 438.  Because the "defendant's repudiation of the Agreement was motivated exclusively by its own economic self-interest," the court concluded that the plaintiff had not shown that the defendant committed "willful acts" under the parties' contract.  Id. at 439.

Metropolitan Life is of little assistance here.  The Court of Appeals relied on the statutory canon of ejusdem generis to conclude that "willful acts" referred "to conduct similar in nature to the 'intentional misrepresentation' and 'gross negligence' with which it was joined as exceptions to defendant's general immunity from liability for consequential damages."  Id. at 438 (citations omitted).  Here, however, "willful" is used alone to describe the type of breach that constitutes an "Event of Default" under the parties' contract.  The term is not defined in the Contract Documents and neither side has pointed to anything in the Contract Documents that sheds light on its meaning.  The parties have likewise not offered extrinsic evidence that would help explain the meaning of "willful" as used in the Contract Documents.

58

Courts have noted that "'[w]illful' is a notoriously ambiguous word, which can indicate any of a number of mental states." Johnson & Johnson v. Guidant Corp., 525 F. Supp. 2d 336, 349 (S.D.N.Y. 2007). Black's Law Dictionary gives two definitions; one favors the MTA while the other favors Lockheed. Compare id. at 349 ("'Proceeding from a conscious motion of the will; voluntary; knowingly; deliberate. Intending the result which actually comes to pass; designed; intentional; purposeful; not accidental or involuntary.'" (quoting Black's Law Dictionary 1599 (6th ed. 1990))) with id. ("Premeditated; malicious; done with evil intent, or with a bad motive or purpose, or with indifference to the natural consequences; unlawful; without legal justification." (quoting same)).

Finally, even if this Court were to accept the MTA's interpretation of "willful," several disputed factual issues would preclude summary judgment. For example, while it is undisputed that Lockheed began "de-staffing" the Project at some point prior to its termination, Lockheed contends that this action merely reflected the changing needs of the Project as it moved from one testing phase to another. (LM Opp. Br. (Dkt. No. 153) at 39) Lockheed further contends that an "accelerated de-staff plan" was implemented in April 2009 after the MTA advised Lockheed "that it was going to delete major chunks of work from the Contract because [the] MTA could not fulfill its own obligations under the Contract." (Id. at 40) Given these and other disputed issues of material fact, this Court cannot determine as a matter of law whether Lockheed "willfully" violated Article 2.01 of the Terms and Conditions. Accordingly, the MTA's motion for summary judgment on this ground will be denied.

**B.      The MTA's Motion for Summary Judgment on Lockheed's Claims**

**1.      Lockheed's Bad Faith Termination and *Quantum Meruit* Claim**

In the Amended Complaint's "Alternative Third Claim for Relief," Lockheed

pleads a cause of action for "Bad Faith Termination and Recovery in Quantum Meruit." (LM

Am. Cmplt. (Dkt. No. 21) at 24)  Lockheed's theory is that the MTA "got rid of Lockheed

Martin so that it would not have to pay for delay that [the] MTA caused." See LM Opp. Br.

(Dkt. No. 153) at 44); see also id. ("[The] MTA acted in bad faith for its financial benefit and . . .

the effect of its bad acts was to destroy and injure Lockheed Martin's contractual right to be paid

because [the] MTA delayed completion of the project"); id. at 47 ("[T]he evidence shows that

Lockheed Martin was terminated so that MTA would not have to pay for its delay of the project

even though these monies were payable under the Contract.").

The MTA argues that Lockheed cannot maintain a quantum meruit claim because

(1) "a party may not sue for quantum meruit where, as here, there is a valid written contract in

place"; (2) under New York law, "where the contract includes a 'Termination for Convenience'

clause, inquiry as to whether the owner acted in bad faith in terminating the contract is not

relevant"; and (3) "the Contract expressly precludes claims for rescission or quantum meruit."

(MTA Reply Br. (Dkt. No. 151) at 18; see also MTA Br. (Dkt. No. 149) at 43-45)

Lockheed does not respond to these arguments directly.  Instead, it merely states

that the "MTA acted in bad faith for its financial benefit," and that "[i]f MTA wanted to

eliminate a claim based on MTA's bad faith, MTA could have and should have specifically

included language [in the Contract Documents] barring such a claim." (LM Opp. Br. (Dkt. No.

