UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LOCKHEED MARTIN TRANSPORTATION
SECURITY SOLUTIONS, AN OPERATING UNIT
OF LOCKHEED MARTIN CORPORATION,                    No. 09 CV 4077 (PGG)(GWG)

                Plaintiff,

            -against-                                **AFFIDAVIT OF**
                                                     **RONALD J. PEZIK**
MTA CAPITAL CONSTRUCTION COMPANY and
METROPOLITAN TRANSPORTATION
AUTHORITY,

                Defendants.

---

TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA, FEDERAL INSURANCE
COMPANY, and SAFECO INSURANCE COMPANY    No. 09 CV 6033 (PGG)(GWG)
OF AMERICA,

                Plaintiffs,

            -against-

METROPOLITAN TRANSPORTATION
AUTHORITY, MTA CAPITAL CONSTRUCTION
COMPANY, NEW YORK CITY TRANSIT
AUTHORITY, and LOCKHEED MARTIN
CORPORATION,

                Defendants.

---

STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF NEW YORK    )

        Ronald J. Pezik, being duly sworn, declares that:

        1.      The information contained in this affidavit is based on my personal knowledge

and where it is not I state the source of my belief.



2. I submit this affidavit as a witness for defendants Metropolitan Transportation Authority ("MTA") and MTA Capital Construction Company ("MTACC") in the trial of this action.

3. I have been employed by MTACC since 2006 as a program manager. From 2006 through late 2009 I was MTACC's program manager on the IESS/C3 project.

## I. MY BACKGROUND.

4. I earned a Bachelor of Science in Civil Engineering from the New Jersey Institute of Technology in 1979 and a Master of Science in Civil Engineering from NJIT in 1983. I have been a professional engineer, licensed by the states of New York and New Jersey, for over 30 years. During my career, I have managed a variety of large construction projects on behalf of private businesses and government entities including Elizabethtown Gas Company, ConEdison of New York, Hill International and Long Island Lighting Company/Keyspan. I have overseen the design and construction of municipal facilities, public improvement works, and transit projects, some having a security component. I have managed several multimillion dollar projects throughout the years, including overseeing the design and construction of gas facility installations, gas pipeline and distribution systems, and capital improvements.

5. I began working for the New York City Transit Authority ("NYCT") in 1998. While there, I was the Senior Director of the Office of Capital Program Management, a subdivision of the NYCT Division of Materiel (sometimes referred to as the Procurement Department). This position required a program management, engineering and construction background. In this position I acted as a go-between for the Procurement Department to interact with NYCT's Capital Program Management department. I advised the Procurement Department on technical construction and engineering matters. I also worked closely with Capital Program

2

Management and construction managers in the field on projects of all sizes and value, including NYCT's Rail Control Center, rehabilitation of the Franklin Ave Shuttle, construction of the Zerega Bus Facility in the Bronx, and construction of the 100th Street Bus Facility in Manhattan. I was also responsible for the development and award of profession services contracts for the design and construction management of the Second Avenue Subway, the 7 Line Extension Project and the Fulton Street Transit Center and the negotiation and award of the South Ferry Structural Construction contract, which had a value in excess of $160 million. I managed projects in all phases, from the procurement of new contracts, to working with construction managers on change orders, claims, and defaults. I worked closely with MTACC on many of its mega projects including the Second Avenue construction work, the extension of the 7 subway line, and preliminary work on the IESS project.

6. Early in the IESS project, I represented the NYCT Procurement Department in meetings at which the IESS/C3 contract terms and conditions were negotiated between NYCT's counsel and Lockheed's counsel.

## II. THE IESS/C3 PROJECT AND THE ROLE OF MTACC STAFF

7. In the late fall 2006, I joined MTACC as a program manager. In this position, I was the Program Manager for its Electronic Security Program, of which the IESS/C3 project was a component. After leaving this project in late 2009, I became the Program Manager for the 7 Line Construction Project, which extends the 7 subway line from its current last stop at Times Square to 34th Street and 11th Avenue. My current assignment is as Program Manager for the construction of the 96th Street Station for the Second Avenue subway line, which is a new 8.5 mile line along the length of Manhattan's East Side.

8.      The Security Program I worked on when I joined MTACC included, in addition to IESS/C3, a fire/life safety project associated with Amtrak.

**a.   The IESS/C3 Project**

9.      The IESS/C3 project was part of an overall security strategy of MTACC intended to enhance the MTA's ability to protect critical and sensitive infrastructure and provide for the security and continuity of vital MTACC operations. The goal was to create an integrated electronic security system common to all agencies of the MTA.

10.     The IESS/C3 work was to be the initial part of a comprehensive command, control, communication, and security system for the MTA.  It required building out infrastructure to accommodate the new electronic systems, including running conduit and cable, installing panels and devices, constructing and outfitting command centers and much other such work. The construction was to take place in subway tunnels and stations, railroad tunnels and stations, vehicular and rail bridges, and other places.

11.     At the outset, the IESS/C3 work was planned to encompass five MTA agencies: NYCT; Metro-North Railroad (MNR); the Long Island Rail Road (LIRR); MTA Bridges & Tunnels (the former Triborough Bridge & Tunnel Authority, here called "B&T"), and the MTA Police Department ("MTAPD").  Early in the project, the scope was increased with the addition of: (i) thirteen (13) NYCT Under River Tunnels (URT's); (ii) the design and construction of a new MTAPD Central C3 Facility in Long Island City, Queens, and (iii) a new Verrazano Bridge Local C3 Facility.

12.     The IESS was designed to be scalable, meaning that, once the concept had been proven to work, the system was to be deployable at many additional MTA locations.

