UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOCKHEED MARTIN TRANSPORTATION SECURITY SOLUTIONS, AN OPERATING UNIT OF LOCKHEED MARTIN CORPORATION,<br><br>    Plaintiff,<br><br>  -against-<br><br>MTA CAPITAL CONSTRUCTION COMPANY and METROPOLITAN TRANSPORTATION AUTHORITY,<br><br>    Defendants. | 09 CIV 4077 (PGG) (GWG)<br><br><br><br>ECF CASE |
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, FEDERAL INSURANCE COMPANY, and SAFECO INSURANCE COMPANY OF AMERICA,<br><br>    Plaintiffs,<br><br>  -against-<br><br>METROPOLITAN TRANSPORTATION AUTHORITY, MTA CAPITAL CONSTRUCTION COMPANY, NEW YORK CITY TRANSIT AUTHORITY, and LOCKHEED MARTIN CORPORATION,<br><br>    Defendants. | 09 CIV 6033 (PGG) (GWG) |

**DEFENDANTS' RESPONSE TO PLAINTIFF LOCKHEED MARTIN'S POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendants (together the "MTA") respond below to paragraphs of Plaintiff's Findings of Fact ("LM Post-Trial Findings of Fact") and Conclusions of Law ("PCL") as to which correction or the addition of information appears appropriate. In some instances cross-references are provided to Defendants' Proposed Findings of Fact ("MTA Post-Trial Findings of Fact") and Conclusions of Law ("DPCL").

This Response, and Defendants' previously filed Proposed Findings of Fact and Conclusion of Law, assume that the documents admitted into evidence include those that are the subject of the parties' Stipulation submitted to the Court on November 21, 2014.

I.  **DEFENDANTS' RESPONSE TO PLAINTIFF'S FINDINGS OF FACT**

9. LMX511, cited to support this paragraph, was not admitted in evidence.

16. Lockheed cites a comment, written by Ronald Pezik to a consultant's report in 2007, (LMX350), to the effect that the MTA had accepted, when the Contract was awarded, Lockheed's proposal that it would not do software development but would rather have the software vendors put the Contract's requirements into their products. Mr. Pezik's statement is not effective to vary the meaning of the Contract as determined by the Court on summary judgment. SJ Order 09/16/2014, p. 35 ("The Contract Documents unambiguously provide that Lockheed must meet all of the requirements set forth in the RFP"). In any event, Mr. Pezik testified that he wrote this comment in April 2007 on the basis of having been told by Jim Gaughan that Lockheed would not have to do software development because it could get the vendors to enhance their COTS products to meet MTA requirements. Mr. Pezik testified that, when FAT testing later failed, Mr. Gaughan said that the MTA could not expect Lockheed to satisfy requirements that the COTS products did not meet, to which the MTA responded that

1

Lockheed was indeed obligated to meet all Contract requirements. Pezik, Trial Tr. 10/31/2014 58:10-62:18.

20. The portion of Lockheed's technical proposal cited here, JX9.2 § 2.2.2, p. 34, does not support the Proposed Finding. Fred Robinson's deposition, Robinson Dep. 77:9-78:8, also does not support the Proposed Finding.

22. Lockheed cites LMX438 (MTAX659 contains the same document with a cover email) for the proposition that the MTA "recognized that until the COTS programs mature, it was necessary to '[a]llow and direct managers to change procedures . . . '." LMX438 does not support Lockheed's characterization. Its author, Wael Hibri, rather recommends that, given FAT testing failures, the MTA "prioritize" failed items based on their impact on functionality and, in that context, ask managers to change procedures to fit this functionality. The record does not reflect that the recommendations made in LMX438 were adopted by the MTA.

30. Lockheed asserts that the change from a 70% pass rate for FAT to a 90% pass rate overall was "making the exit criteria for SIST more stringent . . . ." Eliminating the 70% pass rate for FAT made the testing program less, not more, stringent. <u>See</u> MTAX551, email attachment (Commissioning Agent's February 10, 2008 letter stating that Lockheed was failing FAT at more than 30%).