153) at 44, 48)

Article 7.03 of the Terms and Conditions states, in pertinent part, that

[i]f the [MTA] makes a determination . . . to hold the Contractor in default and/or terminate the Contract for cause, and it is determined subsequently for any reason whatsoever that either such determination was improper, unwarranted or wrongful, then any such termination shall be deemed for all purposes to have been a termination for convenience in accordance with **ARTICLE 2.09, TERMINATION FOR CONVENIENCE BY THE AUTHORITY**. The Contractor agrees that it shall be entitled to no damages, allowance or expenses of any kind other than as provided for in said **ARTICLE 2.09** in connection with any such termination.

(JA Ex. 10.4 (Dkt. No. 163-53), Contract Terms and Conditions, Art. 7.03 (emphasis in original))  Article 2.09(e), in turn, provides that "[a]ll payments pursuant to this **ARTICLE** shall be accepted by the Contractor in full satisfaction of all claims against the Contracting Party," and that "[t]he Contractor shall have no cause of action under any theory of quasi-contract or quantum meruit by reason of any delay, and whether or not compensable hereunder."  (JA Ex. 10.4 (Dkt. No. 163-50), Contract Terms and Conditions, Art. 2.09(e) (emphasis in original))

As an initial matter, the MTA incorrectly asserts that a party may not sue in quantum meruit where it is undisputed that the parties entered into an enforceable written contract. "Although recovery in quantum meruit is generally barred where there is a valid written contract covering the subject matter at issue, where, as here, a contract has been terminated prior to completion, quantum meruit is the appropriate measure of damages." MCK Bldg. Associates, Inc. v. St. Lawrence Univ., 301 A.D.2d 726, 728 (3d Dept. 2003) (internal citations omitted).

Lockheed's bad faith termination and quantum meruit claim fails under the contract's Terms and Conditions, however. Where, as here, "[a] party has an absolute, unqualified right to terminate a contract on notice pursuant to an unconditional termination clause[, that party may do so] without court inquiry into whether the termination was activated by an ulterior motive." Big Apple Car, Inc. v. City of New York, 204 A.D.2d 109, 111 (1st

61

Dept. 1994) (citations omitted); see also Schwartz v. Fortune Magazine, 89 F. Supp. 2d 429, 434 (S.D.N.Y. 1999) ("[T]he court does not inquire into why a party exercised his right to terminate a contract when the contract is terminable without cause."). Although Lockheed contends that Article 2.09 – the termination for convenience provision – does not apply here – because "the MTA terminated [Lockheed] for cause[,] thereby inviting review of its action, including whether it acted in bad faith" (LM Opp. Br. (Dkt. No. 153) at 49) – Article 7.03 of the Terms and Conditions makes clear that if the MTA "terminate[s] the Contract for cause, and it is determined subsequently for any reason whatsoever that either such determination was improper, unwarranted or wrongful," then Article 2.09 – the termination for convenience provision – applies. Accordingly, even if Lockheed's arguments regarding bad faith termination are accepted, its recovery is governed by Article 2.09.

Under Article 2.09, the Contractor's damages are calculated as the lesser of its "actual cost or the fair and reasonable value" of its work. (JA Ex. 10.4 (Dkt. No. 163-53), Contract Terms and Conditions, Art. 7.03) However, as noted above, under Article 2.09 "[t]he Contractor shall have no cause of action under any theory of quasi-contract or quantum meruit by reason of any delay. . . ." (JA Ex. 10.4 (Dkt. No. 163-50), Contract Terms and Conditions, Art. 2.09(e) (emphasis in original)) In sum, in agreeing to Article 2.09, Lockheed bargained away its right to pursue a quantum meruit claim based on delay.[15] That is precisely the claim Lockheed has brought, however.

Lockheed complains that it "was terminated so that the MTA would not have to pay for its delay of the project." (LM Opp. Br. (Dkt. No. 153) at 47) Under express language in

---

[15] Under New York law, a party may contractually waive its right to assert a quantum meruit claim. Abax Inc. v. N.Y.C. Hous. Auth., 282 A.D.2d 372, 373 (1st Dept. 2001) (holding that quasi-contract and quantum meruit claims had been contractually waived).

the Terms and Conditions, however, Lockheed "specifically assume[d] the risk of . . . delays"

and agreed that it would "have no right to rescind or terminate th[e] Contract," or maintain a

cause of action "under any theory of quasi-contract or quantum meruit by reason of any delay  . .

. ." (JA Ex. 10.4 (Dkt. No. 163-50), Contract Terms and Conditions, Art. 2.07(d))

Because Lockheed bargained away its right to bring a bad faith termination and

quantum meruit claim, the MTA is entitled to summary judgment on Lockheed's "Alternative

Third Claim for Relief."