**b. The IESS/C3 Contract**

13.     The MTA through MTACC entered into its contract C-52038 on August 31, 2005 to build the IESS/C3 system with Lockheed Martin Transportation and Security Solutions ("Lockheed"). The contract calls for the "Design, Development, Furnishing and Installation of an Integrated Electronic Security System (IESS) and Security Operations (C3) Centers at Various Locations."

14.     . The contract provided for Lockheed to design, develop, furnish and install the IESS/C3 system for the MTA. It was a "design-build" contract as that term is used in the construction industry, meaning that the contractor, Lockheed, was responsible for designing the project as well as building it.

15.     I became the Program Manager for the Electronic Security Program which included the IESSC/3 project, succeeding Mr. Ashok Patel. .

16.     Upon becoming Program Manager, I familiarized myself with the IESS/C3 project by reading the plans and specifications, attending meetings, looking at project correspondence and meeting with the MTACC project team.

17.     As the Program Manager for the IESS/C3 project, I supervised the MTACC's project management staff. Nino Pirraglia was my construction manager. He was responsible for overseeing the implementation of the construction of the project, making payments, negotiating the change orders, coordinating track diversion requests, and reporting to me as to any related developments.

18.     As Program Manager I also supervised our consultant construction manager on the IESS/C3 project, Washington Group International (here called "URS" as this firm was later acquired by URS Corporation). Kenneth Shields of URS was designated the lead consultant

construction manager ("CCM") and was the Engineer for the project as defined in the contract. Mr. Shields, and a group of engineers on his staff, were responsible for the oversight and the management of the entire project, including preparing and keeping records, documenting the work as it was progressing, making recommendations regarding payment requisitions, and evaluating requests for change orders.

19.     Terry Fetters was also part of my project team.  Mr. Fetters was an employee of Parsons Brinckerhoff and Parsons Transportation Group Joint Venture ("PB/PTG").  Mr. Fetters acted for MTACC as coordinator of the IESS/C3 testing program, in which capacity he observed software testing and reported to me about test protocol and testing issues.

20.     As Program Manager for the IESS/C3 project I also provided the MTA agencies with periodic updates of Lockheed's work, which meant that throught URS my staff oversaw track and tunnel diversion requests and worksite access; distributed project documents to the agencies; scheduled meetings between MTACC and the agencies; provided the agencies with a status report at monthly meetings; provided support during change order negotiations, and assisted in developing the resulting documentation.  Essentially my role as Program Manager was to be the intermediary between Lockheed and the MTA agencies who were our "customers," that is, the end users of the work.  My overall responsibility was to provide overall direction and guidance to see the project to completion, and therefore I found myself alternately encouraging and scolding both the Lockheed personnel and the agencies' staff, as I tried to get everyone to push forward together.

21.     As Program Manager for the IESS/C3 project, I reported directly to MTACC's Program Executive, Richard Miras, who in turn reported to its President, Mysore Nagaraja (later Veronique Hakim, who served as Acting President in early 2008, and subsequently Michael

Horodniceanu, who became President in mid-2008).

22.     As Program Manager, my focus was on the broader issues relating to the management of the project, as opposed to the day-to-day details, which were in the purview of my CCM and his staff.  I became involved in decision-making when my staff believed issues were serious enough to need my attention. When I had to make or participate in decisions on such issues, I studied relevant documentation and had discussions with my staff before reaching the decision. Specifically I relied on Mr. Shields and Mr. Fetters for day-to-day information on construction matters (Mr. Shields) and systems and testing matters (Mr. Fetters).

## III. <u>THE DEFAULT OF LOCKHEED</u>

23.     During the course of the IESS/C3 project, Lockheed committed fundamental breaches that led to MTA and MTACC's issuance, on May 26, 2009, of a Default Notice – Opportunity to Cure ("Default Notice").  (JX6).  I issued the Default Notice as the representative of both MTA and MTACC based on my personal knowledge of Lockheed's performance and on information reported to me by the CCM, Mr. Shields, Mr. Fetters the testing coordinator, and other project staff.

24.     In the end, Lockheed's failure to prosecute the work after being given many opportunities to do so is what led to my recommendation that Lockheed be defaulted. Lockheed's many failures included poor design work; failure to keep proper project schedules; inadequate management of its subcontractors; failure to design and develop a contractually compliant IESS System, as reflected in its abysmal testing record; failure to put together a training program, and refusal to provide software maintenance.  All of these problems and more contributed to my conclusion that Lockheed would not complete this project and would not adhere to the contract's requirements.  Based upon Lockheed's lack of diligence in prosecuting

the work, MTA and MTACC no longer believed, by May 2009, that Lockheed would finish the job.

25.    Mr. Shields regularly provided information to me that reflected Lockheed's performance on the project. Based on this information, and after discussions with Mr. Shields, I made my recommendation of default to my superior, Mr. Miras, and to Ms. Hakim.  Mr. Shields as well as Mr. Fetters, who also contributed information, were in agreement that Lockheed had failed to perform its obligations under the contract. My superiors accepted my recommendation and, thereafter, the Default Notice was prepared, I signed it, and it was issued to Lockheed.

26.    I here provide information about Lockheed's breaches of the contract.

   **a.  Lockheed's Schedule Breaches**

27.     Lockheed persistently failed to prepare, maintain, and appropriately update progress schedules as required by the contract.

28.    This includes a failure consistently to submit monthly schedule updates as well as to submit proper updates that satisfy the scheduling specifications. Lockheed also failed, for a significant portion of the contract duration, to have an approved project scheduler.