31. <u>See</u> MTA Post-Trial Findings of Fact ¶¶ 36-37. Mr. Gaughan advised his superior Carlaine Blizzard on March 20, 2008, that the MTA had "approved [the TEMP] on 9/6/07 with seven (7) 'punch list' comments from LIRR….)." MTAX617. Thus Mr. Gaughan knew that the LIRR comments were outstanding though he downplayed them as "punch list" items.

34. As to Lockheed's contention that the "MTA did not make any comments to the pass rate formula of the TEMP, see MTA Post-Trial Findings of Fact ¶¶ 36-37.

37. Lockheed states that, since the TEMP did not include a minimum pass rate for FAT completion, "each FAT requirement did not need to pass to complete FAT." The MTA's position, by contrast, was (and is) that the TEMP and the Contract required Lockheed to address all FAT failures, and fix them and retest and regression test to ensure that Contract requirements were met. MTAX435; MTAX1178, Fetters ¶ 76.

43. Lockheed's statement that the "DI (disputed), NS (not statused) and NA (not applicable)" test statuses were determined by a consensus of people at testing" is not supported by the record. Lockheed created the "disputed" test status and decided what requirements should be recorded as "disputed." MTAX1178, Fetters ¶¶ 91-92; MTAX1192, Panzer ¶¶ 60-71.

44. The cited portion of the Viviano deposition, Viviano Dep. 283:14-285:21, is not in evidence.

49. Mr. Gaughan's declaration (LMX1785), cited to support this proposed finding, asserts Lockheed's contentions – not the record facts.

51. For the MTA's rebuttal of Lockheed's claim that it did $5.4 million of work in the month prior to default, see MTA Post-Trial Findings of Fact ¶ 148.

52. While Ms. Humpton told the MTA, when this suit was filed, that the Lockheed team would continue working to completion, Lockheed's actions told a different story. See MTAX915 (Kenneth Shields says that Lockheed is reducing staff and seeks assurance that work will be progressed); MTAX950 (Mr. Shields addresses Lockheed work stoppage at LIRR); MTAX1013 (MTACC concern that Lockheed is not using planned outages to work in tunnels); MTAX887 (MTACC continued to be concerned that Cisco interface with Pelco cameras does

not work).  At trial Mr. Shields said he had observed that the "resources being provided for the work in the field was reduced, the experienced staff were starting to leave the project.  We just had a general feeling that work was slowing down."  Shields, Trial Tr. 10/30/2014 36:1-11.

58. Mr. Shields's direct testimony supports the default decision.  MTAX1201, Shields ¶¶ 16-20.  At trial, asked if default was appropriate in June 2009, Mr. Shields answered that it was a "really difficult call" because "everyone was concerned about getting the project done" and "We weren't sure it was going to get completed."  He attributed the failure to meet the substantial completion date to Lockheed "not being able to meet all the requirements" and that some designs were still being done (referencing Grand Central Historic District).  Looking back, Mr. Shields said, there had been concern about access but now it seemed that the access was not being used fully.  Lockheed had not started to work on legacy integration until very late and had not left sufficient time to address it.  Shields, Trial Tr. 10/30/2014 48:5-50:10.

60. Lockheed says the Path Forward Committee was not consulted about the default decision; the record reflects that the Path Forward Committee stopped meeting in Summer 2008, nearly a year before the default.  MTAX1183, Hibri ¶ 36.

64. The MTA's Default Notice dated May 20, 2009, which was addressed to Mr. Gaughan, asked Lockheed to provide a plan for "[p]rofessional staffing to manage Project properly."  JX6, p. 9.  Lockheed provided a "staffing plan" with its Cure Response.  With its Cure Response, dated June 4, 3009, Lockheed submitted what it described as its "current staffing plan" that "identifies all key personnel and employees performing Contract work . . . ."  JX7.1, p. 2. The attached Organization Chart ("MTA Program Organization") on its first page, at the top of the organization, identifies Jim Gaughan as the Program Director.  JX7.2, p. 2.  As of the date of the Cure Response, however, Mr. Gaughan had given notice of his resignation from

4

Lockheed's employ and he left on June 12, 2009. Gaughan, Trial Tr. 10/07/2014 298:23-299:14; Marks, Trial Tr. 10/06/2014 107:15-108:2, 110:21-111:11.