### 2. The MTA's Motion for Summary Judgment on Lockheed's Breach of Contract Claim

The MTA argues that it is entitled to summary judgment on Lockheed's "Second

Claim for Recovery" – which seeks damages under Article 2.09 – because "Lockheed has failed

to provide documentation in support of its claim." (MTA Br. (Dkt. No. 149) at 46-49)

As discussed above, the parties agreed that Article 2.09 would govern Lockheed's

damages in the event that the MTA's termination of Lockheed for cause was found to be

improper. Under Article 2.09(b), Lockheed is entitled to recover:

1. its actual cost or the fair and reasonable value, whichever is less, of (i) the portion of the Work completed in accordance with the Contract up to the Effective Date, and (ii) non-cancelable material and equipment that is not capable of use except in the performance of this Contract and has been specifically fabricated for the sole purpose of this Contract but not incorporated in the Work; and

2. ten percent (10%) of the difference between the Total Contract Price and the aggregate of all payments made apart from those due pursuant to subparagraph (b)(1) above.

(JA Ex. 10.4 (Dkt. No. 163-50), Contract Terms and Conditions, Art. 2.09(b))  Article 2.09

further provides that any amount payable under this provision is to be reduced by the amount

already paid under the contract.  (Id. at Art. 2.09(d))

Lockheed claims that it is entitled to recover $93,990,043 under Article 2.09.

(LM Opp. Br. (Dkt. No. 153) at 20)  This figure is derived from the "actual cost or fair and

reasonable value" of Lockheed's work on the Project, which Lockheed calculated during

discovery at \$323,058,862. (MTA R. 56.1 Stmt. (Dkt. No. 150) ¶ 559)

The MTA asserts that (1) during discovery, it asked Lockheed to explain how it

arrived at the \$323,058,862 figure, but that "Lockheed never responded to [the MTA's]

interrogatory or the several follow-up reminders from MTA's counsel;" and (2) "[t]he \$323

million figure appears to be improper under Article 2.09." (MTA R. 56.1 Br. (Dkt. No. 149) 47-

48)

In its opposition to the MTA's summary judgment motion, Lockheed states that

the "fair and reasonable value" of its work is \$331,440,406.75, while its "actual cost" at the time

its interrogatory response was prepared was \$323,058,862.00. (LM R. 56.1 Resp. (Dkt. No. 161)

¶ 925) In support of these calculations, Lockheed has submitted declarations from two Lockheed

employees, Donato Antonucci and Gary Porter. (Dkt. Nos. 158, 159)[16]

The MTA contends, however, that in order to assert its claim for "actual cost,"

Lockheed has improperly "inflated the [fair and reasonable value] number by including rejected

claims for additional compensation for delay damages (approximately \$35 million); uninstalled

inventory (\$7.3 million); rack integration (\$2.9 million); and "disputed changes" (\$2.8

million)."[17] (MTA Reply Br. (Dkt. No. 151) at 19-20) The MTA argues that "[t]hese figures are

baseless" and that "Lockheed should be precluded from presenting any proof of damages under

---

[16] According to the Antonucci Declaration, "At the time Lockheed Martin prepared its
interrogatory response, the Project cost was \$323,058,862. Subsequently it was determined that
Lockheed Martin's actual costs are in the amount of \$322,418.49." (Antonucci Decl. (Dkt. No.
158) ¶ 12)

[17] As noted above, under Article 2.09(b), Lockheed is entitled to its "actual cost" or "the fair
and reasonable value [of its work], whichever is less." (JA Ex. 10.4 (Dkt. No. 163-50), Contract
Terms and Conditions, Art. 2.09(b))

64

Article 2.09," because it "should have presented its explanation and documentary support for these claims years ago." (Id. at 20)

Because the parties' dispute about damages presents material issues of fact – such as whether Lockheed's "fair and reasonable value" calculation is inflated – it cannot be resolved on a motion for summary judgment. The MTA's motion is also premature, because the parties agreed to proceed with summary judgment briefing before damages discovery was completed. (LM R. 56.1 Resp. (Dkt. No. 161) ¶ 914)  Accordingly, the MTA's motion for summary judgment on Lockheed's claim for damages under Article 2.09 will be denied.

## CONCLUSION

For the reasons stated above, Lockheed's motion for partial summary judgment is granted to the extent that the MTA's breach of contract counterclaim is based on past events of default, but is otherwise denied. The MTA's motion for partial summary judgment is granted as to Lockheed's "Alternative Third Claim for Relief," but is otherwise denied.

The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 137, 148). Trial will commence at **9:00 a.m.** on **Monday, October 6, 2014,** in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.

Dated: New York, New York            SO ORDERED.
       September 16, 2014

Paul G. Gardephe
United States District Judge

65