29.    Lockheed's violations of the scheduling specifications included: self-serving changes in logic (*i.e.* the duration and sequence of the steps of the project), which masked Lockheed's inability to progress critical aspects of the work and enabled it to set up false claims for impact costs under the contract; logic changes that were never approved by MTACC, and failure to provide look-ahead reports, which should have provided detailed information regarding type, locations, and resources planned to complete work in the immediate future.

30.    Because Lockheed was never able to provide complete and accurate schedules, MTACC and the agencies expended considerable resources to assist Lockheed to complete the

work efficiently.  MTACC was essentially in the dark as to the true progress of the work.

31.     Lockheed's scheduling breaches were frequently brought to my attention by my CCM, Mr. Shields. I relied on his expertise and personal experience reviewing all of Lockheed's schedules during my time on the project.

32.     Subsequent to Lockheed's default, I learned that during the project, Lockheed maintained two different schedules – an internal one and an external one, the latter being the schedule that Lockheed presented to MTACC.  I understand that Lockheed's Program Manager testified at his deposition that the MTA was made aware of this. I was never aware that Lockheed was using an internal schedule not shared with us.  We never would have approved this practice, as it was contrary to the contract and defeated the purpose of sharing schedule information in the first place, which is to enable the players to work together effectively and ensure the necessary level of participation from all the MTA agencies.

**b.  <u>Lockheed's Failure to Satisfy its Design Obligations</u>**

33.     Under the contract, Lockheed was responsible for the design of the IESS system, and this was a key element of its responsibility.

34.     Survey and design delays directly attributable to Lockheed led to significant delays to the project schedule.

35.     As my CCM, Mr. Shields and his resident engineers reviewed Lockheed's designs and worked with the agencies and Lockheed to resolve comments on design errors and omissions. Mr. Shields reported to me frequently regarding Lockheed's design failures and the delays we were incurring due to Lockheed's errors and omissions.

36.     As a consequence of Lockheed's failure to adequately survey sites, and its failure to submit professionally competent designs, MTACC and the agencies were forced to expend

resources far in excess of what should have been needed.

37. As of the time of the Default Notice, there were many important areas of design work yet to be approved by MTA, due to Lockheed's apparent incompetence. For example Lockheed had still not prepared final design documents for significant portions of the MNR work; and it had still not submitted a complete design to demonstrate that certain legacy systems could be integrated into the IESS/C3 system, as required by the contract.

**c. Lockheed Breached by Failing to Properly Manage the Project**

38. Examples abound of Lockheed's failure to manage its subcontractors in the manner required by the Contract. For instance:

- Lockheed removed its on-site representative at the Long Island City C3 facility during the performance of its work;

- Lockheed failed to properly supervise the installation of conduit in the Steinway tunnel by its subcontractor, resulting in an incident on December 3, 2007, in which a train struck a section of conduit;

- Lockheed failed to monitor the safety and work of its subcontractor at the Long Island City facility in March 2007, resulting in an injury to an inspector working for the MTA when an unsecured scaffolding plank fell and struck the inspector in the head and shoulder;

- Lockheed failed to supervise its subcontractor at the Long Island City C3 facility in the summer of 2007, resulting in improperly sequenced installation work (in particular, Lockheed's unsupervised subcontractor delayed closing up walls inside the facility due to its failure to properly sequence the work);

- Lockheed improperly allowed its subcontractor to arrange for track outages, resulting

in conflicting instructions to railroad officials and, ultimately, inefficiencies including a waste of MTA resources;

- At several locations, Lockheed declared that it was ready for SPIT (Site Performance and Inspection Tests), but Lockheed's dry runs of the tests revealed that the devices to be tested were non-functional as the test failures were caused by incorrect wiring by the subcontractors, whose drawings were different than Lockheed's final drawings;

- The SPIT tests also revealed that the subcontractor's work was so poorly installed (due to Lockheed's failure to ensure that its subcontractor had the right designs), that Lockheed could not fix the work on site (instead Lockheed was forced to create a new testing facility at its offices in One Penn Plaza to re-design and re-test the equipment prior to returning to the field to fix the defects and do the actual testing);

- At Times Square, Lockheed's subcontractor installed panels in public areas despite Lockheed's participation in joint surveys with MTA personnel establishing that these panels would be installed in non-public areas (Lockheed did not correct this improper installation);

- At the Harlem River Lift Bridge, Lockheed failed to manage the subcontractor's work resulting in delays in the shop drawing process and the start of installation work.

39.     Lockheed's failure to manage the project properly is also evident in its record drawings (these are the drawings a contractor leaves behind as a record of work that has been done). When Lockheed submitted such record drawings (and it sometimes omitted to do this), the drawings often did not reflect work that was actually constructed.

40.     Lockheed often had insufficient representation at the field sites where its subcontractors were working; and the subcontractors would be working off drawings that had not

been accepted and did not reflect the previously agreed-upon changes.

41. Lockheed allowed its subcontractors to manage their own portions of the work, in lieu of Lockheed performing its managerial responsibilities, in violations of the contract.

**d. <u>Lockheed's Violation of Contractually Mandated Testing Procedures</u>**

42. I supervised a team that included Terry Fetters of PB/PTG with regard to project testing requirements. I did not participate in the testing program myself but was informed about it by Mr. Fetters and my CCM, Mr. Shields.

43. Under the contract, testing of the IESS/C3 system was to be conducted in phases. Formal testing was to be witnessed by MTACC, the agencies, and the Commissioning Agent. The Commissioning Agent was an engineering firm that the contract required Lockheed to hire to verify independently that contract requirements were being met. Lockheed engaged Systra Engineering as the Commissioning Agent and Systra designated Linda Martinez as its project lead.