68.   For the MTA's evidence concerning problems with the Grand Central Historic Area designs, <u>see</u> MTA Post-Trial Findings of Fact ¶ 27.

71-74. Regarding scheduling, Lockheed cites the deposition of Nino Pirraglia for the proposition that Lockheed submitted proper schedules and look-aheads on the Project. Mr. Pirraglia's trial testimony, while it addressed his role in helping Lockheed get outages and track access, did not address the subject of scheduling. This subject was addressed in the trial testimony of Kenneth Shields (MTAX1201, Shields ¶¶ 21-50), to which Lockheed does not refer. <u>See</u> MTA Post-Trial Findings of Fact ¶¶ 115-118.

76.   Regarding the MTA Default Notice's demand (JX6, p.9) that Lockheed provide a "plan to satisfy all system requirements with a 100% pass rate on all testing and a plan to demonstrate all functional non-testable requirements:"

i)   Lockheed's Cure Response, according to its Proposed Finding, stated that it "reaffirmed its commitment to follow the approved Test Evaluation Master Plan (TEMP)." Under the TEMP, however, SIST was not complete until at least 90% of requirements were passed with no outstanding Severity 1 or 2 variances (MTAX391, pp.23-24), and that condition was far from met at either MTAPD or B&T where Lockheed claimed SIST testing was "complete" in Spring 2009. <u>See</u> MTA Post-Trial Findings of Fact ¶¶ 82-88, 100-14. Lockheed's alleged commitment to follow the TEMP was therefore not meaningful as a statement of intent to meet the TEMP as well as the Contract requirements. The expert testimony of Mr. Hughes and Mr. Reith establishes, further, that given the deficiencies inherent in Lockheed's design for the IESS system which resulted in the failures of FAT and SIST testing, it was not possible for

5

Lockheed suddenly, just before Substantial Completion, to "fix" the many failed requirements to bring the system into Contract compliance.  MTAX1197, Reith ¶¶ 151, 195-201 (discussion of Lockheed lacking plan for completion); MTAX1185, Hughes ¶¶ 205-213 (discussion of the state of variances at termination and the lack of progress in closing them over the final months of the project).

ii) As to functional non-testable requirements, Lockheed cites Mr. Fetters's deposition to support its Proposed Finding that Mr. Fetters had been satisfied with methodology Lockheed had previously proposed for verifying the Contract's 1869 functional non-testable requirements. Mr. Fetters' trial declaration, however, to which Lockheed nowhere cites nor refers, states that Lockheed, in a letter dated April 6, 2009 (MTAX910), "flagrantly refused to verify any of the functional non-testable requirements (there were over 1,800 of those System wide)." MTAX1178, Fetters ¶ 132.  Lockheed's letter, to which Mr. Fetters's trial declaration refers, addressed an MTACC comment that "Any of these functional non-testable requirements that are relevant to the MTAPD BU [Beneficial Use] will need to be verified prior to BU [Beneficial Use]," by stating "[Lockheed] disagrees.  LM has completed all of the construction, installation, documentation, inspection and testing activities for MTAPD Central C3 Beneficial Use."  In other words, Lockheed refused at the time of default, exactly as Mr. Fetters's trial declaration states, to do any work to verify functional non-testable requirements.

80. Lockheed cites the deposition of Commissioning Agent Linda Martinez for the proposition that she did not recommend that Lockheed achieve a 100% pass rate before leaving FAT.  Lockheed does not, in this paragraph or elsewhere, refer to Ms. Martinez's trial testimony, which details Lockheed's failures in FAT testing (see MTAX1189, Martinez ¶¶ 40-56), and her

recommendation in February 2008 that FAT testing be halted because of the high failure rate. MTAX551.