44. Formal systems testing under the contract began with factory acceptance testing or "FAT."

45. Following FAT, Lockheed was required to conduct further testing at the field sites for each of the agencies. This site testing fell into two categories: Site Performance Installation Tests ("SPIT") and Site Integration System Tests ("SIST").

46. Consistent with the sequential testing of the whole system, the contract required that the FAT phase for each subsystem be fully verified and that all failures ("variances") be fixed, retested, and closed before advancing to the next phase.

47. The contract specified many requirements that the system had to meet, and each such requirement had to be tested. The requirements were supposed to be recorded in the

project's Requirements Traceability Matrix ("RTM") database, which was to be submitted for approval to MTACC. There were well over 1400 requirements to be verified via testing to complete the FAT phase, and other requirements were to be tested in later test phases.

48. MTACC expected a 100% passing rate for all requirements.

49. Mr. Fetters was the MTACC representative to witness testing. Each agency, and the Commissioning Agent, also sent representatives to act as test witnesses. Lockheed was required by the contract to establish a test facility, which was at Mitchell Field on Long Island.

50. Early in the FAT test program, Mr. Fetters informed me that Lockheed was experiencing an extraordinarily high rate of failure and was deferring tests to future "waves."

51. To help MTACC manage the burgeoning issues arising from the high rate of test failures, I authorized PB/PTG to hire a software engineering firm, Dnutch, Inc., to support us in observing and responding to test issues.

52. On February 11, 2008, I received an email from the Commissioning Agent, Linda Martinez of Systra, with respect to the state of the testing program. (MTAX0551). Ms. Martinez expressed to me and Lockheed's representative that she had "grave concerns about the ability [of Lockheed] to successfully achieve Stage I Beneficial Use in August, 2008 given the ongoing failure of FAT." Ms. Martinez recommended that the FAT program be discontinued so that Lockheed could establish a design that would meet the System requirements in advance of the resumption of testing.

53. Ms. Martinez attached a formal letter to her email, which was dated February 10, 2008, detailing the reasons for her recommendation. That letter was addressed to me, and to Paul Shimp, Lockheed's Director of Quality Systems. (MTAX0548)

54. After we received the Systra recommendation, on or about February 14, 2008, we

wrote to ask Lockheed to respond to the concerns raised by Systra.  (MTAX0562).

55.     On the afternoon of February 15, 2008, I met with Lockheed Program Manager Jim Gaughan to discuss the state of the testing program and Systra's recommendation.  Mr. Gaughan's statements to me that day were so extraordinary, that I made a contemporaneous record of what he said, and put it in an email to Mr. Miras and Ms. Hakim. (MTAX0566)

56.     Mr. Gaughan stated to me, in a manner that I found condescending, that the MTA did not need all of the requirements in the contract, and that Lockheed would determine which requirements the MTA really needed and that Lockheed would meet.  In response, I stated to Mr. Gaughan that it sounded like Lockheed simply wanted to eliminate requirements that it could not or would not meet and write new ones that it could meet.

57.     Mr. Gaughan then made an even more extraordinary statement to me.  He stated in effect that Lockheed no longer agreed with all of the failed test results, even though the tests were witnessed by MTA, the agencies, the Commissioning Agent, and Lockheed itself and the results were recorded immediately after the administration of the tests.  Mr. Gaughan then said that in his opinion, even though he did not observe the tests, the test results were subject to interpretation of the contractual requirements and that he was going to revisit the results and decide whether the tests had actually failed or not.

58.     Mr. Gaughan then stated that Lockheed never had any intentions of satisfying all of the requirements and that, with a COTS solution, the MTA had no right to expect that it would get what it wanted. I responded by saying that it was always MTA's expectations to get a system that would meet all of the requirements. I also reminded him that the contract called for a COTS-based system, not all COTS, and that, to the extent that the COTS products did not meet the requirements, we expected Lockheed to make it happen, whether through getting the vendors to

do what was needed, writing code, or otherwise. I reminded Mr. Gaughan that the contract included specifications for developing software, including writing code, because it was anticipated that such work might be needed.

59. One of the reasons Mr. Gaughan's remarks struck me as outrageous is that on multiple prior occasions he had specifically stated to me that Lockheed would have no problems satisfying all of the system requirements because it had relationships with the COTS vendors and Lockheed had the leverage to get them to modify or develop the software so as to comply with the MTA's contractual requirements.

60. I demanded that Lockheed provide a response to the Commissioning Agent's letter.

61. On March 7, 2008, MTACC sent Lockheed a follow-up letter (MTA Letter 943), asking again that it respond to the Commissioning Agent's February 10, 2008 letter and referencing our letter of February 14, asking for the same thing. MTAX1168. We never received a response to the views of Systra as we had requested in our February 10 and March 7 letters and February 11 email.

62. In or around early 2008, MTACC began to discuss internally whether it was feasible to continue with Lockheed or whether it would be necessary to default the contract.

63. In January 2008, my staff and I were required to submit an evaluation of Lockheed's performance for the MTA's All Agency Contractor Evaluation System ("AACES"). My staff and I unanimously concluded that Lockheed should be given an "unsatisfactory" rating. However, my superior Mr. Miras told me that the MTA did not want to take this course at the time. Rather, we continued to address Lockheed's deficiencies through direct communication with Lockheed.

64. In or around early February 2008, I received a phone call from the Federal Aviation Administration. They explained that they were considering Lockheed's bid for a separate project. They asked me about Lockheed's performance on the IESS/C3 project. I was candid and told them about the delay and design issues we were having on the project.