105.    The cited deposition testimony of Mr. Horodniceanu does not support the Proposed Finding.  What Mr. Horodniceanu said is: "The work that Lockheed did at the time of termination definitely had value because we paid for it and how much value and that is a different story."  Horodniceanu Dep. 136:20-137:8.

114.    Lockheed quotes at length from LMX402, which is not in evidence.

115.    Lockheed cites Wael Hibri's deposition for the proposition that Lockheed was making progress on the system prior to termination.  Mr. Hibri's trial testimony, to which Lockheed does not refer, shows in detail what the four "showstoppers" were and why Mr. Hibri believed Lockheed failed to satisfy them.   MTAX1183, Hibri ¶¶ 20-43; Hibri, Trial Tr. 11/03/2014 74:19-75:2.

122.    Lockheed recites a litany of complaints from the Krampf and Williamson trial declarations about the conduct of MTA representatives during testing sessions.  The Court should not base any finding of fact in this case on these complaints because their testimony does not establish any Contract breach and because this testimony is expressed in general terms (MTA representatives "disagreed" with each other, came unprepared, etc.) rather than providing any specific instance, date, occasion or requirement that would be susceptible of examination. Lockheed's bellyaching is not entitled to evidentiary weight.

123.    Based on the Krampf and Williamson declarations, Lockheed asks the Court to find that the MTA overused Severity 1 and Severity 2 in classifying variances.  Under the TEMP, however, the MTA had the right ultimately to determine severity levels.  MTAX391, p. 24; MTAX1178, Fetters ¶ 65.  The Commissioning Agent testified, as reflected in a report at the

time, that Lockheed classified as Severity 3 many variances that would have interfered with the functioning of the system. MTAX1189, Martinez ¶ 49.

126. Lockheed asks the Court to find that the MTA delayed testing by failing to provide the network and communication rooms prepared for installation of equipment. However, Mr. Gaughan and Ms. Humpton testified that the network was not needed for FAT testing and was provided, via Verizon leased lines, when needed for SIST testing at MTAPD, B&T and LIRR. See MTA Post-Trial Findings of Fact ¶¶ 192-195. Lisa Schreibman's trial testimony answers Lockheed's claims regarding NYCT communications rooms. MTAX1200, Schreibman ¶¶ 23-27.

131. Lockheed says that Mr. Horodniceanu said, at deposition, that he was not told at the time of the Operational Readiness Workshop that Lockheed was in default. In the cited portion of the deposition, the witness says he was not told when he came on board that Lockheed was in default. Horodniceanu Dep. 50:9-13. He became MTACC President in August 2008, when he said he was briefed by Ms. Hakim. Horodniceanu Dep. 45:17-25. The Operational Readiness Workshop was held in May 2008. MTAX1183, Hibri ¶16. Mr. Horodniceanu also testified at trial that a contractor is not "in default" until MTA declares the contractor to be in default. MTAX1184, Horodniceanu ¶13.

146. Lockheed says it satisfied the Lenel showstopper by installing software on workstations and that Lockheed agreed to pay for the licenses. The email chain Lockheed cites to support this contention (LMX1562), supports Mr. Pezik's trial testimony on this issue. See Pezik, Trial Tr. 10/30/2014 164:2-174:6. Essentially, Lockheed wanted to buy licenses so that some console operators could use the software, while Mr. Pezik insisted that the licenses had to be such that all operators could access the Lenel data even if at the same time. In the final email

on which Lockheed relies, Mr. Gaughan states that "access to the [Lenel] application is still presumed to be by those with system administration privileges" and that Lockheed will provide "enterprise licenses" that allow for a "designated number of concurrent users" for each application at Lockheed's expense. LMX1562. Mr. Pezik testified that, in his view, all Lockheed was offering was what the base contract required; he wanted Lockheed, as a way of addressing the deficient integration of Lenel with Intergraph, to make the Lenel software available to all users all the time. Hibri, Trial Tr. 11/03/2014 82:22-83:14.