65. Sensing the MTA's frustration with the extremely poor results with the testing program, and with its performance in general, Lockheed's executives set up a display to present to the MTA at the Long Island City C3 Center for the MTA and its agency representatives that they would receive a contractually compliant system. This display was referred to by Lockheed as an Operational Readiness Workshop, and was conducted in May 2008.

66. I attended Lockheed's workshop, but was unimpressed by its presentation. Nevertheless, MTA agreed to continue with the program based on Lockheed's promise to continue working on the system in order to satisfy the contractual requirements.

67. By May 2009, Lockheed had still not resolved the outstanding FAT issues. The testing failures continued into the subsequent phases of SPIT and SIST testing of parts of the system. By the date of the Default Notice, Lockheed had not completed SPIT testing at any of the agencies; and after stating it had "completed" SIST testing at MTAPD and B&T, Lockheed ran up hundreds of additional test failures.

68. By the date of default, Lockheed had amassed no fewer than 315 FAT test failures, and, through just two agencies, MTAPD and B&T, another 273 test failures, bringing the total number of recorded failures to nearly 600. Lockheed indicated in correspondence that it had no intention of fixing these failures.

e. **Lockheed's Failure to Continuously and Diligently Prosecute the Work**

69. Article 2.01 of the Contract requires the Contractor to "prosecute the Work

continuously and diligently." Lockheed's failure to abide by this requirement was one of the grounds for default set forth in the Default Notice.  (JX6).

70.     In spring 2009 we were getting strong indications from Lockheed that it did not intend to complete the project.  On multiple occasions, I told Mr. Gaughan that if Lockheed was falling behind in the work, he would have to use additional staff to catch up.  Mr. Gaughan bluntly asserted that he "only [had] so much money to spend."

71.     I was also present at meetings during this time where Lockheed personnel would talk about being out of this project, one way or another, by summer 2009.

72.     Lockheed was clearly not applying the resources to finish the work.  Under the contract, Lockheed was obligated to lease and maintain a local project office in New York for management of this job until final completion. The contract also required Lockheed to lease space for MTACC's project team, and to provide the testing facility which was at Mitchell Field.

73.     On March 25, 2009, I received an email from Mr. Gaughan advising me that my staff had to vacate the MTACC project office by August 2009, notwithstanding that it was inconceivable that Lockheed could complete the work by that time.  Mr. Gaughan's email stated his intention to repossess the computers and mobile devices provided to MTACC pursuant to the contract, as well as to remove and sell the office furnishings. MTAX0893.

74.     Two days later, on March 27, 2009, Lockheed notified MTACC by formal project correspondence that it would not renew its lease at One Penn Plaza,  and that it would shut down its project office (and consequently, MTACC's project office) in advance of the expiration of its lease in September 2009.  MTAX0901.

75.     Lockheed's determination to shut down its field office and evict the MTA from its project office in advance of the completion of the work was a clear breach of the contract.

76.     On April 13, 2009, MTACC sent its formal Letter 1584 to Lockheed regarding Lockheed's reduction of its staff as well as that of its subcontractors on the IESS/C3 project. We stated in our letter that "The Project is at a critical juncture and LM appears to be eliminating experienced staff that would help in completing the Project. " We requested an organizational chart and an explanation as how the work would be completed with the reduction in resources. MTAX0915.

77.     During this time period, I noticed that the Lockheed project office, once busy with employees, was now largely empty. By May 2009, based on my observations, it was clear to me that Lockheed did not have the will to complete the project as spelled out by the contract specifications.

78.     In the Default Notice, we highlighted some of the areas of work that Lockheed had failed to diligently and continuously prosecute. Among these areas was Lockheed's failure to take the measures necessary to verify through testing that the IESS/C3 system requirements were being satisfied. We also noted that Lockheed had not verified a large grouping of functional requirements that were to be verified by means other than testing (known as the "functional non-testable" requirements). (There were more than 1,800 of these requirements that Lockheed had done nothing to verify).

79.     We enumerated many additional examples of Lockheed's failure to progress the work. These included:

- Not developing the software and performing the integration work necessary to create a system that satisfied all of the Contract's requirements, including resolution of outstanding FAT and SIST failures;

- Failing to correct its deficient Training Program;

- Failing to fix the defects which caused the system to crash during pilot training, so as to ensure that the system would meet the Contract's requirement that it be fully available 99.99 % of the time;

- Failing to complete the outstanding work items necessary for the issuance of certificates of occupancy at the MTAPD, NYCT Regional, and B&T regional and local C3 centers at the time of the default;

- Failing to integrate the legacy access control system and legacy CCTV system with the new IESS/C3 system at a Penn Station;

- Failing to install aerial cable and access control devices at the Harlem River Lift Bridge;

- failing to install the entire security system in the GCT Train Shed;

- Failing to complete installation of an access control system at GCT, including the integration with legacy systems;

- Failing to submit proper designs for installation work in GCT historical areas;

- Failing to install a network linking the GCT communication rooms to MNR's C3 Center;

- failing to complete installation of Remote Console Installations at MNR and NYCT sites;

- failing to complete Transition Plans for L1RR, MNR and GCT;

- Failing to install and test equipment in available NYCT communication rooms;

- Failing to install cameras and devices in 4 NYCT station complexes (TSQ, PS, GCS and 63rd St); and -Failing to complete the remote console installations at GCT.

80.     Lockheed was also cited for failing to diligently prosecute the AWO 1 portion of

the work. This unfinished work included all of the communications room work; the completion

of the device, cable and conduit installation at 60th Street, 53rd Street, 149th Street, 161st Street,

and the Lexington Avenue tunnels, and the panel work at the lower tunnels, including the

Joralamon, Montague, Cranberry, Clark, 14th, Rutgers, Jackson, and Steinway tunnels.