154. Lockheed's Proposed Finding avers that MTACC "inappropriately" refused to take Beneficial Use of the MTAPD C/3 Center. If Lockheed means by this statement that the MTA's refusal to take Beneficial Use of this facility was a breach of contract, its position is meritless. The proposed Beneficial Use would have had to be bifurcated – the MTAPD wanted to use the dispatch function, but the security functions were nowhere near ready – and the MTA had no obligation under the Contract to agree to this modification on terms acceptable to Lockheed or otherwise. Nor had the MTA committed to take Beneficial Use of any facility until SIST testing was complete. SIST testing at MTAPD (as at B&T) failed miserably. See MTA Post-Trial Findings of Fact ¶¶ 103-111. And, Lockheed insisted that MTA pay to maintain the software after Beneficial Use, which the MTA refused to do since Beneficial Use under the Contract did not include software, the software did not meet Contract requirements, and the MTA did not propose, by taking Beneficial Use, to either accept the deficient software or agree to maintain it until Substantial Completion. LMX170.

165. Breitbeil answered, when asked at deposition if Intergraph was working with Lockheed to solve software problems, "Those that we could, we would work collaboratively to try to come up with a solution for each requirement." Breitbeil Dep. 273:24-274:8.

9

167. The transparent reason for Lockheed's statement that it "never communicated in word or writing that it would not meet MTA's requirements" is that Lockheed cannot find evidence in the record that it communicated to the MTA in word or writing that it would, affirmatively, meet the Contract's requirements.  Lockheed then says it was working to provide the MTA with a "'system' that included COTS software configured for MTA business rules, hardware, trained operators and policies/procedures that together would meet MTA requirements." This backhanded statement translates to mean the following: Lockheed was not able to provide a system that addressed all functional requirements with software and hardware, as the Contract required (JX10.02 §§ IV.A, p.12 and II.B.1, p. 8), so Lockheed was going to have to find other means of addressing the shortfalls of its system.

171. Findings supported by the testimony of Mr. Davies should be disregarded since his testimony is based on what Lockheed told him about the MTA's alleged management failings and did not pertain to Contract breaches.  Davies, Trial Tr. 10/23/2014 54:11-24, 55:19-56:22, 63:16-64:15, 68:7-69:6, 85:1-88:5, 93:9-94:22, 95:9-96:20, 98:11-101:21.

175. Lockheed insisted that, because the Contract provided for the MTA to purchase a software maintenance contract, the MTA should pay for maintenance between Beneficial Use and Substantial Completion.  Under the Contract, however, Beneficial Use did not include software and the MTA was unwilling to accept the software at Beneficial Use because it was deficient and did not comply with Contract requirements.  Lockheed's unwillingness to maintain the software until variances had been fixed and the system complied with the Contract is another instance of Lockheed's unwillingness to meet its Contract obligations.  Pezik, Trial Tr. 10/30/2014 164:2-174:6.

193. Mr. Shields testified that Lockheed's schedule LM 37 submitted with its cure response, like its predecessor schedules, was not sufficiently detailed. Shields, Trial Tr. 10/30/2014 45:24-47:9.

194-196. Without citation to the record, Lockheed avers that MTA did not review Lockheed's Cure Response to determine whether it provided a plan to complete or that defaults existed under the Contract. The record shows that Mr. Pezik and the MTACC team including Mr. Fetters and Mr. Shields reviewed the Cure Response and concluded that Lockheed had not proposed a plan to cure the defaults identified in the Default Notice. MTAX1194a, Pezik ¶¶ 93-97; MTAX1201, Shields ¶¶ 101-103; MTAX1178, Fetters ¶¶ 146-153.

201. Mr. Pezik testified that the MTA had funding to complete the work called for by Additional Work Order 1. MTAX1194a, Pezik ¶ 119; Pezik, Trial Tr. 10/31/2014 110:13-114:4.