81.     As of the date of the Default Notice, there were tens of millions of dollars of

outstanding work that Lockheed had not performed and was making little progress on. This lack

of progress by Lockheed warranted the issuance by MTACC of the Default Notice.

**f.   Lockheed Breached its Obligation to Maintain the Software Pending Completion of the Work**

82.     The contract included a section of provisions referred to as "Special Conditions"

("SC").   (JX10.05).   SC2 is entitled "Beneficial Use" and provided that there would be five

individual Beneficial Use Certificates ("BU Certificates") issued for this project - one for each of

the five agencies. The term "Beneficial Use" is defined at Article 1.02(4) of the contract's Terms

and Conditions, which states that "Beneficial Use shall mean a written determination by the

Engineer that a discrete portion of the work or identified equipment is sufficiently complete and

fit for its intended purpose, in accordance with the Contract, that the Authority is able to

physically occupy such portion of the Work or utilize such equipment."  (JX10.04).

83.     Although this was to be an MTA agency-wide system of systems, the idea was

that the police and individual agency security departments would be able to begin using their

own security systems independently, in advance of the entire system of systems being placed

into service.   For the latter to occur, the entire Work would have to achieve "substantial

completion," *i.e*, the whole must be deemed by the Engineer to be "complete and fit for its

intended purpose."

84.     In providing for Beneficial Use for each of the agencies, SC2 carves out of the

BU Certificates all software and software-related items. Only the hardware and equipment items subsumed within the agency portion of the work was to be subject to BU Certification. The reason for this is that the IESS/C3 project was to be an MTA-wide system of systems. For the software and software-related items to be accepted, the functionality of the entire system of systems needed to be verified, which could only occur after all agencies were brought into operation.

85.     During the early part of 2009, Lockheed began communicating to MTACC its plan to turn over individual agencies for Beneficial Use. Although the work was nowhere near ready for Beneficial Use, I wanted to be prepared for that possibility. It was in this context that I raised with Mr. Gaughan Lockheed's post-BU responsibility to maintain the software. I reminded Mr. Gaughan that under SC2, an agency may begin using the system, but that the software items would not be part of the BU certification. The significance of this is that the contract's one-year warranty provisions for software would not commence as of the BU date, and that Lockheed would therefore have to continue to maintain the software (which would include providing the latest software versions, updates, etc.) following BU up until the end of the software warranty period (which is one year after substantial completion).

86.     Lockheed refused to provide software maintenance for the period between BU and substantial completion. MTACC wrote to Lockheed explaining its obligation to maintain the software until the end of the software warranty period, which extends one year beyond substantial completion   (MTA Letter 1546), but Lockheed refused (LM Letter 1632). (MTAX866, MTAX886).

87.     Lockheed's refusal violated the contract provisions governing the furnishing of software, which provided for maintenance services up until one year after substantial completion

at no cost to MTA. Lockheed's position also frustrated MTA's right to take beneficial use of individual agencies under SC2.

### g. Lockheed Breached its Obligation to Maintain Utility Service Prior to Beneficial Use

88.     Specification 1B.1.7 (JX12.01) and 1F.1.1(i) (JX12.05) of the contract required that Lockheed provide utility service to the work site prior to turning over the work for beneficial use. Lockheed refused to pay for utility service at the MTAPD Central C3 facility in Long Island City, in violation of the contract.

### h. Failure to Provide Training

89.     Pursuant to Specification 1AB12 (JX13.12) and 1AB 13 (JX13.13), Lockheed was required to provide a pilot training program. At the first training session, scheduled for April 20, 2009, Lockheed provided an instructor who was unprepared and not familiar with the material on which he was required to provide training. Lockheed cancelled and rescheduled the session, resulting in an inconvenience to the MTA and a waste of its resources.

90.     On the second day of training, Lockheed provided a different instructor who used a teaching plan that did not match the training materials given to the class. The MTA representatives were left with the impression that these inconsistencies, among others, greatly limited the value of the training.

91.     MTACC cited many other deficiencies in Lockheed's training program and the pilot training program in a letter to Lockheed dated May 7, 2009. See MTAX1169.

92.     Lockheed's training was inadequate and far short of the contract's requirements and served as a separate cause for default.

### i. Decision to Terminate Lockheed

93.     After the Default Notice was sent to Lockheed, it had a final opportunity to cure

its deficient performance.

94.     When I received Lockheed's response to the Default Notice (the "Cure Response") (JX7) I reviewed it and discussed its content with my staff, including Mr. Shields and Mr. Fetters. With one exception, the Cure Response indicated, in my view, that Lockheed would not remedy any of the deficiencies in the work as identified in the Default Notice. The only item that Lockheed agreed to correct was with respect to its cancellation of its lease at One Penn Plaza in New York City for Lockheed's and the MTA's field offices.

95.     Generally, Lockheed categorically denied our assertions in the Default Notice that its work was deficient. I noted in particular that Lockheed insisted that its performance in FAT and SIST testing was satisfactory and that, as far as it was concerned, was "complete." interpreted this as a statement that it would not advance the IESS/C3 system to a point where it would be in compliance with the contractual requirements

96.     With the Default Notice, we gave Lockheed an opportunity to provide a plan that would demonstrate how it intended to achieve all of the contractually-mandated functional system requirements. Lockheed did not provide any such plan.

97.     After discussing the Cure Response with my staff, and reaching unanimous agreement with them that it did not address the many deficiencies we raised in the Default Notice, I recommended terminating Lockheed to my supervisor, Mr. Miras, and to Ms. Hakim.