203. Mr. Pezik testified that he recommended in August 2008 that the scope of Lockheed's work, and hence the range of disputes between the parties, be narrowed by deleting Additional Work Order 1 work on the 25 communication rooms in the Under River Tunnels from the Contract. Pezik, Trial Tr. 10/31/2014 74:9-80:12. Lockheed made the same proposal to the MTA in October 2008. Marks, Trial Tr. 10/06/14 147:15-148:16.

215-224. Lockheed's work on the Project was not delayed due to the lack of network connections. The MTA made alternative network connections available when needed as the Contract contemplated might become necessary. JX9.3, p. 12; see also MTAX391 § 8.2, p. 42 (identifying network connectivity as a schedule risk and referencing alternative connections). Lockheed was able to conduct SIST at the MTAPD's Central C3, B&T's C3, and LIRR's C3. JX7.1, pp. 25-26; see also MTAX954; MTAX1201, Shields ¶ 120. Lockheed's witnesses

11

testified that the alternative network caused no delays. Humpton, Trial Tr. 10/07/2014 262:12-17, 263:4-11, 263:12-15; Gaughan, Trial Tr. 10/15/2014 23:5-19.

225. Mr. Pezik testified that the MTA did not cause delays that impeded Lockheed's access to communications rooms. Pezik, Trial Tr. 10/31/2014 75:17-76:20. Lockheed had work it could have done in the communications rooms had it wanted to do so. MTAX1194a, Pezik ¶¶ 120-128.

227. Lockheed incorrectly summarizes the Impact Cost provisions of the Contract, which clearly bar the award of Impact Costs when delay is concurrent with delay attributable to Lockheed. JX10.04, Article 2.05, pp. 15-17.

226. While he collaborated with the MTACC team, Mr. Shields exercised independent judgment in preparing responses to Lockheed's delay and Impact Cost claims. Shields, Trial Tr. 10/29/2014 143:9-15.

229-236. See MTA Post-Trial Findings of Fact ¶¶ 184-206.

238. Contrary to the testimony of Mr. Peterson cited by Lockheed, the MTA's schedule expert, Gary Jentzen, shows that all of the work necessary for completion of Additional Work Order 1 was included the first MTA-approved baseline schedule, LM 03. Jentzen, Trial Tr. 11/04/2014 23:6-20.

253-255. Additional Work Order 1 required Lockheed to install fiber optic cable in the 13 URTs using conduit. During the Project, Lockheed changed its design from conduit to strapping the fiber cable to existing messenger cable. MTAX346. MTA accepted this change, which became Additional Work Order 68 (see MTAX1177, Christen ¶56; MTAX819). Since installing fiber optic cable via messenger cable is significantly cheaper than installing conduit, the MTA asked Lockheed for a credit for the changed installation method. See MTAX1177,

Christen ¶56; MTAX819.  Lockheed did not submit a timely credit proposal, but the MTA nonetheless provided direction for Lockheed to do the work via messenger cable.  See MTAX429.  Lockheed then advised that it would not give the MTA a credit for Additional Work Order 68 on the ground that (it said) the use of messenger cable was covered by Additional Work Order 1.  MTAX432.  Thus Lockheed claimed that it should have been paid for the conduit it did not install.  MTAX452; see MTAX1177, Christen ¶ 56.

253-255.  MTACC determined that the savings associated with Additional Work Order 68 totaled $2,781,143, representing the reduction in cost due to using existing messenger cable to install new fiber optic cable instead of installing new conduit.  MTAX823; see also MTAX788.  MTACC provided a requested breakdown of the credit.  See MTAX824.  MTACC then issued Additional Work Order 68 directing Lockheed to provide a credit of $2,781,143.  MTAX819.  Lockheed in response issued a letter disputing the MTA's determination.  MTAX828; MTAX1177, Christen ¶ 57.

253-255.  The MTA is entitled to a credit in the amount of $12,638,785 with respect to Additional Work Order 3.  MTAX1177, Christen ¶ 58.