**j.     The Completion Work**

98.     After Lockheed's termination, my staff and I assessed the state of the project as of the time of termination. The MTA had paid Lockheed a substantial amount of money and had nothing to show for it. There was an urgency to begin our completion effort as quickly as possible.

99.     Our plan during this time involved completing the work with MTACC acting on its own, and subcontracting the completion work to Lockheed's subcontractors and vendors, to the extent necessary. The goal was to achieve some type of initial operating capability.

100.    To this end, Mr. Pirraglia and Mr. Shields provided me with an assessment of the amount of installation of the physical components of the work to date, as well as the amount of the work that still remained unfinished. This information was readily available to us through, among other means, a review of project records recording daily construction activity, visits to storage areas as a means of roughly estimating the amount of work left to do, and physical inspections of the work sites.

101.    Because we were not privy to Lockheed's internal discussions regarding the true status of software configuration, a second phase of assessment involved talking to as many of Lockheed's subcontractors as possible. This included, among others, FSE, Arinc, Intergraph, Broadware, Nice, and Cisco.

102.    Although we generally knew the system's deficiencies, we could not be aware of what enhancements or corrections, if any, Lockheed and its subcontractors were working on without speaking to Lockheed's contractors.

103.    We also learned of new deficiencies. For instance, Intergraph personnel told me during a meeting in my office that they would never be able to provide the functionality that Lockheed had promised us, and that they had to told Lockheed the same thing early in the project.

104.    From the state of the Lockheed work, we knew that the project would never be completed as per the contract's terms. The goal was to get the system to achieve a level that would comport to some of the contractual requirements.

105.    At the time I left the project in the lattter part of 2009, the effort to determine the state of the project at the time of termination, and the corresponding effort to determine the scope of the completion work, was ongoing.

## IV. **LOCKHEED'S ALLEGATIONS**

106.    In its case against the MTACC, Lockheed has made several unfounded allegations, some of which I address below.

### a.    **Lockheed's Claim That it was Delayed Due to Additional Work Orders**

107.    On September 19, 2007, Lockheed submitted a claim asserting that the MTACC was responsible for impact costs related to the issuance of several AWO's and an alleged direction from the MTACC to accelerate the job. (MTAX417).

108.    The MTACC rejected this claim on November 16, 2007 (MTAX472) in part because the claim was untimely, as the contract required that requests for extensions of time need to be made within ten (10) days after the time that Lockheed discovered the cause of the need for an extension. Lockheed did not provide notice anywhere near the 10-day period. Lockheed also failed to provide the proper documentation, as required by the contract, showing how the alleged MTACC delays affected the project's critical path. Without such analysis, the MTACC had no way of knowing the veracity of Lockheed's claims.

109.    Lockheed further failed to account for Lockheed-caused concurrent delays. In fact, Lockheed's ongoing inability to provide proper schedules and schedule updates meant that Lockheed could not claim that all delays were the responsibility of MTACC without acknowledging any Lockheed-associated delays.

110.    The acceleration claim was similarly rejected because Lockheed failed to provide any excusable reasons for its delays or for any request of extension of time beyond the original

project completion date.

111.    MTACC concluded that the delays associated with Lockheed's September 19, 2007 letter were not caused by the issuance of AWO's, which comprised a small portion of the total work, but were, at most, concurrent with Lockheed's own delays.

112.    On April 9, 2008, Lockheed submitted a new claim again related to delays it claimed were related to MTACC's issuance of AWO's. (MTAX641). MTACC rejected this claim on June 9, 2008 for the same reasons it rejected Lockheed's first claim. (MTAX679).

113.    MTACC added that this claim of delay was particularly egregious because the delay associated with the AWO was due to Lockheed's insistence on charging MTACC for overhead and profit on Lockheed's own estimate. As MTACC explained in the rejection of the claim, the contract's terms and conditions did not allow for this.

114.    Finally, on October 30, 2008, Lockheed submitted its final claim, wherein it sought $40 million for an extension of time and associated impact costs for a variety of alleged and wide-ranging MTACC-caused delays. (MTAX775). Once again, on November 26, 2008, MTACC rejected this claim because it was not submitted within the required time period and failed to provide the contractually required accompanying documentation, including scheduling analysis. (MTAX790).

115.    And again, MTACC added that, beyond the contractual requirements, the claim was impossible to verify because of Lockheed's own failure to maintain proper schedules or account for its own delays.

116.    More troubling, during the ongoing negotiations regarding the 2008 delay claims, it became apparent that Lockheed did not consider its ongoing failure to provide an integrated system a delay, or even a failure at all.

117. On one occasion, Mr. Gaughan told me that the system Lockheed provided was strictly a COTS system, and that "you get what you get."

118. I now recognize this was an early indication that Lockheed did not intend to meet its contractual requirement to provide us with a fully integrated system.

119. Contrary to Lockheed's stated position in this case, Lockheed's claim against MTA for delays and its assertion that MTA lacked funding to complete the work is baseless, and had nothing to do with MTA's decision to terminate Lockheed.

b. **Lockheed's Claim that it was Denied Access to the Communications Rooms**

120. AWO 69 related to changes in the base contract work to be performed by Lockheed within the NYCT communications rooms located at Penn Station, Grand Central, Times Square, and in the 63rd Street Tunnel.

121. Lockheed has claimed that the additional work required to the communications rooms under AWO 69 delayed the project. I disagree with this claim because, at the time AWO 69 was issued, Lockheed had remaining contractual work that it could have performed but did not. To the extent that Lockheed could show that there was any delay on the part of the MTA related to AWO 69, it would at most be concurrent to Lockheed's own delays throughout the Project.