253-255.  Additional Work Order 3 relaxed the previous "home run" requirement that East River Tunnel device cables be connected directly to their final location, here a panel in one of the Penn Station communication rooms, and required instead that Lockheed terminate the devices in East River Tunnel communication rooms and connect them to the Penn Station room via an Amtrak network.  MTAX795.  The Additional Work Order 3 alternate scheme was established at a Design Coordination Meeting on March 27, 2006.  MTAX93.  Relaxing the "home run" cable connection requirement represented a large saving for Lockheed.  Instead of responding to the MTA's request with a credit proposal, however, Lockheed by letter dated

October 5, 2006 submitted a claim for an additional $2,494,583 as an Additional Work Order 3 cost. MTAX214.

257-267.   Article 2.07 sets forth what Lockheed was required to provide to support a claim for Impact Costs under the Contract. JX10.04, pp. 17-18. Lockheed claimed its actual costs as Impact Costs, not limiting its claims to the types of costs specified by the Contract. MTAX991; LMX1792, Musgrave ¶ 70; Musgrave, Trial Tr. 10/28/2014 8:14-10:7, 28:22-31:13.

260.   In January 2007, the parties submitted the Additional Work Order 3 dispute to an "Independent Observer," who concluded that Lockheed had, after signing the Contract, found a subcontractor willing to do the work based on a drawing that allowed use of the existing ducts and lighting system (i.e., with no "home run") and that "this saved [Lockheed] some $10 million." MTAX1177, Christen ¶60. Subsequent negotiations between the parties did not resolve the dispute. In January 2009, MTACC issued Additional Work Order 3 as Directive Work Order No. 3 for the unilateral lump sum credit price of $12,638,785. MTAX830; MTAX1177, Christen ¶ 59.

268-272.   MTACC's Construction Manager for the Project, Nino Pirraglia, performed an analysis of the prepaid material payment records to determine what portion of those materials had, in fact, been installed at project worksites. Mr. Pirraglia concluded that, of the approximately $24 million of materials invoiced by Lockheed, approximately $8 million of prepaid materials – nearly one third of the value – were never installed or otherwise accounted. MTAX1195, Pirraglia ¶¶ 65-66.

273-275.   In or around late 2006, Lockheed asked MTACC to advance funds for materials that it had procured, but not yet installed at project field sites. MTAX1195, Pirraglia ¶ 36. The Contract required that in order for Lockheed to receive prepayment for project

14

materials, the materials must be suitably stored and secured, including appropriate labeling and tracking and segregation from other materials so that they do not get intermingled. Id. ¶¶ 37-41; JX10.04 § 3.05(c); JX12.1 § 1.27.  Lockheed failed to comply with these requirements, and MTA's requests that the prepaid materials be tracked, by providing spreadsheets only listing the materials and their respective dollar values, but not including any control number or other tracking mechanism that would allow Lockheed or MTA to determine if those materials were ultimately deployed on the project. MTAX1195, Pirraglia ¶ 46.  The MTA advanced Lockheed funds for these materials on the basis of Lockheed's repeated assurances that it would institute a compliant materials tracking system for these items, but Lockheed never did so. Id. ¶¶ 53-54. Between March 2007 and November 2007, MTA received six invoices for prepaid materials. Id. ¶ 55-58; MTAX1046, Invoice #19, p. 30.

276-278.  The MTA overpaid paid Lockheed for work that was part of its Contract design obligations.  Lockheed was required to submit redesigns for equipment racks that that did not take account of actual field conditions and that did not fit in the allocated space. MTAX1194a, Pezik ¶ 124; Gaughan, Trial Tr. 10/15/2014 136:24-138:10, 141:14-143:21. Lockheed received $3,857,468 for this redesign work, as part of Additional Work Order 88. MTAX1194a, Pezik ¶ 124; MTAX1177, Christen ¶ 20.  As Mr. Pezik testified, "Essentially, Lockheed double-billed the MTA, to the extent of approximately $3.4 million, for the redesign of racks and communications rooms."  MTAX1194a, Pezik ¶ 126.  At trial, Mr. Pezik acknowledged that payment of this amount was a "mistake."  MTAX1194a, Pezik ¶ 124; Gaughan, Trial Tr. 10/15/2014 136:24-138:10, 141:14-143:21.  Lockheed received $3,857,468 for this work, as part of Additional Work Order 88.  MTAX1194a, Pezik ¶ 124; MTAX1177, Christen ¶ 20.