122. Furthermore, AWO 69 did not affect all of the communications rooms, despite Lockheed's allegation of some universal delay affecting all of the rooms.

123. And, within the communications rooms that were affected by AWO 69, Lockheed was still required to run cameras, conduits, fibers, and other component of the work. It would have been able to do this work even after the AWO 69 changes, but it failed to advance this work.

124.    For example, in NYCT's Grand Central Subway Station, Lockheed designed four racks that did not take into account the space requirements within the communications rooms they were to be housed in. Lockheed's design, essentially, did not take into account the field conditions. As a result, MTACC mitigated Lockheed's design error by re-configuring the system and installing racks and related equipment outside of the communications rooms. This was an example of work that Lockheed could have done and should have done but was unable to advance because of its own design errors and omissions.

125.    More troubling about the above-referenced design errors was Lockheed's billing of the MTA to fix them. Particularly, the redesign of the racks, which was generally associated with the communications rooms design work, was billed to the MTA.

126.    Some of this design work was included in a "bucket," AWO 88, but Lockheed was not entitled to that sum. Essentially, Lockheed double-billed the MTA, to the extent of approximately $3.4 million, for the redesign of racks and communications rooms.

127.    Similarly, Lockheed made claims that there were universal power and lighting issues delaying the progress within the communications rooms. As with the space requirements, Lockheed could not and can not claim that these issues were delaying the communications room work when Lockheed was failing to advance the tunnel work that was a necessary precursor to working within the communications rooms, such as running conduit and cameras through the tunnels and connecting them to the communications rooms.

128.    Furthermore, had Lockheed been ready to proceed with work within the communications room themselves, the MTA was ready to provide power, and had told them as much. As with the network connection, Lockheed illogically blames the MTA for the supposed delay of not providing resources or service to do work Lockheed was not ready to perform.

c. **The Showstoppers**

129.     In May of 2008, Lockheed wanted to show the MTA and the operating agencies what the system could do at that point in time. Lockheed held what it called an Operational Readiness Workshop.

130.     With the Operational Readiness Workshop, Lockheed created a series of hypothetical events and walked the audience through how the system would perform in a case of these hypothetical events.

131.     Lockheed came up with the idea of the Operational Readiness Workshop because of MTA's expressed frustration over Lockheed's continuous FAT testing failures.

132.     In weekly meetings prior to the Operational Readiness Workshop, which I attended, Ms. Judy Marks and other Lockheed executives openly tried to calm Mr. Nagaraja and other MTA executives by reassuring them that the testing failures were mere hiccups, and common on Lockheed projects. They proposed the Operational Readiness Workshop to visually demonstrate the progression of the project to date, and with an emphasis on how the project would eventually meet all contractual requirements.

133.     The Operational Readiness Workshop did not involve any contractual testing itself, but was meant to put our minds at ease.

134.     After the event, I understood that Lockheed had still not achieved a system that was contractually compliant. I was generally not impressed with the performance.  Some of the demonstrations were via PowerPoint slides.   None of the demonstrations involved or even discussed testing in any way. The entire presentation was clearly and unconvincingly scripted.

135.     At around this time, the MTA, working within what was known as a "Path Forward Committee," established what became known as the "showstoppers." These were four

contractual software functions that included publish/subscribe, data segmentation, Lenel licenses and maintenance mode. I understood these functions to be absolutely necessary to resolve before the project could be operated under a minimally operating state.

136. The concept was that if Lockheed could demonstrate this level of functionality, then it would be possible for the MTA to get at least some initial capability from this system. It was *never* intended to be a substitute for Lockheed's contract obligations.

137. I understand that Lockheed has asserted that MTACC deemed the showstopper requirements satisfied but reversed itself after Lockheed served its lawsuit against the MTA. This is a false and baseless assertion. Beyond the fact that the showstoppers had not, in fact, been successfully tested prior to (or after) the lawsuit, I also recorded in a draft letter to Lockheed on April 23, 2009 that there were many outstanding requirements that Lockheed needed to demonstrate before Beneficial Use could be certified for the MTAPD facility, and that among the outstanding requirements of particular concern to MTAPD was the absence of two of the showstoppers – data segmentation and maintenance mode. My understanding was memorialized in the draft, which I sent by email to MTAPD for comment on April 23, 2009 (MTAX0924).

138. Lockheed Martin never satisfactorily demonstrated that the requirements for the Showstoppers had been resolved.

139. A slide from the April all-agency progress meeting, that I did not attend, nevertheless said that "The FAT show-stoppers are closed."

140. I was not present at the meeting and do not know who prepared the slide.

141. Nevertheless, this slide did not state that the requirements associated with the showstoppers had been successfully tested. At most, it suggests that there was an acceptable plan

for Lockheed to proceed to test, which is where the focus should have been.

142.  I do not know who created the wording on the aforementioned slide.

143.  These showstoppers were never actually resolved. This viewpoint is unanimously supported by the agencies as well.

144.  I have also previously testified that satisfaction of the showstoppers, if it had ever been achieved by Lockheed, would not produce a "successful project" because these impromptu requirements were designed to add a higher degree of confidence that the contractual requirements would someday be met.

145.  In fact, the "showstoppers" merely represented some particularly obvious deficiencies in the system delivered by Lockheed which, if Lockheed could not fix, would indicate its inability to progress the program. The showstoppers were not a substitute for satisfying contractual requirements.

_____

RONALD PEZIK

Sworn to before me this
7l day of Octo 2014

IRA J. LIPTON
Notary Public State of New York
No. 02LI6022147
Qualified in Westchester County
Commission Expires March 29, 20 l5