## II. DEFENDANTS' RESPONSE TO PLAINTIFF'S CONCLUSIONS OF LAW

1-3. The legal standard is not in dispute. The existence of the Contract is not in dispute. The MTA denies that Lockheed worked diligently until termination to progress the Contract work (and this is a conclusion of fact, not of law).

4. The Contract did not require the MTA to give Lockheed notice of default. Trial Tr. 10/06/2014 15:11-18 (The Court: "The Contract does not require, as Lockheed argues, that the MTA provide Lockheed with an opportunity to cure purported defaults.")

5-6. These paragraphs accurately quote Contract sections

7-8. Under the Contract's Article 7.01 (JX10.04), the power to declare the Contract in default lies with the MTA. The Contract is not fairly read to require a previous determination of default by the Engineer.

9. Under New York law, a party may exercise contract rights and is not to be held to have acted in bad faith by virtue of having exercised those rights. There is no evidence that the MTA acted in bad faith within the meaning of New York law.

10-13. New York law provides for a covenant of good faith and fair dealing in contracts. The MTA did not, however, deprive Lockheed of its claimed "right to cure" as the Contract did not provide such right and it will not be implied. In deciding that it wanted to replace Lockheed, which was in default, with a new contractor, the MTA did not breach any right of Lockheed.

14-15. Lockheed was in material breach of the Contract at the time it was defaulted. The MTA was entitled to conclude, as it did, that Lockheed's Cure Response did not promise a cure for the breaches that existed.

16. Lockheed was obligated to maintain the software until it was accepted by the MTA at the time of Substantial Completion.

17. Lockheed was obligated under the Contract to pay for Project utilities until Substantial Completion.

18-21. Lockheed was in material breach of the Contract at the time of default because the IESS system it designed and built was not operational or capable of being made operational in compliance with Contract requirements due to Lockheed's design and testing defaults. Lockheed was in default under the Contract because it failed to progress the work in accordance with the Contract.

22. This is not a conclusion of law.

23. This is a conclusion of fact, not of law. Additionally, the F.1 version of the TEMP was never approved by MTA.

24. Specification Section 1AB12 is not ambiguous as to the meaning of "corrected." Therefore, there is no reason for the Court to look outside the Contract for the meaning of this term.

25. A breach of Lockheed's obligation to correct FAT variances before shipping equipment to the field would go to the heart of the parties' agreement, which requires that Lockheed not only provide a contractually compliant security system, but also prove the system is compliant. At the time of the default, there was no evidence that Lockheed was expeditiously progressing the project work to completion.

26. The doctrine of election of remedies is inapplicable in this case, where MTA never made an election and Lockheed never relied on an election to its detriment.

27. The showstoppers are not a contractual requirement, and therefore have no bearing on the ultimate obligations of the parties under the Contract.

28. Lockheed is not entitled to any damages from MTA under the Contract, as MTA did not breach the Contract. Moreover, even if Lockheed could prove its breach of contract claim, pursuant to the Contract, it would only be entitled to $3.7 million.

Dated: December 5, 2014
     New York, New York

HOGUET NEWMAN REGAL & KENNEY LLP

By: _____
    Ira J. Lipton (IL-4835)
    Laura Hoguet (LH-7485)
    Helene Hechtkopf (HH-7402)
    Marc Melzer (MM-0677)
    Edwin Fragoso (EF-5501)

10 East 40th Street
New York, New York 10016
(212) 689-8808

*Counsel for Defendants Metropolitan Transportation Authority, MTA Capital Construction Company and New York City Transit Authority*